## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| In re: | Joint Administration Pending |
| Granite City Food & Brewery Ltd. | Case No. 19-43756 |
| Debtor. | Chapter 11 Cases |

| | |
|---|---|
| In re: | Joint Administration Pending |
| Granite City Restaurant Operations, Inc. | Case No. 19-43757 |
| Debtor. | Chapter 11 Cases |

| | |
|---|---|
| In re: | Joint Administration Pending |
| Granite City of Indiana, Inc. | Case No. 19-43758 |
| Debtor. | Chapter 11 Cases |

| | |
|---|---|
| In re: | Joint Administration Pending |
| Granite City of Maryland, Inc. | Case No. 19-43760 |
| Debtor. | Chapter 11 Cases |

| | |
|---|---|
| In re: | Joint Administration Pending |
| Granite City of Kansas Ltd. | Case No. 19-43759 |
| Debtor. | Chapter 11 Cases |

## DECLARATION OF RICHARD H. LYNCH
## IN SUPPORT OF CHAPTER 11 PETITIONS
## AND FIRST DAY MOTIONS

I, Richard H. Lynch, declare as follows:

AFDOCS/21423824.2

12246043v3

1.      I am the President and Chief Executive Officer of Granite City Food & Brewery Ltd., Granite City Restaurant Operations, Inc., Granite City of Indiana, Inc., Granite City of Kansas Ltd., Granite City of Maryland, Inc. (together the "Debtors").

2.      I submit this Declaration (the "Declaration") to assist the Court and parties in interest in (a) understanding the Debtors' operations and capital structure; (b) understanding the circumstances related to the commencement of these Chapter 11 cases; and (c) in support of: (i) the Debtors' petitions for relief under Chapter 11 of Title 11 of the United States Code filed on the date hereof (the "Petition Date"); and (ii) the relief requested by the Debtors in various First Day Motions filed with the Court along with the petitions for relief (the "First Day Motions").

3.      Based on my positions with the Debtors, and my experience with the companies, I am familiar with the day-to-day operations, business affairs, assets and liabilities, and books and records of the Debtors.   Except as otherwise indicated herein, all facts set forth in this Declaration are based on: (a) my personal knowledge of the Debtors' operations and finances; (b) my experience with the Debtors; (c) information supplied to me by other members of the Debtors' management or by the Debtors' advisors; (d) information obtained from my review of the relevant documents; and (e) information obtained from other sources relating to the Debtors' operations and financial condition.

4.      On the date of this Declaration (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code, and each filed a motion to have their Chapter 11 cases jointly-administered.

5.      The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.   No

request has been made for the appointment of a trustee or examiner and no official committee of creditors has been appointed in these cases.

**HISTORY, OPERATIONS
AND EVENTS LEADING TO THE FILINGS**

## I.    OVERVIEW OF THE BUSINESSES

6.    Debtor Granite City Food & Brewery Ltd. ("Granite City") is a Minnesota corporation with principal offices located at 3600 American Boulevard West, Suite 400, Bloomington, Minnesota  55431.  Granite City was incorporated on June 26, 1997.  After approximately two years of planning and developing a business plan, the Debtors commenced restaurant operations on June 19, 1999 when they opened their original restaurant called Granite City Food & Brewery at 3945 Second Street South in St. Cloud, Minnesota.

7.    During the ensuing twenty-plus years, Granite City expanded to become a predominantly Midwestern-based restaurant chain.  As of the Petition Date, the Debtors operated 25 Granite City restaurants in 13 states and four Cadillac Ranch restaurants in four states.

8.    The following is a list of locations for each of the Debtors' operating restaurants as of the Petition Date:

| Granite City Food & Brewery | | | | Cadillac Ranch |
|---|---|---|---|---|
| St. Cloud, MN<br>St. Louis, MO<br>Naperville, IL<br>Schaumburg, IL<br>Davenport, IA<br>Troy, MI<br>Rockford, IL | Eagan, MN<br>Fargo, ND<br>Des Moines, IA<br>Cedar Rapids, IA<br>Roseville, MN<br>Detroit, MI | Sioux Falls, SD<br>Kansas City, KS<br>Olathe, KS<br>Omaha, NE<br>National Harbor, MD<br>Maple Grove, MN | Kansas City, MO<br>Fort Wayne, IN<br>Toledo, OH<br>Northville, MI<br>Lincoln, NE<br>Franklin, TN | Bloomington, MN<br>Miami, FL<br>Oxon Hill, MD<br>Pittsburgh, PA |

9.    The Debtors' early growth was fueled in part by a September 2000 initial public offering.  Granite City common stock was thereafter listed on the NASDAQ Capital Market

exchange under the ticker symbol "GCFB."  The stock was continually listed on NASDAQ until

April 25, 2013.  It traded on the OTCQB from April 26, 2013 through December 6, 2013.

Commencing December 9, 2013, it began trading on the OTC Pink market, where it has traded at

all relevant times through the Petition Date.

10.     The Debtors' restaurant business deploys two casual dining concepts: Granite

City Food & Brewery® and Cadillac Ranch American Bar & Grill®:

- ***Granite City Restaurant***.  The Granite City concept centers on a variety of award-winning hand-crafted beers finished on-site at each individual restaurant together with local and regional craft beers from markets where restaurants are located.  The menu features contemporary American cuisine prepared fresh daily.  Granite City strives to offer an attractive price point, quality service and great food and beer.  The prototypical Granite City restaurant consists of a 9,800 square foot facility located just off of the interstate or centrally within a locality's retail, lodging and transportation district.  Distinctive interior finishes incorporate granite and other rock materials and natural woods and glass.  Granite City restaurants are open-concept and feature outdoor patios for dining during warm weather months.

- ***Cadillac Ranch Restaurant.*** The Cadillac Ranch concept, in contrast, features a dynamic, classic Rock N' Roll inspired atmosphere with associated memorabilia and, in most locations, a mechanical bull.  The Cadillac Ranch menu offers a wide variety of steaks, burgers, seafood, pasta, and salads along with an array of signature cocktail, wine and beer offerings.  Cadillac Ranch restaurants average approximately 10,000 square feet and have state-of-the art sound systems and large-screen televisions throughout.

11.     The Debtors' restaurants offer on-site and take-out dining, catering and private

event hosting services.

12.     The Debtors also own a centralized beer production facility in Ellsworth, Iowa.

Through a patented process, the production facility generates a liquid extract called "wort" which

is then transported to fermentation vessels at each Granite City restaurant location. This enables

each restaurant to brew its own craft beer on-site.  Granite City's proprietary brewing process

enhances efficiency by eliminating initial stages of brewing and storage at multiple locations.

13.     The Debtors' home office is located in Bloomington, Minnesota and consists of approximately 11,000 square feet of office space.  The Debtors lease the space pursuant to a 67-month lease entered into in April 2016.  The Debtors have options to renew the lease through March 2027.

14.     Today, the Debtors employ over 2,200 restaurant and front office workers in locations spread out over 15 states.

## II.     EVENTS LEADING UP TO THE PETITIONS

15.     A variety of factors contributed to the Debtors' financial difficulties and eventual bankruptcy filings.

16.     Increased competition in the casual dining sector negatively impacted the Debtors' operating performance and margins.  In addition to longstanding casual dining chains with somewhat similar menu offerings (i.e. AppleBees, Ruby Tuesdays, Houlihans, Outback Steakhouse, etc.), the Debtors were forced to compete with emergent and inexpensive "fast casual" outlets such as Chipotle Mexican Grill, Inc. and Panera Bread Co.

17.     The number of new entrants into the craft beer and brew pub space exploded during the second decade of the new millennium.  Granite City, an early entrant into the craft beer market sector, suddenly faced competition from hundreds of new brew pubs and craft brewers.

18.     The Debtors also had strategically located many of their restaurants in or near shopping malls and then "locked in" what appeared to be favorable, long-term leases, typically with options to renew.  The Debtors simultaneously made large capital expenditures building out restaurants in a manner that featured those distinctive characteristics associated with the brand.

19.     As a result of the "Great Recession" that began in 2008, consumer income growth stagnated for nearly a decade.  This led to an overall decline in consumer spending, including retail spending and spending to eat out.

20.     During roughly the same time period, the United States experienced a major shift in consumer preference toward online shopping.  Consumers developed a preference for eating takeout or delivered food in the comfort of their own homes, as opposed to spending time for a sit down meal at a casual dining location.  This led to declining foot traffic in shopping malls and retail outposts where many restaurants, including most of the Debtors' restaurants, are (or were) located.

21.     The confluence of these factors: increased and evolving competition, the proliferation of brew pubs and eating establishments featuring craft beer offerings, and changes in spending patterns and consumer preferences, all negatively impacted the profitability of the Debtors businesses.  In-store sales and associated revenues began to shrink. As a result of declining foot traffic in the malls, Granite City's in-store patronage slipped such that seemingly favorable long-term rental rates the Debtors had negotiated gradually morphed into above-market rates.

22.     Declining revenues eventually made it difficult for the Debtors to meet financial obligations as they arose in the ordinary course of business.

23.     As of December 27, 2016, the Debtors failed to meet certain financial covenants under secured credit facilities with Citizens Bank, N.A. (f/k/a RBS Citizens, N.A.) ("Citizens Bank").  On January 31, 2017, the Debtors failed to make a $5 million principal payment to Citizens Bank in connection with a development loan line of credit.  From and after March 31, 2018, the Debtors have not made any principal payments and have missed all but two interest

payments to Citizens Bank under a separate credit facility.  That credit facility matured and became immediately due and payable on May 15, 2019.

24.     The Debtors' failure to make payments of principal, interest and other amounts due and owing to Citizens Bank gave rise to numerous events of default under those facilities.

25.     The same defaults relative to the Citizens Bank debt caused events of default to occur under a subordinate debt agreement with one of the Debtors' other secured lenders, Great Western Bank ("Great Western").

26.     The Debtors received notices of default and reservation of rights letters from Citizens and Great Western.  In the aggregate, the Debtors currently owe Citizens $40 million in principal together with accrued interest, fees and other amounts payable under the Citizens credit facilities.  The Debtors currently owe Great Western over $1 million in principal together with accrued interest, fees and other amounts payable under the Great Western credit facility.

27.     In addition, results of operations have continued to be disappointing.  In 2018, the Debtors suffered decreases in comparable restaurant sales.  Year-over-year sales' decreases similarly occurred during the first quarter and first half of 2019, exacerbated by severe winter weather that plagued the Midwest.

28.     In an effort to offset the impact of negative comparable sales, the Debtors had implemented several initiatives aimed at increasing sales and generating guest traffic.  In February 2019, Granite City introduced a menu and guest experience relaunch in six of its markets and by July 2019 had increased the relaunch to 17 additional locations.  The Debtors simultaneously sought to improve their financial performance and enhance liquidity by pursuing lease concessions and by seeking extensions of the time afforded to pay their key food and beverage suppliers.

29.     Following consultations with counsel and advisors, and discussions with Citizens, the Debtors' board of directors determined to actively explore strategic alternatives to improve financial performance and enhance liquidity.

30.     During the first two weeks of July 2019, the Debtors interviewed several investment banking firms in an effort to identify one that could represent the Debtors as their exclusive advisor in connection with the pursuit of strategic and financial alternatives.

31.     On August 3, 2019 the Debtors entered into a letter agreement with Duff & Phelps, pursuant to which the Debtors retained Duff & Phelps to provide investment banking services in connection with a potential sale, financing or other recapitalization.

32.     Following its engagement, Duff & Phelps quickly began taking steps to facilitate a potential sale or recapitalization transaction.  Duff & Phelps established a due diligence data room, contacted potentially interested parties, bound them to confidentiality agreements, created and circulated a Confidential Information Memorandum ("CIM"), and solicited preliminary indications of interest from potential lenders, buyers and investors.

33.     Efforts were also undertaken to persuade Citizens to restructure the Debtors' senior secured debt.  Following protracted discussions during the spring and summer of 2019, Citizens notified the Debtors that it would be unable to lend additional amounts to facilitate a restructuring of the existing indebtedness. Especially in view of their deteriorating liquidity, the Debtors determined that an infusion of additional capital – either through debt or equity – would be required to sustain the Debtors' operations while efforts to right-size and repackage the business were underway.

34.     It ultimately became apparent that the Debtors would likely need to pursue relief under the Bankruptcy Code, as a number of restaurant locations were non-performing, and the

Debtors needed the ability to reject associated leases (as the Bankruptcy Code allows) to effectively limit their exposure to long-term lease obligations for underperforming locations. The threat of rejection would also operate as a tool to augment the Debtors' negotiating position with its landlords.

35.     As the process unfolded, and expenses associated with the contemplated sale and bankruptcy process began to mount, the Debtors' liquidity began to wane.  Projections suggested that the Debtors – even after taking aggressive steps to curtail costs such as withholding monthly rental payments and slow-paying food and beverage vendors – were in danger of running out of cash.

36.     To address liquidity concerns, the Debtors stepped up ongoing efforts to conserve cash.  To that end, on August 21, 2019, the Debtors closed their Granite City restaurant located in Downtown Indianapolis.  The Downtown Indianapolis location was one of seven locations the Debtors had identified for potential closure due to sustained store-level operating losses.

37.     The Debtors also initiated efforts to identify potential funding sources and to procure prepetition bridge financing in an amount sufficient to sustain operations long enough to accommodate a sale process that would identify one or more stalking horse bidders in advance of a bankruptcy filing, with post-petition financing.

38.     On October 8, 2019, the Debtors received a term sheet from JMB Capital Partners Lending, LLC ("JMB") for a $5 million debtor in possession term loan, with up to $1.5 million available on a prepetition basis as a last-in, first-out ("LIFO") priming loan funded as part of the Debtors' existing credit facility with Citizens.  The prepetition LIFO loan closed and funded on October 23, 2019.

39.     One day later, on October 24, 2019, the Debtors closed six more underperforming Granite City restaurant locations: (i) Carmel, IN; (ii) Orland Park, IL; (iii) Northbrook, IL; (iv) Peoria, IL; (v) Lyndhurst, OH; and (vi) Mishawaka, IN.  Cost-savings associated with these closures helped to shore up the Debtors' liquidity as Granite City made preparations to commence these bankruptcy cases.

40.     As a result of the prepetition sale process, the Debtors have identified a stalking horse bidder to purchase substantially all of the Debtors' restaurant properties ("Assets") for $7,500,000  (subject to certain adjustments), and the parties have entered into a stalking horse Asset Purchase Agreement ("APA") with such bidder related to the Assets.

## CORPORATE STRUCTURE

41.     Debtor Granite City Food & Brewery Ltd. is a Minnesota corporation with principal business offices located in Bloomington, Minnesota.  Granite City Food & Brewery Ltd. is the Debtors' primary operating entity and is the ultimate parent company to a number of subsidiary corporations who are also debtors in these Chapter 11 proceedings.  As noted above, Granite City's common stock is traded on the OTC Pink market.

42.     Debtor Granite City Restaurant Operations, Inc. ("GCRO"), a Minnesota corporation, is a wholly-owned subsidiary of Granite City Food & Brewery Ltd.  GCRO has no business operations separate from those of its parent company, except that (a) GCRO is named as tenant in various leases for space used to house Granite City restaurants; (b) GCRO owns 50% of Granite City of Kansas, Ltd.; and (c) GCRO owns 100% of Granite City of Maryland, Inc.

43.     Debtor Granite City of Indiana, Inc. ("GCIN"), an Indiana corporation, is a wholly-owned subsidiary of Granite City Food & Brewery Ltd.  GCIN was formed to hold the liquor license used by the Debtors in Indiana restaurant operations so as to comply with

applicable Indiana law.  GCIN is the Lessee on the Lease for the Fort Wayne, Indiana restaurant location.  GCIN has no business operations separate from those of its parent company.

44.     Debtor Granite City of Kansas Ltd. ("GCK") is a Kansas corporation, owned in equal 50% shares by William R. Hutton, a Kansas resident, and GCRO.  GCK was formed to hold the liquor license used by the Debtors in Kansas restaurant operations so as to comply with applicable Kansas law.  GCK is the Lessee on the Lease for the Kansas restaurant location so as to comply with applicable Kansas law.  GCK has no business operations separate from those of its parent company.

45.     Debtor Granite City of Maryland, Inc. ("GCM"), an Ohio corporation, is a wholly owned subsidiary of Granite City Food & Brewery Ltd.  GCM was formed to hold the liquor license used by the Debtors in Maryland restaurant operations so as to comply with applicable Maryland law.  GCM has no business operations separate from those of its parent company.

46.     In addition to the Debtors, Granite City Food & Brewery Ltd. also has a number of non-debtor affiliates.

47.     Non- Debtor Granite City – Creve Coeur, Inc. ("GCCC"), a Missouri corporation, is a wholly-owned subsidiary of Granite City Food & Brewery Ltd.  GCCC has no business operations separate from those of its parent company, and has no assets that could be monetized in these Chapter 11 cases.

48.     Non-Debtor Granite City – Orland Park, Inc. ("GCOP"), an Illinois corporation, is a wholly-owned subsidiary of  Granite City Food & Brewery Ltd.  GCOP has no business operations separate from those of its parent company, and has no assets that could be monetized in these Chapter 11 cases.

49.     Non-Debtor Granite City – Peoria, Inc. ("GCP"), an Illinois corporation, is a wholly-owned subsidiary of Granite City Food & Brewery Ltd.  GCP has no business operations separate from those of its parent company, and has no assets that could be monetized in these Chapter 11 cases.

50.     Non-Debtor Granite City – Rockford, Inc. ("GCR"), an Illinois corporation, is a wholly-owned subsidiary of Granite City Food & Brewery Ltd.  GCR has no business operations separate from those of its parent company, and has no assets that could be monetized in these Chapter 11 cases.

51.     Non-Debtor Granite City – Arkansas, Inc. ("GCA"), an Arkansas corporation, is a wholly-owned subsidiary of Granite City Food & Brewery Ltd.  GCA has no business operations separate from those of its parent company, and has no assets that could be monetized in these Chapter 11 cases.

52.     Non-Debtor Granite City of Ohio, Inc. ("GCO"), an Ohio corporation, is a wholly-owned subsidiary of Granite City Food & Brewery Ltd.  GCO has no business operations separate from those of its parent company, and has no assets that could be monetized in these Chapter 11 cases.

53.     All of the Debtors and Non-Debtors above are direct borrowers or guarantors under the Citizens' credit facilities described below.  All of their respective assets, with the exception of the Great Western Collateral (as defined below), have been pledged and serve as collateral to support the JMB and Citizens' loans.

## PREPETITION SECURED DEBT

54.    Each of the Debtors is a borrower or guarantor under a Credit Agreement with Citizens Bank dated as of May 15, 2014, as amended by a First Amendment to Credit Agreement dated as of September 1, 2016 (together the "Credit Agreement"). Pursuant to the Credit Agreement, Citizens agreed to make the following loans and extensions of credit to the Debtors: (a) a secured term loan in the original principal amount of $29.0 million; (b) a revolving line of credit in the original principal amount of $6.0 million; and (c) a development line of credit in the original principal amount of $5.0 million (together the "Citizens' Loans").

55.    As more fully set forth in the Credit Agreement, to secure repayment of the Citizens' Loans, each of the Debtors granted to Citizens first priority liens and security interests in and to all or substantially all of the assets of the Debtors, including all of their personal property, fixtures, and in real estate owned or to be acquired (with the exception of the Great Western Collateral).

56.    In addition to the Citizens' Loans, pursuant to a Second Amendment to Credit Agreement dated as of October 23, 2019 (the "Second Amendment"), JMB, as a participant under the Credit Agreement, agreed to provide the Debtors with bridge financing in the form of a priming $1.5 million LIFO term loan secured by all of the Debtors' assets (with the exception of the Great Western Collateral) (the "JMB Loan").  Pursuant to a Prepetition Credit Agreement and a Subordination Agreement dated as of October 23, 2019 (the "JMB Subordination Agreement") Citizens, as agent for the lenders under the Credit Agreement, agreed that the obligations under the JMB Loan are senior in priority to the payment of the obligations under the Citizen's Loan.

57.     As noted above, the proceeds from the JMB Loan were used to facilitate completion of the prepetition sale process and to shore up the Debtors' liquidity as they worked to restructure the businesses and to prepare for the Chapter 11 filings.

58.     GCRO is indebted to Great Western Bank ("Great Western"), a South Dakota banking corporation, pursuant to a Business Loan Agreement and Promissory Note dated as of September 30, 2015 in the original principal amount of $1,080,000.00 (the "Great Western Loan").  Granite City Food & Brewery Ltd. has unconditionally guaranteed repayment of the Great Western Loan.

59.     The Great Western Loan is secured by liens on the real property, improvements and fixtures that comprise the Debtors' Omaha Granite City operation, which is located at 1001 102nd Street, Omaha, Nebraska  68114 (the "Great Western Collateral").

60.     Pursuant to a Subordination and Intercreditor Agreement dated September 30, 2015 (the "Intercreditor Agreement"), Citizens, as agent for the lenders under the Credit Agreement, agreed to subordinate to Great Western any lien Citizens might possess with respect to any real and/or personal property comprising the Great Western Collateral.

## REAL PROPERTY

61.     Granite City Food & Brewery Ltd. owns a fee interest in the Debtors' unique wort production facility located at 1722 Detroit Street, Ellsworth, Iowa  50075 (the "Worthouse").

62.     The Debtors are parties to unexpired real property leases that house their Granite City and Cadillac Ranch restaurants as detailed on **Exhibit A** to my declaration.  As described above, the Debtors closed seven restaurant locations prior to the Petition Date, and those locations are the subject of a motion to reject certain leases that the Debtors are pursuing as one of their First Day Motions (as defined below).

## FIRST DAY MOTIONS

63.     To enable the Debtors to minimize adverse effects from the commencement of these cases, the Debtors have requested various types of relief in certain "first day" applications and motions (together the "First Day Motions") filed concurrently with this Declaration.

64.     I have reviewed the First Day Motions (including all related attachments and exhibits).  The facts stated in this Declaration are true and correct to the best of my knowledge, information and belief, and I believe the relief sought in each of the First Day Motions is necessary to enable the Debtors to: (a) continue operating their businesses and maintain going concern value; (b) conduct and complete an orderly sale process; and (c) maximize the value of the Debtors' assets for the benefit of the Debtors' estates, creditors and other constituents.

65.     It is my further belief that, with respect to those First Day Motions requesting authority to pay certain, limited prepetition claims, the relief requested is essential to the Debtors' efforts to preserve and maximize value in these cases and to avoid immediate and irreparable harm to the Debtors and their estates and creditors.

66.     I believe that any diminution in the limited relief requested in the First Day Motions could have an immediate and irreparably harmful impact on the value of the Debtors' assets to the detriment of all of the Debtors' stakeholders.  The Debtors believe that payment of those selected prepetition claims identified in the First Day Motions will protect the Debtors from the onset of such harm and that the Debtors' creditors will ultimately derive a benefit from the relief requested.

## I.     SALE OF ASSETS

67.     The Debtors intend to continue operating all of the Granite City and Cadillac Ranch restaurants in operation as of the Petition Date in the ordinary course of business pending

court approval and completion of a sale process that will involve one or more sales constituting all or substantially all of the Debtors' assets.

68.     Prior to the Petition Date, as part of the prepetition sale process described above, the Debtors entered into a stalking horse APA for the sale of substantially all of the Debtors' assets.

69.     The Debtors have either concurrently filed a motion seeking authority to sell estate property outside the ordinary course of business (the "Sale Motion") or will file a motion seeking such authority within a week after the Petition Date.  The Sale Motion will propose specific bid procedures and timelines related to the sale of the Debtors' restaurants.

70.     The Debtors, with the assistance of their investment banker Duff & Phelps, engaged in a comprehensive marketing program aimed at securing debt or equity financing or a sale of the Debtors' restaurant assets.   To that end, in mid-September 2019, the Debtors established a due diligence data room populated with information related to the Debtors assets, liabilities, financial condition and business operations.  Duff & Phelps then began outreach to potential financing parties, investors and buyers, initiating communications with 299 parties Duff believed might have an interest in pursuing a transaction with the Debtors.

71.     More than 60 parties signed nondisclosure agreements and thereafter received an 80-page confidential information memorandum regarding the Debtors and their businesses and a process letter outlining the process for submitting indications of interest ("IOI").  The Debtors received three IOI prior to the submission deadline, and thereafter received marked-up asset purchase agreements from several parties interested in buying some or all of the Debtors' restaurants.

72.     The Debtors subsequently engaged in lengthy negotiations with potential buyers and, following an exhaustive process, determined that the APA represented the highest and best available offer to purchase that the Debtors had received.  Accordingly, on December 13, 2019, the Debtors' board authorized entry into the APA.

73.     It is critical that the sale process proceed as expeditiously as reasonably possible as the Debtors have finite liquidity.  Even with the infusion of cash from JMB pursuant to the proposed post-petition financing arrangement to fund the post-petition operations and restructuring efforts, the Debtors cannot continue to operate for an extended period under current conditions without potentially running out of cash.  Time is therefore of the essence of the sale process.

## II.     POST-PETITION FINANCING/USE OF CASH COLLATERAL

74.     The Debtors seek interim approval to enter into a post-petition financing arrangement with JMB in accordance with the terms of that certain Senior Secured, Super Priority Debtor-in-Possession Loan and Security Agreement (the "DIP Loan Agreement"), and also seek authorization to use cash collateral.

75.     The Debtors have an urgent and immediate need to use cash in order to operate their businesses, fund payroll, make lease payments, and pay food and beverage suppliers, utilities, and other ordinary course vendors.

76.     In addition, and as noted above, the Debtors need access to cash in order to implement and conclude the sale processes related to the APA and to fund costs of administering the estates.  Consequently, obtaining additional financing and use of cash collateral is crucial to the success of the chapter 11 cases.

77.     On a system-wide basis, the Debtors currently employ approximately 2,228 people.  Without access to cash in real time, the Debtors will be unable to meet payroll and will be forced to immediately cease all operations and to terminate all remaining employees, thus causing immediate and irreparable harm to these Chapter 11 estates.

78.     The Debtors also currently spend approximately $500,000 to $600,000 per week to procure food and beverages from their primary suppliers.  The Debtors need to maintain sufficient liquidity to meet these obligations as they become due in the ordinary course of business.

79.     The Debtors are unable to obtain financing on more favorable terms than those offered by JMB.  After being informed that Citizens would be unable to lend additional amounts, the Debtors, with the assistance of Duff & Phelps, contacted a large number of potential financing parties.  After review of proposed terms, the Debtors determined that the financing offered by JMB, as reflected in the DIP Loan Agreement, was the best financing package available to the Debtors under the circumstances.

80.     The Debtors believe that entry into the DIP Loan Agreement represents a sound exercise of business judgment.  The terms of the DIP Loan Agreement are fair and reasonable, and Citizens, the Debtors' other primary secured lender, supports the Debtors' decision to enter into the DIP Loan Agreement.  Access to the liquidity afforded under the DIP Loan Agreement will help to ensure there are no disruptions to business operations and that sufficient funds will be available to backstop the sale process and cover administrative expenses.

## III.    USE OF EXISTING BANK ACCOUNTS AND CASH MANAGEMENT SYSTEMS

81.    The Debtors have filed a motion for authorization to continue the use of existing bank accounts and cash management systems (the "Bank Accounts Motion") on an expedited basis.

82.    A description of the Debtors' bank accounts, and their cash management system, is set out in the Bank Accounts Motion.  I have reviewed those descriptions and they are accurate to the best of my knowledge, information and belief.

83.    I am advised that Chapter 11 debtors are generally required to: (a) close all existing bank accounts and open new debtor-in-possession accounts; (b) establish a single debtor-in-possession account for all estate monies required for the payment of taxes, including payroll taxes; (c) maintain a separate debtor-in-possession account for cash collateral; and (d) obtain checks for all debtor-in-possession bank accounts bearing the designation "Debtor In Possession," the bankruptcy case number, and the type of account.

84.    As I understand it, these requirements are designed to provide a clear line of demarcation between prepetition and post-petition claims and payments, and to help to protect against the inadvertent payment of prepetition claims by preventing banks from honoring checks drawn before the Petition Date.

85.    To avoid delays in payments to administrative creditors and critical vendors, to ensure a smooth transition into Chapter 11 with minimal disruption in the Debtors' business operations, and to aid the Debtors' efforts to complete a successful reorganization, it is important that the Debtors be permitted to continue to maintain existing bank accounts, with the same account numbers, following commencement of this case, subject to a prohibition against

honoring checks issued or dated before the Petition Date absent a prior order of the Court allowing such action.

86.     I believe that by preserving business continuity and avoiding the disruption and delay in the Debtors' performance of its payment obligations that will result if the Debtors are forced to close their existing bank accounts and open new debtor-in-possession accounts, all parties in interest, including employees, vendors, lenders and customers will be best served.

87.     I further believe that the relief sought under the Bank Accounts Motion must be granted immediately to avoid irreparable harm.  Without the relief sought, the Debtors could be forced to discontinue restaurant operations and other activities being undertaken in an effort to maximize value for all concerned.  Any shutdown or interruption in the Debtors' operations would damage Debtors' relationships with customers and vendors, undermine employee confidence, and further impair the Debtors' going concern value.

## IV.    PAYMENT OF PREPETITION WAGES AND BENEFITS

88.     The Debtors seek authority to (a) pay prepetition wages to employees that, absent the bankruptcy filings, would be paid to employees in the ordinary course of business; (b) maintain funding of employee benefit contributions, including contributions to insurance and related programs, in the ordinary course of business; and (c) have Debtors' payroll provider and applicable financial institutions receive, honor and pay any and all checks drawn to the extent those checks or transfers relate to any of the foregoing and provided that sufficient funds are immediately available and on deposit in the applicable accounts.

89.     The Debtors further request that Debtors' payroll provider and all other financial institutions be authorized and directed to rely on the representations of the Debtors as to which checks, drafts or wire transfers are in payment of prepetition wages.

90.     The Debtors also request authorization to: (a) withhold amounts from employee paychecks necessary to satisfy third-party requirements, including taxes, Social Security and Medicare; employee contributions toward benefit plans and other benefits; and other deduction programs, including garnishment and child support or other similar orders; (b) honor obligations to employees to pay amounts necessary to provide employees with health benefits, including medical, dental, and vision insurance, and other insurance benefits, including disability and life insurance, as well as flexible spending and health savings account plans; (c) continue offering COBRA coverage for departed employees; (d) pay any unpaid prepetition amounts owed on account of employer matching and otherwise continue the Debtors' 401(k) program in the ordinary course of business; (e) reimburse employees for expenses relating to travel and related items when employees are working away from their normal location; and (f) honor the Debtors' obligations with respect to paid time off and vacation accrued prepetition ("PTO"), subject to the Debtors' oversight and approval.

91.     Employee morale and retention will be critical to complete the planned sales and restructuring transactions contemplated in these cases.  Both will likely falter if employees do not receive timely payments for their work.  Moreover, it is my understanding that the employees at issue would qualify for a priority in payment in any event such that the only question raised by the motion is the timing of payment of employee claims.  Many of the Debtors' employees have served the companies for years and bear no responsibility for the Debtors' financial challenges. The bankruptcy filing is in itself destabilizing to the work force; employees should not be forced to shoulder the additional burden of having to wait to be paid wages and benefits they have earned.

92.     Cause exists to grant the wages and benefits motion on an expedited basis.  If the motion is not granted expeditiously, the Debtors' payroll processing will be disrupted, potentially preventing the Debtors from timely meeting their wage and benefit obligations.  If that occurs, there is a risk that a large number of employees will stop working and seek employment elsewhere, with potentially devastating effects on the Debtors' sale and restructuring efforts, to the detriment of the Debtors', their estates and creditors.

## V.     CONTINUATION OF UTILITIES AND ADEQUATE PROTECTION

93.     In connection with the operation of their business, the Debtors obtain utility services for electricity, natural gas, water, sanitation services, and telephone and cable television services from the utility service providers listed on an exhibit to the Debtors' motion seeking authority to establish procedures for the continuation of utility services and for adequate assurance of payment to utility providers; the exhibit to the utilities motion also shows the current amounts owed to each of the Utilities. The Debtors believe they are current in their payments with all Utilities.  Any amounts now owed relate to only the most recent statements of such Utilities.

94.     Uninterrupted utility services are essential to the Debtors' ongoing operations. The Debtors cannot operate their existing restaurants without uninterrupted access to the Utility Services.  Should any Utility refuse or discontinue service, even for a brief period, the Debtors' operations will be severely disrupted. The impact of this disruption on the Debtors' business operations and revenue would be extremely harmful and would jeopardize the Debtors' efforts to reorganize and maximize value for all parties in interest.

95.     I believe that the Debtors' motion relating to utility services must be addressed on an expedited basis in order to avoid potential cessation of services, which would cause immediate and irreparable harm.

## VI.   CONTINUATION OF CUSTOMER GIFT CARD AND PROMOTIONAL PROGRAMS

96.     As part of the relief requested in the First Day Motions, the Debtors are seeking authorization to honor certain prepetition obligations to customers and credit card companies, to continue their prepetition customer programs and practices in the ordinary course of business including the Debtors' obligations related to the Debtors' Loyalty Programs, Gift Cards, Credit Card Agreements and Promotions as hereafter defined (together the "Customer Programs"). Details related to the Debtors' Customer Programs, including potential liabilities associated with each, are set forth in the motion relating to the Debtors' Customer Programs.  I have reviewed the contents of the motion and the factual information set forth in the motion is true and correct to the best of my information, knowledge and belief.

97.     Uninterrupted continuation of the Customer Programs is vital to conserving the Debtors' going concern value.  These Customer Programs generate patronage in the Debtors' restaurants.  Refusing to honor gift cards or other benefits provided by the Debtors' Customer Programs would result in a loss of customers and could severely damage the Debtors' reputation, potentially undermining the Debtors' going concern value and ability to complete the planned sale transactions.

98.     I believe that expedited relief is necessary to ensure that there is no disruption to the Debtors' Customer Programs, which would result in irreparable harm. If such a disruption were to occur, the Debtors would lose existing customers and encounter far more difficulty attracting new customers. The confluence of these factors would likely depress revenues and the

Debtors' ability to generate earnings.  Granting this motion on an expedited basis is necessary to effectuate a smooth transition into Chapter 11 and to maintain customer loyalty and goodwill.

## VII.    PAYMENT OF CRITICAL VENDORS

99.    The Debtors also seek authorization (but not the obligation) to pay valid prepetition amounts due to certain critical vendors who are listed on an exhibit to the Debtors' critical vendor motion.  Each of the identified critical vendors provides essential goods and/or services to the Debtors for use in restaurant operations.  The Debtors' seek authorization to pay prepetition amounts owed to critical vendors in the amounts set forth in the critical vendor motion.

100.    It is my understanding that all of the prepetition amounts proposed to be paid pursuant to the critical vendors motion would be administrative expenses under Section 503(b)(9) of the Bankruptcy Code or are subject to liens under the Perishable Agricultural Commodities Act.  The identified critical vendors include Sysco, by far the Debtors' largest food supplier.

101.    As part of the requested relief, the Debtors are also asking the Court to authorize and direct banks and financial institutions, at the Debtors' instruction, to receive, honor, process, and pay to the extent of funds on deposit, any and all checks or electronic funds transfers relating to the prepetition claims of the critical vendors.

102.    The Debtors rely on the critical vendors to supply food and other essential goods and/or services needed for restaurant operations. There are no alternative vendors who could supply needed goods and services in the same quantities, with the same quality standards, efficiency and cost.  Even if suitable alternative vendors could be located, changing the supply chain would cause a significant interruption in the supply of perishable food stock. This would

cause severe disruption to the business, an inability to serve numerous menu items during the interruption, and would ultimately occasion a loss of good will with customers that would diminish the Debtors' going concern value.

103.     The Debtors' intend to honor only those prepetition obligations related to food delivered within the 20 day period immediately preceding the filing of the bankruptcy or that are subject to PACA liens.  In addition, the Debtors' plan to condition payment to critical vendors for prepetition amounts owed upon the vendors' agreement to continue supplying goods and/or services on the same terms afforded the Debtors prepetition.

104.     A disruption in food supply would devastate the Debtors' restaurant operations. Cause therefore exists to grant the Debtors' critical vendor motion on an expedited basis.

## VIII.   REJECTION OF CERTAIN PREPETITION LEASES

105.     The Debtors seek authorization to reject certain leases effective as of the date of the Petition.  As they evaluated restructuring options, the Debtors, with their advisors, reviewed their operations and concluded that certain restaurants, which had long been underperforming and losing money, should be closed. The Debtors consequently closed seven restaurants before filing in an effort to mitigate loss and conserve needed liquidity. The unexpired nonresidential real property leases associated with these store closings are identified on an exhibit to the Debtors' motion seeking authority to reject certain leases of real property.

106.     The rejected leases are burdensome to the Debtors and are not part of the Debtors' plan to restructure and sell its restaurants.  If the Debtors are unable to immediately reject the leases effective as of the date of the Petition, the landlords for such properties may seek administrative expense priority in these cases, causing an unnecessary diminution to the estates.

I therefore believe that the requested relief is imperative and should be granted on an expedited basis.

## IX.   JOINT ADMINISTRATION

107.   As described above, the Debtors are all affiliated – Granite City Food & Brewery Ltd. is the ultimate parent company to each of the other Debtors.   Virtually all of the Debtors' business operations were run through the parent company.   Moreover, each of the Debtors is an obligor or guarantor on the Citizens, JMB and Great Western secured debt described above.

108.   It is my belief that joint administration of these cases is appropriate and warranted.   I am advised that joint administration essentially provides one-stop shopping for parties interested in the bankruptcy case and avoids duplication, unwarranted expense, and eases the burden of administration for the Court.   I am further advised that an order for joint administration is most effective if granted at the outset.   Given the benefits of joint administration, and the potential for confusion among parties in interest if joint administration is delayed, the Debtors believe that good cause exists to grant the motion for joint administration on an expedited basis.

109.   For the reasons stated above, and all additional reasons set forth in the Debtors' First Day Motions, the Debtors respectfully request that their First Day Motions be granted.

I swear that the foregoing is true and accurate to the best of my knowledge and belief.

Dated:  December 16, 2019

Richard H. Lynch

## <u>EXHIBIT A TO LYNCH DECLARATION</u>

### Leased Locations

Granite City Restaurant Operations, Inc. ("GCRO") is the lessee of certain real property located in Indianapolis, Indiana, (Carmel location) that is used as a Granite City Food & Brewery restaurant. The lease term ends on February 1, 2024. The monthly rent obligations are $26,113.13. The landlord is Duke Realty Limited Partnership. This location closed on October 23, 2019.

Granite City Food & Brewery Ltd. ("GCFB") is the lessee of certain real property located in Cedar Rapids, Iowa, that is used as a Granite City Food & Brewery restaurant. The lease term ends on November 30, 2023. The monthly rent obligations are $31,762.50. The landlord is Rainmaker Management Inc.

GCRO is the lessee of certain real property located in Des Moines, Iowa, (Clive) that is used as a Granite City Food & Brewery restaurant. The lease term ends on September 2, 2023. The monthly rent obligations are $36,882.50. The landlord is Francis Properties LLC.

GCFB is the lessee of certain real property located in St. Louis, Missouri, (Creve Ceour) that is used as a Granite City Food & Brewery restaurant. The lease term ends on December 4, 2022. The monthly rent obligations are $27,644.34. The landlord is Caplaco Nine Inc.

GCRO is the lessee of certain real property located in Davenport, Iowa, that is used as a Granite City Food & Brewery restaurant. The lease term ends on May 31, 2029. The monthly rent obligations are $32,585.33. The landlord is Store Master Funding I, LLC.

GCRO is the lessee of certain real property located in Eagan, Minnesota, that is used as a Granite City Food & Brewery restaurant. The lease term ends on May 31, 2029. The monthly rent obligations are $37,772.50. The landlord is Store Master Funding I, LLC.

GCRO is the lessee of certain real property located in Olathe, Kansas, that is used as a Granite City Food & Brewery restaurant. The lease term ends on May 31, 2029. The monthly rent obligations are $21,882.57. The landlord is Store Master Funding I, LLC.

GCRO is the lessee of certain real property located in Naperville, Illinois, that is used as a Granite City Food & Brewery restaurant. The lease term ends on May 31, 2029. The monthly rent obligations are $35,894.13. The landlord is Store Master Funding I, LLC.

GCRO is the lessee of certain real property located in Schaumburg, Illinois, that is used as a Granite City Food & Brewery restaurant. The lease term ends on May 31, 2029. The monthly rent obligations are $35,438.12. The landlord is Store Master Funding I, LLC.

GCRO is the lessee of certain real property located in St. Cloud, Minnesota, that is used as a Granite City Food & Brewery restaurant. The lease term ends on May 31, 2029. The monthly rent obligations are $26,981.51. The landlord is Store Master Funding I, LLC.

GCRO is the lessee of certain real property located in Troy, Michigan, that is used as a Granite City Food & Brewery restaurant. The lease term ends on May 31, 2029. The monthly rent obligations are $35,122.10. The landlord is Store Master Funding I, LLC.

GCRO is the lessee of certain real property located in Detroit, Michigan, that is used as a Granite City Food & Brewery restaurant. The lease term ends on May 29, 2036. The monthly rent obligations are $77,129.36. The landlord is Store Master Funding I, LLC.

GCRO is the lessee of certain real property located in Indianapolis, Indiana, (Downtown Indy) that is used as a Granite City Food & Brewery restaurant. The lease term ends on June 30, 2023. The monthly rent obligations are $23,993.20. The landlord is Circle Centre Mall LLC. This location closed on August 21, 2019.

GCRO is the lessee of certain real property located in Fargo, North Dakota, that is used as a Granite City Food & Brewery restaurant. The lease term ends on November 30, 2021. The monthly rent obligations are $9,572.88. The landlord is West Acres Development LLP.

GCRO is the lessee of certain real property located in Franklin, Tennessee, that is used as a Granite City Food & Brewery restaurant. The lease term ends on April 21, 2027. The monthly rent obligations are $19,151.55. The landlord is Drury Development Corp.

Granite City of Indiana, Inc. is the lessee of certain real property located in Fort Wayne, Indiana, that is used as a Granite City Food & Brewery restaurant. The lease term ends on December 31, 2022. The monthly rent obligations are $20,486.25. The landlord is Brookfield Property REIT Inc.

GCRO is the lessee of certain real property located in Miami, Florida, that is used as a Cadillac Ranch restaurant. The lease term ends on August 1, 2021. The monthly rent obligations are $36,010.97. The landlord is Weingarten Realty.

Granite City of Kansas Ltd. is the lessee of certain real property located in Kansas City, KS, (Legends) that is used as a Granite City Food & Brewery restaurant. The lease term ends on January 31, 2033. The monthly rent obligations are $37,500.00. The landlord is Westrim Properties LLC.

GCFB is the lessee of certain real property located in Lincoln, Nebraska, that is used as a Granite City Food & Brewery restaurant. The lease term ends on September 30, 2026. The monthly rent obligations are $22,668.33. The landlord is Store Master Funding I, LLC.

GCRO is the lessee of certain real property located in Beachwood, Ohio, that is used as a Granite City Food & Brewery restaurant. The lease term ends on July 31, 2024. The monthly rent obligations are $33,333.33. The landlord is Legacy Village Investors LLC. This location closed on October 23, 2019.

12246043v3

GCRO is the lessee of certain real property located in Minneapolis, Minnesota, that is used as a Cadillac Ranch restaurant.  The lease term ends on November 30, 2020.  The monthly rent obligations are $46,578.00.  The landlord is MOAC Mall Holdings LLC.

GCFB is the lessee of certain real property located in Maple Grove, Minnesota, that is used as a Granite City Food & Brewery restaurant.  The lease term ends on June 30, 2024.  The monthly rent obligations are $30,625.00.  The landlord is Todd and Lori Hanson.

GCRO is the lessee of certain real property located in Toledo, Ohio, (Maumee) that is used as a Granite City Food & Brewery restaurant.  The lease term ends on January 31, 2023.  The monthly rent obligations are $28,319.90.  The landlord is Fallen Timbers Ohio LLC.

GCRO is the lessee of certain real property located in Mishawaka, Indiana, that is used as a Granite City Food & Brewery restaurant.  The lease term ends on July 31, 2023.  The monthly rent obligations are $25,331.50.  The landlord is University Mark Mall, LLC.  This location closed on October 23, 2019.

GCRO is the lessee of certain real property located in Oxon Hill, Maryland, (CR National Harbor) that is used as a Cadillac Ranch restaurant.  The lease term ends on February 5, 2024.  The monthly rent obligations are $57,269.61.  The landlord is Peterson Companies.

GCRO is the lessee of certain real property located in Northbrook, Illinois, that is used as a Granite City Food & Brewery restaurant.  The lease term ends on August 30, 2031.  The monthly rent obligations are $29,850.22.  The landlord is Regency Centers.  This location closed on October 23, 2019.

GCRO is the lessee of certain real property located in Northville, Michigan, that is used as a Granite City Food & Brewery restaurant.  The lease term ends on March 1, 2030.  The monthly rent obligations are $43,860.86.  The landlord is The Inland Real Estate Group, Inc.

GCFB is the lessee of certain real property located in Omaha, Nebraska, that is used as a Granite City Food & Brewery restaurant.  The lease term ends on February 28, 2027.  The monthly rent obligations are $14,823.96.  The landlord is Westroads Mall L.L.C.

GCFB is the lessee of certain real property located in Orland Park, Illinois, that is used as a Granite City Food & Brewery restaurant.  The lease term ends on December 31, 2020.  The monthly rent obligations are $21,666.67.  The landlord is Richard A. Lane and P. Cameron Lane. This location closed on October 23, 2019.

GCFB is the lessee of certain real property located in East Peoria, Illinois, that is used as a Granite City Food & Brewery restaurant.  The lease term ends on October 31, 2027.  The monthly rent obligations are $32,000.00.  The landlord is Doug Johnson. This location closed on October 23, 2019.

GCRO is the lessee of certain real property located in Pittsburgh, Pennsylvania, that is used as a Cadillac Ranch restaurant. The lease term ends on November 30, 2024. The monthly rent obligations are $35,925.63. The landlord is Inland Commercial Real Estate Group, Inc.

GCRO and GCFB is the lessee of certain real property located in Rockford, Illinois, that is used as a Granite City Food & Brewery restaurant. The lease term ends on July 2, 2021. The monthly rent obligations are $17,500.00. The landlord is Cherryvale Mall LLC.

GCRO is the lessee of certain real property located in Roseville, Minnesota, that is used as a Granite City Food & Brewery restaurant. The lease term ends on January 31, 2022. The monthly rent obligations are $48,225.65. The landlord is PPF RTL Rosedale Shopping Center LLC.

GCFB is the lessee of certain real property located in Minneapolis, Minnesota, that is used as corporate headquarters. The lease term ends on March 31, 2022. The monthly rent obligations are $27,612.54. The landlord is KBS/GK Fund II LP.

GCRO is the lessee of certain real property located in Sioux Falls, South Dakota, that is used as a Granite City Food & Brewery restaurant. The lease term ends on December 31, 2030. The monthly rent obligations are $28,270.90. The landlord is Doug Johnson.

GCRO is the lessee of certain real property located in Kansas City, Missouri, (Zona Rosa) that is used as a Granite City Food & Brewery restaurant. The lease term ends on June 1, 2030. The monthly rent obligations are $21,850.00. The landlord is Doug Johnson.

Granite City of Maryland, Inc. is the lessee of certain real property located in Oxon Hill, Maryland, that is used as a Granite City Food & Brewery restaurant. The lease term ends on July 19, 2026. The monthly rent obligations are $55,716.71, plus garage rental to NH-P Garage LLC of $896.46. The landlord is Peterson Companies.