# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MINNESOTA

---

| | |
|---|---|
| In re: | Joint Administration Pending |
| Granite City Food & Brewery Ltd. | Case No. 19-43756 |
| Debtor. | Chapter 11 Cases |

---

| | |
|---|---|
| In re: | Joint Administration Pending |
| Granite City Restaurant Operations, Inc. | Case No. 19-43757 |
| Debtor. | Chapter 11 Cases |

---

| | |
|---|---|
| In re: | Joint Administration Pending |
| Granite City of Indiana, Inc. | Case No. 19-43758 |
| Debtor. | Chapter 11 Cases |

---

| | |
|---|---|
| In re: | Joint Administration Pending |
| Granite City of Maryland, Inc. | Case No. 19-43760 |
| Debtor. | Chapter 11 Cases |

---

| | |
|---|---|
| In re: | Joint Administration Pending |
| Granite City of Kansas Ltd. | Case No. 19-43759 |
| Debtor. | Chapter 11 Cases |

---

## NOTICE OF HEARING AND MOTION FOR INTERIM AND FINAL ORDERS (I) GRANTING EXPEDITED HEARING, (II) APPROVING POSTPETITION FINANCING, (III) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (IV) AUTHORIZING USE OF CASH COLLATERAL, (V) GRANTING ADEQUATE PROTECTION, (VI) MODIFYING AUTOMATIC STAY, AND (VII) GRANTING RELATED RELIEF

---

12256494v1

TO:    THE PARTIES-IN-INTEREST AS SPECIFIED IN LOCAL RULE 9013-3.

1.      The above-named Debtors ("Debtors"), through their undersigned attorneys, move the court for the relief requested below and give notice of hearing.

2.      The court will hold a hearing on this motion for expedited hearing and on the portion of this Motion seeking an interim order at 2:00 p.m. on Thursday, December 19, 2019, before the Honorable William J. Fisher, Courtroom 2B, U.S. Courthouse, 316 N. Robert Street, St. Paul, Minnesota 55101. A hearing on the portion of this Motion seeking a final order will be held at 1:30 p.m. on Wednesday, January 22, 2020 before the Honorable William J. Fisher, Courtroom 2B, U.S. Courthouse, 316 North Robert Street, St. Paul, Minnesota 55101.

3.      Local Rule 9006-1(b) provides deadlines for responses to this Motion.  However, given the expedited nature of the relief sought with respect to the portion of the Motion seeking an interim order, the Debtors do not object to written responses being served and filed two hours prior to the hearing.  Any response to the Motion for a final order must be filed and served no later than Friday, January 17, 2020, pursuant to the applicable Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and the Local Rules.  **UNLESS A RESPONSE OPPOSING THE MOTION IS TIMELY FILED, THE COURT MAY GRANT THE MOTION WITHOUT A HEARING.**

4.      This court has jurisdiction over this motion under 28 U.S.C. §§ 157 and 1334, Bankruptcy Rule 5005 and Local Rule 1070-1. The petitions commencing the Debtors' chapter 11 cases were filed on December 16, 2019 (the "Petition Date"). The cases are now pending before this court.

5.      This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this court pursuant to 28 U.S.C. §§ 1408 and 1409.

2

12256494v1

6.       This motion arises under 11 U.S.C. §§ 105, 361, 362, 363, 364 and 507, and Fed. R. Bankr. P. 4001(b).  This Motion is filed under Fed. R. Bankr. P. 9014 and Local Rules 4001-2 and 9013.

7.       The Debtors are contemporaneously filing a motion requesting joint administration of their chapter 11 cases pursuant to Bankruptcy Rule 1015(b).  The Debtors are authorized to operate their businesses and manage the property of the estates as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No official committee has been appointed.

8.       Information about the Debtors' businesses and the events leading up to the Petition Date can be found in the Declaration of Richard H. Lynch, which is incorporated herein by reference.

**REQUEST FOR RELIEF**

9.       By this Motion, the Debtors seek immediate access to postpetition financing in order to ensure their continued operations during these cases as they implement a sale process. To accomplish this task, the Debtors require the use of a postpetition credit facility consisting of a revolving loan as more fully described below up to an aggregate principal amount of $5,000,000 (the "DIP Financing"), pursuant to the DIP Credit Agreement.  The DIP Financing will provide the Debtors with the necessary liquidity to fund their operations, bankruptcy costs including professional fees, working capital needs and general corporate purposes during the course of these cases.

10.      Without the DIP Financing, the Debtors will not possess sufficient liquidity to ensure uninterrupted operations.  Any cessation in operations would, in turn, likely result in immediate liquidation, the loss of more than 2,200 jobs and severe losses for vendors, customers and creditors.  Therefore, the Debtors' customers, their employees and all of the Debtors' other

3

12256494v1

constituents depend on the Debtors' ability to access the DIP Financing so that the Debtors can continue operating while a sale process takes place that will maximize recoveries for the estates and creditors.

11.     The Debtors request that the Court enter an interim order (the "Interim Order") and a final order (the "Final Order," and collectively the "DIP Orders"). The Interim Order is attached hereto and the Final Order will be served and filed at least 10 days prior to the Final Hearing. In summary, the Debtors request orders granting:

a.     authority, pursuant to sections 105, 363, and 364(c) and 364(d) of the Bankruptcy Code, for each of the Debtors, jointly and severally, to obtain senior secured postpetition financing ("DIP Facility") in an aggregate principal amount of up to $5,000,000 (the "Delayed Draw Commitment") (of which (x) upon entry of this Interim Order and satisfaction or waiver of the borrowing conditions set forth in the DIP Loan Documents (as defined below), $4,000,000 (the "Interim Advance") shall be made available to the Debtors and may be drawn in a single draw on the Closing Date and the Additional Term Loan Obligations (as defined below) shall be rolled up into the DIP Facility and  (y) subject to entry of the Final Order, the balance shall be made available to the Debtors upon entry of the Final Order in amount set forth in the DIP Credit Agreement (as defined below));

b.     authority (a) for the Debtors to enter into that certain Senior Secured, Super-Priority Debtor-in-Possession Loan and Security Agreement, among the Debtors as Borrowers and Guarantors and JMB Capital Partners Lending, LLC, as Lender (the "DIP Lender") in substantially the same form as attached hereto as Exhibit A (as amended, restated, supplemented or otherwise modified from time to time in accordance with the

4

terms thereof, the "DIP Credit Agreement" and, together with any ancillary, collateral or related documents and agreements, the "DIP Loan Documents");

      c.      authority for the Debtors to use the DIP Facility and the proceeds thereof in accordance with the DIP Loan Documents to (a) fund the postpetition working capital needs of the Debtors during the pendency of the Chapter 11 Cases, (b) pay fees, costs and expenses of the DIP Facility on the terms and conditions described in the DIP Loan Documents,  (c) roll-up of outstanding Additional Term Loan Obligations held by the Prepetition Secured Parties that become the DIP Lender into DIP Obligations (the "Roll-Up Loan"), subject to the rights preserved in paragraph 16 of the Interim Order, and (d) pay the allowed administrative costs and expenses of the Chapter 11 Cases, in each case, solely in accordance with the DIP Loan Documents, this Interim Order and the Final Order;

      d.      authority for the Debtors to grant to the DIP Lender valid, enforceable, non-avoidable, automatically and fully perfected security interests, liens and superpriority claims, including allowed superpriority administrative expense claims pursuant to sections 364(c)(1) and 507(b) of the Bankruptcy Code, subject only to the Carve-Out and liens pursuant to sections 364(c)(2), 364(c)(3) and 364(d)(1) of the Bankruptcy Code in the Collateral (as defined below) (and all proceeds thereof), including, without limitation, all property constituting "Cash Collateral," as defined in section 363(a) of the Bankruptcy Code, ("Cash Collateral"), to secure all DIP Obligations (as defined below), as more fully set forth in this Interim Order, subject only to the Carve-Out (as defined below);

      e.      authority for the Debtors to grant the Prepetition Secured Parties (as defined below) valid, enforceable, non-avoidable, automatically and fully perfected security interests, liens and superpriority claims, including allowed superpriority administrative

5

expense claims pursuant to section 507(b) of the Bankruptcy Code, subject only to the Carve-Out, and liens pursuant to sections 361, 362, 363(c)(2) and 363(e) of the Bankruptcy Code in the collateral to secure any diminution in value of the Prepetition Collateral, as more fully set forth in this Interim Order, subject only to the Carve-Out and senior lien and superpriority claims of the DIP Lender;

f.      subject to and only effective upon entry of the Final Order, waiver by the Debtors of all rights to surcharge against the collateral of the DIP Lender and the Prepetition Secured Parties pursuant to section 506(c) of the Bankruptcy Code;

g.      subject to and only effective upon entry of the Final Order, waiver of the equitable doctrine of marshaling or any other similar doctrine with respect to any collateral of the DIP Lender and the Prepetition Secured Parties;

h.      modification of the automatic stay to the extent hereinafter set forth and waiving the 14-day stay provisions of Bankruptcy Rules 4001(a)(3) and 6004(h);

i.      the scheduling of a final hearing (the "Final Hearing") on the Motion for January 22, 2020 to consider entry of the Final Order *inter alia,* authorizing borrowings under the DIP Facility on a final basis and approving notice procedures with respect thereto; and

j.      related relief.

### RULE 4001 STATEMENT

12.      Pursuant to Local Rule 4001-2(a), attached hereto as Exhibit B are the Debtors' cash flow projections (the "Proposed Budget").

13.      Pursuant to Fed. R. Bankr. P. 4001(b), the following summarizes the significant terms of the DIP Credit Agreement and the Interim Order.  The Debtors believe that the following

6

12256494v1

provisions of the DIP Credit Agreement and the Interim Order are justified and necessary in the

context and circumstances of these cases.

| Provision | Description and location |
|---|---|
| Borrowers | Granite City Food & Brewery, Ltd., a Minnesota corporation; Granite City Restaurant Operations, Inc., a Minnesota corporation; Granite City of Kansas Ltd., a Kansas corporation; Granite City of Indiana, Inc., an Indiana corporation |
| Borrowing limits | Aggregate $5.0 million secured term loan superpriority debtor-in-possession financing. |
| Interest rate | 9.0% per annum payable in cash monthly |
| Fees | (1) Commitment Fee of 1.0% of the Facility (less the amount of the Prepetition Additional Term Loan), earned and payable upon entry of the Interim Order and paid at time of funding from loan proceeds.<br>(2) Funding Fee of 2.0% of each advance payable in cash at time of funding.<br>(3) Exit Fee of 3.0% of the Facility, earned at time of funding and payable upon repayment, including any mandatory or voluntary prepayment, or at maturity.<br>(4) Work Fee a non-refundable work fee of $50,000 (which was paid prior to the Petition Date) to DIP Lender's counsel for due diligence and legal services rendered.<br>(5) Stated Maturity Fee of 10% of the amount of the DIP Facility, due in cash following the Stated Maturity Date in the event the Obligations are not indefeasibly paid in full on the Stated Maturity Date.<br><br>DIP Credit Agreement, § 2.8. |
| Stated Maturity Date | March 31, 2020. |
| Events of default | Usual and customary events of default for facilities of this type and purpose, among other things, failure to pay obligations, failure to comply with warranties and covenants, amendments to the Interim Order without JMB's consent, entry of an order granting relief from the automatic stay, conversion or dismissal of the case, and appointment of a chapter 11 trustee.<br><br>DIP Credit Agreement, § 8 |
| Liens | The DIP Obligations will be secured by first priority senior priming liens in substantially all assets of the borrowers.<br><br>DIP Credit Agreement, § 9 |
| Borrowing conditions | The obligations to make the interim financing available are subject to certain conditions precedent, including the entry of the Interim Order. |

7

| | |
|---|---|
| | DIP Credit Agreement, § 3. |
| Grant of priority or a lien under §364(c) or (d) | Lien on all of the Borrower's assets, including without limitation all of the pre- and postpetition assets and property of the Debtors, including all prepetition and postpetition real property and all prepetition and postpetition tangible and intangible personal property of each Borrower, in each case wherever located and whether now owned or hereafter acquired, including, but not limited to, all accounts, contracts rights, chattel paper, cash, general intangibles, investment property, machinery, equipment, goods, inventory, furniture, fixtures, letter of credit rights, books and records, deposit accounts, documents, instruments, commercial tort claims, leases and leaseholds and rents, avoidance actions under section 549 and related recoveries under section 550 of the Bankruptcy Code, together with all proceeds of each of the following, including insurance proceeds (as each such term above is defined in the UCC, to the extent applicable), and, subject to Final Order, including the proceeds and recoveries from Avoidance Actions (the "DIP Collateral") as follows, in each case subject to the Carve-Out:

Liens Priming the Prepetition Citizens Liens.  Pursuant to section 364(d)(1) of the Bankruptcy Code, valid, binding, continuing, enforceable, non-avoidable automatically and fully perfected first priority senior priming liens and security interests in all DIP Collateral, regardless of where located, which senior priming liens and security interests in favor of the DIP Lender shall be senior to all Prepetition Citizens Liens.  For the avoidance of doubt, as a result of the priming of the Prepetition Citizens Liens pursuant to this Interim Order, the DIP Lender shall have a first priority senior priming lien and security interest in, among other things, (A) all of the assets of Debtors and its debtor and non-debtor Subsidiaries, including, but not limited to, the "Collateral" as defined in the Prepetition Credit Agreement, and (B) the Debtors' prepetition and postpetition commercial tort claims, including but not limited to all claims and causes of action (i) against the Debtors' officers and directors, and (ii) all other prepetition tort claims, and the proceeds thereof (regardless of whether such proceeds arise from damages to the Prepetition Collateral);

(ii)      Liens on Unencumbered Property.  Pursuant to section 364(c)(2) of the Bankruptcy Code, valid, binding, continuing, enforceable, non-avoidable automatically and fully perfected first priority liens on and security interests in all DIP Collateral that is not otherwise subject to any valid, enforceable, and non- |

avoidable liens on and security interests in the DIP Collateral that (A) were perfected prior to the Petition Date (or perfected on or after the Petition Date to the extent permitted by Section 546(b) of the Bankruptcy Code), (B) are not subject to avoidance, disallowance, or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law, and (C) are senior in priority to the DIP Liens under applicable law and after giving effect to any lien release, subordination or inter-creditor agreements, including the Great Western Senior Liens (each a "Permitted Prior Lien"); provided, however, that the DIP Liens shall have priority over all Prepetition Citizens Liens; and

(iii)      Liens Junior to Certain Other Liens.  Pursuant to section 364(c)(3) of the Bankruptcy Code, valid, enforceable, non-avoidable automatically and fully perfected junior liens on and security interests in all DIP Collateral (other than as set forth in clauses (i) and (ii)) subordinate only to the Permitted Prior Liens.

The DIP Obligations will constitute allowed senior administrative expense claims against each Debtor and their estates (the "DIP Superpriority Claims") with priority in payment over any and all administrative expenses at any time existing or arising, of any kind or nature whatsoever, including, without limitation, the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including, but not limited to, sections 105, 326, 328, 330, 331, 503(b), 506(c) (subject to the entry of the Final Order with respect to section 506(c) only), 507(a), 507(b), 726, 1113 and 1114 of the Bankruptcy Code or otherwise, including those resulting from the conversion of any of the Chapter 11 Cases pursuant to section 1112 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment; provided, however, that the DIP Superpriority Claims shall be subject to and subordinate to only the Carve-Out; provided, further that the DIP Superpriority Claims shall have recourse to and be payable from all prepetition and postpetition property and assets of the Debtors and the estates and all DIP Collateral and all proceeds thereof, and (a) any and all avoidance power claims or causes of action under sections 544, 545, 547, 548 through 551 and 553(b) of the Bankruptcy Code (the "Avoidance Actions") and the proceeds thereof, (b) prepetition tort claims, including claims against the Debtors' current and former directors and officers (if any) and the proceeds thereof; and (c) any deposit in connection with a proposed Sale (whether terminated or otherwise) that becomes property of the Debtors' estates (a "Sale Deposit") subject,

9

| | |
|---|---|
| | however, only to the senior lien rights of a stalking horse purchaser and such stalking horse bid protections as may be approved by this Court. |
| Adequate protection or priority for prepetition claims | Citizens Bank, N.A. has consented to the priming liens and is to receive replacement liens in all assets junior only to the DIP Lender's liens. In addition, Citizens Bank is to be granted superpriority claim status junior only to the DIP Lender's superpriority claims. Other prepetition secured lenders are included in a list of "Permitted Prior Liens" as appropriate. |
| Rollup | Upon entry of the Interim Order, the outstanding Additional Term Loan Obligations shall be "rolled-up" into the DIP Facility. |
| Determinations regarding prepetition claim or lien | The Debtors' stipulation that prepetition secured obligations owed to Citizens Bank and JMB constitute allowed, legal, valid, binding, enforceable and non-avoidable obligations of Debtors, subject to other parties in interests right to challenge. |
| Waiver or modification regarding automatic stay | Modified as necessary to effectuate all terms, benefits, privileges, remedies and provisions in the Interim Order and the DIP Loan Documents, without further notice or order of the Court. |
| Waiver or modification of any entity's authority or right to file a plan, exclusivity, request the use of cash collateral or request authority to obtain credit | N/A. |
| Establishment of deadlines for filing a plan, for approval of a disclosure statement, for a hearing on confirmation, or for entry of a confirmation order | N/A. |
| Waiver or modification of the applicability of nonbankruptcy law relating to the perfection or enforcement of a lien | Automatic perfection upon entry of the Interim Order and waiver of any claim, counterclaim, setoff or defense of any kind, nature or description that would in any way affect the validity, enforceability and non-avoidability of any of the prepetition secured obligations. Waiver of the equitable doctrine of marshaling. |
| Release, waiver, or limitation on any claim or other cause of action belonging to the estate or the trustee | N/A. |
| Indemnification | As detailed in paragraph 8 of the Interim Order, the Debtors are requesting that they be authorized to hereby indemnify and hold |

| | harmless the DIP Lender and certain of its affiliates from Indemnity Claims. |
|---|---|
| Release, waiver, or limitation of any right under § 506(c) | The waiver of rights to surcharge against the collateral for the DIP Lender and Prepetition Secured Parties is being requested upon entry of the Final Order. |
| Granting of a lien on any claim or cause of action arising under §§ 544, 545, 547, 548, 549, 553(b), 723(a), or 724(a) | Liens in all claims under sections 544, 545, 547, 548 through 551 and 553(b) of the Bankruptcy Code. |
| DIP Carve-Out | As detailed in paragraph 14 of the Interim Order: (i) U.S. Trustee fees; (ii) reasonable fees and expenses up to $15,000 incurred by any Chapter 7 trustee; and (iii) subject to the terms of the paragraph 14, (a) unpaid allowed estate professional fees limited to the amount set forth in the Approved Budget incurred prior to the delivery of the Carve-Out Trigger Notice, and (b) $100,000 for allowed estate professional fees incurred after the delivery of the Carve-Out Trigger Notice (the "Carve-Out"). |
| Continuing Effect of Prepetition Subordination Agreement | The JMB Subordination Agreement in favor of JMB remains binding on the parties thereto. |

## PREPETITION FINANCING FACILITIES

14.      As of the Petition Date, the Debtors owe a total of approximately $43,400,000 in principal plus accrued interest on the Prepetition Secured Obligations (defined below).

15.      Prior to the Petition Date, Citizens Bank, N.A. (formerly known as RBS Citizens, N.A.), as Administrative Agent (the "Prepetition Agent") and as a lender (the "Prepetition Citizens Lenders"), and the other lenders party thereto, including JMB Capital Partners Lending, LLC ("Prepetition JMB Lender and together with the Prepetition Citizens Lenders, the "Prepetition Lenders") made loans, advances and provided other financial accommodations to the Debtors pursuant to the terms and conditions set forth in: (a) that certain Credit Agreement dated as of May 15, 2014, as amended by the First Amendment to Credit Agreement dated as of September 1, 2016, and the Second Amendment to Credit Agreement dated as of October 23, 2019 (as amended, supplemented or otherwise modified from time to time through the Petition Date, the "Prepetition Credit Agreement"), by and among Granite City Food & Brewery Ltd., as

11

a Borrower and as Borrower Representative, each of the other Borrowers party thereto, the other

Loan Parties party thereto, the Prepetition Agent and the Prepetition Lenders; and (b) all other

agreements, documents and instruments executed and/or delivered with, to, or in favor of

Prepetition Agent or Prepetition Lenders, including, without limitation, the Subordination

Agreement, all security agreements, notes, guarantees, mortgages, Uniform Commercial Code

financing statements and all other related agreements, documents and instruments executed

and/or delivered in connection therewith or related thereto (all of the foregoing, together with the

Prepetition Credit Agreement, as all of the same have heretofore been amended, supplemented,

modified, extended, renewed, restated and/or replaced at any time prior to the Petition Date,

collectively, the "Prepetition Loan Documents").

16.    As of the Petition Date, the Debtors were indebted under the Prepetition Loan

Documents: (a) to the Prepetition Agent and Prepetition Citizens Lenders (the "Citizens Secured

Parties") (i) in an aggregate outstanding principal amount of not less than $6,000,000 plus

interest accrued and accruing thereon, together with all costs, fees, expenses (including attorneys'

fees and legal expenses) and other charges accrued, accruing or chargeable with respect thereto

(the "Prepetition Revolving Loan Obligations"), (ii) in an aggregate outstanding principal

amount of not less than $29,000,000 plus interest accrued and accruing thereon, together with all

costs, fees, expenses (including attorneys' fees and legal expenses) and other charges accrued,

accruing or chargeable with respect thereto in outstanding principal balance of a Term Loan (the

"Prepetition Term Loan Obligations"), (iii) in an aggregate outstanding principal amount of not

less than $5,000,000 plus interest accrued and accruing thereon, together with all costs, fees,

expenses (including attorneys' fees and legal expenses) and other charges accrued, accruing or

chargeable with respect thereto (the "Prepetition Development Loan Obligations," and together

12

with the Prepetition Revolving Loan Obligations and the Prepetition Term Loan Obligations, the "Prepetition Citizens Loan Obligations"), and (b) to the Prepetition Agent and Prepetition JMB Lender in an aggregate outstanding principal amount of not less than $1,500,000 plus interest accrued and accruing thereon, together with all costs, fees, expenses (including attorneys' fees and legal expenses) and other charges accrued, accruing or chargeable with respect thereto (the "Prepetition Additional Term Loan Obligations" and together with the Prepetition Citizens Loan Obligations, the "Prepetition Secured Obligations").   The Prepetition Secured Obligations constitute allowed, legal, valid, binding, enforceable and non-avoidable obligations of Debtors, and are not subject to any offset, defense, counterclaim, avoidance, recharacterization or subordination pursuant to the Bankruptcy Code or any other applicable law, and Debtors do not possess, shall not assert, hereby forever release, and are forever barred from bringing any claim, counterclaim, setoff or defense of any kind, nature or description which would in any way affect the validity, enforceability and non-avoidability of any of the Prepetition Secured Obligations.

17.     As of the Petition Date, the Prepetition Secured Obligations were secured pursuant to the Prepetition Loan Documents by valid, perfected, enforceable and non-avoidable first-priority security interests and liens (the "Prepetition Citizens Liens") granted by Debtors to Prepetition Agent, for the benefit of itself and the Prepetition Lenders under the Prepetition Loan Documents, in substantially all of the existing and after-acquired assets of the Debtors and the other Loan Parties as more fully set forth in the Prepetition Loan Documents (the "Prepetition Collateral"), and such security interest is perfected and has priority over all other security interests. The Debtors do not possess and will not assert any claim, counterclaim, setoff or defense of any kind, nature or description which would in any way affect the validity,

13

enforceability and non-avoidability of any of the Prepetition Agent or Prepetition Lenders' liens, claims or security in the Prepetition Collateral.

18.     Pursuant to the (a) Subordination and Intercreditor Agreement dated September 30, 2015 (the "Great Western Intercreditor Agreement") between the Debtors, Great Western Bank, a South Dakota banking corporation ("Great Western") and the Prepetition Agent, the Prepetition Agent agreed to subordinate any lien of the Prepetition Agent to the prior existing liens of Great Western solely with respect to the real property and fixtures located at 1001 102nd Street, Omaha, Nebraska 68114 (the "Great Western Senior Liens"), and (b) Prepetition Credit Agreement and a Subordination Agreement dated as of October 23, 2019 (the "JMB Subordination Agreement") between the Debtors, the Prepetition Citizens Lenders and the Prepetition JMB Lender, the parties agreed that the payment of the Prepetition Additional Term Loan Obligations to the Prepetition JMB Lender is senior in priority to payment of the Prepetition Citizens Loan Obligations to the Prepetition Citizens Lenders.

19.     The Debtors and their estates have no claims, objections, challenges, causes of actions, counterclaims, and/or choses in action, including, without limitation, avoidance claims under Chapter 5 of the Bankruptcy Code, against any of the Prepetition Secured Parties or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors or employees arising out of, based upon or related to the Prepetition Credit Documents.

20.     All of the Debtors' cash, including the cash in their deposit accounts, wherever located, whether as original collateral or proceeds of other Prepetition Collateral, constitute Cash Collateral and is Prepetition Collateral of the Prepetition Secured Parties.

21.     By virtue of filing petitions for relief under title 11, the Debtors are in default under the Prepetition Loan Documents.

12256494v1

## DEBTORS' NEED FOR ONGOING FINANCING
## AND USE OF CASH COLLATERAL

22.    The Debtors need access to the cash collateral ("Cash Collateral") and debtor in possession financing ("DIP Financing") to, among other things, (a) purchase goods from and make payments to vendors on a current basis post-petition; (b) continue to pay employees; and (c) pay ordinary operating expenses, such as rent, utilities, taxes and fees.  The Debtors' cash needs are set forth on the attached budget.

23.    The Debtors have analyzed whether they could finance their operations during the case using only the Cash Collateral. They have concluded that DIP Financing is necessary for a number of reasons.  First, the Debtors considered such factors as the uncertainty inherent in estimating the timing of receipts and disbursements and the need for access to continued periodic incremental liquidity during these cases in order to maintain the going concern value of these estates.  Second, the Debtors require support of their vendors and other suppliers in order to replenish inventory and maintain ordinary course operations during the case.  The availability of DIP Financing sends a strong signal of support to such vendors and suppliers that the Debtors will have adequate funding available to pay post-petition obligations. Third, the Debtors considered extraordinary or one-time costs that have been or will be incurred in these cases including costs incurred for professional fees for the Debtors, the Unsecured Creditors Committee and secured creditors, insurance renewal costs, and to address the rights of third parties such as utility companies to demand and receive deposits.  In consideration of these factors, the Debtors concluded that the risks associated with attempting to finance the operations with cash collateral outweighed the benefits and certainty provided by the use of DIP financing.  Accordingly, if approved, the DIP Financing will preserve and enhance the value of the Debtors' estates and, as such, entry into the DIP Financing is a sound exercise of the Debtors' business judgment.

15

12256494v1

24.     The Debtors were unable to obtain any alternative proposals for DIP Financing despite numerous inquiries.

25.     Under the DIP Financing, the Debtors will pay 2.0% of the facility amount as a Funding Fee, 1.0% as a Commitment Fee, 3.0% as an Exit Fee, and 10% as a Stated Maturity Fee if the DIP Financing is not repaid by the Maturity Date.  In addition, the Debtors will pay $50,000.00 as a Work Fee for JMB's attorney fees and due diligence expenses.  The Fees are in line with market rates and other DIP facilities approved in recent retail cases.

26.     The Debtors, with the assistance of Duff & Phelps and their other advisors, have determined that the proposal submitted by the DIP Lender is the only proposal available at this time.

27.     The Debtors and the DIP Lender negotiated the DIP Credit Agreement in a good faith and arm's length manner, with the advice of sophisticated counsel and advisors.  The DIP Credit Agreement represents the best and most favorable financing available to the Debtors under the circumstances.

**PROPOSED DIP FINANCING**

28.     Recognizing the Debtors' need for financing, and in consultation with its advisors, the Debtors negotiated with the DIP Lender regarding the terms of potential DIP financing. As the result of good faith, arms-length negotiations, the DIP Lender has agreed to availability of up to $5,000,000 of post-petition financing, $1,500,000 of which will be utilized to Roll-Up the Additional Term Loan Obligations. The terms of the DIP Credit Agreement are summarized above.

29.     Upon entry of the Interim Order and the occurrence of the Closing Date (as defined in the DIP Loan Documents), without further action by the Debtor or any other party, all Additional Term Loan Obligations held by the Prepetition JMB Lender shall be deemed to have been

16

12256494v1

converted into DIP Obligations. The Roll-Up Loan as provided for under the DIP Facility and this

Interim Order is appropriate and the DIP Lender would not be willing to provide the DIP Facility

or extend credit to the Debtors thereunder without the inclusion of the Roll-Up Loan. The Roll-Up

Loan is subject to the challenge rights preserved in  paragraph 16 of the Interim Order and will not

prejudice any other party in interest.

30.     As a condition to entry into the DIP Credit Agreement, the extensions of credit

under the DIP Facility and the authorization to use Cash Collateral, the DIP Lender requires, and

the Debtors have agreed, that proceeds of the DIP Facility shall be used in a manner consistent

with the terms and conditions of the DIP Loan Documents and the Interim Order and in accordance

with the Approved Budget, solely for (i) post-petition capital expenditures, operating expenses and

other working capital, (ii) certain transaction fees and expenses, (iii) permitted payment of costs

of administration of the Cases, including professional fees, (iv) adequate protection payments to

the Prepetition Secured Parties as set forth herein, and (v) as otherwise permitted under the DIP

Loan Documents, as applicable.

31.     As a condition to entry into the DIP Loan Documents, the extension of credit under

the DIP Facility, and the authorization to use Cash Collateral, the Debtors and the DIP Lender

have agreed that the proceeds of DIP Collateral (as defined in the Interim Order) shall be applied

in accordance with paragraph 18 of the Interim Order. The extension of the DIP Facility and the

repayment of the Prepetition Additional Term Loan Obligations are part of an integrated

transaction. Such payments will not prejudice the Debtors or their estates, because payment of

such amounts is subject to the rights of parties in interest under paragraphs 14 and 15 of the Interim

Order.

12256494v1

**ADEQUATE PROTECTION**

32.     As a result of the granting of the DIP Liens, the incurrence of the DIP Obligations, the subordination of the Prepetition Citizens Liens to the DIP Carve-Out, the use of Cash Collateral, and the imposition of the automatic stay, the Prepetition Secured Parties are entitled to receive adequate protection pursuant to Sections 361, 362, 363 and 364 of the Bankruptcy Code and as set forth in paragraphs 12 and 13 of the Interim Order.

33.     As adequate protection, the Debtors propose that the holders of the Prepetition secured Obligations shall receive, subject to the Intercreditor Agreement, among other things, (i) the Adequate Protection Liens (as defined in the DIP Orders) to secure the Prepetition Secured Obligations and Adequate Protection Superpriority Claims (as defined in the DIP Orders) with respect to the Prepetition Secured Obligations; (ii) certain rights in connection with the sale of the Debtors' assets; (iii) access to information; and (iv) superpriority claims to the extent that the Adequate Protection Liens do not adequately protect against any Diminution in Value of the Prepetition Secured Parties' respective interests in the Prepetition Collateral.

**NOTICES**

34.     Prior to the hearing on the Motion for a final order authorizing use of cash, and in settlement of any and all matters raised in this Motion, the Debtors may enter into a stipulation or agreed order with parties claiming a security interest in cash collateral assets of the Debtors concerning the use of cash collateral, adequate protection and other related matters. In the event that the Debtors enter into any such stipulation, they will seek approval of the stipulation without further notice or hearing pursuant to Rule 4001(d)(4) of the Federal Rules of Bankruptcy Procedure, and DEBTORS HEREBY GIVE NOTICE OF THEIR INTENTION TO SEEK APPROVAL OF ANY SUCH STIPULATION.

18

12256494v1

35.      Pursuant to Local Rule 9013-2(a), this Motion is accompanied by a memorandum of law, proposed order, and proof of service.

36.      No prior request for the relief sought in this Motion has been made by the Debtors to this or any other court.

37.      Pursuant to Local Rule 9013-2(c), the Debtors give notice that they may, if necessary, call Richard H. Lynch, Chief Executive Officer of Debtors to testify on behalf of the Debtors about the factual matters raised in this Motion.

WHEREFORE, the Debtors request that the Court (a) enter an interim order (the "Interim Order") substantially in the form attached hereto as Exhibit C, and the final order granting the relief requested herein and (b) grant such other and further relief as is just and proper.


**BRIGGS AND MORGAN, P.A.**

/e/ James M. Jorissen

Dated: December 17, 2019                By: _____
James M. Jorissen, #262833
Karl J. Johnson, #391211
2200 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
Telephone: 612-977-8400
Facsimile: 612-977-8650
jjorissen@briggs.com
kjohnson@briggs.com

**PROPOSED COUNSEL FOR THE
DEBTORS**

12256494v1

## **VERIFICATION**

I, Richard H. Lynch, Chief Executive Officer of the Debtors named in the foregoing motion, declare under penalty of perjury that the foregoing is true and correct according to the best of my knowledge, information and belief.

Dated this 16th day of December, 2019.

Richard H. Lynch

# EXHIBIT A

AF Draft 12/16/2019

**SENIOR SECURED, SUPER-PRIORITY DEBTOR-IN-POSSESSION
LOAN AND SECURITY AGREEMENT**

**by and among**

**the Borrowers and Guarantors party hereto**

**and**

**JMB Capital Partners Lending, LLC
as Lender**

**Dated as of December __, 2019**

AFDOCS/21193210.

# TABLE OF CONTENTS

1.   DEFINITIONS AND CONSTRUCTION. ................................................................ 2

   1.1   Definitions.................................................................................................. 2

   1.2   Accounting Terms .................................................................................... 12

   1.3   UCC .......................................................................................................... 13

   1.4   Construction ............................................................................................. 13

   1.5   Schedules and Exhibits ............................................................................ 13

2.   LOAN AND TERMS OF PAYMENT. ................................................................ 14

   2.1   Agreement to Lend; Delayed Draw; Security Documents and Loan
      Documents. ............................................................................................... 14

   2.2   Borrowing Procedures ............................................................................. 14

   2.3   Payments; Reductions of the Commitment; Prepayments. ....................... 14

   2.4   Interest Rates and Rates, Payments and Calculations. ............................. 16

   2.5   Crediting Payments; Clearance Charge .................................................... 17

   2.6   Designated Account. ................................................................................ 17

   2.7   Maintenance of Loan Account; Statements of Obligations; Promissory
      Note .......................................................................................................... 17

   2.8   Fees .......................................................................................................... 17

3.   CONDITIONS; TERM OF AGREEMENT. ......................................................... 18

   3.1   Conditions Precedent to Advancing the Commitment............................... 18

   3.2   Conditions Precedent to all Extensions of Credit .................................... 18

   3.3   Maturity.................................................................................................... 19

   3.4   Effect of Maturity .................................................................................... 19

4.   REPRESENTATIONS AND WARRANTIES ....................................................... 20

   4.1   Due Organization and Qualification. ....................................................... 20

   4.2   Due Authorization .................................................................................... 20

   4.3   Binding Obligations ................................................................................. 20

   4.4   Existing Prepetition Liens ........................................................................ 20

   4.5   Jurisdiction of Formation; Location of Chief Executive Office;
      Organizational; Identification Number; Commercial Tort Claims. ............ 21

   4.6   Litigation ................................................................................................. 21

   4.7   Fraudulent Transfer ................................................................................. 21

   4.8   Indebtedness ............................................................................................ 21

4.9   Payment of Taxes......................................................................... 21

4.10  Budget ........................................................................................ 22

4.11  Restaurants and Site Leases. ..................................................... 22

4.12  Permits ....................................................................................... 22

4.14  Guarantor Representations ........................................................ 23

5.   AFFIRMATIVE COVENANTS. ............................................... 23

5.1   Financial Statements, Reports, Certificates ............................. 23

5.2   Reporting.................................................................................... 23

5.3   Material Contracts; Sale Offers ................................................ 23

5.4   Existence .................................................................................... 24

5.5   Maintenance of Properties; Permits ......................................... 24

5.6   Taxes .......................................................................................... 24

5.7   Insurance .................................................................................... 24

5.8   Inspection .................................................................................. 25

5.9   Environmental............................................................................ 25

5.10  Compliance with Laws .............................................................. 26

5.11  Disclosure Updates .................................................................... 26

5.12  Formation of Subsidiaries ......................................................... 26

5.13  Further Assurances..................................................................... 26

5.14  Staffing....................................................................................... 26

5.15  Budget ........................................................................................ 26

6.   NEGATIVE COVENANTS. ...................................................... 27

6.1   Indebtedness............................................................................... 27

6.2   Liens........................................................................................... 27

6.3   Restrictions on Fundamental Changes...................................... 27

6.4   Disposal of Assets ..................................................................... 27

6.5   Change Name ............................................................................. 27

6.6   Nature of Business ..................................................................... 27

6.7   Material Leases or Contracts; Amendments ............................. 28

6.8   Change of Control ..................................................................... 28

6.9   Accounting Methods.................................................................. 28

6.10  Transactions with Affiliates ..................................................... 28

6.11  Use of Advances ....................................................................... 28

|       | 6.12 | Limitation on Capital Expenditures ................................................................ 28 |
|       | 6.13 | Chapter 11 Case ........................................................................................... 28 |
|       | 6.14 | Plan ............................................................................................................. 29 |
| 7.    |      | GUARANTY. ............................................................................................... 29 |
|       | 7.1  | Guaranty ...................................................................................................... 29 |
|       | 7.2  | Separate Obligation ..................................................................................... 29 |
|       | 7.3  | Limitation of Guaranty ................................................................................ 29 |
|       | 7.4  | Liability of Guarantors ................................................................................ 29 |
|       | 7.5  | Consents of Guarantors ............................................................................... 30 |
|       | 7.6  | Guarantor's Waivers ................................................................................... 31 |
|       | 7.7  | Continuing Guaranty ................................................................................... 31 |
|       | 7.8  | Reinstatement .............................................................................................. 31 |
| 8.    |      | EVENTS OF DEFAULT. ............................................................................... 32 |
|       | 8.1  | Event of Default .......................................................................................... 32 |
|       | 8.2  | Rights and Remedies .................................................................................... 33 |
|       | 8.3  | Application of Proceeds upon Event of Default ............................................ 34 |
|       | 8.4  | Remedies Cumulative ................................................................................... 35 |
|       | 8.5  | Acknowledgments ........................................................................................ 35 |
| 9.    |      | PRIORITY AND COLLATERAL SECURITY ................................................ 35 |
|       | 9.1  | Superpriority Claims; Subordination in favor of Lender Liens. ...................... 35 |
|       | 9.2  | Grant of Security Interest in the Collateral ................................................... 36 |
|       | 9.3  | Representations and Warranties in Connection with Security Interest .............. 37 |
|       | 9.4  | Covenants with Respect to Collateral ........................................................... 37 |
|       | 9.5  | Lender's Ability to Perform Obligations on Behalf of Loan Parties with Respect to the Collateral .............................................................................. 38 |
|       | 9.6  | Filing of Financing Statements ..................................................................... 38 |
|       | 9.7  | No Discharge; Survival of Claims ................................................................. 38 |
| 10.   |      | WAIVERS; INDEMNIFICATION. ................................................................. 39 |
|       | 10.1 | Demand; Protest; etc ................................................................................... 39 |
|       | 10.2 | Lender's Liability for Collateral ................................................................... 39 |
|       | 10.3 | Indemnification ........................................................................................... 39 |
| 11.   |      | NOTICES ...................................................................................................... 40 |
| 12.   |      | CHOICE OF LAW AND VENUE; JURY TRIAL WAIVER. ....................... 41 |

13.    AMENDMENTS; WAIVERS; SUCCESSORS; INDEMNIFICATION........................ 42

    13.1    Amendments and Waivers ..................................................................... 42

    13.2    No Waivers; Cumulative Remedies........................................................ 42

    13.3    Successors .............................................................................................. 42

14.    GENERAL PROVISIONS. ................................................................................. 43

    14.1    Effectiveness ......................................................................................... 43

    14.2    Section Headings ................................................................................... 43

    14.3    Interpretation.......................................................................................... 43

    14.4    Severability of Provisions ..................................................................... 43

    14.5    Debtor-Creditor Relationship................................................................. 43

    14.6    Counterparts; Electronic Execution ...................................................... 43

    14.7    Revival and Reinstatement of Obligations ........................................... 44

    14.8    Lender Expenses .................................................................................... 44

    14.9    Integration .............................................................................................. 44

15.    JOINT AND SEVERAL LIABILITY AMONG BORROWERS ................................. 44

    15.1    Inducement.............................................................................................. 44

    15.2    Combined Liability ................................................................................ 44

    15.3    Separate Exercise of Remedies ............................................................. 44

<u>Exhibits</u>

Exhibit A – Form of Compliance Certificate

Exhibit B – Budget

Exhibit C – Reporting Requirements

Exhibit D – Form of Request for Advance

<u>Schedules</u>

Schedule A-1 – Loan Account

Schedule A-2 – Authorized Persons

Schedule D-1 – Designated Account and Designated Account Bank

Schedule 4.1(a) –Organizational Chart

Schedule 4.1(b) – Borrowers and Equity Ownership

Schedule 4.4 – Existing Prepetition Liens

Schedule 4.5 – Uniform Commercial Code Filing Information

Schedule 4.6 – Litigation

Schedule 4.8 – Existing Indebtedness

Schedule 4.9 – Taxes

Schedule 4.11(b) – Site Leases and Site Lease Defaults

Schedule 4.12 –Maintenance of Properties; Permits

Schedule 9.4(e) – Collateral Locations

### SENIOR SECURED, SUPER-PRIORITY DEBTOR-IN-POSSESSION
### LOAN AND SECURITY AGREEMENT

**THIS SENIOR SECURED, SUPER-PRIORITY DEBTOR-IN-POSSESSION LOAN AND SECURITY AGREEMENT** (this "Agreement"), is entered into as of December __, 2019 (the "Effective Date"), by and among the borrowers signatory hereto (collectively, the "Borrowers"), the guarantors signatory hereto (collectively, the "Guarantors" and together with the Borrowers, the "Loan Parties"), and JMB Capital Partners Lending, LLC, a California limited liability company, as lender (together with its successors and assigns, the "Lender").

**WHEREAS**, on December 16, 2019 (the "Petition Date"), the Borrowers commenced voluntary bankruptcy proceedings, under Chapter 11 of the Title 11 of the United States Code (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Minnesota (the "Bankruptcy Court"), which cases are subject to pending motions for joint administration under the lead case filed by Granite City Food & Brewery, Ltd.,  Case No. _____ (each, a "Chapter 11 Case" and collectively, the "Chapter 11 Cases").

**WHEREAS**, the Borrowers remain in possession of their businesses and manage their properties as debtors and debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code;

**WHEREAS**, the Guarantors have not filed petitions under the Bankruptcy Code with the Bankruptcy Court because the Loan Parties have represented that the Guarantors have no assets or no material assets, but the Guarantors are party hereto because they are borrowers or have guaranteed the obligations under the Prepetition Credit Agreement and have granted Liens on their assets, if any, to secure such indebtedness;

**WHEREAS**, prior to the Petition Date, the Lender provided financing to the Borrowers pursuant to that certain Credit Agreement dated as of May 15, 2014, as amended by the First Amendment to Credit Agreement dated as of September 1, 2016, and the Second Amendment to Credit Agreement dated as of October 23, 2019 (as amended, supplemented or otherwise modified from time to time through the Petition Date, the "Prepetition Credit Agreement"), by and among Granite City Food & Brewery Ltd., as a Borrower and as Borrower Representative, each of the other borrowers and guarantors party thereto, Citizens Bank, N. A. (formerly known as RBS Citizens, N.A.), as Administrative Agent and as a lender ("Citizens Bank"), and the other lenders party thereto, including the Lender (Citizens Bank and such other lenders, the "Prior Lenders");

**WHEREAS,** as of the close of business on _____, 2019, the Prior Lenders under the Prepetition Credit Agreement were owed: (i) $6,000,000 in outstanding principal balance of a Revolving Loan (which was converted to a term loan) (the "Prepetition Revolving Loan"), (ii) $29,000,000 in outstanding principal balance of a Term Loan (the "Prepetition Term Loan"), (iii) $5,000,000 in outstanding principal balance of a Development Loan (the "Prepetition Development Loan," and together with the Prepetition Revolving Loan and the Prepetition Term Loan, the "Prepetition Citizens Loans," each of which was funded by Citizens Bank), and (iv) $1,500,000 in outstanding principal balance of an Additional Term Loan, which was funded by the Lender (the "Prepetition Additional Term Loan");

**WHEREAS**, the Obligations under and as defined in the Prepetition Credit Agreement, including the Obligations in respect of the Prepetition Additional Term Loan, are secured by a security interest in substantially all of the existing and after-acquired assets of the Borrowers and the other Borrowers (as defined in the Prepetition Credit Agreement) as more fully set forth in the Prepetition Loan Documents, and such security interest is perfected and, with certain exceptions, as described in the Prepetition Loan Documents, has priority over other security interests;

**WHEREAS**, pursuant to the Prepetition Credit Agreement and a Subordination Agreement dated as of October 23, 2019 between the Loan Parties, Citizens Bank and the Lender, payment of the Prepetition Additional Term Loan to the Lender is senior in priority to payment of the Prepetition Citizens Loans to Citizens Bank;

**WHEREAS**, the Loan Parties have requested that Lender provide financing to Borrowers consisting of a senior secured super priority term loan in a principal amount of up to Five Million Dollars ($5,000,000) (the "<u>Facility</u>") pursuant to Sections 105, 363, 364(c) and 364(d) of the Bankruptcy Code;

**WHEREAS**, Lender has indicated its willingness to agree to extend the Facility to Borrowers, all on terms and conditions set forth herein and in the other Loan Documents and in accordance with Sections 105, 363, 364(c) and 364(d) of the Bankruptcy Code, so long as the Obligations are (i) secured by priming Liens on the Collateral granted by the Loan Parties as hereinafter provided, and (ii) given superpriority status as provided in the Interim Order and Final Order as applicable;

**WHEREAS**, the Loan Parties have agreed to grant to the Lender a priming security interest in all their assets as Collateral, and the Borrowers have further agreed that the Lender shall have Superpriority Claims in their Chapter 11 Cases for the repayment of the Obligations pursuant to the Interim Order and the Final Order, subject to the approval of the Bankruptcy Court; and

**WHEREAS**, the Loan Parties have agreed that the Prepetition Additional Term Loan will be rolled up into the Facility by conversion into Obligations under this Agreement (the "<u>Roll up Loan</u>") as more fully set forth in the Interim Order.

**NOW, THEREFORE**, in consideration of the premises and of the mutual covenants and agreements contained herein, the parties hereto hereby agree as follows:

1. **DEFINITIONS AND CONSTRUCTION.**

    1.1 <u>Definitions</u>

. As used in this Agreement, the following terms shall having the meanings specified below:

"<u>Acceptable Plan</u>" means a plan of reorganization or liquidation for the Chapter 11 Cases that (i) provides for the indefeasible payment in full in cash of the Obligations, in exchange for full discharge thereof, on or prior to the effective date of the plan as a condition to the effectiveness thereof, and (ii) contains releases, exculpations, waivers and indemnification for the Lender in form and substance acceptable to the Lender in its reasonable discretion.

"<u>Additional Documents</u>" has the meaning specified in <u>Section 5.13</u>.

"<u>Advances</u>" has the meaning specified in <u>Section 2.1(a)</u>.

"<u>Affiliate</u>" means, as to any Person, any other Person (a) that, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such Person, (b) who is a director or officer (i) of such Person, (ii) of any Subsidiary of such Person, or (iii) of any Person described in clause (a) above with respect to such Person, or (c) which, directly or indirectly through one or more intermediaries, is the beneficial or record owner (as defined in Rule 13d-3 of the Securities Exchange Act of 1934, as amended, as the same is in effect on the date hereof) of twenty-four percent (24%) or more of any class of the outstanding voting equity interests, securities or other equity or ownership interests of such Person.  For purposes of this definition, the term "control" (and the correlative terms, "controlled by" and "under common control with") shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies, whether through ownership of securities or other interests, by contract or otherwise.

"<u>Authorized Person</u>" means any one of the individuals identified on <u>Schedule A-2</u>, as such schedule is updated from time to time by written notice from Loan Parties to Lender.

"<u>Avoidance Actions</u>" has the meaning specified in <u>Section 9.1(a)(i)</u>.

"<u>Avoidance Action Proceeds</u>" means the proceeds and recoveries from Avoidance Actions.

"<u>Bankruptcy Code</u>" has the meaning specified in the recitals hereto.

"<u>Bankruptcy Court</u>" has the meaning specified in the recitals hereto.

"<u>Borrowers</u>" has the meaning set forth in the preamble to this Agreement.

"<u>Budget</u>" means an initial budget, prepared by Borrowers, that sets forth in reasonable detail all of the Borrowers' projected receipts and disbursements on a weekly basis, separated into line items for each category of receipt or disbursement, and is otherwise in form and substance reasonably acceptable to Lender, and is attached hereto as <u>Exhibit B</u>.

"<u>Business Day</u>" means any day that is not a Saturday, Sunday, or other day on which banks are authorized or required to close in the State of New York.

"<u>Capital Expenditures</u>" means, with respect to any Person for any period, the aggregate of all expenditures by such Person during such period that are capital expenditures as determined in accordance with GAAP, whether such expenditures are paid in cash or financed.

"<u>Capital Lease</u>" means a lease that is required to be capitalized for financial reporting purposes in accordance with GAAP.

"<u>Carve-Out</u>" has the meaning ascribed to it in the Interim Order and Final Order, as applicable.

"Cash Collateral" has the meaning ascribed to it in the Interim Order and Final Order, as applicable.

"Change of Control" means, except with respect to the consummation of a Sale (whether under a plan of reorganization or under Section 363 of the Bankruptcy Code), or as otherwise approved by Lender, the acquisition, through purchase or otherwise (including the agreement to act in concert without anything more), by any Person or group (as such term is used in Section 13(d)(3) of the Securities Exchange Act of 1934, as amended), after the date of this Agreement, of (i) the beneficial ownership, directly or indirectly, of 50% or more of the equity interests in any Loan Party or (ii) all or substantially all of the assets of such Loan Party, except as permitted in this Agreement.

"Chapter 11 Cases" has the meaning specified in the recitals hereto.

"Chapter 11 Plan" means a chapter 11 plan that provides for, *inter alia*, payment in full in cash of all Obligations on the effective date thereof, together with releases, exculpations, waivers and indemnification to the extent acceptable to Lender, in its reasonable discretion.

"Citizens Bank" has the meaning specified in the recitals hereto.

"Closing Date" means the date upon which the first Advance is made under Section 2.1.

"Collateral" means, collectively, all pre-petition and post-petition real property and all pre-petition and post-petition tangible and intangible personal property of each Loan Party, in each case wherever located and whether now owned or hereafter acquired, including, but not limited to all accounts, contracts rights, chattel paper, cash, general intangibles, investment property, machinery, equipment, goods, inventory, furniture, fixtures, letter of credit rights, books and records, deposit accounts, documents, instruments, commercial tort claims, leases and leaseholds and rents, avoidance actions under Section 549 of the Bankruptcy Code and related recoveries under Section 550 of the Bankruptcy Code, together with all proceeds of each of the foregoing, including insurance proceeds (as each such term above is defined in the UCC, to the extent applicable), and, subject to Final Order, including the proceeds and recoveries from Avoidance Actions.

"Commitment" means Five Million Dollars ($5,000,000).

"Commitment Fee" means the fee of 1.00% of the amount of the Facility (less the amount of the Prepetition Additional Term Loan), which fee shall be earned and payable upon entry of the Interim Order and which shall be paid to the Lender on the Closing Date from the proceeds of the first Advance of the Facility.

"Compliance Certificate" means a certificate substantially in the form of Exhibit A delivered by the Authorized Person of Borrowers to Lender.

"Control Agreement" means, with respect to each Deposit Account of a Borrower, an agreement in form and substance reasonably satisfactory to the Lender and the depository institution maintaining such Deposit Account, pursuant to which such depository institution agrees to comply with the Lender's instructions with respect to disposition of funds in such Deposit

Account without further consent by the relevant Borrower.

"Daily Balance" means, as of any date of determination and with respect to any fixed monetary Obligations, the amount of such Obligations owed at the end of such day.

"Default" means an event, condition, or default that, with the giving of notice, the passage of time, or both, would be an Event of Default.

"Default Rate" has the meaning specified in Section 2.4(b).

"Deposit Account" means any deposit account, as that term is defined in the UCC.

"Designated Account" means the Deposit Account of Borrowers identified on Schedule D-1.

"Designated Account Bank" has the meaning specified in Schedule D-1.

"Dollars" or "$" means United States dollars.

"Environmental Action" means any written complaint, summons, citation, notice, directive, order, claim, litigation, investigation, judicial or administrative proceeding, judgment, letter, or other written communication from any Governmental Authority, or any third party involving violations of Environmental Laws or releases of Hazardous Materials (a) from any Collateral; (b) from adjoining properties or businesses of any real property that constitutes Collateral, or (c) from or onto any facilities, with respect to the Collateral, which received Hazardous Materials generated by any Loan Party.

"Environmental Law" means any applicable federal, state, provincial, foreign or local statute, law, rule, regulation, ordinance, code, binding and enforceable guideline, binding and enforceable written policy, or rule of common law now or hereafter in effect and in each case as amended, or any judicial or administrative interpretation thereof, including any judicial or administrative order, consent decree or judgment, in each case, to the extent binding on the Borrowers, relating to the environment, the effect of the environment on employee health, or Hazardous Materials, in each case as amended from time to time.

"Environmental Liabilities" means all liabilities, monetary obligations, losses, damages, costs and expenses (including all reasonable fees, disbursements and expenses of counsel, experts, or consultants, and costs of investigation and feasibility studies), fines, penalties, sanctions, and interest incurred as a result of any claim or demand, or Remedial Action required, by any Governmental Authority or any third party, and which relate to any Environmental Action.

"Environmental Lien" means any Lien in favor of any Governmental Authority for Environmental Liabilities.

"Event of Default" has the meaning specified in Section 8.1.

"Existing Prepetition Liens" has the meaning specified in Section 4.4.

"Exit Fee" means the fee of 3.00%, as applicable (i) of any outstanding principal amount hereunder that is prepaid pursuant to Section 2.3(c) or (d), or (ii) without duplication of any amounts paid pursuant to clause (i), of the amount of the Commitment on the Maturity Date, in each case to be paid in cash and without further order of the Bankruptcy Court.

"Facility" has the meaning specified in the recitals to this Agreement.

"Fees" means all fees due to the Lender under this Agreement, any Loan Document or the Interim Order or Final Order, as applicable, including the Commitment Fee, the Exit Fee, the Funding Fee, the Stated Maturity Date Fee and the Work Fee.

"Final Order" means a final order of the Bankruptcy Court authorizing and approving the Borrowers' entry into this Agreement and the other Loan Documents, in form and substance satisfactory to Lender, in its sole discretion, Borrowers, and their respective counsel, on a final basis and entered following a final hearing.

"Funding Fee" means, with respect to each Advance, 2.00% of such Advance, payable in cash upon funding of such Advance by the Lender; provided that in no event shall the Funding Fee be imposed with respect to the amount previously funded in connection with the Prepetition Additional Term Loan.

"GCFB" means Granite City Food & Brewery Ltd., a Minnesota corporation.

"Governmental Authority" means any federal, state, local, or other governmental or administrative body, instrumentality, board, department, or agency or any court, tribunal, administrative hearing body, arbitration panel, commission, or other similar dispute-resolving panel or body.

"Guaranteed Obligations" has the meaning specified in Section 7.1.

"Guaranty" means the terms and provisions of Section 7.

"Hazardous Materials" means (a) substances that are defined or listed in, or otherwise classified pursuant to, any applicable laws or regulations as "hazardous substances," "hazardous materials," "hazardous wastes," "toxic substances," or any other formulation intended to define, list, or classify substances by reason of deleterious properties such as ignitability, corrosivity, reactivity, carcinogenicity, reproductive toxicity, or "EP toxicity", (b) oil, petroleum, or petroleum derived substances, natural gas, natural gas liquids, synthetic gas, drilling fluids, produced waters, and other wastes associated with the exploration, development, or production of crude oil, natural gas, or geothermal resources, (c) any flammable substances or explosives or any radioactive materials, and (d) asbestos in any form or electrical equipment that contains any oil or dielectric fluid containing levels of polychlorinated biphenyls in excess of 50 parts per million.

"Indebtedness" means (a) all obligations for borrowed money, including, without limitation, the Obligations, (b) all obligations evidenced by bonds, debentures, notes, or other similar instruments and all reimbursement or other obligations in respect of letters of credit, bankers acceptances, or other financial products, (c) all obligations as a lessee under Capital Leases, (d) all obligations or liabilities of others secured by a Lien on any asset of such Person,

6

irrespective of whether such obligation or liability is assumed, (e) all payment obligations to pay the deferred purchase price of assets (other than trade payables incurred in the ordinary course of business and repayable in accordance with customary trade practices), (f) all indebtedness created or arising under any conditional sale or other title retention agreement, or incurred as financing, in either case with respect to property acquired by such Person, (g) the principal balance outstanding under any synthetic lease, off-balance sheet loan or similar off balance sheet financing products, or (h) any obligation guaranteeing or intended to guarantee (whether directly or indirectly guaranteed, endorsed, co-made, discounted, or sold with recourse) any obligation of any other Person that constitutes Indebtedness under any of clauses (a) through (h) above.  For purposes of this definition, (i) the amount of any Indebtedness represented by a guaranty or other similar instrument shall be the lesser of the principal amount of the obligations guaranteed and still outstanding and the maximum amount for which the guaranteeing Person may be liable pursuant to the terms of the instrument embodying such Indebtedness, and (ii) the amount of any Indebtedness described in clause (d) above shall be the lower of the amount of the obligation and the fair market value of the assets of such Person securing such obligation.

"Indemnified Liabilities" has the meaning specified in Section 10.3.

"Indemnified Person" has the meaning specified in Section 10.3.

"Interim Funding" means an Advance in the principal amount of $4,000,000 (inclusive of the Roll up Loan) to be funded upon entry of the Interim Order.

"Interim Order" means that interim order entered by the Bankruptcy Court authorizing and approving the Borrowers' entry into this Agreement and the other Loan Documents, in form and substance satisfactory to the Lender, in its sole discretion, the Borrowers, and their respective counsel.

"IRC" means the Internal Revenue Code of 1986, as in effect from time to time.

"KRG Granite Sale" means the sale to KRG Granite Acquisition, LLC of the Acquired Assets and assumption of the Assumed Liabilities pursuant to (and as such terms are defined in) the Purchase Agreement.

"Lead Borrower" means GCFB.

"Lender" has the meaning set forth in the preamble to this Agreement.

"Lender Expenses" means all (a) costs or expenses (including taxes and insurance premiums) required to be paid by the Borrowers under any of the Loan Documents that are paid, advanced, or incurred by Lender, including but not limited to the Work Fee paid to Lender's counsel, (b) reasonable out-of-pocket fees or charges paid or incurred by Lender in connection with its transactions with the Borrowers under any of the Loan Documents, including, but not limited to, fees or charges for photocopying, notarization, couriers and messengers, telecommunication, public record searches (including tax lien, litigation, and UCC searches and including searches with the patent and trademark office, the copyright office, or the department of motor vehicles), filing, recording, publication, appraisal (including periodic collateral appraisals or business valuations), real estate surveys, real estate title policies and endorsements, and

7

environmental audits, (c) out-of-pocket costs and expenses incurred by Lender in the disbursement of funds to Borrowers (by wire transfer or otherwise), (d) out-of-pocket charges paid or incurred by Lender resulting from the dishonor of checks payable by or to any Loan Party, (e) out-of-pocket costs, fees (including reasonable attorneys' fees) and expenses paid or incurred by Lender to correct any default or enforce any provision of the Loan Documents, or during the continuance of an Event of Default, in gaining possession of, maintaining, handling, preserving, storing, shipping, selling, preparing for sale, or advertising to sell the Collateral, or any portion thereof, irrespective of whether a sale is consummated, (f) reasonable out-of-pocket audit fees and expenses of Lender (including travel, meals, and lodging) related to any inspections or audits, (g) out-of-pocket costs and expenses of third party claims or any other suit paid or incurred by Lender in enforcing or defending the Loan Documents or in connection with the transactions contemplated by the Loan Documents or Lender's relationship with the Borrowers, (h) Lender's reasonable out-of-pocket costs and expenses (including reasonable attorneys' fees) incurred in advising, structuring, drafting, reviewing, administering (including travel, meals, and lodging), or amending the Loan Documents, (i) reasonable out-of-pocket fees and expenses of Lender (including travel, meals, and lodging) related to any due diligence in connection with the Facility or meetings with Borrowers in connection with the Facility, and (j) Lender's costs and expenses (including reasonable attorneys, accountants, consultants, and other advisors fees and expenses) incurred in terminating, enforcing (including attorneys, accountants, consultants, and other advisors fees and expenses incurred in connection with a "workout," a "restructuring," or an insolvency proceeding concerning any Loan Party or in exercising rights or remedies under the Loan Documents), or defending the Loan Documents, irrespective of whether suit is brought, or in taking any Remedial Action concerning the Collateral.

"Lender Related Person" means Lender, together with Lender's Affiliates, officers, directors, employees, attorneys, and agents.

"Lender's Liens" means the Liens granted by Borrowers in and to the Collateral in favor of Lender.

"Lien" means any pledge, hypothecation, assignment (which is intended as security), charge, deposit arrangement (which is intended as security), encumbrance, easement, lien (statutory or other), mortgage, security interest, or other security arrangement and any other preference, priority, or preferential arrangement of any kind or nature whatsoever (which is intended as security), including any conditional sale contract or other title retention agreement, the interest of a lessor under a Capital Lease, and any synthetic or other financing lease having substantially the same economic effect as any of the foregoing.

"Loan Account" means the Deposit Account of Lender identified on Schedule A-1.

"Loan Documents" means this Agreement, the Interim Order, the Final Order, the Control Agreements, the Additional Documents and any other notes, account control agreements, or mortgages executed by Borrowers in connection with the Agreement and payable to Lender, any other agreement entered into, now or in the future, by the Borrowers or Lender in connection with this Agreement, and all amendments, modifications, renewals, substitutions and replacements of any of the foregoing.

"Material Adverse Change" means, (a) except as a result of the commencement of the Chapter 11 Cases, a material adverse change in the business, operations, results of operations, assets, liabilities or financial condition of the Loan Parties, (b) a material impairment of any Loan Party's ability to perform its material obligations under any Loan Document to which it is a party, or of Lender's ability to enforce the Obligations or realize upon the Collateral or (c) a material impairment of the enforceability or priority of Lender's Liens with respect to the Collateral, or the priority of such Liens, all determined at the Lender's reasonable discretion.

"Material Contract" means each contract or agreement as to which the breach, nonperformance, cancellation, termination, loss, expiration or failure to renew by any party thereto could reasonably be expected to result in a Material Adverse Change.

"Maturity Date" means the earliest of (i) the Stated Maturity Date; (ii) the effective date of a plan of reorganization; (iii) if the Final Order has not been entered by the Bankruptcy Court, the date that is one day after the Final Hearing (as defined in the Interim Order) and all continuations thereof; (iv) entry of an order converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code or dismissing the Chapter 11 Cases; (v) the closing of a Sale of all, or substantially all, the assets of all Borrowers; (vi) the closing of the KRG Granite Sale; and (vii) the acceleration of the outstanding Obligations or termination of the Commitment as a result of the occurrence and continuation of an Event of Default.

"Net Cash Proceeds" means with respect to any sale or disposition of Collateral by any Person, the amount of cash proceeds received (directly or indirectly) from time to time (whether as initial consideration or through the payment of deferred consideration) by or on behalf of such Person, in connection therewith, after deducting therefrom only (i) reasonable (as determined by the Lender) fees, commissions, and expenses related thereto and required to be paid in connection with such sale or disposition and (ii) taxes paid or payable to any taxing authorities in connection with such sale or disposition, in each case to the extent, but only to the extent, that the amounts so deducted are payable to a Person that is not a Borrower or an Affiliate of a Borrower, and are properly attributable to such transaction; provided however for the avoidance of doubt, that such reasonable fees, commissions and expenses shall exclude fees and expenses of estate professionals.

"Obligations" means all loans (including without limitation the Roll up Loan), Advances, debts, principal, interest, contingent reimbursement or indemnification obligations, premiums, liabilities (including all amounts charged to the Loan Account pursuant to this Agreement), obligations (including indemnification obligations), Fees (including, without limitation the Commitment Fee, Work Fee, Funding Fee, Exit Fee and Stated Maturity Date Fee), Lender Expenses, guaranties, covenants, and duties of any kind and description owing by any Loan Party, to the Lender pursuant to or evidenced by the Loan Documents and/or pursuant to or in connection with any one or more documents, instruments or agreements described in clause (i) of the definition of Lender Expenses and, in each case, irrespective of whether for the payment of money, whether direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising, and including all interest not paid when due and all other expenses or other amounts that Borrowers are required to pay or reimburse by the Loan Documents or by law or otherwise in connection with the Loan Documents, including without limitation in connection with the collection or enforcement of or preservation of rights under the Loan Documents.

"Ordinary Course" shall mean, in respect of any Person, the ordinary course and reasonable requirements of such Person's business, as conducted in accordance with past practices, and undertaken in good faith.

"Organizational Documents" means (a) for any corporation, the certificate or articles of incorporation, the bylaws, any certificate of designation or other instrument relating to the rights of preferred shareholders or stockholders of such corporation, any shareholder rights agreement and all applicable resolutions of the board of directors (or any committee thereof) of such corporation, (b) for any partnership, the partnership agreement and, if applicable, the certificate of limited partnership, (c) for any limited liability company, the operating agreement and articles or certificate of formation or organization and all applicable resolutions of any managing member of such limited liability company, and (d) any agreement between any Loan Party and its shareholders, members, partners or its equity owners, or among any of the foregoing.

"Permits" means any license, lease, power, permit, franchise, certificate, authorization or approval issued by a Governmental Authority.

"Permitted Indebtedness" means:

(a)     Indebtedness evidenced by this Agreement and the other Loan Documents;

(b)     Indebtedness outstanding as of the Petition Date;

(c)     Indebtedness, including any unsecured guarantees, incurred in the Ordinary Course with respect to surety and appeal bonds, performance bonds, bid bonds, appeal bonds, statutory bonds, completion guarantees and similar obligations; and

(d)     Indebtedness for purchase money obligations incurred after the Petition Date for equipment used in the ordinary course of the Borrowers' business in an aggregate principal amount not to exceed at any time $150,000.

"Permitted Liens" means all Permitted Prior Liens, the Liens described on Schedule 4.4, and all other Liens permitted pursuant to Section 4.4.

"Permitted Prior Lien" has the meaning specified in Section 9.2(b).

"Permitted Protest" means the right of any Loan Party to protest any Lien (other than any Lien that secures the Obligations), taxes (other than payroll taxes or taxes that are the subject of a United States federal tax lien), or rental payment, provided that (a) a reserve with respect to such obligation is established on such Loan Party's books and records in such amount as is required under GAAP, (b) any such protest is instituted promptly and prosecuted diligently by such Loan Party in good faith and (c) Lender is reasonably satisfied that, while any such protest is pending, there will be no impairment of the enforceability, validity, or priority of any of Lender's Liens.

"Permitted Variance" means a variance of net cash flow on the Budget of no more than 10%, which variance shall be tested on a four week cumulative basis, as opposed to a line-by-line, basis; provided that, (a) for the avoidance of doubt, the calculation of any aforementioned Permitted Variance includes any disbursements in connection with estate professional fees, and

10

(b) due to uncertainty related to the timing of cure costs, cure costs shall not be considered when calculating variance from the Budget.

"Person" means natural persons, corporations, limited liability companies, limited partnerships, general partnerships, limited liability partnerships, joint ventures, trusts, land trusts, business trusts, or other organizations, irrespective of whether they are legal entities, and governments and agencies and political subdivisions thereof.

"Petition Date" means on or about December 16, 2019.

"Prepetition Credit Agreement" has the meaning specified in the recitals hereto.

"Prepetition Credit Liens" has the meaning given to such term in the Interim Order and upon entry thereof, the Final Order.

"Prepetition Loan Documents" means the Loan Documents as defined in the Prepetition Credit Agreement.

"Prior Lenders"  has the meaning specified in the recitals hereto.

"Promissory Note" shall mean the promissory note, in form and substance satisfactory to Lender, to be given by the Borrowers to the Lender to evidence the Advances.

"Purchase Agreement" means that certain asset purchase agreement, dated as of December 16, 2019, by and among Lead Borrower, certain subsidiaries thereof, and KRG Granite Acquisition, LLC.

"Record" means information that is inscribed on a tangible medium or that is stored in an electronic or other medium and is retrievable in perceivable form.

"Remedial Action" means all actions taken to (a) clean up, remove, remediate, contain, treat, monitor, assess, evaluate, or in any way address Hazardous Materials in the indoor or outdoor environment, (b) prevent or minimize a release or threatened release of Hazardous Materials so they do not migrate or endanger or threaten to endanger public health or welfare or the indoor or outdoor environment, (c) restore or reclaim natural resources or the environment, (d) perform any pre-remedial studies, investigations, or post-remedial operation and maintenance activities, or (e) conduct any other actions with respect to Hazardous Materials required by Environmental Laws.

"Required Lien Priority" has the meaning set forth in Section 9.2.

"Roll up Loan" has the meaning specified in the recitals hereto.

"Sale" means the sale of all or substantially all of the assets of any Borrower or any Subsidiary thereof (including any Collateral transferred to another Borrower), to any party, including the Lender, pursuant to the provisions of Section 363 of the Bankruptcy Code or pursuant to an Acceptable Plan.

"Sale Deposit" has the meaning specified in Section 9.1(a)(i).

"Schedules" means those certain schedules annexed hereto and made a part hereof.

"Security Documents" means (i) all UCC financing statements, or amendments or continuations thereof, and (ii) any other documents or filings in connection with the perfection of the Liens hereunder.

"Site Lease" means a lease pursuant to which each restaurant location operated by a Loan Party or a Subsidiary of a Loan Party has been leased to such Person.

"Stated Maturity Date" means March 31, 2020.

"Stated Maturity Date Fee" means the fee of 10.00% of the Facility, which shall be due and payable in cash, without further order of the Bankruptcy Court, immediately upon the day following the Stated Maturity Date in the event that the Obligations are not indefeasibly paid in full on the Stated Maturity Date.

"Subsidiary" means, with respect to any Person, any corporation, partnership, limited liability company, association or other business entity of which more than fifty percent (50%) of the total voting power of shares of stock (or equivalent ownership or controlling interest) entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers, governors or trustees thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof.

"Superpriority Claim" has the meaning specified in Section 9.1(a)(i).

"UCC" means the Uniform Commercial Code as in effect in the State of New York; provided that, if perfection or the effect of perfection or non-perfection or the priority of any security interest in any Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of New York, "UCC" means the Uniform Commercial Code as in effect from time to time in such other jurisdiction for purposes of the provisions hereof relating to such perfection, effect of perfection or non-perfection or priority.

"United States" means the United States of America.

"Weekly Budget Variance Report" has the meaning specified in Section 5.2.

"Work Fee" means a non-refundable fee in the amount of $50,000, heretofore paid to Lender's counsel for due diligence and legal services rendered.

## 1.2    Accounting Terms

.  All accounting terms not specifically defined herein shall be construed in accordance with GAAP; provided, that if Borrowers notify Lender that Borrowers requests an amendment to any provision hereof to eliminate the effect of any change occurring after the Closing Date in GAAP or in the application thereof on the operation of such provision (or if Lender notifies Borrowers that Lender requests an amendment to any provision hereof for such purpose), regardless of

whether any such notice is given before or after such change in GAAP or in the application thereof, then Lender and Borrowers agree that they will negotiate in good faith amendments to the provisions of this Agreement that are directly affected by such change in GAAP with the intent of having the respective positions of Lender and Borrowers after such change in GAAP conform as nearly as possible to their respective positions as of the date of this Agreement and, until any such amendments have been agreed upon, the provisions in this Agreement shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective.  When used herein, the term "financial statements" shall include the notes and schedules thereto.  Whenever the term "Borrowers" is used in respect of a financial covenant or a related definition, it shall be understood to mean Borrowers on a consolidated basis, unless the context clearly requires otherwise.

### 1.3    UCC

.  Any terms used in this Agreement that are defined in the UCC shall be construed and defined as set forth in the UCC unless otherwise defined herein; provided, that to the extent that the UCC is used to define any term herein and such term is defined differently in different Articles of the UCC, the definition of such term contained in Article 9 of the UCC shall govern.

### 1.4    **Construction**

.  Unless the context of this Agreement or any other Loan Document clearly requires otherwise, references to the plural include the singular, references to the singular include the plural, the terms "includes" and "including" are not limiting, and the term "or" has, except where otherwise indicated, the inclusive meaning represented by the phrase "and/or."  The words "hereof," "herein," "hereby," "hereunder," and similar terms in this Agreement or any other Loan Document refer to this Agreement or such other Loan Document, as the case may be, as a whole and not to any particular provision of this Agreement or such other Loan Document, as the case may be. Section, subsection, clause, schedule, and exhibit references herein are to this Agreement unless otherwise specified.  Any reference in this Agreement or in any other Loan Document to any agreement, instrument, or document shall include all alterations, amendments, changes, extensions, modifications, renewals, replacements, substitutions, joinders, and supplements, thereto and thereof, as applicable (subject to any restrictions on such alterations, amendments, changes, extensions, modifications, renewals, replacements, substitutions, joinders, and supplements set forth herein).  The words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts, and contract rights.  Any reference herein or in any other Loan Document to the satisfaction, repayment, or payment in full of the Obligations shall mean the repayment in full in cash of all Obligations other than unasserted contingent indemnification Obligations (with all such Obligations consisting of monetary or payment Obligations having been paid in full in cash).  Any reference herein to any Person shall be construed to include such Person's successors and assigns.  Any requirement of a writing contained herein or in any other Loan Document shall be satisfied by the transmission of a Record.

### 1.5    **Schedules and Exhibits**

. All of the schedules and exhibits attached to this Agreement shall be deemed incorporated herein by reference.

**2.      LOAN AND TERMS OF PAYMENT.**

**2.1      Agreement to Lend; Delayed Draw; Security Documents and Loan Documents.**

(a)      Subject to the terms and conditions of this Agreement, Lender agrees, subject to the satisfaction or waiver of the conditions precedent in Section 3, to make two (2) advances to Borrowers (each, an "Advance" and collectively, the "Advances"); provided that in no event shall the Advances made by Lender exceed the Lender's Commitment.  The first Advance in the amount of the Interim Funding, which includes the Roll up Loan, shall be made upon entry of the Interim Order and the second Advance in the amount of the remaining Commitment shall be made upon entry of the Final Order, subject to the satisfaction or waiver of the conditions precedent in Section 3 relating to such Advance.  Any Advance, or portion thereof, that is repaid or prepaid (whether as an optional prepayment or a mandatory prepayment) cannot be reborrowed.

(b)      The Advances shall be secured by the Collateral as set forth in this Agreement, the Interim Order, the Final Order, and the other Loan Documents.

(c)      Each Loan Party agrees that it is jointly and severally liable for the prompt payment and performance of all Obligations under the Loan Documents.  Borrowers promise to pay the Obligations (including principal, interest, fees, costs, and expenses) in Dollars in full (including the Exit Fee) on the Maturity Date.

**2.2      Borrowing Procedures**

. Each Advance under Section 2.1(a) shall be made by a written request substantially in the form of the Request for Advance attached hereto as Exhibit D executed by an Authorized Person of the Lead Borrower and delivered to the Lender no later than one (1) Business Day prior to the requested funding date (or such shorter period as the Lender may permit in its sole discretion); provided, that (i) Lead Borrower shall submit such requests only after approval of the Interim Order or the Final Order as applicable, and (ii) the aggregate amount of all such Advances shall not exceed the Lender's Commitment.  Upon satisfaction or waiver of the conditions precedent specified herein, Lender shall make the proceeds of the relevant Advance available to the Borrowers on the requested funding date by causing the principal amount of the relevant Advance to be credited to the Designated Account.

**2.3      Payments; Reductions of the Commitment; Prepayments.**

(a)      **Payments by Borrowers**.  Except as otherwise expressly provided herein, all payments by Borrowers shall be made to the Loan Account for the account of Lender and shall be made in immediately available funds, no later than 4:00 p.m. (Eastern time) on the date specified herein.  Any payment received by Lender later than 4:00 p.m. (Eastern time) shall be deemed to have been received on the following Business Day and any applicable interest or fee shall continue to accrue until such following Business Day.

(b)      **Application of Payments and Proceeds**.  All payments remitted to Lender and all proceeds of Collateral received by Lender shall be applied as follows (unless otherwise directed by Lender):

(i)      first, to pay any Lender Expenses (including cost or expense reimbursements, such as attorneys' fees in excess of the Work Fee) then owed to the Lender or Lender Related Persons in accordance with the Interim Order or the Final Order, as applicable, or indemnities then due to Lender under the Loan Documents, until paid in full;

(ii)      second, to pay any Fees then due to Lender under the Loan Documents until paid in full;

(iii)      third, to pay interest due in respect of the Advances until paid in full;

(iv)      fourth, to pay the principal of all Advances until paid in full;

(v)      fifth, to pay any other Obligations until paid in full; and

(vi)      sixth, to Borrowers (to be wired to the Designated Account) or as otherwise required by applicable law.

In the event of a direct conflict between the priority provisions of this Section 2.3(b) and any other provision contained in any other Loan Document (except for the Interim Order or Final Order, as applicable), it is the intention of the parties hereto that such provisions be read together and construed, to the fullest extent possible, to be in concert with each other.  In the event of any actual, irreconcilable conflict that cannot be resolved as aforesaid, the terms and provisions of this Section 2.3(b) shall control and govern.  Notwithstanding the foregoing, to the extent there is a conflict between the Interim Order or the Final Order, as applicable, and any other Loan Document, the Interim Order or the Final Order, as applicable, shall control and govern.

(c)      **Optional Prepayments**.  Upon three Business Days' prior notice to Lender, Borrowers may prepay any Advance, in whole or in part, at any time, provided that (i) the principal amount being prepaid shall be an amount not less than $1,000,000 and (ii) Borrowers shall also pay all accrued and unpaid interest on such principal amount and the Exit Fee as applied to the principal amount that was prepaid.

(d)      **Mandatory Prepayments**.

(i)      **Dispositions**.  Within one (1) Business Day of the date of receipt by any Loan Party or any Subsidiary of a Lon Party of the Net Cash Proceeds of any disposition (whether through a voluntary or involuntary sale, the loss, destruction or damage thereof or any actual condemnation, confiscation, requisition, seizure or taking thereof or otherwise) of Collateral (other than the sale or replacement of such Collateral in the Ordinary Course), the Borrowers shall prepay such portion of the outstanding amount of the Obligations in accordance with Section 2.3(b) in an amount equal to 100% of the Net Cash Proceeds (including insurance proceeds, condemnation awards, and payments in lieu thereof) received in connection with such sales or dispositions, plus the Exit Fee as applied to the amount of such prepayment.  Nothing contained in this Section 2.3(d)(i) shall

15

permit any Loan Party to sell any Collateral other than in accordance with <u>Section 6.4</u>. In no event shall any amount paid to Lender under this <u>Section 2.3(d)(i)</u> exceed the outstanding amount of the Obligations.

(ii)     **Indebtedness**.  Within one (1) Business Day of the date of incurrence by any Loan Party or any Subsidiary of a Loan Party of any Indebtedness (other than Permitted Indebtedness), the Borrowers shall prepay the outstanding principal amount of the Obligations in accordance with <u>Section 2.3(b)</u> in an amount equal to 100% of the Net Cash Proceeds received by such Person in connection with the incurrence of such Indebtedness plus the Exit Fee as applied to the principal amount of such prepayment.  The provisions of this <u>Section 2.3(d)(ii)</u> shall not be deemed to be implied consent to any such incurrence otherwise prohibited by the terms and conditions of this Agreement.

## 2.4     <u>Interest Rates and Rates, Payments and Calculations</u>.

(a)     **Interest Rate**.  Except as provided in <u>Section 2.4(b)</u>, all Advances shall bear interest on the Daily Balance thereof at a rate equal to 9.00% per annum.  For the avoidance of doubt, for the purpose of calculating interest for purposes of this <u>Section 2.4(a)</u>, the Daily Balance shall exclude accrued but unpaid interest due or owing hereunder.

(b)     **Default Rate**.  Upon the occurrence and during the continuation of an Event of Default, all Obligations shall bear interest on the Daily Balance thereof at a per annum rate equal to five percentage points (5%) above the per annum rate otherwise applicable hereunder upon notice from Lender of its election to impose interest at the default rate.  Any such notice may impose interest at the default rate retroactively to the date of the occurrence of the related Event of Default.  For the avoidance of doubt, for the purpose of calculating interest for purposes of this <u>Section 2.4(b)</u>, Daily Balance shall exclude accrued but unpaid interest due or owing hereunder.

(c)     **Payment**.  Except to the extent provided to the contrary herein, interest, all Fees payable hereunder or under any of the other Loan Documents, and all costs, expenses, and Lender Expenses payable hereunder or under any of the other Loan Documents shall be due and payable, in arrears, on the first day of each month at any time that Obligations or the Commitment are outstanding.  Borrowers hereby authorize Lender, from time to time, without prior notice to Borrowers, to charge all interest and Fees payable hereunder or under any of the other Loan Documents (in each case, as and when due and payable), all costs, expenses, and Lender Expenses payable hereunder or under any of the other Loan Documents (in each case, as and when due and payable), all Fees provided for in <u>Section 2.8</u> (in each case, as and when due and payable), and all other payments as and when due and payable under any Loan Document to the Loan Account, which amounts thereafter shall constitute Obligations hereunder and shall accrue interest at the rate then applicable to Obligations.

(d)     **Computation**.  All interest and fees chargeable under the Loan Documents shall be computed on the basis of a 360 day year, in each case, for the actual number of days elapsed in the period during which the interest or fees accrue.

(e)     **Intent to Limit Charges to Maximum Lawful Rate**.  In no event shall the interest rate or rates payable under this Agreement, plus any other amounts paid in connection

herewith, exceed the highest rate permissible under any law that a court of competent jurisdiction shall, in a final determination, deem applicable. Loan Parties and Lender, in executing and delivering this Agreement, intend legally to agree upon the rate or rates of interest and manner of payment stated within it; provided, that, anything contained herein to the contrary notwithstanding, if said rate or rates of interest or manner of payment exceeds the maximum allowable under applicable law, then, *ipso facto*, as of the date of this Agreement, Loan Parties are and shall be liable only for the payment of such maximum as allowed by law, and payment received from Loan Parties in excess of such legal maximum, whenever received, shall be applied to reduce the principal balance of the Obligations to the extent of such excess.

### 2.5    Crediting Payments; Clearance Charge

. The receipt of any payment item by Lender shall not be considered a payment on account unless such payment item is a wire transfer of immediately available federal funds made to the Loan Account or unless and until such payment item is honored when presented for payment. Should any payment item not be honored when presented for payment, then Loan Parties shall be deemed not to have made such payment and interest shall be calculated accordingly. Anything to the contrary contained herein notwithstanding, any payment item shall be deemed received by Lender only if it is received into the Loan Account on a Business Day on or before 5:00 p.m. (Eastern time). If any payment item is received into the Loan Account on a non-Business Day or after 5:00 p.m. (Eastern time) on a Business Day, it shall be deemed to have been received by Lender as of the opening of business on the immediately following Business Day.

### 2.6    Designated Account.

(a)    Borrowers agree to establish and maintain the Designated Account with the Designated Account Bank and to receive the proceeds of the Advances requested by Borrowers and made by Lender hereunder in such Designated Account.

(b)    Borrowers agree to deposit all proceeds of sales of the Collateral into the Designated Account.

### 2.7    Maintenance of Loan Account; Statements of Obligations; Promissory Note

. Lender shall maintain true, correct and complete electronic or written records evidencing the Indebtedness and other Obligations owed by the Borrowers to Lender, in which Lender will record (i) the amount of all Advances made under this Agreement, (ii) the amount of any principal and/or interest due and payable and/or to become due and payable from the Borrowers to the Lender under this Agreement and (iii) all amounts received by Lender under this Agreement from any Loan Party. Borrower's obligation to pay the principal of, and interest on, the Advances made to the Borrower shall be evidenced by the Promissory Note executed by the Borrowers and delivered to the Lender in addition to such records.

### 2.8    Fees

. Upon entry of the Interim Order, Borrowers shall pay from the proceeds of the Facility to the Lender, the Commitment Fee and the Funding Fee as set forth in the Interim Order. All such fees

shall be non-refundable and non-avoidable obligations of the Borrowers and shall be paid by the Borrowers in cash.

**3.      CONDITIONS; TERM OF AGREEMENT.**

**3.1      <u>Conditions Precedent to Advancing the Commitment</u>**

. Lender shall not be required to advance the Interim Funding unless and until all of the conditions specified below in this <u>Section 3.1</u> (other than those pertaining to the second Advance) and <u>Section 3.2</u> shall have been satisfied or waived by Lender in its sole discretion.  Lender shall not be required to advance the second Advance unless and until all of the conditions specified below in this <u>Section 3.1</u> and in <u>Section 3.2</u> shall have been satisfied or waived by Lender in its sole discretion.

(a)      Lender shall have received a copy of the Budget.

(b)      With respect to the extension of the Interim Funding, the Bankruptcy Court shall have entered the Interim Order, and with respect to the extension of any subsequent Advance, the Bankruptcy Court shall have entered the Final Order in form and substance satisfactory to the Lender in its sole discretion and such Final Order shall be in full force and effect and shall not have been modified or amended, reversed, stayed or subject to a motion for re-argument or reconsideration, or appealed (unless, in each case set forth above, otherwise agreed to by Lender). Borrowers and Lender shall be entitled to rely in good faith upon the Interim Order or the Final Order, as applicable, and shall be permitted and required to perform their respective obligations in compliance with this Agreement notwithstanding any such objections thereto, unless the relevant order has been stayed by a court of competent jurisdiction.

(c)      Lender shall have received evidence, in form and substance reasonably acceptable to Lender, that, all necessary Uniform Commercial Code financing statements necessary to provide Lender with a valid, perfected security interest in the Collateral pledged by the Loan Parties in accordance with the Required Lien Priority have been filed or will be filed by Lender promptly upon the Effective Date.

(d)      Lender shall have received copies of UCC, tax, and judgment lien searches and title reports, in each case satisfactory to Lender in its sole discretion.

(e)      All fees required to be paid on the Closing Date under this Agreement shall have been paid or will be paid from such Advance. (Lender acknowledges that it has received the Work Fee.)

(f)      All other documents in connection with the transactions contemplated by this Agreement shall have been delivered or executed and shall be in form and substance reasonably satisfactory to Lender.

**3.2      <u>Conditions Precedent to all Extensions of Credit</u>**

. Lender shall not be required to make any Advances unless and until all of the additional conditions specified below shall have been satisfied or waived by Lender in its sole discretion.

(a)      Borrowers shall be in compliance with the conditions precedent set forth in Section 3.1 of this Agreement.

(b)      The representations and warranties of Borrowers contained in this Agreement or in the other Loan Documents shall be true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) on and as of the date of such extension of credit, as though made on and as of such date (except to the extent that such representations and warranties relate solely to an earlier date).

(c)      No Default or Event of Default shall have occurred and be continuing on the date of such extension of credit, nor shall either result from the making thereof.

(d)      No injunction, writ, restraining order, or other order of any nature restricting or prohibiting, directly or indirectly, the extending of such credit shall have been issued and remain in force by any Governmental Authority against any Loan Party or Lender; and

(e)      No action, proceeding, investigation, regulation or legislation shall have been instituted or threatened before any Governmental Authority to enjoin, restrain or prohibit, or to obtain damages in respect of, or which is related to or arises out of this Agreement or any of the other Loan Documents or the consummation of the transactions contemplated hereby and thereby and which, in Lender's sole judgment, would make it inadvisable to consummate the transactions contemplated by this Agreement or any of the other Loan Documents.

### 3.3      **Maturity**

. This Agreement shall continue in full force and effect until the payment in full of the Obligations. All Obligations, including without limitation the outstanding unpaid principal balance and all accrued and unpaid interest and all fees (including without limitation) the Exit Fee)on the Advances shall be due and payable on the Maturity Date.

### 3.4      **Effect of Maturity**

. On the Maturity Date, the Commitment of Lender to provide any additional credit hereunder shall automatically be terminated and all Obligations immediately shall become due and payable without notice or demand.  No termination of the obligations of Lender (other than payment in full of the Obligations and termination of the Commitment) shall relieve or discharge any Loan Party of its duties, obligations, or covenants hereunder or under any other Loan Document and Lender's Liens in the Collateral shall continue to secure the Obligations and shall remain in effect until all Obligations have been paid in full and the Commitment has been terminated.  When all of the Obligations have been indefeasibly paid in full in immediately available funds and Lender has no further obligation hereunder to make further Advances, Lender will, at the Borrowers' expense, execute and deliver any termination statements, lien releases, discharges of security interests, and other similar discharge or release documents (and, if applicable, in recordable form) as are reasonably necessary to release, as of record, Lender's Liens and all notices of security interests and Liens previously filed by Lender with respect to the Obligations.

4.      **REPRESENTATIONS AND WARRANTIES.**

In order to induce Lender to enter into this Agreement, each Loan Party makes the following representations and warranties to Lender.  The Loan Parties further represent that such representations and warranties shall be true, correct, and complete, in all respects, as of the Closing Date, and shall be true, correct, and complete, in all respects, as of the date of the making of each Advance (or other extension of credit) made thereafter, as though made on and as of the date of such Advance (or other extension of credit) (except to the extent that such representations and warranties relate solely to an earlier date) and such representations and warranties shall survive the execution and delivery of this Agreement:

4.1     **Due Organization and Qualification**.

(a)      Each Loan Party (i) is duly formed and existing and in good standing under the laws of the jurisdiction of its formation, (ii) where the ownership of Collateral requires such qualification, is qualified to do business in any state where the failure to be so qualified could reasonably be expected to result in a Material Adverse Change, and (iii) subject to the Bankruptcy Court's entry of the Interim Order or the Final Order, as applicable, and any limitation under the Bankruptcy Code or other debtor relief law, has all requisite power and authority to own and operate its properties, to carry on its business as now conducted and as proposed to be conducted, to enter into the Loan Documents to which it is a party and to carry out the transactions contemplated thereby.  Schedule 4.1(a) is an organizational chart showing the complete and accurate ownership structure of the Loan Parties.

(b)      Schedule 4.1(b) sets forth, for each Loan Party, its legal name (within the meaning of Section 9-503 of the UCC), jurisdiction of incorporation or formation, type of entity (for profit or non-profit), and equity owners.

4.2     **Due Authorization**

. The execution, delivery, and performance by each Loan Party of the Loan Documents to which it is a party have been duly authorized by all necessary corporate or limited liability company action on the part of such Loan Party and, with respect to each Borrower, is only subject to the Bankruptcy Court's entry of the Interim Order or Final Order, as applicable.

4.3     **Binding Obligations**

. Each Loan Document has been duly executed and delivered by each Loan Party that is a party thereto and is the legally valid and binding obligation of such Loan Party pursuant to the Final Order, enforceable against such Loan Party in accordance with its respective terms, except as enforcement may be limited by equitable principles or by bankruptcy, insolvency, reorganization, moratorium, or similar laws relating to or limiting creditors' rights generally (regardless of whether such enforceability is considered in a proceeding at law or in equity).

4.4     **Existing Prepetition Liens**

. Except for the existing Liens of Loan Parties' pre-Petition Date lenders or creditors set forth on Schedule 4.4 ("Existing Prepetition Liens"), each Loan Party has (i) good, sufficient and legal title

20

to, and (ii) good and marketable title to (in the case of personal property), all of such Loan Party's right, interest and title in the Collateral.

**4.5    Jurisdiction of Formation; Location of Chief Executive Office; Organizational; Identification Number; Commercial Tort Claims.**

(a)    The name (within the meaning of Section 9-503 of the UCC), jurisdiction of formation, tax identification numbers and organizational identification number (if any) of each Loan Party are as set forth on Schedule 4.5 (as such Schedule may be updated from time to time by notice from such Loan Party to Lender).

(b)    The chief executive office of each Loan Party is located at the address indicated on Schedule 4.5 (as such Schedule may be updated from time to time by notice from such Loan Party to Lender).  Except with respect to potential claims with respect to accounts receivable collections, the Loan Parties have no actual knowledge of the existence by them of any commercial tort claims except as described on such Schedule 4.5.

**4.6    Litigation**

.  There are no actions, suits, proceedings, claims or disputes pending or, to the knowledge of Loan Parties, threatened or contemplated, at law, in equity, in arbitration or before any Governmental Authority, by or against any Loan Party or against any of its properties or revenues that (a) purport to affect or pertain to this Agreement or any other Loan Document, or any of the transactions contemplated hereby, or (b) except as set forth on Schedule 4.6, either individually or in the aggregate, if determined adversely, could reasonably be expected to have a Material Adverse Change.

**4.7    Fraudulent Transfer**

.  No transfer of property is being made by a Loan Party and no obligation is being incurred by a Loan Party in connection with the transactions contemplated by this Agreement or the Loan Documents with the intent to hinder, delay or defraud either present or future creditors of any Loan Party.

**4.8    Indebtedness**

.  Set forth on Schedule 4.8 is a true and complete list of all Indebtedness of each Loan Party outstanding immediately prior to the Petition Date and such Schedule accurately sets forth the aggregate principal amount of such Indebtedness as of such date.

**4.9    Payment of Taxes**

.  Except as provided on Schedule 4.9, all United States federal, state and other material tax returns and reports of each Borrower required to be filed by any of them with respect to the Collateral have been timely filed, and all taxes due with respect to the period covered by such tax returns and all material assessments, fees and other governmental charges upon any Collateral that are due and payable have been paid when due and payable, other than taxes that are the subject of a Permitted

Protest.  With respect to the Collateral, the Loan Parties are not aware of any proposed tax assessment against a Borrower with respect to United States federal, state or municipal taxes.

### 4.10    Budget

.  Attached to this Agreement as <u>Exhibit B</u> is a true and complete copy of the Budget.  The Budget may be amended from time to time with the written consent of the Lender.

### 4.11    Restaurants and Site Leases.

(a)    Each restaurant location maintained by a Loan Party or a Subsidiary of a Loan Party, including but not limited to all buildings and other improvements comprising any real property, is (i) in good condition and repair and well maintained, ordinary wear and tear and casualty or condemnation events excepted; (ii) equipped and operational in all material respects for purposes of the business operated therein; (iii) to each Loan Party's knowledge, free from material structural defects; and (iv) to each Loan Party's knowledge, in compliance in all material respects with all applicable regulations relating to public safety.  The equipment, including all machinery, furniture, appliances, trade fixtures, tools, and office and record keeping equipment, of each Loan Party and their respective Subsidiaries now located at such locations includes all of the material equipment, machinery, furniture, appliances, trade fixtures, tools, and office and record keeping equipment necessary for the proper and prudent operation of such locations as "Granite City Food & Brewery" and "Cadillac Ranch" restaurants, substantially as such restaurant concept is maintained as of the Effective Date (or such other restaurant concept as may have been approved in writing in advance by the Lender in its reasonable discretion) and all such equipment is in good condition and repair and well maintained, ordinary wear and tear excepted, in each case in all material respects.

(b)    Borrowers have delivered to Lender a true, correct and complete copy of each Site Lease in effect on the Closing Date.  Each Site Lease is in full force and effect and the applicable Loan Party or Subsidiary is the sole owner of the entire leasehold interest thereunder, and such Person's interest in such Site Lease has not been assigned, transferred, subleased, mortgaged, hypothecated or otherwise encumbered, except for Permitted Liens and as set forth on <u>Schedule 4.11(b)</u>.  To each Loan Party's knowledge, no event has occurred and no condition exists that, with the giving of notice or the lapse of time or both, would constitute a material default by any Loan Party or any of their respective Subsidiaries under any Site Lease, except as set forth on <u>Schedule 4.11(b)</u>.  As of the Closing Date, each Site Lease listed on <u>Schedule 4.11(b)</u> is the only agreement between the applicable lessor and the applicable Loan Party (or Subsidiary of a Loan Party) with respect to the leasing of such restaurant location.

### 4.12    Permits

(a)    Except as set forth on <u>Schedule 4.12</u>, each Loan Party is in compliance with, and has, all Permits required for the operation of its business and for the execution, delivery and performance by, and enforcement against, such Loan Party of each Loan Document.  Except as set forth in <u>Schedule 4.12</u>, no Loan Party is in breach of or default under the provisions of any such Permit, nor is there any event, fact, condition or circumstance which, with notice or passage

of time or both, would constitute or result in any of the foregoing, which in each case could reasonably be expected to have a Material Adverse Change.

**4.13**

**4.14    Guarantor Representations**

. Each Guarantor represents to the Lender that it has no assets or, to the extent it has any assets, they are of inconsequential value.

**5.    AFFIRMATIVE COVENANTS.**

Each Loan Party covenants and agrees that, until termination of the Commitment and payment in full of the Obligations, it shall comply with each of the following:

**5.1    Financial Statements, Reports, Certificates**

. Lead Borrower shall deliver to Lender (a) promptly upon it or any Loan Party becoming aware of any Default, notice of such default; (b) promptly upon becoming aware of any litigation threatened in writing against any Loan Party or filed (other than any adversary proceeding filed in the Chapter 11 Cases), or any event (other than events of public knowledge in the Chapter 11 Cases) which could reasonably be expected to have a Material Adverse Change; and (c) at the time of a request for any Advance, a Compliance Certificate.  In addition, the Borrowers agree to maintain a system of accounting that enables the Borrowers to produce unaudited financial statements in accordance with GAAP.

**5.2    Reporting**

. Each Loan Party shall comply with the agreements, requirements, covenants and undertakings applicable to it set forth in Exhibit C, in accordance with the terms thereof.  Each Borrower will: (a) commencing on the first Wednesday to occur after the entry of the Interim Order and on the Wednesday of each week thereafter, prepare and deliver to Lender (x) a report showing actual cash receipts and disbursements of the entities covered by the Budget for the preceding Wednesday through the following Tuesday certified in writing by an Authorized Person of Lead Borrower as being true and accurate, and (y) a written explanation of all material variances (the "Weekly Budget Variance Report"); (b) update and roll-forward the proposed Budget no less frequently than every four (4) weeks or at such other interval as agreed to by the Lender and the Borrowers, each such amended Budget to be delivered to Lender no later than the third Business Day of each week for the week immediately prior; and (c) participate in a weekly conference call, if required, commencing on the third Business Day of each week following the Petition Date regarding the Budget, management issues, sale process, and other matters.

**5.3    Material Contracts; Sale Offers**

. Other than defaults existing as of the date hereof, Lead Borrower shall deliver to Lender (a) promptly upon any Loan Party becoming aware of any default (other than the filing of the Chapter 11 Case) under any Material Contract to which any Loan Party is a party, notice of such defaults, and (b) promptly notify Lender upon any written offer by a third party to purchase all or

substantially all of the assets of the Borrowers, or to purchase all or substantially all of the equity of the Borrowers or to refinance the Facility.  If requested by Lender, the chief restructuring officer and/or the chief financial officer of the Borrowers shall participate in a conference call with Lender (as long as no Event of Default has occurred and is continuing, such call shall be no more often than weekly), following the Petition Date regarding management issues and other matters.

### 5.4    Existence

.  At all times, each Loan Party shall (a) maintain and preserve in full force and effect its existence (including being in good standing in its jurisdiction of incorporation or formation) and (b) maintain all its rights and franchises, licenses and permits, except where the failure to maintain any such rights and franchises, or licenses and permits could not reasonably be expected to result in a Material Adverse Change.

### 5.5    Maintenance of Properties; Permits

.  Each Loan Party shall (a) maintain and preserve the Collateral that is necessary to the proper conduct of its business in good working order and condition, ordinary wear, tear, and casualty excepted, (b) comply with the material provisions of all material leases related to the Collateral pledged by it, so as to prevent the loss or forfeiture thereof, unless (i) such provisions are the subject of a Permitted Protest, or (ii) such lease is a Site Lease that is rejected in the exercise of such Borrower's reasonable judgment, or a Site Lease described on Schedule 4.11(b); and (c) maintain, comply with and keep in full force and effect its Permits with respect to the Collateral pledged by it.  Each Loan Party shall comply with, and obtain and maintain, all Permits required for the operation of its business.

### 5.6    Taxes

.  Each Loan Party shall cause all assessments and taxes imposed, levied, or assessed after the Petition Date against any Collateral to be paid in full, before delinquency or before the expiration of any extension period, except to the extent that any such assessments and taxes shall be paid as part of a plan of reorganization approved by Lender or subject to a Permitted Protest.

### 5.7    Insurance

.  At the relevant Loan Party's expense, each Loan Party shall maintain insurance with respect to the Collateral in which such Loan Party has any right, interest or title, covering loss or damage by fire, theft, explosion, and all other hazards and risks as ordinarily are insured against by other Persons engaged in the same or similar businesses and consistent with such Loan Party's insurance policies in effect on the Petition Date.  Each Loan Party shall maintain general liability, director's and officer's liability insurance, fiduciary liability insurance, employment practices liability insurance, title insurance as well as insurance against larceny, embezzlement, and criminal misappropriation.  All such policies of insurance shall be with responsible and reputable insurance companies and in such amounts as is carried generally in accordance with sound business practice by companies in similar businesses similarly situated and located and in any event in amount, adequacy and scope reasonably satisfactory to Lender.  All property insurance policies and title insurance policies covering the Collateral are to be made payable to Lender for the benefit of Lender, in case of loss, pursuant to a standard loss payable endorsement with a standard non-

contributory "lender" or "secured party" clause and are to contain such other provisions as Lender may reasonably require to fully protect Lender's interest in the Collateral and any payments to be made under such policies.  All certificates of property and general liability insurance are to be delivered to Lender, with the loss payable (but only in respect of Collateral) and additional insured endorsements in favor of Lender and shall provide for not less than 30 days (10 days in the case of non-payment) prior written notice to Lender of the exercise of any right of cancellation. If any Loan Party fails to maintain the insurance required by this <u>Section 5.7</u>, Lender may arrange for such insurance, but at the Borrowers' expense and without any responsibility on Lender's part for obtaining the insurance, the solvency of the insurance companies, the adequacy of the coverage, or the collection of claims.  Each relevant Loan Party shall give Lender prompt notice of any loss covered by its casualty or business interruption insurance.  Upon the occurrence and during the continuance of an Event of Default, Lender shall have the sole right to file claims under any property and general liability insurance policies in respect of the Collateral, to receive, receipt and give acquittance for any payments that may be payable thereunder, and to execute any and all endorsements, receipts, releases, assignments, reassignments or other documents that may be necessary to effect the collection, compromise or settlement of any claims under any such insurance policies.

###### 5.8   <u>Inspection</u>

. Each Loan Party shall permit Lender and each of its duly authorized representatives or agent to visit any of its properties and inspect any of its Collateral or books and records, to conduct appraisals and valuations, to examine and make copies of its books and records, and to discuss its affairs, finances, and accounts with, and to be advised as to the same by, its officers and employees at such reasonable times and intervals as Lender may reasonably require and, so long as no Default or Event of Default exists, with reasonable prior notice to the applicable Loan Party.  Such inspections shall not occur more than once every three (3) months; provided that no such limitation shall apply in the event that a Default or Event of Default exists.

###### 5.9   <u>Environmental</u>

. Each Loan Party shall:

(a)     Keep the Collateral owned or operated by it free of any Environmental Liens,

(b)     Comply with all applicable Environmental Laws, except where the failure to so comply could not reasonably be expected result in a Material Adverse Change.

(c)     Promptly notify Lender of any release of which such Loan Party has knowledge of a Hazardous Material in any reportable quantity from or onto property owned or operated by any Loan Party that could reasonably be expected to result in a Material Adverse Change, and

(d)     Promptly, but in any event within five (5) Business Days of its receipt thereof, provide Lender with written notice of any of the following:  (i) written notice that an Environmental Lien has been filed against any of the Collateral, (ii) commencement of any Environmental Action or written notice that an Environmental Action will be filed against any

Loan Party, and (iii) written notice of a violation, citation, or other administrative order from a Governmental Authority.

### 5.10    Compliance with Laws

. Each Loan Party shall comply with the requirements of all applicable laws, rules, regulations, and orders of any Governmental Authority, other than laws, rules, regulations, and orders the non-compliance with which, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Change.

### 5.11    Disclosure Updates

. Each Loan Party shall promptly and in no event later than three (3) Business Days after obtaining actual knowledge thereof, notify Lender of any written information, exhibit, or report (other than materials marked as drafts and forward-looking information and projections and information of a general economic nature and general information about such Loan Party's industry) furnished to Lender contained, at the time it was furnished, any untrue statement of a material fact or omitted to state any material fact necessary to make the statements contained therein (taken as a whole) not misleading in light of the circumstances in which made.  The foregoing to the contrary notwithstanding, any notification pursuant to the foregoing provision will not cure or remedy the effect of the prior untrue statement of a material fact or omission of any material fact nor shall any such notification have the effect of amending or modifying this Agreement or any of the Schedules hereto.

### 5.12    Formation of Subsidiaries

. No Loan Party may form any direct or indirect Subsidiary or acquire any direct or indirect Subsidiary after the Closing Date without the consent of Lender, in its sole but reasonable discretion, unless such Subsidiary is joined as a Borrower under this Agreement and executes any such documentation reasonably requested by Lender.

### 5.13    Further Assurances

. Upon reasonable written notice from Lender, each Loan Party shall execute or deliver to Lender any and all financing statements, fixture filings, endorsements of certificates of title, mortgages, deeds of trust, and all other documents (collectively, the "Additional Documents") that Lender may reasonably request in form and substance reasonably satisfactory to Lender, to create, perfect, and continue perfected or to better perfect Lender's Liens in all the Collateral (whether now owned or hereafter arising or acquired, tangible or intangible, real or personal).

### 5.14    Staffing

. Each Loan Party shall maintain at all times an appropriate and necessary staff to carry out its business with respect to the Collateral in compliance with all other applicable laws and with training and experience and in number equal to or greater than would be customarily maintained by businesses engaging in similar activities.

### 5.15    Budget

. Borrowers shall comply with the Budget and the Permitted Variance.

## 6.    NEGATIVE COVENANTS.

Each Loan Party covenants and agrees that, until termination of the Commitment and payment in full of the Obligations, such Loan Party will not do any of the following without the prior consent of Lender in its reasonable discretion:

### 6.1    <u>Indebtedness</u>

. Except for Permitted Indebtedness, create, incur, assume, suffer to exist, guarantee, or otherwise become or remain, directly or indirectly, liable with respect to any Indebtedness with respect to the Collateral.

### 6.2    <u>Liens</u>

.  Create, incur, assume, or suffer to exist on or after the date of this Agreement, directly or indirectly, any Lien on or with respect to any of the Collateral, of any kind, whether now owned or hereafter acquired, or any income or profits therefrom, except for Liens (a) created by the Loan Documents, (b) set forth on <u>Schedule 4.4</u> and (c) any other Lien that is the subject of a Permitted Protest.

### 6.3    <u>Restrictions on Fundamental Changes</u>

. Except in connection with a plan of reorganization or a Sale or Sales approved by the Bankruptcy Court or otherwise with the prior written consent of Lender:

(a)    no Loan Party shall enter into any merger, consolidation, reorganization, or recapitalization, or reclassify its equity interests,

(b)    no Borrower shall liquidate, wind up, or dissolve itself (or suffer any liquidation or dissolution), and

(c)    no Borrower shall suspend or close a substantial portion of its business.

### 6.4    <u>Disposal of Assets</u>

. Except for a Sale approved by the Bankruptcy Court, convey, sell, lease, license, assign, transfer, or otherwise dispose of (or enter into an agreement to convey, sell, lease, license, assign, transfer, or otherwise dispose of) any Collateral held by any Loan Party, other than the sale or replacement of Collateral in the Ordinary Course.  For the avoidance of doubt, any proceeds of such disposed Collateral shall be used to replace such Collateral or satisfy the Obligations consistent with <u>Section 2.3(d)(i)</u>.

### 6.5    <u>Change Name</u>

. Change any Loan Party's name, state of organization, or organizational identity.

### 6.6    <u>Nature of Business</u>

. Make any change in the nature of any Loan Party's business or acquire any properties or assets that are not reasonably related to the conduct of such business activities; <u>provided</u>, that the foregoing shall not prevent any Loan Party from (i) engaging in any business that is reasonably related or ancillary to its or their business, or (ii) complying with any requirement of the Bankruptcy Code.

### 6.7   <u>Material Leases or Contracts; Amendments</u>

.  Change or modify the material terms of any material lease or contract in connection with Collateral except in a manner that could not reasonably be expected to result in a Material Adverse Change, or materially alter any Organizational Documents, except, in each case, with the prior written consent of Lender.

### 6.8   <u>Change of Control</u>

. Cause, permit, or suffer, directly or indirectly, any Change of Control.

### 6.9   <u>Accounting Methods</u>

. Modify or change its fiscal year or its method of accounting (other than as may be required to conform to GAAP).

### 6.10   <u>Transactions with Affiliates</u>

. Directly or indirectly enter into or permit to exist any transaction with any other Borrower or any Affiliate of any Loan Party, except for transactions that are in the Ordinary Course of such Loan Party's business, including intercompany transactions and various employee incentive and retention programs (in compliance with the Bankruptcy Code) among the Loan Parties and their Affiliates.

### 6.11   <u>Use of Advances</u>

. Use the proceeds of the Advances for any purpose other than to pay (i) the Fees and Lender's Expenses, and (ii) such other costs, expenses and fees for Borrowers' conduct of their respective businesses and operations and other post-Petition Date expenses, including the fees and expenses of the administration of the Borrowers' Chapter 11 Cases in accordance with the Budget.

### 6.12   <u>Limitation on Capital Expenditures</u>

. Except for Permitted Indebtedness, make or incur any Capital Expenditure.

### 6.13   <u>Chapter 11 Case</u>

. Seek, consent or suffer to exist (i) any modification, stay, vacation or amendment to the Interim Order or the Final Order, as applicable; (ii) in connection with the Collateral, a priority claim for any administrative expense or unsecured claim against any Borrower (now existing or hereafter arising of any kind or nature whatsoever, including, without limitation, any administrative expense of any kind specified in Section 503(b), 506(b) or (c) or 507(b) of the Bankruptcy Code) equal to

or superior to the priority claim of Lender in respect to the Collateral; and (iii) any Lien on Collateral having a priority equal or superior to the Liens in favor of Lender in respect of the Obligations, other than as required under a purchase agreement with respect to the good faith deposit thereunder.

### 6.14   Plan

. Propose and/or support any plan or reorganization that fails to pay in full in cash all Obligations on the effective date of said plan or is otherwise not reasonably acceptable to Lender.

## 7.   GUARANTY.

### 7.1   Guaranty

. Each Guarantor unconditionally and irrevocably guarantees to the Lender the full and prompt payment when due (whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise) and performance of the Obligations (the "Guaranteed Obligations").

### 7.2   Separate Obligation

. Each Guarantor acknowledges and agrees that, in providing benefits to Borrowers, the Lender is relying upon the enforceability of this Section 7 and the Guaranteed Obligations.  The fact that the guaranty is set forth in this Agreement rather than in a separate guaranty document is for the convenience of Borrowers and Guarantors and shall in no way impair or adversely affect the rights or benefits of the Lender under this Section 7.

### 7.3   Limitation of Guaranty

. To the extent that any court of competent jurisdiction shall impose by final judgment under applicable Laws (including Sections 544 and 548 of the Bankruptcy Code) any limitations on the amount of any Guarantor's liability with respect to the Guaranteed Obligations that the Lender can enforce under this Section 7, Lender accepts such limitation on the amount of such Guarantor's liability hereunder only to the extent needed to make this Section 7 fully enforceable and non-avoidable.

### 7.4   Liability of Guarantors

. The liability of each Guarantor under this Section 7 shall be irrevocable, absolute, independent and unconditional, and shall not be affected by any circumstance that might constitute a discharge of a surety or Guarantor other than the indefeasible payment and performance in full of all Guaranteed Obligations.  In furtherance of the foregoing and without limiting the generality thereof, each Guarantor agrees as follows:

(a)     such Guarantor's liability hereunder shall be the immediate, direct, and primary obligation of such Guarantor and shall not be contingent upon the Lender 's exercise or enforcement of any remedy it may have against Borrowers or any other Person, or against any Collateral or any security for any Guaranteed Obligations;

(b)      this guarantee is a guaranty of payment when due and not merely of collectability;

(c)      such Guarantor's payment of a portion, but not all, of the Guaranteed Obligations shall in no way limit, affect, modify or abridge such Guarantor's liability for any portion of the Guaranteed Obligations remaining unsatisfied; and

(d)      such Guarantor's liability with respect to the Guaranteed Obligations shall remain in full force and effect without regard to, and shall not be impaired or affected by, nor shall such Guarantor be exonerated or discharged by, any of the following events:

(i)      any proceeding under the Bankruptcy Code (except to the extent set forth in Section 7.3);

(ii)      any limitation, discharge, or cessation of the liability of Borrowers or any other Person for any Guaranteed Obligations due to any applicable law, or any invalidity or unenforceability in whole or in part of any of the Guaranteed Obligations or the Loan Documents;

(iii)      any merger, acquisition, consolidation or change in structure of Borrowers, any Subsidiary thereof or any other Guarantor or Person, or any sale, lease, transfer or other disposition of any or all of the assets of Borrowers or any other Person;

(iv)      any assignment or other transfer, in whole or in part, of the Lender's interests in and rights under this Agreement (including this Section 7) or the other Loan Documents;

(v)      any claim, defense, counterclaim or setoff, other than that of prior performance, that Borrowers, such Guarantor, any other Guarantor or any other Person may have or assert, including any defense of incapacity or lack of corporate or other authority to execute any of the Loan Documents;

(vi)      the amendment, modification, renewal, extension, cancellation or surrender of any Loan Document or any Guaranteed Obligations; or

(vii)      the Lender's exercise or non-exercise of any power, right or remedy with respect to any Guaranteed Obligations.

**7.5      Consents of Guarantors**

. Each Guarantor hereby unconditionally consents and agrees that, without notice to or further assent from such Guarantor:

(a)      the principal amount of the Guaranteed Obligations may be increased or decreased and additional indebtedness or obligations of Borrowers under the Loan Documents may be incurred and the time, manner, place or terms of any payment under any Loan Document may be extended or changed, by one or more amendments, modifications, renewals or extensions of any Loan Document or otherwise;

(b)      the time for Borrowers' (or any other Person's) performance of or compliance with any term, covenant or agreement on its part to be performed or observed under any Loan Document may be extended, or such performance or compliance waived, or failure in or departure from such performance or compliance consented to, all in such manner and upon such terms as the Lender may deem proper;

(c)      the Lender may request and accept other guaranties and may take and hold security as collateral for the Guaranteed Obligations, and may, from time to time, in whole or in part, exchange, sell, surrender, release, subordinate, modify, waive, rescind, compromise or extend such other guaranties or security and may permit or consent to any such action or the result of any such action, and may apply such security and direct the order or manner of sale thereof; and

(d)      the Lender may exercise, or waive or otherwise refrain from exercising, any other right, remedy, power or privilege even if the exercise thereof affects or eliminates any right of subrogation or any other right of such Guarantor against Borrowers.

**7.6      Guarantor's Waivers**

. Each Guarantor waives and agrees not to assert:

(a)      any defense arising by reason of any lack of corporate or other authority or any other defense of Borrowers, such Guarantor or any other Person;

(b)      any and all notice of the acceptance of this Guaranty, and any and all notice of the creation, renewal, modification, extension or accrual of the Guaranteed Obligations. The Guaranteed Obligations shall conclusively be deemed to have been created, contracted, incurred and permitted to exist in reliance upon this Guaranty. Each Guarantor waives promptness, diligence, presentment, protest, demand for payment, notice of default, dishonor or nonpayment and all other notices to or upon Borrowers, each Guarantor or any other Person with respect to the Guaranteed Obligations.

**7.7      Continuing Guaranty**

. This Guaranty is a continuing guaranty and agreement of subordination and shall continue in effect and be binding upon each Guarantor until termination of the Commitment and payment and performance in full of the Guarantied Obligations.

**7.8      Reinstatement**

. This Guaranty shall continue to be effective or shall be reinstated and revived, as the case may be, if, for any reason, any payment of the Guarantied Obligations by or on behalf of Borrowers (or receipt of any proceeds of Collateral) shall be rescinded, invalidated, declared to be fraudulent or preferential, set aside, voided or otherwise required to be repaid to Borrowers, its estate, trustee, receiver or any other Person (including under the Bankruptcy Code), or must otherwise be restored by the Lender in the Chapter 11 Cases of the Borrowers.

8.      **EVENTS OF DEFAULT.**

    8.1    <u>**Event of Default**</u>

. Any one or more of the following events shall constitute an event of default following giving of any applicable notice (if required) and the expiration of the applicable cure period (if any) (each, an "<u>Event of Default</u>") under this Agreement:

        (a)    Any Loan Party shall fail to pay any Obligation to the Lender when due, including, but not limited to, the payment of principal, interest or any fees or costs due to the Lender under this Agreement or any Loan Document;

        (b)    Any Loan Party shall fail to comply with its obligations under <u>Sections 5.1, 5.2, 5.3</u>, <u>5.4</u>, <u>5.8</u>, <u>5.11</u>, <u>5.12</u>, <u>Section 6</u> and/or <u>Section 9</u>;

        (c)    Other than as set forth in any other sub-section of this <u>Section 8.1</u>, any Loan Party, as applicable, shall fail to perform, or otherwise breach, any of its respective covenants or obligations contained in this Agreement, which failure or breach shall continue for ten (10) Business Days after the earlier to occur of (i) the date on which such failure to comply is known or reasonably should have become known to any officer of the relevant Loan Party, or (ii) the date on which Lender shall have notified the relevant Loan Party of such failure; <u>provided, however</u>, that such ten (10) Business Day period shall not apply in the case of any failure which is not capable of being cured at all or within such ten (10) Business Day period;

        (d)    Any representation or warranty made by any Loan Party in this Agreement or in any agreement, certificate, instrument or financial statement or other statement delivered to the Lender pursuant to or in connection with this Agreement shall prove to have been incorrect in any material respect when made or deemed made, which failure or breach shall continue for ten (10) Business Days after the date upon which such default is known or reasonably should have become known to any officer of the relevant Loan Party or it has received a written notice of such failure or breach from the Lender;

        (e)    Except upon the Lender's prior written request or with the Lender's express prior written consent (and no such consent shall be implied from any other action, inaction, or acquiescence of the Lender), any Loan Party shall file a motion with the Bankruptcy Court or any other court with jurisdiction in the matter seeking an order, or an order is otherwise entered, modifying, reversing, revoking, staying, rescinding, vacating, or amending the Interim Order, the Final Order or any of the Loan Documents;

        (f)    Borrowers shall file or obtain Bankruptcy Court approval of a disclosure statement for a plan of reorganization that does not propose to pay in full in cash all Obligations on the effective date of said plan;

        (g)    Any Loan Party shall file any motion or application, or the Bankruptcy Court allows the motion or application of any other Person, which seeks approval for or allowance of any claim, lien, security interest ranking equal or senior in priority to the claims, liens and security interests granted to the Lender under the Interim Order or the Final Order, as applicable, or with respect to the Collateral or any such equal or prior claim, lien, or security interest shall be

established in any manner, except, in any case, as expressly permitted under the Interim Order or the Final Order, as applicable;

(h)     The Interim Order or the Final Order, as applicable, shall cease to be in full force and effect from and after the date of entry thereof by the Bankruptcy Court;

(i)     The occurrence of any default or event of default under the Interim Order or the Final Order, as applicable, and the continuance thereof after any grace or cure period provided in such order or granted by order of a court in the Bankruptcy Cases;

(j)     The entry of an order which provides relief from the automatic stay otherwise imposed pursuant to Section 362 of the Bankruptcy Code, which order permits any creditor, other than the Lender (other than any creditor having a Lien on specific equipment that is senior to the Lender), to realize upon, or to exercise any right or remedy with respect to, the Collateral;

(k)     Conversion of the Chapter 11 Case to a Chapter 7 case under the Bankruptcy Code, or dismissal of the Chapter 11 Case or any subsequent Chapter 7 case either voluntarily or involuntarily and the Obligations are not simultaneously indefeasibly paid in full;

(l)     The Interim Order or the Final Order, as applicable, is modified, reversed, revoked, remanded, stayed, rescinded, vacated or amended on appeal or by the Bankruptcy Court without the prior written consent of Lender (and no such consent shall be implied from any other authorization or acquiescence by Lender);

(m)     A trustee or an examiner with special powers is appointed pursuant to Section 1104 of the Bankruptcy Code;

(n)     A chapter 11 plan is confirmed that does not provide for the payment in full in cash of all Obligations on the effective date thereof, together with releases, exculpations, waivers and indemnifications for the Lender and Lender Related Persons; or

(o)     The occurrence of a Change of Control.

**8.2     <u>Rights and Remedies</u>**.

(a)     Upon the occurrence and during the continuance of an Event of Default, and notwithstanding Section 362 of the Bankruptcy Code and without further order of the Bankruptcy Court or any other court or the initiation of any further proceeding with the Loan Parties except as provided in this <u>Section 8.2</u>, in addition to any other rights or remedies provided for hereunder or under any other Loan Document (including the Interim Order or the Final Order, as applicable) or by the UCC or any other applicable law, the Lender may do any one or more of the following:

(i)     declare the Obligations, whether evidenced by this Agreement or by any of the other Loan Documents immediately due and payable, whereupon the same shall become and be immediately due and payable, without presentment, demand, protest, or further notice or other requirements of any kind, all of which are hereby expressly waived by the Loan Parties;

(ii)     upon three (3) Business Days' notice to the Loan Parties, Borrowers' lead bankruptcy counsel and the United States Trustee and lead counsel for any creditors' committee, terminate the Borrowers' ability to use Cash Collateral other than amounts used for purposes and in a manner otherwise permitted by this Agreement and held in operating accounts subject to deposit account control agreements in favor of Lender until such time as Borrowers are no longer in possession of their revenue generating properties;

(iii)     charge interest at the Default Rate;

(iv)     upon five (5) days' prior written notice (which period shall be deemed to be reasonable notice) to the Loan Parties, Borrower's lead bankruptcy counsel and the United States Trustee and lead counsel for any creditors' committee, obtain and liquidate the Collateral.  If notice of disposition of Collateral is required by law, ten (10) days prior notice by the Lender to the Loan Parties designating the time and place of any public sale or the time after which any private sale or other intended disposition of Collateral is to be made, shall be deemed to be reasonable notice thereof and shall constitute "authenticated notice of disposition" within the meaning of Section 9-611 of the UCC, and the Loan Parties waive any other notice.  The Lender may bid for and purchase the Collateral at any public sale.  The Lender may bid and purchase any Collateral at a private sale if the Collateral in question has a readily ascertainable market value;

(v)     require the applicable Loan Party to assemble all of the Collateral constituting personal property without judicial process pursuant to Section 9-609 of the UCC;

(vi)     upon five (5) days' prior written notice (which period shall be deemed to be reasonable notice) to the Loan Parties and the Borrowers' lead bankruptcy counsel and the United States Trustee and lead counsel for any creditors' committee, take possession of all Collateral constituting tangible personal property without judicial process pursuant to Section 9-609 of the UCC; and

(vii)     exercise any of its other rights under the Loan Documents, any rights granted under the Interim Order or Final Order, as applicable, and applicable law.

(b)     To the extent an Event of Default occurs as a result of the Loan Parties' failure to indefeasibly satisfy the Obligations in full by the Stated Maturity Date, the Loan Parties waive any right (a) to any notice period set forth in Section 8.2 (except to the extent a notice period is required by operation of law) and (b) to challenge (i) whether or not the Maturity Date or an Event of Default has occurred, (ii) the Lender's exercise of its rights and remedies against the Collateral, including without limitation, any foreclosure through a state court proceeding, and (iii) the applicability of the Default Rate or the Stated Maturity Date Fee.

### 8.3     Application of Proceeds upon Event of Default

.  Lender shall apply the cash proceeds actually received from any foreclosure sale, other disposition of the Collateral upon an Event of Default as follows: (i) first, to Lender Expenses consisting of reasonable attorneys' fees and all expenses (including, but not limited to, court costs,

reasonable advertising expenses, auctioneer's fees, premiums for any required bonds, auditor's fees, amounts advanced for taxes and other reasonable expenses) incurred by the Lender in attempting to enforce this Agreement or in the prosecution or defense of any action or proceeding related to the subject matter of this Agreement; (ii) second, to the discharge of any accrued but unpaid Fees (including, but not limited to, the Exit Fee and the Stated Maturity Date Fee), (iii) third, to the discharge of any accrued but unpaid interest on the Obligations, (iv) fourth, to the outstanding principal balance of any Obligations, (v) fifth, to the satisfaction of the other security interests and liens of record which are inferior to the security interest created by this Agreement, in order of their priority; and (vi) sixth, to pay any remaining surplus to Lead Borrower, on behalf of the Loan Parties collectively.

### 8.4   Remedies Cumulative

. The rights and remedies of Lender under this Agreement, the other Loan Documents, and all other agreements shall be cumulative.  Lender shall have all other rights and remedies not inconsistent herewith as provided under the UCC, by law, or in equity.  No exercise by Lender of one right or remedy shall be deemed an election, and no waiver by Lender of any Event of Default shall be deemed a continuing waiver.  No delay by Lender shall constitute a waiver, election, or acquiescence by it.

### 8.5   Acknowledgments

**.** Notwithstanding anything herein to the contrary, Lender acknowledges and agrees that in no event shall an "event of default" or "default" under the Prepetition Credit Agreement, any Site Lease or any other Indebtedness of any Borrower (other than the Indebtedness evidenced by this Agreement and the other Loan Documents), cause a Default or Event of Default hereunder, or cause a breach of any covenant described in Section 5 or Section 6 of this Agreement.

## 9.   PRIORITY AND COLLATERAL SECURITY

### 9.1   Superpriority Claims; Subordination in favor of Lender Liens.

(a)   Each Borrower warrants and covenants that, except as otherwise expressly provided in this paragraph, upon the entry of the Interim Order or the Final Order, as applicable, the Obligations of any Borrower under the Loan Documents (including without limitation the Roll Up Loan):

(i)   Shall, in accordance with section 364(c)(1) of the Bankruptcy Code, constitute allowed senior administrative expense claims against each Borrower and their estates (the "Superpriority Claims") with priority in payment over any and all administrative expenses at any time existing or arising, of any kind or nature whatsoever, including, without limitation, the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including, but not limited to, Sections 105, 326, 328, 330, 331, 503(b), 506(c) (subject to the entry of the Final Order with respect to Section 506(c) only), 507(a), 507(b), 726, 1113 and 1114 of the Bankruptcy Code or otherwise, including those resulting from the conversion of any of the Chapter 11 Cases pursuant to Section 1112 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment; provided, however, that

the Superpriority Claims shall be subject to and subordinate to only the Carve-Out; provided, further that the Superpriority Claims shall have recourse to and be payable from all prepetition and postpetition property and assets of the Debtors and the estates and all Collateral and all proceeds thereof, and (a) any and all avoidance power claims or causes of action under Sections 544, 545, 547, 548 through 551 and 553(b) of the Bankruptcy Code (the "Avoidance Actions") and the proceeds thereof, (b) prepetition tort claims, including claims against the Debtors' current and former directors and officers (if any) and the proceeds thereof; and (c) any deposit in connection with a proposed Sale (whether terminated or otherwise) that becomes property of the Debtors' estates (a "Sale Deposit") subject, however, only to the senior lien rights of a stalking horse purchaser and such stalking horse bid protections as may be approved by the Bankruptcy Court;

(ii)    shall be secured by valid, enforceable, non-avoidable and perfected priming liens on and security interests in favor of the Lender in all Collateral in which any Borrower has any right, title or interest, in accordance with the Required Lien Priority.

(b)    In the event any of the Collateral is transferred to any Borrower, such transfer shall be subject in all respects to the Lender's Liens.

(c)    The Superpriority Claims referred to in this Section 9.1 shall have the priority afforded to such Superpriority Claims in the Interim Order and upon entry thereof, the Final Order.

## 9.2    Grant of Security Interest in the Collateral

. To secure the payment and performance of the Obligations, each Borrower hereby grants, collaterally pledges and assigns to Lender the following:

(a)    *Liens Priming the Prepetition Credit Liens*.  Pursuant to Section 364(d)(1) of the Bankruptcy Code, valid, binding, continuing, enforceable, non-avoidable automatically and fully perfected first priority senior priming liens and security interests in all Collateral, regardless of where located, which senior priming liens and security interests in favor of the Lender shall be senior to all Prepetition Credit Liens.  For the avoidance of doubt, as a result of the priming of the Prepetition Credit Liens pursuant to this Interim Order, the Lender shall have a first priority senior priming lien and security interest in, among other things, (A) all of the assets of GCFB and its debtor and non-debtor Subsidiaries, including, but not limited to, the "Collateral" as defined in the Prepetition Credit Agreement, and (B) the Debtors' prepetition and postpetition commercial tort claims, including but not limited to all claims and causes of action (i) against the Debtors' officers and directors, and (ii) all other prepetition tort claims, and the proceeds thereof (regardless of whether such proceeds arise from damages to the Prepetition Collateral).

(b)    *Liens on Unencumbered Property*.  Pursuant to Section 364(c)(2) of the Bankruptcy Code, valid, binding, continuing, enforceable, non-avoidable automatically and fully perfected first priority liens on and security interests in all Collateral that is not otherwise subject to any Permitted Prior Lien.  As used herein, the term "Permitted Prior Lien" shall mean any valid, enforceable, and non-avoidable liens on and security interests in the Collateral that (A) were perfected prior to the Petition Date (or perfected on or after the Petition Date to the extent permitted

by Section 546(b) of the Bankruptcy Code), (B) are not subject to avoidance, disallowance, or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law, and (C) are senior in priority to the Lender's Liens under applicable law and after giving effect to any lien release, subordination or inter-creditor agreements; provided, however, that the Lender's Liens shall have priority over all Prepetition Credit Liens; and

      (c)    *Liens Junior to Certain Other Liens*.  Pursuant to Section 364(c)(3) of the Bankruptcy Code, valid, enforceable, non-avoidable automatically and fully perfected junior liens on and security interests in all Collateral (other than as set forth in clauses (i) and (ii)) subordinate only to the Permitted Prior Liens.

The Lien priorities set forth above shall be referred to as the "Required Lien Priorities".

### 9.3    Representations and Warranties in Connection with Security Interest

.  Each Loan Party represents and warrants to the Lender as follows:

      (a)    Such Loan Party has full right and power to grant to the Lender a perfected, security interest and Lien, in accordance with the Required Lien Priority, on such Loan Party's respective interests in the Collateral pursuant to this Agreement and the other Loan Documents, and with respect to Borrowers upon entry of the Interim Order.

      (b)    Upon (i) the execution and delivery of this Agreement, (ii) the filing of the necessary financing statements and other appropriate filings or recordations and/or delivery of any necessary certificates, as applicable, and (iii) the entry of the Interim Order, the Lender will have a good, valid and perfected Lien and security interest in the Collateral granted by the applicable Loan Party, in accordance with the Required Lien Priority, subject to no transfer or other restrictions or Liens of any kind in favor of any other Person.

      (c)    As of the Closing Date, no financing statement, mortgage or any other evidence of lien relating to any of the Collateral granted by such Loan Party is on file in any public office except those on behalf of the Lender, other than the filings made by the Loan Parties' pre-Petition Date lenders or creditors as referenced in Schedule 4.4.

      (d)    As of the Closing Date, such Loan Party is not party or otherwise subject to any agreement, document or instrument that conflicts with this Section 9.3.

### 9.4    Covenants with Respect to Collateral

.  As long as any Obligations are outstanding, each Loan Party covenants and agrees as follows:

      (a)    Such Loan Party shall not sell, transfer, give, assign or in any other manner dispose of all or any portion of, or any interest in, any of the Collateral, except to the extent permitted by this Agreement.  Such Loan Party shall not permit or suffer to exist any Liens or security interests encumbering any of the Collateral other than as permitted under this Agreement.

      (b)    Lead Borrower shall inform the Lender of any default or event of default under any agreement comprising the Collateral that materially and adversely impacts the Collateral

37

or its value as soon as practicable upon any Loan Party becoming aware of any such default or event of default, and shall exercise remedies thereunder at the instruction of, or with the prior written consent of, the Lender.

(c)     Such Loan Party shall not consolidate with or merge with or into any other corporation, or liquidate or dissolve, without the prior written consent of the Lender. Such Loan Party shall not sell all or substantially all of its assets, except as otherwise permitted by this Agreement or otherwise with the prior written consent of the Lender.

(d)     Such Loan Party shall not change the jurisdiction of its formation without the prior written consent of the Lender. Such Loan Party shall not change its name or the location of its principal executive office without giving the Lender thirty (30) days' prior written notice.

(e)     The Collateral shall be kept only at the locations set forth on <u>Schedule 9.4(e)</u> and shall not be moved from such locations without the prior consent of the Lender, except for ordinary course activities incidental to the operation of the Loan Parties businesses.

(f)     With respect to any Deposit Account of a Loan Party, the relevant Loan Party shall cause the depositary institution maintaining such account to enter into a Control Agreement (in such depositary institution's form thereof or such other form acceptable to such depositary institution) in favor of the Lender within thirty (30) days after the funding of the first Advance, as such date may be extended by the Lender in its reasonable discretion.

**9.5     Lender's Ability to Perform Obligations on Behalf of Loan Parties with Respect to the Collateral**

. The Lender shall have the right, but not the obligation, to perform on such Loan Party's behalf any or all of such Loan Party's obligations under this Agreement with respect to the Collateral, when such obligations are due, at the expense, for the account and at the sole risk of the applicable Loan Party.

**9.6     Filing of Financing Statements**

. Each Loan Party irrevocably authorizes the Lender to prepare and file financing statements provided for by the UCC, including, without limitation, describing such property as "all assets, whether now owned or hereafter acquired, developed or created" or words of similar effect, to perfect the Lender's security interest in the Collateral, in all jurisdictions in which the Lender believes in its sole opinion that such filing is appropriate. Each Loan Party also irrevocably authorizes the Lender to file such continuation statements and amendments and to take such other action as may be required or appropriate, in either case in Lender's sole judgment, in order to perfect and to continue the perfection of Lender's security interests in the Collateral, unless prohibited by law.

**9.7     No Discharge; Survival of Claims**

. Pursuant to Section 1141(d)(4) of the Bankruptcy Code, the Borrowers hereby waive any discharge of the Obligations with respect to any plan of reorganization that shall not provide for the indefeasible payment in full in cash of the Obligations under this Agreement.

## 10.    WAIVERS; INDEMNIFICATION.

### 10.1    <u>Demand; Protest; etc</u>

.  To the extent permitted by applicable law or as expressly required pursuant to the terms of this Agreement, each Loan Party waives demand, protest, notice of protest, notice of default or dishonor, notice of payment and nonpayment, nonpayment at maturity, release, compromise, settlement, extension, or renewal of documents, instruments, chattel paper, and guarantees at any time held by Lender on which such Loan Party may in any way be liable.

### 10.2    <u>Lender's Liability for Collateral</u>

.  As long as Lender complies with its obligations, if any, under the UCC, Lender shall not in any way or manner be liable or responsible for:  (i) the safekeeping of the Collateral, (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (iii) any diminution in the value thereof, or (iv) any act or default of any carrier, warehouseman, bailee, forwarding agency, or other Person.  All risk of loss, damage, or destruction of the Collateral shall be borne by the Loan Parties, except any thereof resulting from the gross negligence, bad faith or willful misconduct of Lender as finally determined by a court of competent jurisdiction.

### 10.3    <u>Indemnification</u>

.  Each Loan Party shall pay, indemnify, defend, and hold the Lender Related Persons (each, an "<u>Indemnified Person</u>") harmless (to the fullest extent permitted by law) from and against any and all claims, demands, suits, actions, investigations, proceedings, liabilities, fines, costs, penalties, and actual damages, and all reasonable out-of-pocket fees and disbursements of attorneys, experts, or consultants and all other costs and expenses actually incurred in connection therewith or in connection with the enforcement of this indemnification (as and when they are incurred and irrespective of whether suit is brought), at any time asserted against, imposed upon, or incurred by any of them (a) in connection with or as a result of or related to the execution and delivery, enforcement, performance, or administration (including any restructuring or workout with respect hereto) of this Agreement, any of the other Loan Documents, or the transactions contemplated hereby or thereby or the monitoring of the Loan Parties' compliance with the terms of the Loan Documents, (b) with respect to any investigation, litigation, or proceeding related to this Agreement, any other Loan Document, or the use of the proceeds of the credit provided hereunder (irrespective of whether any Indemnified Person is a party thereto), or any act, omission, event, or circumstance in any manner related thereto, and (c) in connection with or arising out of any presence or release of Hazardous Materials at, on, under, to or from any Collateral or any Environmental Actions, Environmental Liabilities or Remedial Actions related in any way to any Collateral (each and all of the foregoing, the "<u>Indemnified Liabilities</u>").  The foregoing to the contrary notwithstanding, the Loan Parties shall have no obligation to any Indemnified Person under this <u>Section 10.3</u> with respect to any Indemnified Liability that a court of competent jurisdiction finally determines to have resulted from the gross negligence or willful misconduct of such Indemnified Person or its officers, directors, employees, attorneys, or agents.  This provision shall survive the termination of this Agreement and the repayment of the Obligations.  If any Indemnified Person makes any payment to any other Indemnified Person with respect to an Indemnified Liability as to which any Loan Party was required to indemnify the Indemnified

Person receiving such payment, the Indemnified Person making such payment is entitled to be indemnified and reimbursed by such Loan Party with respect thereto. **WITHOUT LIMITATION OF THE FOREGOING, THE INDEMNITY ABOVE SHALL APPLY TO EACH INDEMNIFIED PERSON WITH RESPECT TO INDEMNIFIED LIABILITIES WHICH IN WHOLE OR IN PART ARE CAUSED BY OR ARISE OUT OF ANY NEGLIGENT ACT OR OMISSION OF SUCH INDEMNIFIED PERSON.**

**11.    NOTICES.**

All notices or demands relating to this Agreement or any other Loan Document shall be in writing and shall be personally delivered or sent by registered or certified mail (postage prepaid, return receipt requested), overnight courier, or electronic mail (at such email addresses as a party may designate in accordance herewith).  In the case of notices or demands to any party hereunder or any service of process to any party hereunder, they shall be sent to the respective addresses set forth below:

If to any Loan Party:

Granite City Food & Brewery Ltd.
3500 American Blvd W., Suite 450
Bloomington, MN 55431
Attn: Mr. Nathan G. Hjelseth
Telephone: (952) 646-2307
Email address: nhjelseth@gcfb.net

With a copy, which shall not constitute notice to:

Briggs and Morgan, Professional Association
2200 IDS Center
80 South 8th Street
Minneapolis, MN 55402
Attn: James Jorissen
Telephone:  612-977-8400
Email:  JJorissen@Briggs.com

Attn: Brett Anderson
Telephone:  612-977-8400
Email:  BAnderson@Briggs.com

If to Lender:

JMB Capital Partners Lending, LLC
1999 Avenue of the Stars, Suite 2040
Los Angeles, CA 90067
Attn:  Vikas Tandon
Telephone:  310-286-2929

Facsimile:  310-286-6662

with copies to:

Arent Fox LLP
1301 Avenue of the Americas, 42nd Fl.
New York, NY 10019-6040
Attn:  Rob Hirsh
Telephone:  212-457-5430
Email:  robert.hirsh@arentfox.com

Attn:  Jordana Renert
Telephone:  212-457-5476
Email:  jordana.renert@arentfox.com

Any party hereto may change the address at which they are to receive notices hereunder, by notice in writing in the foregoing manner given to the other party.  All notices or demands sent in accordance with this Section 11, shall be deemed received on the earlier of the date of actual receipt or three (3) Business Days after the deposit thereof in the mail; provided, that (a) notices sent by overnight courier service shall be deemed to have been given when received, and (b) notices by electronic mail shall be deemed received when sent upon confirmation of transmission as evidenced by a delivery receipt or similar electronic mail function.  If any notice, disclosure, or report is required to be delivered pursuant to the terms of this Agreement on a day that is not a Business Day, such notice, disclosure, or report shall be deemed to have been required to be delivered on the immediately following Business Day.

## 12.    CHOICE OF LAW AND VENUE; JURY TRIAL WAIVER.

(a)    THE VALIDITY OF THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS (UNLESS EXPRESSLY PROVIDED TO THE CONTRARY IN ANOTHER LOAN DOCUMENT IN RESPECT OF SUCH OTHER LOAN DOCUMENT), THE CONSTRUCTION, INTERPRETATION, AND ENFORCEMENT HEREOF AND THEREOF, AND THE RIGHTS OF THE PARTIES HERETO AND THERETO WITH RESPECT TO ALL MATTERS ARISING HEREUNDER OR THEREUNDER OR RELATED HERETO OR THERETO SHALL BE DETERMINED UNDER, GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK.

(b)    THE PARTIES AGREE THAT ALL ACTIONS OR PROCEEDINGS ARISING IN CONNECTION WITH THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS SHALL BE TRIED AND LITIGATED ONLY IN THE BANKRUPTCY COURT AND, TO THE EXTENT PERMITTED BY APPLICABLE LAW, FEDERAL COURTS LOCATED IN NEW YORK; PROVIDED, HOWEVER, THAT ANY SUIT SEEKING ENFORCEMENT AGAINST ANY COLLATERAL OR OTHER PROPERTY MAY BE BROUGHT, AT LENDER'S OPTION, IN THE COURTS OF ANY JURISDICTION WHERE LENDER ELECTS TO BRING SUCH ACTION OR WHERE SUCH COLLATERAL OR OTHER PROPERTY MAY BE FOUND.  EACH LOAN PARTY AND LENDER WAIVE, TO THE EXTENT PERMITTED UNDER APPLICABLE LAW, ANY RIGHT EACH MAY HAVE

TO ASSERT THE DOCTRINE OF <u>FORUM NON CONVENIENS</u> OR TO OBJECT TO VENUE TO THE EXTENT ANY PROCEEDING IS BROUGHT IN ACCORDANCE WITH THIS <u>SECTION 12(b); PROVIDED</u>, <u>FURTHER</u>, <u>HOWEVER</u>, THAT ALL PARTIES HEREBY AGREE THAT THEY HAVE CONSENTED TO THE JURISDICTION OF THE BANKRUPTCY COURT AND THAT THE BANKRUPTCY COURT WILL RETAIN EXCLUSIVE JURISDICTION WITH RESPECT TO ALL DISPUTES SO LONG AS THE CHAPTER 11 CASE REMAINS PENDING.

       (c)    TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, EACH LOAN PARTY AND LENDER HEREBY WAIVE THEIR RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF ANY OF THE LOAN DOCUMENTS OR ANY OF THE TRANSACTIONS CONTEMPLATED THEREIN, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW OR STATUTORY CLAIMS. EACH LOAN PARTY AND LENDER REPRESENT THAT EACH SUCH PARTY HAS REVIEWED THIS WAIVER AND EACH KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL. IN THE EVENT OF LITIGATION, A COPY OF THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

## 13.    AMENDMENTS; WAIVERS; SUCCESSORS; INDEMNIFICATION.

### 13.1    <u>Amendments and Waivers</u>

. No amendment, waiver or other modification of any provision of this Agreement or any other Loan Document, and no consent with respect to any departure by any Loan Party therefrom, shall be effective unless the same shall be in writing and signed by Lender and Loan Parties that are party thereto and then any such waiver or consent shall be effective, but only in the specific instance and for the specific purpose for which given.

### 13.2    <u>No Waivers; Cumulative Remedies</u>

. No failure by Lender to exercise any right, remedy, or option under this Agreement or any other Loan Document, or delay by Lender in exercising the same, will operate as a waiver thereof. No waiver by Lender will be effective unless it is in writing, and then only to the extent specifically stated. No waiver by Lender on any occasion shall affect or diminish Lender's rights thereafter to require strict performance by Loan Parties of any provision of this Agreement. Lender's rights under this Agreement and the other Loan Documents will be cumulative and not exclusive of any other right or remedy that Lender may have.

### 13.3    <u>Successors</u>

. This Agreement shall bind and inure to the benefit of the respective successors and assigns of each of the parties; <u>provided</u> that no Loan Party may assign this Agreement or any rights or duties hereunder without Lender's prior written consent and such consent shall not, unless otherwise provided in such consent, release any Loan Party from its Obligations. Any assignment by a Loan Party which is not explicitly permitted hereunder shall be absolutely void *ab initio*. Lender may assign all or part of its rights and duties hereunder without consent from any other party. Lender

may assign this Agreement and the other Loan Documents and its rights and duties hereunder and thereunder or assign any Advances or Commitment (in whole or in part) to an Affiliate without notice to or consent of any Loan Party.

## 14.    GENERAL PROVISIONS.

### 14.1    Effectiveness

. This Agreement shall be binding and deemed effective when executed by the Loan Parties and Lender.

### 14.2    Section Headings

. Headings and numbers have been set forth herein for convenience only.  Unless the contrary is compelled by the context, everything contained in each Section applies equally to this entire Agreement.

### 14.3    Interpretation

. Neither this Agreement nor any uncertainty or ambiguity herein shall be construed against Lender or any Loan Party, whether under any rule of construction or otherwise.  On the contrary, this Agreement has been reviewed by all parties and shall be construed and interpreted according to the ordinary meaning of the words used so as to accomplish fairly the purposes and intentions of all parties hereto.

### 14.4    Severability of Provisions

. Each provision of this Agreement shall be severable from every other provision of this Agreement for the purpose of determining the legal enforceability of any specific provision.

### 14.5    Debtor-Creditor Relationship

. The relationship between Lender, on the one hand, and each Loan Party, on the other hand, is solely that of creditor and debtor, as applicable.  Lender does not have (and shall not be deemed to have) any fiduciary relationship or duty to any Loan Party arising out of or in connection with the Loan Documents or the transactions contemplated thereby, and there is no agency or joint venture relationship between Lender, on the one hand, and Loan Parties, on the other hand, by virtue of any Loan Document or any transaction contemplated therein.

### 14.6    Counterparts; Electronic Execution

. This Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same Agreement. Delivery of an executed counterpart of this Agreement by facsimile or other electronic method of transmission shall be equally as effective as delivery of an original executed counterpart of this Agreement.  Any party delivering an executed counterpart of this Agreement by facsimile or other electronic method of transmission also shall deliver an original executed counterpart of this

Agreement but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Agreement. The foregoing shall apply to each other Loan Document *mutatis mutandis*.

### 14.7    Revival and Reinstatement of Obligations

. If the incurrence or payment of the Obligations by Loan Parties or the transfer to Lender of any property should for any reason subsequently be asserted, or declared, to be void or voidable under any state or federal law relating to creditors' rights, including provisions of the Bankruptcy Code relating to fraudulent conveyances, preferences, or other voidable or recoverable payments of money or transfers of property (each, a "Voidable Transfer"), and if Lender is required to repay or restore, in whole or in part, any such Voidable Transfer, or elects to do so upon the reasonable advice of its counsel, then, as to any such Voidable Transfer, or the amount thereof that Lender is required or elects to repay or restore, and as to all reasonable and actual out-of-pocket costs, expenses, and attorneys' fees of Lender related thereto, the liability of Loan Parties automatically shall be revived, reinstated, and restored and shall exist as though such Voidable Transfer had never been made.

### 14.8    Lender Expenses

. Notwithstanding the Work Fee, the Borrowers agree to pay any and all Lender Expenses (exclusive of those covered by the Work Fee) promptly after written demand therefor by Lender and that such Obligations shall survive payment or satisfaction in full of all other Obligations.

### 14.9    Integration

. This Agreement, together with the other Loan Documents, reflects the entire understanding of the parties with respect to the transactions contemplated hereby and shall not be contradicted or qualified by any other agreement, oral or written, before the date hereof.

## 15.    JOINT AND SEVERAL LIABILITY AMONG BORROWERS

Each Borrower acknowledges, represents and warrants the following:

### 15.1    Inducement

. Lender has been induced to make the Advances to Borrowers in part based upon the assurances by each Borrower that such Borrower desires that the Advances be honored and enforced as separate obligations of such Borrower, should Lender desire to do so.

### 15.2    Combined Liability

. Notwithstanding the foregoing, the Advances and the other Obligations constitute the joint and several obligations of each and every Borrower, and Lender may at its option enforce the entire amount of the Advances and the other obligations of any Borrower against any one or more Borrowers.

### 15.3    Separate Exercise of Remedies

. Lender may exercise remedies against each Borrower and its property separately, whether or not Lender exercises remedies against any other Borrower or its property.  Lender may enforce one or more Borrower's Obligations without enforcing any other Borrower's Obligations.  Any failure or inability of Lender to enforce one or more Borrower's Obligations shall not in any way limit Lender's right to enforce the Obligations of any other Borrower.  If Lender forecloses or exercises similar remedies on any Collateral, then such foreclosure or similar remedy shall be deemed to reduce the balance of the Advances only to the extent of the cash proceeds actually realized by Lender from such foreclosure or similar remedy or, if applicable, Lender's credit bid at such sale, regardless of the effect of such foreclosure or similar remedy on the Advances secured by such Collateral under the applicable state law.

[Signature pages follow.]

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed and delivered as of the date first above written.

<u>**BORROWERS**</u>**:**

**GRANITE CITY FOOD & BREWERY, LTD., a Minnesota corporation**

By: _____

Name:_____

Title: _____

**GRANITE CITY RESTAURANT OPERATIONS, INC., a Minnesota corporation**

By: _____

Name:_____

Title: _____

**GRANITE CITY OF KANSAS LTD., a Kansas corporation**

By: _____

Name:_____

Title: _____

**GRANITE CITY OF INDIANA, INC., an Indiana corporation**

By: _____

Name:_____

Title: _____

**GRANITE CITY—OHIO, INC., an Ohio corporation**

By: _____

Name:_____

Title: _____

[Signature Page to Granite City DIP Loan and Security Agreement]

**GRANITE CITY OF MARYLAND, INC., a Maryland corporation**

By: _____
Name:_____
Title: _____

**GUARANTORS:**

**GRANITE CITY--ORLAND PARK, INC., an Illinois corporation**

By: _____
Name:_____
Title: _____

**GRANITE CITY – ARKANSAS, INC., a Minnesota corporation**

By: _____
Name:_____
Title: _____

**GRANITE CITY—CREVE COEUR, INC., a Missouri corporation**

By: _____
Name:_____
Title: _____

**GRANITE CITY—ROCKFORD, INC., an Illinois corporation**

By: _____
Name:_____
Title: _____

[Signature Page to Granite City DIP Loan and Security Agreement]

**GRANITE CITY—PEORIA, INC., an Illinois
corporation**


By: _____

Name:_____

Title: _____

**<u>LENDER:</u>**

**JMB CAPITAL PARTNERS LENDING, LLC**

By: _____
Name:  Vikas Tandon
Title:   Manager

## <u>EXHIBIT A</u>

### <u>Form of Compliance Certificate</u>

Date: _____, 2019

This Compliance Certificate (this "<u>Certificate</u>") is given to JMB Capital Partners Lending LLC, a California limited liability company (together with its successors and assigns, the "<u>Lender</u>"), by Granite City Food & Brewery Ltd. a Minnesota corporation, in its capacity as Lead Borrower, pursuant to <u>Section 5.1</u> of that certain Senior Secured, Super-Priority Debtor-In-Possession Loan and Securities Agreement dated as of December __, 2019 (as the same has been amended through the date hereof, the "<u>Loan Agreement</u>") among Granite City Food & Brewery Ltd., the other Borrowers party thereto, their Affiliates party thereto as Guarantors, and JMB Capital Partners Lending, LLC, as Lender.  Capitalized terms used and not defined herein have the meanings set forth in the Loan Agreement.

The Lead Borrower hereby certifies that:

(a)     Borrowers are in compliance with the conditions precedent set forth in <u>Section 3.1</u> and <u>3.2</u> of the Loan Agreement.

(b)     The representations and warranties of the Loan Parties contained in the Loan Agreement and in the other Loan Documents are true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) on and as of the date of such extension of credit, as though made on and as of such date (except to the extent that such representations and warranties relate solely to an earlier date).

(c)     No Default or Event of Default shall have occurred and be continuing on the requested funding date, nor shall either result from the making thereof.

(d)     The Interim Order or the Final Order, as applicable, has been entered by the Bankruptcy Court in form and substance satisfactory to Lender in its sole discretion, and remains in full force and effect on the date hereof and has not been, from the time of the entry of such order, modified or amended (unless otherwise approved by the Lender), reversed, stayed or subject to a motion for re-argument or reconsideration, or appealed.

(e)     No injunction, writ, restraining order, or other order of any nature restricting or prohibiting, directly or indirectly, has been issued by any Governmental Authority against any Loan Party or Lender.

(f)     No action, proceeding, investigation, regulation or legislation has been instituted or threatened before any Governmental Authority to enjoin, restrain or prohibit, or to obtain damages in respect of, or which is related to or arises out of the Loan Agreement or any of the other Loan Documents or the consummation of the transactions contemplated thereby.

**IN WITNESS WHEREOF**, the Lead Borrower has caused this Certificate to be executed this
_____ day of _____, 2019.

**GRANITE CITY FOOD & BREWERY, LTD**., a
Minnesota corporation

By: _____
Name:_____
Title: _____

**<u>EXHIBIT B</u>**

**<u>Budget</u>**

See attached.

## **EXHIBIT C**

**Reporting Requirements**

(a)      **Financial Reports**.  Lead Borrower shall furnish to Lender, in a form satisfactory to Lender, in its sole discretion, as soon as available and in any event within twenty-one (21) days after the end of each calendar month:

(i)      unaudited consolidated financial statements for such calendar month and/or quarter, as applicable, of the Borrowers consisting of a balance sheet, and related statements of income, retained earnings, cash flows and owners' equity, all of which shall be certified on behalf of the Borrowers by an Authorized Person as being in compliance with this paragraph (a);

(ii)      an operating report for Borrowers, including a detailed comparison of the actual year-to-date operating results against the Budget; and

(iii)      solely with respect to the last month of each fiscal quarter, a management report signed by an Authorized Person of Borrowers, describing in reasonable detail the Borrowers' operations and financial condition for such month.

For the avoidance of doubt, the reports required under sub-sections (a)(i) and (a)(iii) above may consist of the monthly operating reports as filed in the Chapter 11 Case.

All financial statements shall be prepared, and shall be complete, correct and fairly presenting in all material respects, in each case in accordance with GAAP consistently applied with prior periods the financial position and results of operations of the Borrower (provided that interim financial statements shall not be required to have footnote disclosure and may be subject to normal year-end adjustments).

(b)      **Other Materials**.  The Loan Parties shall furnish to Lender, in form and substance satisfactory to Lender, as soon as available and in any event within five (5) Business Days after the preparation, receipt or issuance thereof or request therefor by Lender, (A) copies of any reports and management control letters provided by the Loan Parties' independent accountants and (B) such additional information, documents, statements, and other materials as Lender may request from time to time in its sole discretion.

(c)      **Notices**.  Lead Borrower or the Loan Parties for itself, promptly, and in any event within five (5) Business Days after any such Loan Party or any Authorized Person thereof obtains knowledge thereof, shall notify Lender in writing of:

(i)      any pending or threatened action, suit, proceeding or investigation involving a Loan Party or Subsidiary thereof, or any such Person's property to the extent the amount in controversy exceeds $250,000 in the aggregate or any injunctive relief is sought;

(ii)      (A) the receipt of any notice or request from any Governmental Authority regarding any liability or claim equal to or exceeding $250,000 in the aggregate or (B) any

Exhibit C - 1

material action taken or threatened to be taken by any Governmental Authority (or any notice of any of the foregoing);

(iii)    any notice regarding termination by the lessor of any lease of material real property (other than any such termination resulting from the scheduled expiration thereof, pursuant to the originally agreed upon terms) or of any senior officer, or the loss, termination or expiration of any Material Contract to which any Loan Party or its assets are bound; and

(iv)    the filing, recording or assessment of any federal, state, local or foreign tax Lien against any Collateral (other than real estate taxes and municipal charges related to Collateral consisting of real property) or any Loan Party.

(d)    **Updates**.  The Loan Parties shall furnish to Lender revisions to the schedules to any Loan Document to the extent necessary or appropriate; provided, that delivery or receipt thereof by Lender shall not constitute a waiver by Lender or a cure of any Default or Event of Default resulting therefrom, or result in an amendment or modification of such schedules.

(e)    **Material Adverse Change**.  Promptly upon an Authorized Person of any Loan Party obtaining knowledge of any development or event pertaining to such Loan Party that has caused, or which could reasonably be expected to cause, a Material Adverse Change with respect to which notice is not otherwise required to be given pursuant to this Exhibit C, a certificate signed by an Authorized Person of Lead Borrower or the relevant Loan Party setting forth the details of such development or event and stating what action the relevant Loan Party has taken or proposes to take with respect thereto.

(f)    **Management Letters**.  Promptly after the receipt thereof by any Loan Party, copies of any management letters and any reports as to material inadequacies in accounting controls (including reports as to the absence of any such inadequacies) submitted to such Loan Party by its independent certified public accountants in connection with any audit of such Loan Party made by such accountants.

(g)    **Other Information**.  Any other information, including financial statements and computations, relating to the performance of any Loan Party that Lender may from time to time request in its sole discretion and which is reasonably capable of being obtained, produced or generated by such Loan Party.

Exhibit C - 2

## EXHIBIT D

**Request for Advance**

JMB Capital Partners Lending, LLC                    Advance Request No. ___
1999 Avenue of the Stars, Suite 2040
Los Angeles, CA 90067
Attention:  Vikas Tandon

Ladies and Gentlemen:

The undersigned, as Lead Borrower, executes and delivers this Request for Advance ("Request") in connection with the Senior Secured, Super-Priority Debtor-In-Possession Loan and Security Agreement, dated as of December __, 2019 (as amended, restated, supplemented, replaced, renewed or otherwise modified from time to time, the "Loan Agreement") by and among Granite City Food & Brewery Ltd., a Minnesota corporation, the other Borrowers party thereto, their Affiliates party thereto as Guarantors, and JMB Capital Partners Lending, LLC, as Lender. Capitalized terms used in this Request without definition shall have the same meanings herein as they have in the Loan Agreement.  This Request constitutes a Loan Document.

Pursuant to Section 2.2 of the Loan Agreement, Borrowers hereby request an Advance in the amount of _____ Million Dollars ($_____) on _____, 2019.

Lead Borrower hereby represents, warrants to Lender as follows:

1.      As of this date, each Loan Party is in compliance with all of the terms and conditions of the Loan Agreement and the other Loan Documents and no default or Event of Default thereunder exists, nor shall result from the making of the Advance requested hereunder.

2.      Each Loan Party's representations and warranties set forth in the Loan Agreement, the other Loan Documents and any other related document are true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) on and as of the date hereof, as though made on and as of such date (except to the extent that such representations and warranties relate solely to an earlier date).

3.      As of the date of this Request, the sum of the outstanding principal under the Facility (after giving effect to the Advance and pledge to be made on such date pursuant to this Request) plus the amount requested in any outstanding but unfunded Request for Advances does not violate Section 2.1 of the Loan Agreement.

[Signature Page Follows]

Exhibit D - 1

**<u>BORROWERS</u>:**

**GRANITE CITY FOOD & BREWERY, LTD**., a Minnesota corporation

By: _____
Name:_____
Title: _____

[Signature Page to Request for Advance]

Schedules

Schedule A-1 – Loan Account

Schedule A-2 – Authorized Persons

Schedule D-1 – Designated Account and Designated Account Bank

Schedule 4.1(a) –Organizational Chart

Schedule 4.1(b) – Borrowers and Equity Ownership

Schedule 4.4 – Existing Prepetition Liens

Schedule 4.5 – Uniform Commercial Code Filing Information

Schedule 4.6 – Litigation

Schedule 4.8 – Existing Indebtedness

Schedule 4.9 – Taxes

Schedule 4.11(b) – Site Leases and Site Lease Defaults

Schedule 4.12 –Maintenance of Properties; Permits

Schedule 9.4(e) – Collateral Locations

[List of Schedules]

# EXHIBIT B

**Granite City Food & Brewery**
DIP Budget

| Week Ending / Projected Week (FY WEEK) / Budget v. Actual | 12/24/2019 Week 1 Budget | 12/31/2019 Week 2 Budget | 1/7/2020 Week 3 Budget | 1/14/2020 Week 4 Budget | 1/21/2020 Week 5 Budget | 1/28/2020 Week 6 Budget | 2/4/2020 Week 7 Budget | 2/11/2020 Week 8 Budget | 2/18/2020 Week 9 Budget | 2/25/2020 Week 10 Budget | 3/3/2020 Week 11 Budget | 3/10/2020 Week 12 Budget | 3/17/2020 Week 13 Budget | Post-Petition Period Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Cash receipts (Sales + 8.122% sales tax) | $ 2,539,926 | $ 2,245,195 | $ 2,295,105 | $ 2,295,105 | $ 2,295,105 | $ 2,295,105 | $ 2,239,208 | $ - | $ - | $ - | $ - | $ - | $ - | $ 16,204,749 |
| Wort Sales | | | | | | | | - | | | | | | - |
| Costco/Sam's Gift Card | 50,400 | 259,200 | 97,200 | 23,200 | 48,300 | 4,200 | | - | | | | | | 482,500 |
| Other Gift Cards Sold | 300,310 | 60,350 | 21,164 | 18,801 | 14,452 | 15,535 | 13,173 | - | | | | | | 443,785 |
| Gift cards redeemed | (173,849) | (180,069) | (154,766) | (131,609) | (117,056) | (113,387) | (106,372) | - | | | | | | (977,108) |
| Other | (16,444) | (14,536) | (5,000) | (5,000) | (5,000) | (5,000) | (5,000) | - | | | | | | (55,980) |
| **Total Cash Receipts from Operations** | **2,700,344** | **2,370,140** | **2,253,703** | **2,200,497** | **2,235,801** | **2,196,453** | **2,141,009** | **-** | | | | | | **16,097,947** |
| | | | | | | | | | | | | | | |
| Food & Beverage | 549,948 | 566,899 | 640,184 | 611,718 | 540,735 | 580,984 | 580,984 | - | | | | | | 4,071,452 |
| Payroll Related | 97,134 | 1,584,180 | 102,205 | 1,520,059 | 98,068 | 1,550,083 | 100,005 | - | | | | | | 5,051,735 |
| Incentive Compensation | | | | | | | | | | | | | | - |
| Rent (includes CAM) | - | 1,055,732 | - | - | - | - | 1,055,732 | - | | | | | | 2,111,464 |
| Rent - Payment Delayed/settlements | | | | | | | | | | | | | | - |
| (Holding)/Repaying Rents in Arrears | | | | | | | | | | | | | | - |
| Sales Tax | 329,557 | 40,354 | 266,812 | 266,812 | 266,812 | 266,812 | 138,131 | - | | | | | | 1,575,290 |
| Insurance | 49,377 | 42,877 | 64,434 | 52,819 | 57,869 | 52,819 | 99,532 | - | | | | | | 419,729 |
| Property Tax | 110,281 | 104,744 | - | 21,759 | - | - | 69,047 | - | | | | | | 305,831 |
| Capital Expenditures | 15,000 | 15,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | - | | | | | | 155,000 |
| Great Western Bank | - | | | | | | | | | | | | | - |
| Credit Card Fees | | | 153,315 | 35,000 | | | 137,527 | - | | | | | | 325,842 |
| Other Operating | (8,693) | (8,693) | 51,037 | (15,719) | (15,719) | 276 | 45,822 | - | | | | | | 48,310 |
| Non-Prime | 42,555 | 36,251 | 12,365 | 33,575 | 33,575 | 33,575 | 75,966 | - | | | | | | 267,863 |
| Store-Level Direct Operating | 147,995 | 130,822 | 173,051 | 173,051 | 173,051 | 173,051 | 129,826 | - | | | | | | 1,100,848 |
| Repair & Maintenance | 44,633 | 39,454 | 56,846 | 56,846 | 56,846 | 56,846 | 44,556 | - | | | | | | 356,030 |
| Utilities | 77,521 | 68,526 | 106,922 | 106,922 | 106,922 | 106,922 | 87,347 | - | | | | | | 661,082 |
| Legal Fees | - | | 22,117 | | | | | | | | | | | 22,117 |
| Marketing | 4,827 | 4,827 | 40,123 | 22,376 | 22,376 | 23,339 | 37,331 | - | | | | | | 155,199 |
| Corp Credit Card | 90,000 | - | - | - | 90,000 | - | - | | | | | | | 180,000 |
| (Holding)/Repaying AP in Arrears | | | | | | | | | | | | | | - |
| **Cash Disbursements from Operations** | **1,550,136** | **3,680,974** | **1,714,411** | **2,910,220** | **1,455,536** | **2,869,707** | **2,626,807** | **-** | | | | | | **16,807,792** |
| | | | | | | | | | | | | | | |
| **Operating Net Cash Flow** | **1,150,207** | **(1,310,834)** | **539,292** | **(709,723)** | **780,265** | **(673,254)** | **(485,798)** | **-** | | | | | | **(709,845)** |
| | | | | | | | | | | | | | | |
| **Chaper 11 Related Cash Flows** | | | | | | | | | | | | | | |
| Debtor Bankruptcy Counsel | $ 60,000 | $ 40,000 | $ 70,000 | $ 70,000 | $ 90,000 | $ 80,000 | $ 80,000 | $ 40,000 | $ 35,000 | $ 25,000 | $ 20,000 | $ 20,000 | $ 20,000 | $ 650,000 |
| Debtor Investment Bank | | | 50,000 | | | | | | | | | | | 50,000 |
| Restructuring Advisor | 37,500 | 37,500 | 37,500 | 37,500 | 37,500 | 37,500 | 37,500 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 412,500 |
| Noticing Agent | 23,220 | 3,836 | 3,836 | 3,836 | 3,836 | 3,836 | 3,836 | 3,836 | 3,836 | 3,836 | 3,836 | 3,836 | 3,836 | 69,252 |
| Court Filing Fee/ US Trustee Fee | | | | | | | 60,000 | | | | | | | 60,000 |
| DIP Fees/ Interest/ Principal | | 11,250 | | | | | 37,500 | | | | | | | 48,750 |
| Hilco | | | | | | | | 225,000 | | | | | | 225,000 |
| Lender Professionals | 18,750 | 18,750 | 18,750 | 18,750 | 18,750 | 18,750 | 18,750 | 18,750 | 18,750 | 18,750 | 18,750 | 18,750 | 18,750 | 243,750 |
| DIP Lender Professionals | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | | | | | | | 210,000 |
| Creditor Committee | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 200,000 |
| Utility Deposits | 150,000 | | | | | | | | | | | | | 150,000 |
| Sale/Financing Success Fee | 25,000 | | 10,000 | | | | | | | | | | | 35,000 |
| KERP/ KEIP | - | | | | | | | | | | | | | - |
| Landlord Cure | - | | | | | | | | | | | | | - |
| Property Tax Cure | - | | | | | | | | | | | | | - |
| Sale Proceeds | - | | | | | | | | | | | | | - |
| Other Food Vendor Cure (PACA) | - | | | | | | | | | | | | | - |
| **Total Bankruptcy Costs** | **364,470** | **161,336** | **240,086** | **180,086** | **200,086** | **287,586** | **415,086** | **97,586** | **92,586** | **82,586** | **77,586** | **77,586** | **77,586** | **2,354,252** |
| | | | | | | | | | | | | | | |
| **Net Cash Flows** | **785,737** | **(1,472,170)** | **299,206** | **(889,809)** | **580,179** | **(960,840)** | **(900,884)** | **(97,586)** | **(92,586)** | **(82,586)** | **(77,586)** | **(77,586)** | **(77,586)** | **(3,064,097)** |
| | | | | | | | | | | | | | | |
| Beginning Cash Balance | $ 2,209,111 | $ 5,494,849 | $ 4,022,679 | $ 5,321,885 | $ 4,432,076 | $ 5,012,255 | $ 4,051,415 | $ 3,150,530 | $ 3,052,944 | $ 2,960,358 | $ 2,877,772 | $ 2,800,186 | $ 2,722,600 | $ 2,209,111 |
| Change in Cash | 785,737 | (1,472,170) | 299,206 | (889,809) | 580,179 | (960,840) | (900,884) | (97,586) | (92,586) | (82,586) | (77,586) | (77,586) | (77,586) | (3,064,097) |
| DIP Facility Draw / (Repayment) | 2,500,000 | | 1,000,000 | | | | | | | | | | | 3,500,000 |
| **Ending Cash Balance** | **$ 5,494,849** | **$ 4,022,679** | **$ 5,321,885** | **$ 4,432,076** | **$ 5,012,255** | **$ 4,051,415** | **$ 3,150,530** | **$ 3,052,944** | **$ 2,960,358** | **$ 2,877,772** | **$ 2,800,186** | **$ 2,722,600** | **$ 2,645,014** | **$ 2,645,014** |
| | | | | | | | | | | | | | | |
| **Running DIP Balance** | **4,000,000** | **4,000,000** | **5,000,000** | **5,000,000** | **5,000,000** | **5,000,000** | **5,000,000** | **5,000,000** | **5,000,000** | **5,000,000** | **5,000,000** | **5,000,000** | **5,000,000** | **5,000,000** |

# EXHIBIT C

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MINNESOTA

---

| | |
|---|---|
| In re: | Joint Administration Pending |
| Granite City Food & Brewery Ltd. | Case No. 19-43756 |
| Debtor. | Chapter 11 Cases |

---

| | |
|---|---|
| In re: | Joint Administration Pending |
| Granite City Restaurant Operations, Inc. | Case No. 19-43757 |
| Debtor. | Chapter 11 Cases |

---

| | |
|---|---|
| In re: | Joint Administration Pending |
| Granite City of Indiana, Inc. | Case No. 19-43758 |
| Debtor. | Chapter 11 Cases |

---

| | |
|---|---|
| In re: | Joint Administration Pending |
| Granite City of Maryland, Inc. | Case No. 19-43760 |
| Debtor. | Chapter 11 Cases |

---

| | |
|---|---|
| In re: | Joint Administration Pending |
| Granite City of Kansas Ltd. | Case No. 19-43759 |
| Debtor. | Chapter 11 Cases |

---

**INTERIM ORDER (I) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING (II) GRANTING SECURITY INTERESTS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS; (III) GRANTING ADEQUATE PROTECTION TO CERTAIN PREPETITION SECURED CREDIT PARTIES; (IV) MODIFYING THE AUTOMATIC STAY; (V) AUTHORIZING**

**THE DEBTORS TO ENTER INTO AGREEMENTS WITH JMB CAPITAL PARTNERS
LENDING, LLC; (VI) AUTHORIZING USE OF CASH COLLATERAL; (VII)
SCHEDULING A FINAL HEARING AND (VIII) GRANTING RELATED RELIEF**

THIS MATTER having come before the Court upon the motion (the "**Motion**")[1] of the

above-captioned debtors (the "**Debtors**" or the "**Borrowers**") in the above-captioned chapter 11

cases (the "**Chapter 11 Cases**"), pursuant to sections 105, 361, 362, 363, 364 and 507 of title 11

of the United States Code, (11 U.S.C. §§ 101 *et seq.*, as amended, the "**Bankruptcy Code**"), Rules

2002 and 4001 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and

Local Rules 2002-1 and 4001-2, seeking entry of an interim order (the "**Interim Order**") and a

final order (the "**Final Order**") granting *inter alia*:

i.　　authority, pursuant to sections 105, 363, and 364(c) and 364(d) of the Bankruptcy

Code, for each of the Debtors, jointly and severally, to obtain senior secured postpetition financing

("**DIP Facility**") in an aggregate principal amount of up to $5,000,000 (the "**Delayed Draw

Commitment**") (of which (x) upon entry of this Interim Order and satisfaction or waiver of the

borrowing conditions set forth in the DIP Loan Documents (as defined below), $4,000,000 (the

"**Interim Advance**") shall be made available to the Debtors and may be drawn in a single draw

on the Closing Date and the Additional Term Loan Obligations (as defined below) shall be rolled

up into the DIP Facility and  (y) subject to entry of the Final Order, the balance shall be made

available to the Debtors upon entry of the Final Order in amount set forth in the DIP Credit

Agreement (as defined below));

ii.　　authority (a) for the Debtors to enter into that certain Senior Secured, Super-Priority

Debtor-in-Possession Loan and Security Agreement, among the Debtors as Borrowers, the

---

[1] Unless stated otherwise, capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion or the DIP Credit Agreement (as defined below), as applicable.

Guarantors party thereto, as Guarantors and JMB Capital Partners Lending, LLC, as Lender (the "**DIP Lender**") in substantially the same form as attached hereto as **Exhibit 1** (as amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof, the "**DIP Credit Agreement**" and, together with any ancillary, collateral or related documents and agreements, the "**DIP Loan Documents**");

iii.      authority for the Debtors to use the DIP Facility and the proceeds thereof in accordance with the DIP Loan Documents to (a) fund the postpetition working capital needs of the Debtors during the pendency of the Chapter 11 Cases, (b) pay fees, costs and expenses of the DIP Facility on the terms and conditions described in the DIP Loan Documents,  (c) roll-up of outstanding Additional Term Loan Obligations held by the Prepetition Secured Parties that become the DIP Lender into DIP Obligations (the "**Roll-Up Loan**"), subject to the rights preserved in paragraph 16 of this Interim Order, and (d) pay the allowed administrative costs and expenses of the Chapter 11 Cases, in each case, solely in accordance with the DIP Loan Documents, this Interim Order and the Final Order;

iv.      authority for the Debtors to grant to the DIP Lender valid, enforceable, non-avoidable, automatically and fully perfected security interests, liens and superpriority claims, including allowed superpriority administrative expense claims pursuant to sections 364(c)(1) and 507(b) of the Bankruptcy Code, subject only to the Carve-Out and liens pursuant to sections 364(c)(2), 364(c)(3) and 364(d)(1) of the Bankruptcy Code in the Collateral (as defined below) (and all proceeds thereof), including, without limitation, all property constituting "Cash Collateral," as defined in section 363(a) of the Bankruptcy Code, ("**Cash Collateral**"), to secure all DIP Obligations (as defined below), as more fully set forth in this Interim Order, subject only to the Carve-Out (as defined below);

3

v.          authority for the Debtors to grant the Prepetition Secured Parties (as defined below) valid, enforceable, non-avoidable, automatically and fully perfected security interests, liens and superpriority claims, including allowed superpriority administrative expense claims pursuant to section 507(b) of the Bankruptcy Code, subject only to the Carve-Out, and liens pursuant to sections 361, 362, 363(c)(2) and 363(e) of the Bankruptcy Code in the Collateral to secure any diminution in value of the Prepetition Collateral, as more fully set forth in this Interim Order, subject only to the Carve-Out and senior lien and superpriority claims of the DIP Lender;

vi.          subject to and only effective upon entry of the Final Order, waiver by the Debtors of all rights to surcharge against the collateral of the DIP Lender and the Prepetition Secured Parties pursuant to section 506(c) of the Bankruptcy Code;

vii.          subject to and only effective upon entry of the Final Order, waiver of the equitable doctrine of marshaling or any other similar doctrine with respect to any collateral of the DIP Lender and the Prepetition Secured Parties;

viii.          modification of the automatic stay to the extent hereinafter set forth and waiving the 14-day stay provisions of Bankruptcy Rules 4001(a)(3) and 6004(h);

ix.          the scheduling of a final hearing (the "**Final Hearing**") on the Motion for January 22, 2020 to consider entry of the Final Order *inter alia,* authorizing borrowings under the DIP Facility on a final basis and approving notice procedures with respect thereto; and

x.          related relief.

The Court having considered the Motion and the exhibits attached thereto, the evidence submitted or adduced and the arguments of counsel made at the interim hearing held on December 19, 2019 (the "**Interim Hearing**") and having found that due and proper notice (the "**Notice**") of the Motion and the Interim Hearing having been served by the Debtors in accordance with

4

Bankruptcy Rule 4001 and 9006 and Local Rule 2002-1 on (1) counsel for the Citizens Secured

Parties; (2) the Office of the United States Trustee for the District of Minnesota; (3) counsel for

the DIP Lender; (4) the parties included on the Debtors' consolidated list of unsecured creditors;

(5) the Internal Revenue Service; and (6) the United States Attorney for the District of Minnesota;

and the Interim Hearing to consider the interim relief requested in the Motion having been held

and concluded; and all objections, if any, to the interim relief requested in the Motion having been

withdrawn, resolved or overruled by the Court; and it appearing to the Court that granting the

interim relief requested is necessary to avoid potential immediate and irreparable harm to the

Debtors and their estates and otherwise is fair and reasonable and in the best interests of the

Debtors, their estates, and their creditors and equity holders, and is essential for the continued

operation of the Debtors' businesses and represents a sound exercise of the Debtors' business

judgment; and after due deliberation and consideration, and for good and sufficient cause

appearing therefor;

**THIS COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND
CONCLUSIONS OF LAW BASED UPON THE MOTION, THE REPRESENTATIONS OF
COUNSEL AND EVIDENCE SUBMITTED DURING THE INTERIM HEARING**:[2]

A.    _Petition Date_.  On December 16, 2019 (the "**Petition Date**"), the Debtors filed

voluntary petitions under chapter 11 of the Bankruptcy Code in the United States Bankruptcy

Court for the District of Minnesota (the "**Court**") commencing these Chapter 11 Cases.

B.    _Debtors in Possession_.  The Debtors are continuing in the management and

operation of their businesses and properties as debtors in possession pursuant to sections 1107 and

---

[2]    To the extent, any findings of fact constitute conclusions of law, they are adopted as such, and vice versa, pursuant
to Fed. R. Bankr. P. 7052.

5

1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in these Chapter 11 Cases.

C.      *Notice*.  Notice of the Interim Hearing and the relief requested in the Motion has been provided by the Debtors to certain parties in interest, including on (1) counsel for the Citizens Secured Parties (as defined below); (2) the Office of the United States Trustee for the District of Minnesota; (3) counsel for the DIP Lender; (4) the parties included on the Debtors' consolidated list of unsecured creditors; (5) the Internal Revenue Service; (6) the United States Attorney for the District of Minnesota; and (7) any party that has requested notice pursuant to Bankruptcy Rule 2002.

D.      *Jurisdiction and Venue*.  This Court has core jurisdiction over the persons and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334.  Consideration of the Motion constitutes a core proceeding under 28 U.S.C. § 157(b)(2).  Venue for the Chapter 11 Cases and proceedings on the Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

E.      *No Credit Available on More Favorable Terms*.  The Debtors are unable to procure financing in the form of unsecured credit allowable as an administrative expense under §§ 364(a), 364(b), or 503(b)(1) of the Bankruptcy Code and have been unable to procure the necessary financing on terms more favorable, taken as a whole, than the financing offered by DIP Lender pursuant to the DIP Loan Documents.

F.      *Best Interests of Estates*.  It is in the best interests of the Debtors' estates and creditors that the Debtors be allowed to enter into the DIP Facility to obtain postpetition secured financing from the DIP Lender under the terms and conditions set forth herein and in the DIP Loan Documents, as such financing is necessary to avoid immediate and irreparable harm to the Debtors' estates and for the continued operation of the Debtors' businesses.

G.      *Good Faith*.  The extension of credit and financial accommodations under the DIP Loan Documents are fair, reasonable, in good faith, negotiated at arm's length, reflect the Debtors' exercise of prudent business judgment, and are supported by reasonably equivalent value and fair consideration.  Accordingly, the DIP Lender is entitled to the protections of Bankruptcy Code section 364(e).

H.      *Good Cause*. The relief requested in the Motion is necessary, essential and appropriate, and is in the best interest of and will benefit the Debtors, their creditors and their estates, as its implementation will, among other things, provide the Debtors with the necessary liquidity to (1) minimize disruption to the Debtors' businesses and ongoing operations, (2) preserve and maximize the value of the Debtors' estates for the benefit of all the Debtors' creditors, and (3) avoid potential immediate and irreparable harm to the Debtors, their creditors, their businesses, their employees, and their assets.

I.      *Necessity of DIP Facility Terms*.  The terms of the DIP Loan Documents and the Interim Order assuring that the liens and the various claims, superpriority claims, and other protections granted in the Interim Order will not be affected by any subsequent reversal or modification of the Interim Order or any other order, as provided in section 364(e) of the Bankruptcy Code, which is applicable to the postpetition financing arrangement contemplated in the DIP Loan Documents, are necessary in order to induce the DIP Lender to provide postpetition financing to the Debtors.

J.      *Need for Postpetition Financing*.  The Debtors do not have sufficient and reliable sources of working capital, including Cash Collateral, to continue to operate their businesses in the ordinary course of business without the financing requested in the Motion.  The Debtors' ability to maintain business relationships with their vendors, suppliers and customers, to pay their

7

employees, and to otherwise fund their operations is essential to the Debtors' continued viability as the Debtors seek to maximize the value of the assets of their estates for the benefit of all creditors of the Debtors. The ability of the Debtors to obtain sufficient and stable working capital and liquidity through the proposed postpetition financing arrangements with the DIP Lender as set forth in the Interim Order and the DIP Loan Documents is vital to the preservation and maintenance of the going concern value of each Debtor. Accordingly, the Debtors have an immediate need to obtain the postpetition financing in order to, among other things, permit the orderly continuation of the operation of their businesses, minimize the disruption of their business operations, and preserve and maximize the value of the assets of the Debtors' bankruptcy estates in order to maximize the recovery to all creditors of the estates.

K.    *Need to Use Cash Collateral*. The Debtors need to use Cash Collateral, in order to, among other things, preserve, maintain and maximize the value of their assets and businesses. The ability of the Debtors to maintain liquidity through the use of Cash Collateral is vital to the Debtors and their efforts to maximize the value of their assets. Accordingly, the Debtors have demonstrated good and sufficient cause for the relief granted herein.

L.    *Sections 506(c) and 552(b)*. As material inducement to the DIP Lender to agree to provide the DIP Facility and the Prepetition Secured Parties to agree to the use of Cash Collateral, and in exchange for agreement by the DIP Lender and the Prepetition Secured Parties to subordinate their superpriority claims to the Carve-Out, subject to entry of a Final Order, the DIP Lender and the Prepetition Secured Parties are entitled to a waiver of any "equities of the case" exception under section 552(b) of the Bankruptcy Code, and (b) subject to entry of a Final Order, the DIP Lender and the Prepetition Secured Parties are entitled to a waiver of the provisions of section 506(c) of the Bankruptcy Code.

8

M.     *Priming of Prepetition Credit Liens*.  The priming of the Prepetition Credit Liens by the DIP Lender under section 364(d)(1) of the Bankruptcy Code, solely to the extent set forth in the DIP Loan Documents and as further described below, will enable the Debtors to obtain the DIP Facility and, among other benefits, continue to operate its business for the benefit of its estate and stakeholder.

N.     *Debtors' Acknowledgments and Agreements*. Without prejudice to the rights of any creditors' committee appointed in these chapter 11 cases (the "**Committee**") or other parties-in-interest as and to the extent set forth in Section 4.1.1 of this Interim Order, the Debtors admit, stipulate, acknowledge and agree that:

(a)     *Prepetition Loan Documents*.  Prior to the Petition Date, Citizens Bank, N.A. (formerly known as RBS Citizens, N.A.), as Administrative Agent (the "**Prepetition Agent**") and as a lender (the "**Prepetition Citizens Lenders**"), and the other lenders party thereto, including JMB Capital Partners Lending, LLC ("**Prepetition JMB Lender**" and together with the Prepetition Citizens Lenders, the "**Prepetition Lenders**") made loans, advances and provided other financial accommodations to the Debtors pursuant to the terms and conditions set forth in: (a) that certain Credit Agreement dated as of May 15, 2014, as amended by the First Amendment to Credit Agreement dated as of September 1, 2016, and the Second Amendment to Credit Agreement dated as of October 23, 2019 (as amended, supplemented or otherwise modified from time to time through the Petition Date, the "**Prepetition Credit Agreement**"), by and among Granite City Food & Brewery Ltd., as a Borrower and as Borrower Representative, each of the other Borrowers party thereto, the other Loan Parties party thereto, the Prepetition Agent and the Prepetition Lenders; and (b) all other agreements, documents and instruments executed and/or delivered with, to, or in favor of Prepetition Agent or Prepetition Lenders, including, without limitation, the Subordination Agreement, all security agreements, notes, guarantees, mortgages, Uniform Commercial Code financing statements and all other related agreements, documents and instruments executed and/or delivered in connection therewith or related thereto (all of the foregoing, together with the Prepetition Credit Agreement, as all of the same have heretofore been amended, supplemented, modified, extended, renewed, restated and/or replaced at any time prior to the Petition Date, collectively, the "**Prepetition Loan Documents**").

(b)     *Prepetition Secured Obligations*.  As of the Petition Date, the Debtors were

indebted under the Prepetition Loan Documents: (a) to the Prepetition Agent and Prepetition Citizens Lenders (the "**Citizens Secured Parties**") (i) in an aggregate outstanding principal amount of not less than $6,000,000 plus interest accrued and accruing thereon, together with all costs, fees, expenses (including attorneys' fees and legal expenses) and other charges accrued, accruing or chargeable with respect thereto (the "**Prepetition Revolving Loan Obligations**"), (ii) in an aggregate outstanding principal amount of not less than $29,000,000 plus interest accrued and accruing thereon, together with all costs, fees, expenses (including attorneys' fees and legal expenses) and other charges accrued, accruing or chargeable with respect thereto in outstanding principal balance of a Term Loan (the "**Prepetition Term Loan Obligations**"), (iii) in an aggregate outstanding principal amount of not less than $5,000,000 plus interest accrued and accruing thereon, together with all costs, fees, expenses (including attorneys' fees and legal expenses) and other charges accrued, accruing or chargeable with respect thereto (the "**Prepetition Development Loan Obligations**," and together with the Prepetition Revolving Loan Obligations and the Prepetition Term Loan Obligations, the "**Prepetition Citizens Loan Obligations**"), and (b) to the Prepetition Agent and Prepetition JMB Lender in an aggregate outstanding principal amount of not less than $1,500,000 plus interest accrued and accruing thereon, together with all costs, fees, expenses (including attorneys' fees and legal expenses) and other charges accrued, accruing or chargeable with respect thereto (the "**Prepetition Additional Term Loan Obligations**" and together with the Prepetition Citizens Loan Obligations, the "**Prepetition Secured Obligations**").  The Prepetition Secured Obligations constitute allowed, legal, valid, binding, enforceable and non-avoidable obligations of Debtors, and are not subject to any offset, defense, counterclaim, avoidance, recharacterization or subordination pursuant to the Bankruptcy Code or any other applicable law, and Debtors do not possess, shall not assert, hereby forever release, and are forever barred from bringing any claim, counterclaim, setoff or defense of any kind, nature or description which would in any way affect the validity, enforceability and non-avoidability of any of the Prepetition Secured Obligations.

(c)    *Prepetition Collateral*.  As of the Petition Date, the Prepetition Secured Obligations were secured pursuant to the Prepetition Loan Documents by valid, perfected, enforceable and non-avoidable first-priority security interests and liens (the "**Prepetition Citizens Liens**") granted by Debtors to Prepetition Agent, for the benefit of itself and the Prepetition Lenders under the Prepetition Loan Documents, in substantially all of the existing and after-acquired assets of the Debtors and the other Loan Parties as more fully set forth in the Prepetition Loan Documents (the "**Prepetition Collateral**"), and such security interest is perfected and has priority over all other security interests. The Debtors do not possess and will not assert any claim, counterclaim, setoff or defense of any kind, nature or description which would in any way affect the validity, enforceability and non-

10

avoidability of any of the Prepetition Agent or Prepetition Lenders' liens, claims or security in the Prepetition Collateral.

(d)    *Subordination Agreements*.    Pursuant to the (a) Subordination and Intercreditor Agreement dated September 30, 2015 (the "**Great Western Intercreditor Agreement**") between the Debtors, Great Western Bank, a South Dakota banking corporation ("**Great Western**") and the Prepetition Agent, the Prepetition Agent agreed to subordinate any lien of the Prepetition Agent to the prior existing liens of Great Western solely with respect to the real property and fixtures located at 1001 102nd Street, Omaha, Nebraska 68114 (the "**Great Western Senior Liens**"), and (b) Prepetition Credit Agreement and a Subordination Agreement dated as of October 23, 2019 (the "**JMB Subordination Agreement**") between the Debtors, the Prepetition Citizens Lenders and the Prepetition JMB Lender, the parties agreed that the payment of the Prepetition Additional Term Loan Obligations to the Prepetition JMB Lender is senior in priority to payment of the Prepetition Citizens Loan Obligations to the Prepetition Citizens Lenders.

(e)    *Proof of Claim*. The acknowledgment by Debtors of the Prepetition Secured Obligations and the liens, rights, priorities and protections granted to or in favor of Prepetition Agent and Prepetition Lenders (collectively, the "**Prepetition Secured Parties**") in respect of the Prepetition Collateral as set forth herein and in the Prepetition Loan Documents shall be deemed a timely filed proof of claim on behalf of the Prepetition Secured Parties in these Chapter 11 Cases.

O.    Roll-up Loan.  Upon entry of the Interim Order and the occurrence of the Closing Date (as defined in the DIP Loan Documents), without further action by the Debtors or any other party, all Additional Term Loan Obligations held by the Prepetition JMB Lender shall be converted into DIP Obligations.  The Roll-Up Loan as provided for under the DIP Facility and this Interim Order is appropriate and the DIP Lenders would not be willing to provide the DIP Facility or extend credit to the Debtors thereunder without the inclusion of the Roll-Up Loan.  The Roll-Up Loan is subject to the reservation of rights in paragraph 16 below and will not prejudice any other party in interest.  Notwithstanding any other provisions of this Interim Order, the DIP Loan Documents or the JMB Subordination Agreement, all rights of the Prepetition JMB Lender shall be fully preserved.

11

P.      *Adequate Protection*.  The Prepetition Secured Parties are entitled to receive

adequate protection on account of their interests in the Prepetition Collateral pursuant to sections

361, 362, and 363 of the Bankruptcy Code solely to the extent of any diminution in the value of

their interests in the Prepetition Collateral (including Cash Collateral).  As part of the adequate

protection provided by this Interim Order, the Prepetition Secured Parties shall receive, among

other things, replacement liens, superpriority claims and reporting information.  The terms of the

Adequate Protection Obligations (as defined in paragraph 13 below) are fair and reasonable, reflect

the Debtors' prudent exercise of business judgment and are sufficient to allow the Debtors' use of

the Prepetition Collateral (including the Cash Collateral) and to permit the  relief granted in this

Interim Order.

Q.      Immediate Entry.  Sufficient cause exists for immediate entry of this Interim

Order pursuant to Bankruptcy Rule 4001(c)(2).

Based upon the foregoing findings and conclusions, the Motion and the record before the

Court with respect to the Motion, and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED** that:

1.      DIP Facility Approval.  The DIP Facility, including the DIP Roll-Up Obligations,

is hereby approved.  Any objections to the interim relief requested in the Motion that have not

been withdrawn, waived or settled, and all reservations of rights included therein, are hereby

denied and overruled.  The Debtors are authorized, pursuant to section 364 of the Bankruptcy

Code, to enter into and be a party to the DIP Facility pursuant to the DIP Loan Documents (with

such changes, if any, as were authorized to be made as amendments to the DIP Loan Documents

in accordance with this Interim Order), to perform under the DIP Loan Documents and such other

and additional documents necessary or desired to implement the DIP Facility or the DIP Loan

12256869v1

Documents, and to obtain postpetition secured financing from the DIP Lender, to avoid immediate and irreparable harm to the Debtors' estates.

2.      <u>DIP Obligations</u>.  The DIP Loan Documents shall constitute and evidence the valid and binding effect of the Debtors' obligations under the DIP Facility, which DIP Obligations shall be legal, valid, and binding obligations of the Debtors party thereto and enforceable against the Debtors, their estates, any successors thereto, including, without limitation, any trustee appointed in any of the Debtors' cases, or in any case under chapter 7 of the Bankruptcy Code upon the conversion of any such cases, or in any other proceedings superseding or related to any of the foregoing, any successors thereto, and any party determined to be the beneficial owner of the DIP Collateral by this Court.  The Debtors and their successors shall be jointly and severally liable for repayment of any funds advanced pursuant to the DIP Loan Documents, together with interest thereon, at the times and in the amounts set forth in the DIP Loan Documents and all Obligations as defined and provided for in the DIP Credit Agreement (collectively, the "**<u>DIP Obligations</u>**"). No obligation, payment, transfer or grant of security under the DIP Loan Documents or the Interim Order, with respect to the DIP Facility shall be stayed, restrained, voided, voidable or recoverable under the Bankruptcy Code or under any applicable non-bankruptcy law, or subject to any defense, reduction, setoff, recoupment or counterclaim.

3.      <u>Authorization to Borrow</u>.  Upon entry of this Interim Order and during the period prior to entry of the Final Order, the Debtors are immediately authorized to borrow from the DIP Lender under the DIP Facility, the Interim Advance of up to $4,000,000, subject to the terms and conditions set forth in the DIP Loan Documents and this Interim Order.  Once repaid, the DIP Facility Loans incurred may not be re-borrowed.

13

4.     Use of DIP Facility Proceeds.  The Debtors shall use advances of credit under the

DIP Facility (the "**DIP Facility Loans**") only for the express purposes specifically set forth in this

Interim Order and the DIP Loan Documents.  The Debtors are authorized to use the proceeds of

the DIP Facility Loans to (a) fund the postpetition working capital needs of the Debtors during the

pendency of the Chapter 11 Cases, (b) pay fees, costs and expenses of the DIP Facility on the terms

and conditions described in the DIP Loan Documents, (c) roll-up the outstanding Additional Term

Loan Obligations into DIP Obligations, subject to the rights preserved in paragraph 16 of this

Interim Order, and (d) pay the allowed administrative costs and expenses of the Chapter 11 Cases,

in each case, solely in accordance with the DIP Loan Documents (including, but not limited to, the

Budget) and this Interim Order.  Notwithstanding anything herein, the extensions of credit under

the DIP Facility shall not constitute Cash Collateral of the Prepetition Secured Parties.

5.     Roll-up Loan.  Upon entry of the Interim Order and the occurrence of the Closing

Date (as defined in the DIP Loan Documents), without further action by the Debtors or any other

party, all Additional Term Loan Obligations will be immediately, automatically, and irrevocably

deemed to have been converted into DIP Roll-Up Obligations, and such DIP Roll-Up Obligations

shall constitute DIP Obligations and shall be entitled to all the priorities, privileges, rights, and

other benefits afforded to the other DIP Obligations under this Interim Order and the DIP Loan

Documents (subject to the rights of the Debtors and other parties in interest pursuant to paragraph

16 of this Interim Order). The conversion of the DIP Roll-Up Obligations as described in this

paragraph 5 shall be authorized as compensation for, in consideration for, as a necessary

inducement for, and on account of the agreement of the DIP Lender to fund amounts under the

DIP Facility and not as payments under, adequate protection for, or otherwise on account of, any

Prepetition Obligations. As used herein, the term "**DIP Roll-Up Obligations**" shall mean the Roll-

14

Up Loan and all interest accrued and accruing thereon after the conversion into DIP Roll-Up Obligations and all other amounts owing by the respective Debtors in respect thereof after the conversion into the DIP Roll-Up Obligations.

6.      Budget and DIP Facility Reporting.    Except as otherwise provided herein or approved by the DIP Lender, the proceeds from the DIP Facility shall be used only in compliance with the terms of the DIP Loan Documents.    The Debtor shall comply with the reporting requirements and obligations set forth in the DIP Credit Agreement.

7.      Payment of DIP Facility Fees and Expenses.

(a)      The (a) Commitment Fee; (b) Funding Fee; (c) Work Fee, which shall serve as a retainer for the DIP Lender's counsel; (d) Exit Fee; and (e) Stated Maturity Fee are each hereby approved and the Debtors are hereby authorized and directed to and shall pay such fees in accordance with, and on the terms set forth in this Interim Order and the DIP Loan Documents.

(b)      The Debtors are also hereby authorized and directed to pay upon demand, all other fees, costs, expenses and other amounts payable under the terms of this Interim Order and the DIP Loan Documents and all other reasonable fees and out-of-pocket costs and expenses of the DIP Lender in accordance with the terms of this Interim Order and the DIP Loan Documents (including, without limitation, the reasonable and documented postpetition fees and out-of-pocket costs and expenses of Arent Fox LLP as counsel and local counsel to the DIP Lender to the extent not covered by the portion of the Work Fee paid prior to the Petition Date), subject to receiving a written invoice therefor.    None of such fees, costs, expenses or other amounts shall be subject to Court approval except as otherwise provided herein or required to be submitted in any particular format, and no recipient of any such payment shall be required to file with respect thereto any interim or final fee application with this Court; provided, however, that copies of any such invoices

15

shall be provided contemporaneously to the U.S. Trustee, any official committee of unsecured creditors appointed in these Chapter 11 Cases (the "**Committee**") and the Citizens Secured Parties; provided further, however, that such invoices may be redacted to the extent necessary to delete any information subject to the attorney-client privilege, any information constituting attorney work product, or any other confidential information (the "**Redactions**"), and the provision of such invoices shall not constitute a waiver of the attorney-client privilege or any benefits of the attorney work product doctrine.  If the U.S. Trustee, the Committee or the Citizens Secured Parties objects to the reasonableness of the fees and expenses of the DIP Lender, and such objection cannot be resolved within ten (10) days of receipt of such invoices, the objecting party may file with the Court and serve on the DIP Lender, an objection to the reasonableness of such fees and expenses (each, a "**Reasonableness Fee Objection**").  Without limiting the foregoing, if any party objects to the Redactions and such objection cannot be resolved within ten (10) days of receipt of such invoices, the DIP Lender shall file with the Court and serve on the Debtors, the Committee, the U.S. Trustee and the Citizens Secured Parties a request for Court resolution of the disputes concerning the propriety of the disputed Redactions (each, a "**Redaction Fee Objection**," and each Reasonableness Fee Objection and Redaction Fee Objection may be referred to herein generally as a "**Fee Objection**"). The Debtors shall pay, in accordance with the terms and conditions of this Interim Order and the Final Order, within ten (10) days after receipt of the applicable invoice (a) the full amount invoiced if no Fee Objection has been timely filed, and (b) the undisputed fees, costs, and expenses reflected on any invoice to which a Fee Objection has been timely filed.  All such unpaid fees, costs, expenses and other amounts owed or payable to the DIP Lender shall be secured by the DIP Collateral and afforded all of the priorities and protections afforded to the DIP Obligations  under this Interim Order, and the DIP Loan Documents.

16

12256869v1

8.      <u>Indemnification</u>.   The Debtors are hereby authorized to and hereby agree to indemnify and hold harmless the DIP Lender and its affiliates, directors, officers, employees, agents, attorneys, or any other Person affiliated with or representing the DIP Lender (collectively, an "**<u>Indemnified Party</u>**") from and against: (a) all obligations, demands, claims, damages, losses and liabilities (including, without limitation, reasonable fees and disbursements of counsel) (collectively, "**<u>Indemnity Claims</u>**") as set forth in the DIP Loan Documents including those asserted by any other party in connection with the transactions contemplated by the DIP Loan Documents; and (b) all losses or expenses incurred, or paid by the DIP Lender from, following, or arising from the transactions contemplated by the DIP Loan Documents (including reasonable and documented attorneys' fees and expenses), except for Indemnity Claims and/or losses directly caused by the DIP Lender's gross negligence, or willful misconduct or bad faith of the DIP Lender. In the case of an investigation, litigation or other proceeding to which the indemnity in this paragraph applies, such indemnity shall be effective whether or not such investigation, litigation or proceeding is brought by any of the Debtors or any of their respective directors, security holders or creditors, an Indemnified Party or any other Person or an Indemnified Party is otherwise a party thereto and whether or not the transactions contemplated hereby are consummated.   No Indemnified Party shall have any liability (whether direct or indirect, in contract, tort or otherwise) to any Debtor or any of its subsidiaries or any shareholders or creditors of the foregoing for or in connection with the transactions contemplated hereby, except to the extent such liability is determined by a court of competent jurisdiction in a final non-appealable judgment or order to have resulted solely from such Indemnified Party's gross negligence or willful misconduct.   All indemnities of the Indemnified Parties shall constitute DIP Obligations secured by the DIP

17

Collateral and afforded all of the priorities and protections afforded to the DIP Obligations under this Interim Order, the Final Order and the DIP Loan Documents.

9.     <u>DIP Superpriority Claims</u>.  In accordance with section 364(c)(1) of the Bankruptcy Code, the DIP Obligations shall constitute allowed senior administrative expense claims against each Debtor and their estates (the "**DIP Superpriority Claims**") with priority in payment over any and all administrative expenses at any time existing or arising, of any kind or nature whatsoever, including, without limitation, the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including, but not limited to, sections 105, 326, 328, 330, 331, 503(b), 506(c) (subject to the entry of the Final Order with respect to section 506(c) only), 507(a), 507(b), 726, 1113 and 1114 of the Bankruptcy Code or otherwise, including those resulting from the conversion of any of the Chapter 11 Cases pursuant to section 1112 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment; <u>provided</u>, <u>however</u>, that the DIP Superpriority Claims shall be subject to and subordinate to only the Carve-Out; <u>provided</u>, <u>further</u> that the DIP Superpriority Claims shall have recourse to and be payable from all prepetition and postpetition property and assets of the Debtors and the estates and all DIP Collateral and all proceeds thereof, and (a) any and all avoidance power claims or causes of action under sections 544, 545, 547, 548 through 551 and 553(b) of the Bankruptcy Code (the "**Avoidance Actions**") and the proceeds thereof, (b) prepetition tort claims, including claims against the Debtors' current and former directors and officers (if any) and the proceeds thereof; and (c) any deposit in connection with a proposed Sale (whether terminated or otherwise) that becomes property of the Debtors' estates (a "**Sale Deposit**") subject, however, only to the senior lien rights of a stalking horse purchaser and such stalking horse bid protections as may be approved by this Court.

18

12256869v1

10.     <u>DIP Liens</u>.

(a)     Effective immediately as of the entry of this Interim Order, as security for the DIP Obligations, the DIP Lender is granted continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected security interests in and liens (collectively, the "**<u>DIP Liens</u>**") on all DIP Collateral as collateral security for the prompt and complete performance and payment when due (whether at the Stated Maturity Date (i.e. March 31, 2020), by acceleration, or otherwise) of the DIP Obligations.  The term "**<u>DIP Collateral</u>**" means collectively all prepetition and postpetition real property and all prepetition and postpetition tangible and intangible personal property of each Borrower, in each case wherever located and whether now owned or hereafter acquired, including, but not limited to, all accounts, contracts rights, chattel paper, cash, general intangibles, investment property, machinery, equipment, goods, inventory, furniture, fixtures, letter of credit rights, books and records, deposit accounts, documents, instruments, commercial tort claims, leases and leaseholds and rents, avoidance actions under section 549 and related recoveries under section 550 of the Bankruptcy Code, together with all proceeds of each of the following, including insurance proceeds (as each such term above is defined in the UCC, to the extent applicable), and, subject to Final Order, including the proceeds and recoveries from Avoidance Actions (the "**<u>Avoidance Action Proceeds</u>**").

(b)     Subject to the entry of the Final Order, to the fullest extent permitted by the Bankruptcy Code or applicable law, and except as otherwise set forth herein, any provision of any lease other than a real property lease, loan document, easement, use agreement, proffer, covenant, license, contract, organizational document, or other instrument or agreement that requires the consent or the payment of any fees or obligations to any entity in order for any of the Debtors to pledge, grant, mortgage, sell, assign, or otherwise transfer any fee or leasehold interest or the

19

proceeds thereof or other DIP Collateral, shall have no force or effect with respect to the DIP Liens

on such leasehold interests or other applicable DIP Collateral or the proceeds of any assignment

and/or sale thereof by any Debtor, in favor of the DIP Lender in accordance with the terms of the

DIP Loan Documents, or this Interim Order.

11.    <u>Priority of DIP Liens</u>.

(a)    To secure the DIP Obligations, immediately upon and effective as of entry

of this Interim Order, the DIP Lender, is hereby granted on a final basis, continuing, valid, binding,

enforceable, non-avoidable, and automatically and properly perfected first priority DIP Liens in

the DIP Collateral as follows, in each case subject to the Carve-Out:

(i)    *Liens Priming the Prepetition Citizens Liens*.  Pursuant to section 364(d)(1)
of the Bankruptcy Code, valid, binding, continuing, enforceable, non-avoidable
automatically and fully perfected first priority senior priming liens and security
interests in all DIP Collateral, regardless of where located, which senior priming
liens and security interests in favor of the DIP Lender shall be senior to all
Prepetition Citizens Liens.  For the avoidance of doubt, as a result of the priming
of the Prepetition Citizens Liens pursuant to this Interim Order, the DIP Lender
shall have a first priority senior priming lien and security interest in, among other
things, (A) all of the assets of Debtors and its debtor and non-debtor Subsidiaries,
including, but not limited to, the "Collateral" as defined in the Prepetition Credit
Agreement, and (B) the Debtors' prepetition and postpetition commercial tort
claims, including but not limited to all claims and causes of action (i) against the
Debtors' officers and directors, and (ii) all other prepetition tort claims, and the
proceeds thereof (regardless of whether such proceeds arise from damages to the
Prepetition Collateral);

(ii)    *Liens on Unencumbered Property*.  Pursuant to section 364(c)(2) of the
Bankruptcy Code, valid, binding, continuing, enforceable, non-avoidable
automatically and fully perfected first priority liens on and security interests in all
DIP Collateral that is not otherwise subject to any valid, enforceable, and non-
avoidable liens on and security interests in the DIP Collateral that (A) were
perfected prior to the Petition Date (or perfected on or after the Petition Date to the
extent permitted by Section 546(b) of the Bankruptcy Code), (B) are not subject to
avoidance, disallowance, or subordination pursuant to the Bankruptcy Code or
applicable non-bankruptcy law, and (C) are senior in priority to the DIP  Liens
under applicable law and after giving effect to any lien release, subordination or
inter-creditor agreements, including the Great Western Senior Liens (each a

20

"**Permitted Prior Lien**"); provided, however, that the DIP Liens shall have priority over all Prepetition Citizens Liens; and

(iii)     *Liens Junior to Certain Other Liens*.  Pursuant to section 364(c)(3) of the Bankruptcy Code, valid, enforceable, non-avoidable automatically and fully perfected junior liens on and security interests in all DIP Collateral (other than as set forth in clauses (i) and (ii)) subordinate only to the Permitted Prior Liens.

(b)     Except as expressly set forth herein, the DIP Liens and the DIP Superpriority Claims shall not be made junior to or *pari passu* with (1) any lien, security interest or claim heretofore or hereinafter granted in any of the Chapter 11 Cases or any successor cases, and shall be valid and enforceable against the Debtors, their estates, any trustee or any other estate representative appointed or elected in the Chapter 11 Cases or any successor cases and/or upon the dismissal or conversion of any of the Chapter 11 Cases or any successor cases, (2) any lien that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or otherwise, (3) any intercompany or affiliate lien or claim, and (4) subject to entry of the Final Order, any liens arising after the Petition Date excluding any liens or security interests granted in favor of any federal, state, municipal or other governmental unit, commission, or board for any liability of the Debtors.

12.    Use of Cash Collateral.  The Debtors are authorized to use Cash Collateral to fund the postpetition working capital needs of the Debtors during the pendency of the Chapter 11 Cases that are not funded with the DIP Facility Loans and to pay the allowed administrative costs and expenses of the Chapter 11 Cases not funded by the DIP Facility Loans, each solely in accordance with the Budget and this Interim Order, provided that the Debtors' variance from the line items on the Budget shall be no more than: 20% of the line items set forth in the Budget for the first week after the Petition Date, 15% of the line items set forth in the Budget for the second week of the Budget after the Petition Date, and thereafter, 10% of the average of the line items set forth in the

21

Budget for the prior four week period.  The initial Budget is attached hereto as **Exhibit 2**.  The Debtors shall: (a) commencing on the first Wednesday to occur after the entry of this Interim Order and on the Wednesday of each week thereafter, prepare and deliver to the DIP Lender and the Citizens Secured Parties (x) a report showing actual cash receipts and disbursements for the line items set forth in the Budget for the preceding Wednesday through the following Tuesday and (y) a written explanation of all material variances; and (b) update and roll-forward the proposed Budget no less frequently than every four (4) weeks or at such other interval as agreed to by the DIP Lender and the Citizens Secured Parties, each such amended Budget shall be delivered no later than Wednesday of each week for the week immediately prior.  Each proposed Budget shall only become a Budget for the use of Cash Collateral and DIP Obligations as set forth in this Interim Order when it is agreed upon by the Debtors and DIP Lender, in consultation with the Prepetition Secured Parties, provided, however, any modifications to the Case Professionals' fees and expenses in the Budget shall require the consent of the Prepetition Secured Parties. After the payment in full of the DIP Obligations, each proposed Budget shall only become a Budget for the use of Cash Collateral as set forth in this Interim Order when it is agreed upon by the Debtors and the Prepetition Secured Parties. The Debtors' use of Cash Collateral shall automatically terminate upon the occurrence of an Event of Default (as defined below).

13.    <u>Adequate Protection of Prepetition Secured Parties</u>.  The Prepetition Secured Parties are entitled, pursuant to sections 361, 362, 363(c)(2), 363(e) and 507 of the Bankruptcy Code, to adequate protection of their interests in all the Prepetition Collateral, including Cash Collateral, in an amount equal to the aggregate diminution in value of the Prepetition Secured Parties' interests in the Prepetition Collateral (including Cash Collateral) from and after the Petition Date, if any, for any reasons provided under the Bankruptcy Code.  In consideration for

the foregoing, the Prepetition Secured Parties, are hereby granted the following in the amount of such diminution (collectively, the "**Adequate Protection Obligations**"):

      (a)    *Adequate Protection Liens.*  The Prepetition Agent, on behalf of itself and the Prepetition Lenders, is hereby granted (effective and perfected upon the date of this Interim Order and without the necessity of any mortgages, security agreements, pledge agreements, financing statement or other agreements), in the amount equal to the aggregate diminution in value of the interests in the Prepetition Collateral (including Cash Collateral) from and after the Petition Date, if any, for any reasons provided under the Bankruptcy Code (the "**Adequate Protection Claim**"), a valid, perfected replacement security interest in and lien on all prepetition and postpetition property and assets of the Debtors and the estates, including the DIP Collateral and all proceeds thereof (the "**Adequate Protection Collateral**"), subordinate only to (A) the DIP Liens and any liens to which the DIP Liens are junior and (B) the Carve-Out (the "**Adequate Protection Liens**").

      (b)    *507(b) Claims.* The Prepetition Agent, on behalf of itself and the Prepetition Lenders, is hereby granted, an allowed superpriority administrative expense claim as provided in section 507(b) of the Bankruptcy Code in the amount of the Adequate Protection Claim with, except as set forth in this Interim Order, priority in payment over any and all administrative expenses of the kind specified or ordered pursuant to any provision of the Bankruptcy Code (the "**507(b) Claims**"); which 507(b) Claims shall have recourse to and be payable from the Adequate Protection Collateral.  The 507(b) Claims shall, in all instances, be subject and subordinate only to (A) the Carve-Out and (B) the DIP Superpriority Claims.  The Prepetition Secured Parties shall not receive or retain any payments, property or other amounts in respect of the 507(b) Claims unless and until the DIP Obligations (other than contingent indemnification obligations as to which

23

no claim has been asserted) have indefeasibly been paid in cash in full and all DIP Commitments have been terminated.

(c)     *Citizens Secured Parties Information*.  As additional adequate protection of the Citizens Secured Parties' security interests in the Prepetition Collateral, the Debtors shall contemporaneously provide the Citizens Secured Parties with any reporting provided to the DIP Lender under the DIP Credit Agreement.

(d)     *Citizens Secured Parties Fees*.  The Debtors are also hereby authorized and directed to pay upon demand, all reasonable fees and out-of-pocket costs and expenses of the Citizens Secured Parties which amount shall not exceed the aggregate amount per month as set forth in the Budget, in accordance with the terms of this Interim Order and the Prepetition Loan Documents (including, without limitation, the reasonable and documented postpetition fees and out-of-pocket costs and expenses of counsel and financial advisors to the Citizens Secured Parties), subject to receiving a written invoice therefor.  None of such fees, costs, expenses or other amounts shall be subject to Court approval except as otherwise provided herein or required to be submitted in any particular format, and no recipient of any such payment shall be required to file with respect thereto any interim or final fee application with this Court; provided, however, that copies of any such invoices shall be provided contemporaneously to the U.S. Trustee, the Committee and the DIP Lender; provided further, however, that such invoices may include the Redactions and the provision of such invoices shall not constitute a waiver of the attorney-client privilege or any benefits of the attorney work product doctrine.  If the U.S. Trustee, the Committee or the DIP Lender objects to the reasonableness of the fees and expenses of the Citizens Secured Parties, and such objection cannot be resolved within ten (10) days of receipt of such invoices, the objecting party may file with the Court and serve on the Citizens Secured Parties, a Reasonableness

24

Objection. Without limiting the foregoing, if any party objects to the Redactions and such objection cannot be resolved within ten (10) days of receipt of such invoices, the Citizens Secured Parties shall file with the Court and serve on the Debtors, the Committee, the U.S. Trustee and the DIP Lender a request for Court resolution a Redaction Fee Objection. The Debtors shall pay, in accordance with the terms and conditions of this Interim Order and the Final Order, within ten (10) days after receipt of the applicable invoice (a) the full amount invoiced if no Fee Objection has been timely filed, and (b) the undisputed fees, costs, and expenses reflected on any invoice to which a Fee Objection has been timely filed. All such unpaid fees, costs, expenses and other amounts owed or payable to the Citizens Secured Parties shall be secured by the Collateral and afforded all of the priorities and protections afforded to the Adequate Protection Obligations under this Interim Order.

14.   Carve-Out.

(a)   *Carve-Out*. As used in this Interim Order, the term "**Carve-Out**" means, collectively, the sum of: (i) all fees required to be paid to the Clerk of the Court and to the U.S. Trustee pursuant to 28 U.S.C. §1930(a) and section 31 U.S.C. § 3717; (ii) the reasonable fees and expenses up to $15,000 incurred by a trustee under section 726(b) of the Bankruptcy Code; and (iii) the aggregate amount of unpaid, but funded into the Escrow per the terms below, fees and expenses of the Debtors and the Committee (which order has not been reversed, vacated or stayed unless such stay is no longer effective) under sections 327(a), 328 or 1103(a) of the Bankruptcy Code (the "**Case Professionals**"), to the extent such fees and expenses are allowed and payable pursuant to an order of the Court (which order has not been reversed, vacated or stayed) ("**Allowed Professional Fees**"), and $2,500 of the aggregate unpaid out-of-pocket expenses allowed by the Court and incurred by the members of the Committee in the performance of their duties (but

25

excluding fees and expenses of third party professionals employed by such members) ("**Committee Expenses**"), which amount under this clause (iii) shall not exceed the sum of: (x) an aggregate amount per week limited to the amount set forth in the Budget for Allowed Professional Fees and Committee Expenses incurred prior to the delivery of a Carve-Out Trigger Notice and escrowed each month with counsel for Debtors, provided (i) the Maturity Date has not occurred or (ii) Event of Default has not occurred or continuing (the "**Pre Carve-Out Notice Trigger Cap**") plus (y) $75,000 for Allowed Professional Fees and Committee Expenses incurred from and after the delivery of the Carve-Out Trigger Notice (defined below), less any outstanding amount of retainers received by the Case Professionals prior to the Petition Date (the "Post Carve-Out Notice Cap" together, with the Pre Carve-Out Notice Trigger Cap, the "**Carve-Out Cap**"). Each month, Debtors shall pay the amount of the fees and expenses incurred by the Case Professionals (so long as such amounts are equal to or less than the amounts set forth in the Budget for such month), into the client trust account maintained by the Debtors' counsel (the "**Escrow**"). Once such fees and expenses are deemed Allowed Professional Fees they shall be distributed to the respective recipients from the Escrow. No portion of the Carve-Out or any Cash Collateral may be used in violation of this Interim Order. Nothing in this Interim Order or otherwise shall be construed to increase the Carve-Out if actual (i) Allowed Professional Fees of any Case Professional or (ii) Committee Expenses are higher in fact than Carve-Out Cap amount.

(b)       *Carve-Out Trigger Notice*.  As used herein, the term "Carve-Out Trigger Notice" means a written notice provided by the DIP Lender or the Prepetition Secured Parties to the Debtors, counsel to the Committee, and the U.S. Trustee that the Post Carve-Out Notice Trigger Cap is invoked, which notice may be delivered following the occurrence and during the continuance of an Event of Default and/or acceleration of the DIP Obligations under the DIP Loan

Documents, provided the Prepetition Secured Parties may only deliver such notice when an Event of Default occurs under paragraph 25(b) below.  Upon delivery of the Carve-Out Trigger Notice to the Debtors (the "Termination Declaration Date"), the Debtors shall provide notice by email and facsimile to all Case Professionals, at the email addresses and facsimile numbers set forth in each Professional's notice of appearance filed with the Bankruptcy Court (or, if there is no such notice of appearance, at such Professional's last known email address and facsimile number) within one (1) day after the Debtors' receipt of a Carve-Out Trigger Notice informing them that such Carve-Out Trigger Notice has been received and further advising them that the Debtors' ability to pay such Case Professionals is subject to and limited by the Post Carve-Out Notice Trigger Cap.

(c)      *Payment of Allowed Professional Fees Prior to Termination Declaration Date*.  Any payment or reimbursement made prior to the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall not reduce the Carve Out.

(d)      *Payment of Carve-Out on or After the Termination Declaration Date*.  Any payment or reimbursement made on or after the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall permanently reduce the Carve-Out on a dollar-for-dollar basis.  Any funding of the Carve-Out by funds from the DIP Facility Loans shall be added to, and made a part of, the DIP Obligations secured by the DIP Collateral and shall be otherwise entitled to the protections granted under this Interim Order, the DIP Loan Documents, the Bankruptcy Code and applicable law.

(e)      *Objection Rights*.  Nothing contained herein is intended to constitute, nor shall be construed as consent to the allowance of any Case Professional's fees, costs and expenses by any party and shall not affect the rights of the Debtors, the DIP Lender, the Citizens Secured

27

Parties or any other party in interest to object to the allowance and/or payment of any such amounts incurred or requested.

15.    <u>Limitations on Use of DIP Proceeds, Cash Collateral and Carve-Out</u>. The DIP Facility, the DIP Collateral, the Prepetition Collateral, the Adequate Protection Collateral, the Cash Collateral and the Carve-Out may not be used in connection with: (a) preventing, hindering, or delaying any of the DIP Lender or the Prepetition Secured Parties' enforcement or realization upon any of the DIP Collateral, Adequate Protection Collateral or Prepetition Collateral; (b) using or seeking to use Cash Collateral without the permission of the DIP Lender and the Prepetition Secured Parties or selling or otherwise disposing of DIP Collateral without the consent of the DIP Lender or as permitted by the DIP Loan Documents; (c) after payment in full of the DIP Obligations, selling or otherwise disposing of Adequate Protection Collateral without the consent of the Prepetition Secured Parties; (d) using or seeking to use any insurance proceeds constituting DIP Collateral without the consent of the DIP Lender and the Prepetition Secured Parties; (e) seeking to amend or modify any of the rights granted to the DIP Lender or the Prepetition Secured Parties under this Interim Order, the DIP Loan Documents, or the Prepetition Loan Documents, including seeking to use Cash Collateral, Adequate Protection Collateral and/or DIP Collateral on a contested basis; (f) litigating, objecting to, challenging or contesting in any manner in any way the DIP Liens, DIP Obligations, DIP Superpriority Claims, the Prepetition Secured Obligations, DIP Collateral (including Cash Collateral) or, as the case may be, Prepetition Collateral, the Adequate Protection Obligations,  the Adequate Protection Claims, the 507(b) Claims, the Adequate Protection Collateral (including Cash Collateral), the Adequate Protection  Liens or any other claims, held by or on behalf of any of the DIP Lender or the Prepetition Secured Parties, respectively; (g) asserting, commencing or prosecuting any claims or causes of action whatsoever,

28

including, without limitation, Avoidance Actions or applicable state law equivalents or actions to recover or disgorge payments, against any of the DIP Lender, the Prepetition Secured Parties, or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors and employees; (h) litigating, objecting to, challenging, or contesting in any manner, or raising any defenses to, the validity, extent, amount, perfection, priority, or enforceability of any of the DIP Obligations, the DIP Liens, the Prepetition Secured Obligations, the Prepetition Citizens Liens, the Adequate Protection Liens or any other liens or interests of any of the DIP Lender or the Prepetition Secured Parties; or (i) seeking to subordinate, recharacterize, disallow or avoid the DIP Obligations, the Adequate Protection Obligations or the Prepetition Secured Obligations; provided, however, that the Carve Out and such collateral proceeds and loans under the DIP Loan Documents may be used for allowed fees and expenses, in an amount not to exceed $10,000 in the aggregate (the "**<u>Investigation Budget Amount</u>**"), incurred solely by a Committee (if appointed), in investigating (but not prosecuting or challenging) the validity, enforceability, perfection, priority or extent of the Prepetition Citizens Liens within thirty (30) calendar days following appointment of the Committee. Notwithstanding anything to the contrary, any fees, expenses or costs incurred by the Committee or its professionals in excess of the Investigation Budget Amount or in excess of the amount budgeted for Committee's Case Professionals set forth in the Budget shall not constitute an allowable administrative expense claim, including for purposes of section 1129(a)(9)(A) of the Bankruptcy Code.

16.   <u>Effect of Stipulation on Third Parties</u>.

(a)    *Generally*. The admissions, stipulations, agreements, releases, and waivers set forth in this Interim Order (collectively, the "**<u>Prepetition Lien and Claim Matters</u>**") are and shall be binding on the Debtors, any subsequent trustee, responsible person, examiner with

expanded powers, any other estate representative, and all creditors and parties in interest and all

of their successors in interest and assigns, including, without limitation, a Committee (if

appointed), unless, and solely to the extent that, a party in interest that has sought and obtained

standing and the requisite authority to commence a Challenge (as defined below) (other than the

Debtors, as to which any Challenge is irrevocably waived and relinquished) (i) has timely filed the

appropriate pleadings, and timely commenced the appropriate proceeding required under the

Bankruptcy Code and Bankruptcy Rules, including, without limitation, as required pursuant to Part

VII of the Bankruptcy Rules (in each case subject to the limitations set forth in this paragraph 16

of this Interim Order) challenging the Prepetition Lien and Claim Matters (each such proceeding

or appropriate pleading commencing a proceeding or other contested matter, a "**Challenge**") by

no later than (1) thirty (30) days from the date of formation of a Committee (if appointed), or (2)

forty-five (45) days following the entry of the Interim Order for any other party in interest with

requisite standing (each the "**Challenge Deadline**"), as such applicable date may be extended in

writing from time to time in the sole discretion of the Prepetition Secured Parties, or by this Court

for good cause shown pursuant to an application filed by a party in interest prior to the expiration

of the Challenge Deadline, and (ii) this Court enters judgment in favor of the plaintiff or movant

in any such timely and properly commenced Challenge proceeding and any such judgment has

become a final judgment that is not subject to any further review or appeal.

(b)    *Binding Effect*. To the extent no Challenge is timely and properly

commenced by the Challenge Deadline, or to the extent such proceeding does not result in a final

and non-appealable judgment or order of this Court that is inconsistent with the Prepetition Lien

and Claim Matters, then, without further notice, motion, or application to, order of, or hearing

before, this Court and without the need or requirement to file any proof of claim, the Prepetition

Lien and Claim Matters shall, pursuant to this Interim Order, become binding, conclusive, and

final on any person, entity, or party in interest in the Chapter 11 Cases, and their successors and

assigns, and in any successor case for all purposes and shall not be subject to challenge or objection

by any party in interest, including, without limitation, a trustee, responsible individual, examiner

with expanded powers, or other representative of the Debtors' estates. Notwithstanding anything

to the contrary herein, if any such proceeding is properly and timely commenced, the Prepetition

Lien and Claim Matters shall nonetheless remain binding on all other parties in interest and

preclusive as provided in subparagraph (a) above except to the extent that any of such Prepetition

Lien and Claim Matters is expressly the subject of a timely and properly filed Challenge, which

Challenge is successful as set forth in a final judgment as provided in subparagraph (a) above, and

only as to plaintiffs or movants that have complied with the terms hereof. To the extent any such

Challenge proceeding is timely and properly commenced, the Prepetition Secured Parties shall be

entitled to payment of the reasonable related costs and expenses, including, but not limited to

reasonable attorneys' fees, incurred under the Prepetition Loan Documents in defending

themselves in any such proceeding as adequate protection. Upon a successful Challenge brought

pursuant to this paragraph 16, the Court may fashion any appropriate remedy.

      17.     <u>Bankruptcy Code Sections 506(c) and 552(b) Waivers</u>.  Subject to entry of a Final

Order, without limiting the Carve-Out, the Debtors irrevocably waive and shall be prohibited from

asserting (i) any surcharge claim, under section 506(c) of the Bankruptcy Code or otherwise, for

any costs and expenses incurred in connection with the preservation, protection or enhancement

of, or realization by the DIP Lender upon the DIP Collateral or by the Prepetition Secured Parties

upon the Adequate Protection Collateral and no costs or expenses of administration that have been

or may be incurred in any of the Chapter 11 Cases at any time shall be charged against the DIP

31

Lender, the Prepetition Secured Parties or their respective claims or liens (including any claims or liens granted pursuant to this Interim Order), and (ii) the "equities of the case" exception under section 552(b) of the Bankruptcy Code in connection with the DIP Facility and the use of Cash Collateral.

18.     <u>Application of Proceeds</u>.  Subject to the entry of the Final Order, in no event shall the DIP Lender, with respect to the DIP Collateral, or the Prepetition Secured Parties, with respect to the Adequate Protection Collateral, be subject to the equitable doctrine of "marshaling" or any other similar doctrine, and all proceeds of such DIP Collateral and Adequate Protection Collateral shall be received and used in accordance with this Interim Order.

19.     <u>Disposition of Collateral</u>.  The Debtors shall not sell, transfer, lease, encumber or otherwise dispose of any portion of the DIP Collateral, other than in the ordinary course of business or in connection with the payments contemplated under this Interim Order, without the prior written consent of the DIP Lender (and no such consent shall be implied from any other action, inaction or acquiescence by the DIP Lender or from any order of this Court); provided for the avoidance of doubt the Debtors shall comply with Section 6.4 of the DIP Credit Agreement. Notwithstanding anything otherwise provided herein, 100% of any net cash proceeds of any sale of  DIP Collateral outside of the ordinary course of business shall, subject to the satisfaction of the Carve-Out and the lien priorities outlined in paragraph 11 herein, be used to immediately satisfy the DIP Obligations.  Following payment in full of the DIP Obligations, the Debtors shall not sell, transfer, lease, encumber or otherwise dispose of any portion of the Adequate Protection Collateral, other than in the ordinary course of business or in connection with the payments contemplated under this Interim Order, without the prior written consent of the Prepetition Secured Parties (and no such consent shall be implied from any other action, inaction or acquiescence by

32

the Prepetition Secured Parties or from any order of this Court).  Notwithstanding anything otherwise provided herein, following payment in full of the DIP Obligations, 100% of any net cash proceeds of any sale of Adequate Protection Collateral outside of the ordinary course of business shall, subject to the satisfaction of the Carve-Out and the lien priorities outlined in paragraph 11 herein, be used to immediately satisfy the Adequate Protection Obligations and next to satisfy the Prepetition Secured Obligations.

20. <u>Restrictions on Granting Postpetition Liens</u>.  Other than the Carve-Out or as otherwise provided in this Interim Order, the Final Order or the DIP Loan Documents, no claim or lien having a priority superior or *pari passu* with those granted by this Interim Order to the Prepetition Secured Parties and the DIP Lender shall be granted or permitted by any order of this Court in the Chapter 11 Cases heretofore or hereafter, and the Debtors will not grant any such mortgages, security interests or liens in the DIP Collateral (or any portion thereof) or the Adequate Protection Collateral (or any portion thereof) or to any other parties pursuant to section 364(d) of the Bankruptcy Code or otherwise, while (i) any portion of the DIP Facility, any DIP Facility Loans or any other DIP Obligations, are outstanding, (ii) the DIP Lender has any Commitment under the DIP Loan Documents or (iii) the Prepetition Secured Obligations and/or the Adequate Protection Obligations are outstanding.  For avoidance of doubt, there shall be no restriction and this paragraph shall not apply to and excludes any liens or security interests granted in favor of any federal, state, municipal or other governmental unit, commission, board or court for any liability of the Debtors.

21. <u>Automatic Effectiveness of Liens</u>.  The DIP Liens and the Adequate Protection Liens shall not be subject to a challenge and shall attach and become valid, perfected, binding, enforceable, non-avoidable and effective by operation of law as of the date of the entry of this

Interim Order on a final basis, without any further action by the Debtors, the DIP Lender or the

Prepetition Secured Parties, respectively, and without the necessity of execution by the Debtors or

the filing or recordation, of any financing statements, security agreements, deposit control

agreements, vehicle lien applications, mortgages, filings with a governmental unit (including,

without limitation, the U.S. Patent and Trademark Office or the Library of Congress), or other

documents or the taking of any other actions.  All DIP Collateral shall be free and clear of other

liens, claims and encumbrances, except as provided in the DIP Loan Documents, and this Interim

Order.  All Adequate Protection Collateral shall be free and clear of other liens, claims and

encumbrances, except as provided in this Interim Order.  If the DIP Lender or the Prepetition

Secured Parties hereafter requests that the Debtors execute and deliver to such party financing

statements, security agreements, pledge agreements, control agreements, collateral assignments,

mortgages, or other instruments and documents considered by the DIP Lender or the Prepetition

Secured Parties to be reasonably necessary or desirable to further evidence the perfection of the

DIP Liens or the Adequate Protection Liens, as applicable, the Debtors are hereby authorized and

directed to execute and deliver such financing statements, security agreements, pledge agreements,

control agreements, mortgages, collateral assignments, instruments, and documents, and the DIP

Lender and/or the Prepetition Secured Parties, as appropriate, are hereby authorized to file or

record such documents in its discretion without seeking modification of the automatic stay under

section 362 of the Bankruptcy Code, in which event all such documents shall be deemed to have

been filed or recorded at the time and on the date of the entry of this Interim Order; provided,

however, no such filing or recordation shall be necessary or required in order to create or perfect

the DIP Liens or the Adequate Protection Liens.  The DIP Lender and the Prepetition Secured

Parties, in their respective sole discretion, may file a photocopy of this Interim Order as a financing

34

statement with any filing or recording office or with any registry of deeds or similar office, in addition to, or in lieu of, such financing statements, notices of liens or similar statements.[3]

22.    <u>Protection Under Section 364(e) of the Bankruptcy Code</u>.  The DIP Lender and the Prepetition Secured Parties have acted in good faith in connection with this Interim Order and their reliance on this Interim Order is in good faith.  The reversal or modification on appeal of the authorizations under section 364 of the Bankruptcy Code contained in this Interim Order does not affect the validity of any DIP Obligation or the DIP Liens, or the Adequate Protection Liens whether or not the DIP Lender or Prepetition Secured Parties (as applicable) knew of the pendency of the appeal, unless such authorization and incurrence of DIP Obligations and DIP Lien and advance of the DIP Facility Loan under 364 of the Bankruptcy Code in this Interim Order and the Final Order, were stayed pending appeal.

23.    <u>Reservation of Rights of the DIP Lender and the Prepetition Secured Parties</u>. Notwithstanding any other provision of this Interim Order to the contrary, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, or otherwise impair: (i) any of the rights of the DIP Lender or the Prepetition Secured Parties under the Bankruptcy Code or under non-bankruptcy law, including, without limitation, the right of any of such parties to (a) request modification of the automatic stay of section 362 of the Bankruptcy Code, (b) request dismissal of any of these Chapter 11 Cases, conversion of any of these Chapter 11 Cases to cases under chapter 7, or appointment of a chapter 11 trustee or examiner with expanded powers in any of these Chapter 11 Cases, (c) seek to propose, subject to the provisions of section 1121 of the Bankruptcy Code, a chapter 11 plan or plans; or (ii) any other rights, claims, or privileges (whether legal or equitable or otherwise) of the DIP Lender or the Prepetition Secured

---

[3] The provisions of section 1146(a) of the Bankruptcy Code do not apply herein.

Parties. The delay in or failure of the DIP Lender or the Prepetition Secured Parties to seek relief

or otherwise exercise their respective rights and remedies shall not constitute a waiver of any of

the DIP Lender's or the Prepetition Secured Parties' rights and remedies.

24.    <u>Right to Credit Bid</u>. Pursuant to section 363(k) of the Bankruptcy Code, unless the

Court orders otherwise for cause as provided under section 363(k) of the Bankruptcy Code, the

DIP Lender shall have the right to credit bid the total of the DIP Obligations for any or all of the

DIP Collateral at a sale, lease or other disposition of such DIP Collateral outside the ordinary

course of business (including any auction or similar sales), whether pursuant to a plan of

reorganization or a motion pursuant to section 363 of the Bankruptcy Code or otherwise (which

credit bid rights under section 363(k) of the Bankruptcy Code or otherwise shall not be impaired

in any manner). Pursuant to section 363(k) of the Bankruptcy Code, unless the Court orders

otherwise for cause as provided under section 363(k) of the Bankruptcy Code, the Prepetition

Secured Parties shall have the right to credit bid the total of the Prepetition Secured Obligations

and the Adequate Protection Obligations for any or all of the Adequate Protection Collateral and

the Prepetition Collateral at a sale, lease or other disposition of such Adequate Protection Collateral

and/or Prepetition Collateral outside the ordinary course of business (including any auction or

similar sales), whether pursuant to a plan of reorganization or a motion pursuant to section 363 of

the Bankruptcy Code or otherwise (which credit bid rights under section 363(k) of the Bankruptcy

Code or otherwise shall not be impaired in any manner), provided, however any such credit bid

submitted by the Prepetition Secured Parties must include either (i) provisions for the satisfaction

of any secured claims of the DIP Lender that are senior to the secured claim that forms the basis

of the credit bid or (ii) evidence that the DIP Lender has affirmatively consented to any other

treatment of its senior secured claim. A credit bid may be applied only to reduce the cash

36

consideration with respect to those assets in which the party submitting such credit bid holds a perfected security interest.  The DIP Lender and the Prepetition Secured Parties shall each be considered a "Qualified Bidder" with respect to their rights to acquire all or any of the assets by credit bid.

25.     <u>Remedies and Notice Upon the Occurrence of Maturity Date or Event of Default</u>.

(a)     Prior to payment in full of the DIP Obligations, upon prior written notice by the DIP Lender to counsel for the Debtors, counsel for the Committee, counsel to the Citizens Secured Parties, and the U.S. Trustee of the occurrence of an Event of Default (each as defined in the DIP Loan Documents and incorporated herein by reference) and without further order of the Court, the DIP Lender may (i) declare the DIP Obligations to be immediately due and payable; (ii) terminate the DIP Lender's commitment under the DIP Facility (other than the Carve-Out) or use of Cash Collateral; (iii) charge default rate interest; and/or (iv) upon five (5) business days' notice to counsel to the Debtors, counsel to the Committee and the U.S. Trustee, exercise all default-related rights and remedies against the DIP  Collateral, without further order of or application or motion to the Bankruptcy Court, and without restriction or restraint by any stay under sections 362 and 105 of the Bankruptcy Code or otherwise, <u>provided</u> <u>however</u>, that during the five (5) business day notice period, any party in interest shall have the right to file a pleading in opposition to the DIP Lender's exercise of rights and remedies including the delivery of the Carve-Out Trigger Notice; provided further that, unless otherwise ordered by the Court the only issue that may be raised by any party in such pleading shall be whether in fact, an Event of Default has occurred and is continuing; but provided further that, if an Event of Default occurs as a result of the Debtors' failure to indefeasibly satisfy the DIP Obligations by the Stated Maturity Date (as defined in the

37

DIP Loan Documents), the above referenced five (5) day notice period shall not apply and the Debtors and all other interested parties shall not have any challenge rights.

(b) Following the payment in full of the DIP Obligations, an "Event of Default" shall occur hereunder on the earliest to occur of: (i) the effective date of a chapter 11 plan for each of the Debtors; (ii) the entry of an order by this Court terminating the use of Cash Collateral; (iii) the conversion of any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code; (iv) the appointment of a trustee or examiner or other representative with expanded powers for the Debtors; (v) the dismissal of the Chapter 11 Cases; (vi) the Debtors' failure to perform any of their obligations under this Interim Order or their failure to comply with any of the terms or conditions of this Interim Order; provided that no Event of Default shall have occurred under this subsection (vi) until the Prepetition Secured Parties has provided two business days' written notice of any such purported failure to perform to the Debtors, (vii) modification (without the express written consent of the Prepetition Secured Parties), reversal or vacatur of this Interim Order; (viii) the filing of a chapter 11 plan that does not provide for the indefeasible payment in full in cash of all amounts due and owing under the Prepetition Loan Documents and all of the Adequate Protection Obligations on the effective date of such plan, or that provides for the impairment of the Prepetition Secured Parties' claims or liens; (ix) the Court entering an order granting relief from the automatic stay imposed by section 362 of the Bankruptcy Code to any entity other than Citizens Secured Parties, with respect to the Adequate Protection Collateral and/or the Prepetition Collateral having a value in excess of $150,000 without the written consent of the Prepetition Secured Parties, which consent may not be unreasonably withheld; (x) a filing by any Debtor of any motion, pleading, application or adversary proceeding challenging the amount, validity, enforceability, perfection, priority or extent of the Prepetition Credit Liens, the Adequate Protection Liens, or asserting any

38

other claims, counterclaims, causes of action, objections, contests or defenses against the Prepetition Credit Obligations, the Prepetition Collateral, the Prepetition Citizens Liens, the Adequate Protection Liens, and/or the 507(a) Claims; (xi) a filing of a motion for bidding procedures or a motion for the sale of any or all of a Debtors' assets that has not been made in consultation with the Prepetition Secured Parties; or (xii) the Debtors' failure to preserve or impair the right of the Prepetition Secured Parties to credit bid on any sale of the Adequate Protection Collateral and/or the Prepetition Collateral.  Upon the occurrence of an Event of Default under this subparagraph (b), the Citizens Secured Parties may file a motion for relief from the automatic stay upon fourteen (14) days' notice to exercise all default-related rights and remedies against the Adequate Protection Collateral and/or the Prepetition Collateral, without further order of or application or motion to the Bankruptcy Court, and without restriction or restraint by any stay under sections 362 and 105 of the Bankruptcy Code or otherwise, provided however, the only issue that may be raised by any party in opposition to such motion for relief from the automatic stay shall be whether in fact, an Event of Default has occurred and is continuing.

26.   Modification of Stay.  Subject to the terms set forth herein, the automatic stay imposed under section 362(a) of the Bankruptcy Code is hereby modified as necessary to effectuate all of the terms, rights, benefits, privileges, remedies and provisions of this Interim Order, and the DIP Loan Documents including without limitation, to permit the DIP Lender to exercise all rights and remedies provided for in the DIP Loan Documents and take any and all actions provided therein, in each case, without further notice, application to, order of or hearing before this Court, including those set forth in paragraph 25 of this Interim Order.

27.   Survival of DIP Liens, DIP Superpriority Claims, Adequate Protection Liens, Adequate Protection Obligations and Other Rights.  If, in accordance with section 364(e) of the

Bankruptcy Code, this Interim Order does not become a final non-appealable order, if a trustee terminates this Interim Order, or if any of the provisions of this Interim Order are hereafter modified, amended, vacated or stayed by subsequent order of this Court or any other court, such termination or subsequent order shall not affect the priority, validity, enforceability or effectiveness of (or subordination to the Carve-Out of) any lien, security interests or any other benefit or claim authorized hereby with respect to any DIP Obligations or Adequate Protection Obligations incurred prior to the effective date of such termination or subsequent order. All such liens, security interests, claims and other benefits shall be governed in all respects by the original provisions of this Interim Order, and the DIP Lender and Citizens Secured Parties shall be entitled to all the rights, remedies, privileges and benefits granted herein, including the liens and priorities granted herein, with respect to any DIP Loan and Adequate Protection Obligations, subject to the Carve-Out.

      28.    <u>Survival of this Interim Order</u>.

      (a)    The provisions of this Interim Order and any actions taken pursuant hereto shall survive the entry of any order: (i) confirming any plan of reorganization in any of the Chapter 11 Cases; (ii) converting any of the Chapter 11 Cases to a chapter 7 case; or (iii) dismissing any of the Chapter 11 Cases, and the terms and provisions of this Interim Order as well as the DIP Superpriority Claims, the DIP Liens in DIP Collateral granted pursuant to this Interim Order and the DIP Loan Documents, the Adequate Protection Liens, the 507(a) Claims, and the Adequate Protection Obligations shall continue in full force and effect notwithstanding the entry of any such order.

      (b)    The DIP Liens and the DIP Superpriority Claims shall maintain their priority as provided by this Interim Order and the DIP Loan Documents, and to the maximum

40

extent permitted by law, until all of the DIP Obligations are indefeasibly paid in full in cash and

discharged or otherwise treated under a plan of reorganization, which is reasonably acceptable to

the DIP Lender.  In no event shall any plan of reorganization be allowed to alter the terms of

repayment of any of the DIP Obligations from those set forth in the DIP Loan Documents unless

agreed to by and among the Debtors and the DIP Lender.

29.    Modifications of DIP Loan Documents.  The Debtors and the DIP Lender are

hereby authorized to implement, in accordance with the terms of the DIP Loan Documents, any

non-material modifications of the DIP Loan Documents without further notice, motion or

application to, order of or hearing before, this Court.  Any material modification or amendment to

the DIP Loan Documents shall only be permitted pursuant to an order of this Court, after being

submitted to this Court upon five (5) days' notice to the U.S. Trustee, Citizens Secured Parties,

and counsel to the Committee; provided, that any forbearance from, or waiver of, (i) a breach by

the Debtors of a covenant representation or any other agreement or (ii) a default or an Event of

Default, in each case under the DIP Loan Documents shall not require an order of this Court.  In

the event of any inconsistency between this Interim Order and the DIP Credit Agreement, this

Interim Order shall control.

30.    Insurance Policies.  Upon entry of this Interim Order, on each insurance policy

maintained by the Debtors which in any way relates to the DIP Collateral: (i) the DIP Lender shall

be, and shall be deemed to be, without any further action by or notice to any person, named as

additional insureds; and (ii) the DIP Lender shall be and shall be deemed to be, without any further

action by or notice to any person, named as loss payee for DIP Collateral on which the DIP Lien

holds a first priority lien.  The Debtors are hereby authorized on a final basis, to and shall take any

actions necessary to have the DIP Lender be added as an additional insured and loss payee on each

41

insurance policy maintained by the Debtors consistent with this Interim Order and DIP Credit

Agreement which in any way relates to the DIP Collateral.

31.     <u>Financial Information</u>.  The Debtors shall deliver to the DIP Lender and the Citizens

Secured Parties such financial and other information concerning the business and affairs of the

Debtors and any of the DIP Collateral and the Adequate Protection Collateral as may be required

pursuant to the DIP Loan Documents, the Prepetition Loan Documents and/or as the DIP Lender

or the Citizens Secured Parties shall reasonably request from time to time.  The Debtors shall allow

the DIP Lender and the Citizens Secured Parties access to the premises in accordance with the

terms of the DIP Loan Documents and the Prepetition Loan Documents for the purpose of enabling

such parties to inspect and audit the DIP Collateral, the Adequate Protection Collateral and the

Debtors' books and records.

32.     <u>Proofs of Claim</u>.  Notwithstanding any order entered by the Bankruptcy Court in

relation to the establishment of a bar date in the Chapter 11 Cases to the contrary, or otherwise,

the DIP Lender and the Prepetition Secured Parties shall not be required to file proofs of claim in

the Chapter 11 Cases for any claim allowed herein.

12256869v1

33.    <u>Immediate Effect of Order</u>.  The terms and conditions of this Interim Order shall be effective and immediately enforceable upon its entry by the Clerk of the Court notwithstanding any potential application of Bankruptcy Rule 6004(h) or otherwise.  Furthermore, to the extent applicable, the notice requirements and/or stays imposed by Bankruptcy Rules 4001(a)(3), 6003(b), and 6004(a) are hereby waived for good and sufficient cause. The requirements of Bankruptcy Rules 4001, 6003, and 6004, in each case to the extent applicable, are satisfied by the contents of the Motion.

Dated:                                              _____

William J. Fisher
United States Bankruptcy Judge

## __Exhibit 1__

**DIP Credit Agreement**

44

## Exhibit 2

## Approved Budget

AFDOCS/21216102.1

12256869v1

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MINNESOTA

---

| | |
|---|---|
| In re: | Joint Administration Pending |
| Granite City Food & Brewery Ltd. | Case No. 19-43756 |
| Debtor. | Chapter 11 Cases |

---

| | |
|---|---|
| In re: | Joint Administration Pending |
| Granite City Restaurant Operations, Inc. | Case No. 19-43757 |
| Debtor. | Chapter 11 Cases |

---

| | |
|---|---|
| In re: | Joint Administration Pending |
| Granite City of Indiana, Inc. | Case No. 19-43758 |
| Debtor. | Chapter 11 Cases |

---

| | |
|---|---|
| In re: | Joint Administration Pending |
| Granite City of Maryland, Inc. | Case No. 19-43760 |
| Debtor. | Chapter 11 Cases |

---

| | |
|---|---|
| In re: | Joint Administration Pending |
| Granite City of Kansas Ltd. | Case No. 19-43759 |
| Debtor. | Chapter 11 Cases |

---

**DEBTORS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR INTERIM AND FINAL ORDERS (I) GRANTING EXPEDITED HEARING, (II) APPROVING POSTPETITION FINANCING, (III) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (IV) AUTHORIZING USE OF CASH COLLATERAL, (V) GRANTING ADEQUATE PROTECTION, (VI) MODIFYING AUTOMATIC STAY, AND (VII) GRANTING RELATED RELIEF**

---

The above-named Debtors (collectively, the "Debtors"), by and through their undersigned counsel, submit this memorandum of law in support of the accompanying motion in the above-entitled matter and in accordance with Local Rule 9013-2(a).  The relief requested in the Motion should be granted to allow Debtors to continue operating their business.

## FACTUAL BACKGROUND

The supporting facts are set forth in the verified Motion.  All capitalized terms used herein and not otherwise defined shall have the meanings ascribed to them in the motion.

## LEGAL ANALYSIS

### I.    THE DEBTORS' REQUEST FOR EXPEDITED RELIEF SHOULD BE GRANTED.

The Debtors request expedited relief. Bankruptcy Rule 9006(c) provides that the Court may reduce the notice period "for cause shown." Cause exists here to grant the Motion on an expedited basis. As described in the Motion, the liquidity to be provided under the DIP Financing is essential to the Debtors' continued operations and the success of the Debtors' efforts to maximize the value of the estates, and is needed on the most urgent basis possible. Without the proceeds of the DIP Financing, the Debtors will be unable to effectuate an orderly sale process to the prejudice of their creditors, their employees, and other stakeholders. Accordingly, the expedited relief requested is necessary to avoid immediate and irreparable harm.

### II.    THE DEBTORS SHOULD BE AUTHORIZED TO OBTAIN THE DIP FINANCING UNDER SECTION 364 OF THE BANKRUPTCY CODE

Section 364 of the Bankruptcy Code authorizes a debtor in possession to obtain postpetition financing and to grant superpriority administrative status and liens on its property. Specifically, Section 364(c) provides as follows:

> If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt:

2

(1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of [the Bankruptcy Code]; [or]

(2) secured by a lien on property of the estate that is not otherwise subject to a lien; or

(3) secured by a junior lien on property of the estate that is subject to a lien[.]

11 U.S.C. § 364(c). Further, § 364(d) provides:

(1) The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate only if:

(A)     the trustee is unable to obtain such credit otherwise; and

(B)     there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

(2) In any hearing under this subsection, the trustee has the burden of proof on the issue of adequate protection.

11 U.S.C. § 364(d).

Provided that an agreement to obtain secured credit is consistent with the Bankruptcy Code and its underlying policies, courts afford debtors considerable deference in exercising sound business judgment to obtain such credit. *See, e.g., In re Barbara K. Enters., Inc.*, No. 08-11474, 2008 WL 2439649, at *14 (Bankr. S.D.N.Y. June 16, 2008) (explaining that courts defer to a debtor's business judgment "so long as a request for financing does not 'leverage the bankruptcy process' and unfairly cede control of the reorganization to one party in interest."); *In re Ames Dep't Stores, Inc.,* 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 [of the Bankruptcy Code] is to be utilized on grounds that permit [a debtor's] reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest."); *In re Farmland Indus., Inc.*, 294 B.R. 855, 881 (Bankr. W.D. Mo. 2003) (noting that approval of post petition financing requires, *inter alia*, an exercise of "sound and reasonable business judgment").

3

Further, in determining whether the Debtors have exercised sound business judgment in deciding to enter into the DIP Loan Documents, this Court may appropriately take into consideration non-economic benefits to the Debtors accompanying the proposed postpetition facility. For example, in *In re ION Media Networks, Inc.*, the Bankruptcy Court for the Southern District of New York held that:

> Although all parties, including the Debtors and the Committee, are naturally motivated to obtain financing on the best possible terms, a business decision to obtain credit from a particular lender is almost never based purely on economic terms. Relevant features of the financing must be evaluated, including non-economic elements such as the timing and certainty of closing, the impact on creditor constituencies and the likelihood of a successful reorganization. This is particularly true in a bankruptcy setting where cooperation and established allegiances with creditor groups can be a vital part of building support for a restructuring that ultimately may lead to a confirmable reorganization plan. That which helps foster consensus may be preferable to a notionally better transaction that carries the risk of promoting unwanted conflict.

No. 09-13125, 2009 WL 2902568, at *4 (Bankr. S.D.N.Y. July 6, 2009).

Here, given all the facts and circumstances present in these cases, the Debtors have satisfied the necessary conditions under §§ 364(c) and (d) of the Bankruptcy Code for authority to enter into the DIP financing. The Debtors exercised proper business judgment in securing the DIP Financing on terms that are fair and reasonable and the best available to them in the current market. The Debtors could not obtain credit on an unsecured or administrative expense basis, and the Debtors have provided the Prepetition Secured Parties with adequate protection against any potential diminution in value of their interests. Moreover, JMB and Citizens have consented to both the terms of the DIP Financing and the adequate protection proposed in connection therewith. For all the reasons discussed below, therefore, the Court should grant the Debtors' request to enter into the DIP Financing pursuant to §§ 364(c) and (d) of the Bankruptcy Code.

4

### A. The Debtors Exercised Sound and Reasonable Business Judgment in Deciding to Enter into the DIP Financing

Based on the facts of these Cases, the DIP Financing represents a proper exercise of the Debtors' business judgment. Bankruptcy courts routinely defer to the debtors' business judgment on most business decisions, including decisions about whether and how to borrow money. *Grp. Of Institutional Investors v. Chi., Milwaukee, St. Paull & Pac. R.R*., 318 U.S. 523, 550 (1943); *In re Farmland Indus., Inc*. at 882) ("Business judgments should be left to the board room and not to this Court.") (quoting *In re Simasko Prod. Co*., 47 B.R. 444, 449 (Bankr. D. Colo. 1985)); *In re Lifeguard Indus., Inc.*, 37 B.R. 3, 17 (Bankr. S.D. Ohio 1983). "More exacting scrutiny would slow the administration of the debtors' estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." *Richmond Leasing Co. v. Capital Bank, N.A*., 762 F.2d 1303, 1311 (5th Cir. 1985).

In general, a bankruptcy court defers to a debtor's business judgment regarding the need for, and the proposed use of, funds, unless the debtor's decision improperly leverages the bankruptcy process or its purpose is not so much to benefit the estate as it is to benefit a party in interest. *See Ames Dep't Stores*, 115 B.R. at 40; *see also In re Curlew Valley Assocs*., 14 B.R. 506, 511-13 (Bankr. D. Utah 1981). Courts generally will not second-guess a debtor's business decisions when those decisions involve "a business judgment made in good faith, upon a reasonable basis, and within the scope of [its] authority under the [Bankruptcy] Code." *Id*. at 513-14 (footnote omitted).

To determine whether the business judgment test is met, "the court 'is required to examine whether a reasonable business person would make a similar decision under similar circumstances.'" *In re Dura Auto. Sys. Inc*., No. 06-11202 (KJC), 2007 Bankr. LEXIS 2764, at

5

*272 (Bankr. D. Del. Aug. 15, 2007) (quoting *In re Exide Techs., Inc.,* 340 B.R. 222, 239 (Bankr. D. Del. 2006)).

Here, the Debtors have exercised sound business judgment in determining that the DIP financing is appropriate. The Debtors are not able to operate with cash collateral as the sole source of funding. The Debtors and their advisors analyzed whether projected cash collateral would suffice to fund operations during the case, and concluded that DIP Financing is necessary. The Debtors considered such factors as the uncertainty inherent in estimating the timing of receipts and disbursements and the need for continued periodic incremental liquidity. In consideration of these factors, the Debtors concluded that the benefits and certainty provided by using DIP Financing outweighed the risks associated with attempting to finance the operations solely with cash collateral.

With the assistance of their advisors, the Debtors concluded that the DIP Financing represents the best terms available in the current market. The Debtors were unable to find alternative DIP Financing on better terms. *See* Lynch Decl. ¶¶74-80. Given the need for financing, the Debtors' decision is therefore sound and reasonable under the circumstances.

Furthermore, the Prepetition Secured Parties have consented to the terms of the DIP Financing and their treatment thereunder on the terms set forth in the DIP Orders. Their consent to the financing and support for the process are important considerations when planning a successful chapter 11 case. Rather than engaging in a costly and distracting dispute with the Prepetition Secured Parties regarding the use of cash collateral or a priming lien, the Debtors are free to concentrate on operating their business, running a comprehensive sale process, and maximizing the value of the estate.

The DIP Financing will send a strong signal to the Debtors' employees, vendors, and other parties in interest regarding the viability of the Debtors' process. Accordingly, if approved, the

6

DIP Financing will preserve and enhance the value of the Debtors' estates. As such, entry into the

DIP Financing is a sound exercise of the Debtors' business judgment.

## B. The Debtors Meet the Conditions Necessary Under Section 364(c) to Obtain Postpetition Financing on a Senior Secured and Superpriority Basis

Section 364(c) of the Bankruptcy Code authorizes a debtor to obtain postpetition financing

on a secured or superpriority basis, or both, where the Court finds, after notice and a hearing, that

the debtors are "unable to obtain unsecured credit allowable under section 503(b)(1) of the

[Bankruptcy Code]. . . ." 11 U.S.C. § 364(c).

Courts have articulated a three-part test to determine whether a debtor is entitled to obtain

financing under § 364(c) of the Bankruptcy Code. Specifically, courts look to whether:

> (a)  the debtor is unable to obtain unsecured credit under section 364(b), i.e., by allowing a lender only an administrative expense claim;
> (b)  the credit transaction is necessary to preserve the assets of the estate; and
> (c)  the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender.

*In re Ames Dep't Stores, Inc.*, 115 B.R. at 37-39; *accord In re St. Mary Hosp.*, 86 B.R. 893, 401

(Bankr. E.D. Pa. 1988); *In re Crouse Grp., Inc.,* 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987).

In order to satisfy this test, a debtor need only demonstrate "by a good faith effort that

credit was not available" to the debtor on an unsecured or administrative expense basis. *Bray v.*

*Shenandoah Fed. Savs. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986);

*accord In re Ames Dep't Stores, Inc.*, 115 B.R. at 37 (debtor must show that it has made reasonable

efforts to seek other sources of financing under sections 364(a) and (b) of the Bankruptcy Code);

*In re Crouse Grp., Inc.,* 71 B.R. at 549 (secured credit under section 364(c)(2) of the Bankruptcy

Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be

obtained). "The statute imposes no duty to seek credit from every possible lender before

concluding that such credit is unavailable." *Id.*; *see also Pearl-Phil GMT (Far East) Ltd. V. Caldor*

*Corp.*, 266 B.R. 575, 584 (S.D.N.Y. 2001) (superpriority administrative expenses authorized

where debtor could not obtain credit as an administrative expense). This is especially true when

time is of the essence. *In re Reading Tube Indus.*, 72 B.R. 329, 332 (Bankr. E.D. Pa. 1987). When

few lenders are likely to be able and willing to extend the necessary credit, "it would be unrealistic

and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re*

*Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom., Anchor Savs. Bank*

*FSB v. Sky Valley, Inc.,* 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); see also Ames Dep't Stores, 115

B.R. at 40 (approving financing facility and holding that the debtor made reasonable efforts to

satisfy the standards of § 364(c) by approaching four lending institutions and selecting the most

favorable of the two offers it received).

As laid out in the Lynch Declaration, the Debtors made reasonable efforts to secure the

best possible postpetition financing under the circumstances. Because of the Debtors' urgent need

for liquidity and the challenging state of the hospitality industry (Restaurants Unlimited, Kona

Grill, Perkins and Marie Calender's, and Houlihan's have all filed bankruptcy in 2019), the

Debtors were unable to solicit any viable proposals that authorized financing on an unsecured or

administrative expense basis. To the contrary, the Debtors' negotiations made clear that the

Debtors' only viable option was to obtain financing from JMB on the terms provided in the DIP

Loan Documents. *See* Lynch Decl. ¶¶ 74-80.

The Court should therefore authorize the Debtors to provide the DIP Lender superpriority

administrative expense status for any obligations arising under the DIP Credit Agreement as

provided for in § 364(c)(1) of the Bankruptcy Code, subordinate only to the DIP Liens, the DIP

Carve-Out and Permitted Prepetition Liens.

**C.      The Debtors Should Be Authorized to Obtain Postpetition Financing Secured by Liens That are Senior to the Liens Securing the Prepetition Secured Debt**

In addition to authorizing financing under Section 364(c) of the Bankruptcy Code, a court may also authorize a debtor to obtain postpetition credit secured by a lien that is senior in priority to existing liens on encumbered property if the debtor cannot otherwise obtain such credit and the interests of existing lien holders are adequately protected or consent is obtained. *See* 11 U.S.C. § 364(d)(1).

When determining whether to authorize a debtor to obtain credit secured by a lien that is senior or equal to a prepetition lien as authorized by section 364(d) of the Bankruptcy Code, courts focus on whether the transaction will enhance the value of the debtor's assets. Courts consider a number of factors, including, without limitation:

- Whether alternative financing is available on any other basis (i.e., whether any other proposals are before the court);
- Whether the proposed financing is necessary to preserve estate assets and is necessary, essential, and appropriate for continued operation of the debtor's business;
- Whether the terms of the proposed financing are reasonable and adequate given the circumstances of both the debtor and proposed lender(s); and
- Whether the proposed financing agreement was negotiated in good faith and at arm's length and entry therein is an exercise of sound and reasonable business judgment and in the best interest of the debtor's estate and its creditors.

*See, e.g., Ames Dep't Stores*, 115 B.R. at 37-39; *Bland v. Farmworker Creditors*, 308 B.R. 109, 113-14 (S.D. Ga. 2003); *Farmland Indus.*, 294 B.R. at 862-79; *Barbara K. Enters.*, 2008 WL 2439649, at *10.

The DIP Financing satisfies each of these factors. First, as described above, despite significant efforts, the Debtors were unable to obtain alternative DIP financing. The agreement before the court reflects the most favorable terms on which the Debtors were able to obtain financing. The Debtors are not able to obtain financing on equal or better terms than the terms

9

provided by the DIP Lender, or any other source, without granting liens senior in priority to those securing the prepetition obligations.

Second, the Debtors urgently need the funds to be provided under the DIP Financing to preserve the value of their estates for the benefit of all creditors and other parties in interest. Without the DIP Financing, the Debtors will be unable to operate and conduct a responsible sale process. Providing the Debtors with the liquidity necessary to preserve their going concern value through the pendency of these Cases is in the best interests of all stakeholders.

Third, the terms of the DIP Financing are reasonable and adequate to support the Debtors' necessary activities through the pendency of these Cases. The interest rates and fees under the DIP Financing are market rates in comparison to the interest rates and fees in other recent hospitality cases.

Fourth, as described in greater detail above and in the Lynch Declaration, the Debtors and the DIP Lender negotiated the DIP Loan Documents in good faith and at arms' length, and the Debtors' entry into the DIP Loan Documents is an exercise of their sound business judgment. The DIP Financing is on the most favorable terms available to the Debtors under current market conditions and the Debtors' financial condition. In light of all these factors, the Debtors should be authorized to secure the DIP Financing with first priority senior priming liens.

### D.      The Interests of the Prepetition Secured Parties are Adequately Protected

The DIP Financing adequately protects the interests of Citizens Bank and other Prepetition Secured Parties. Furthermore, Citizens Bank has consented to the DIP Financing on the terms set forth in the DIP Orders. The interests of Citizens Bank are protected by (i) the Adequate Protection Liens (as defined in the DIP Orders) to secure the prepetition secured obligations; (ii) superpriority claims to the extent that the Adequate Protection Liens do not adequately protect against any diminution in value of Citizens Bank's Prepetition Collateral; and (iii) contemporaneous access to

10

all post-petition financial reporting provided to the DIP Lender under the DIP Credit Agreement. Other Prepetition Secured Parties are protected through carve-outs and through designation as Permitted Prior Liens.

A debtor may obtain post-petition credit "secured by a senior or equal lien on property of the estate that is subject to a lien only if" the debtor, among other things, provides "adequate protection" to those parties whose liens are primed. *See* 11 U.S.C. § 364(d)(1)(B). What constitutes adequate protection is decided on a case-by-case basis, and adequate protection may be provided in various forms, including payment of adequate protection fees, payment of interest or granting of replacement liens or administrative claims. *See, e.g., In re Martin*, 761 F.2d 472, 474 (8th Cir. 1985) ("[S]uch matters 'are [to be] left to case-by-case interpretation and development.'") quoting H.R. Rep. No. 595, 95th Cong., 2d Sess. 339, reprinted in 1978 U.S. Code Cong. & Ad. News 5963, 6295); *In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996) ("the determination of adequate protection is a fact-specific inquiry . . . left to the vagaries of each case"); *In re Realty Sw. Assocs.*, 140 B.R. 360 (Bankr. S.D.N.Y. 1992); *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986) (the application of adequate protection "is left to the vagaries of each case, but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process") (citation omitted).

The critical purpose of adequate protection is to guard against the diminution of a secured creditor's collateral during the period when such collateral is being used by the debtor in possession. *See Martin*, 761 F.2d at 474; *In re Johnson*, 90 B.R. 973, 978 (Bankr. D. Minn. 1988) (holding that secured creditor is not impaired and is not entitled to receive adequate protection payments where value of collateral does not decline); *495 Cent. Park*, 136 B.R. at 631 ("The goal of adequate protection is to safeguard the secured creditor from diminution in the value of its

interest during the chapter 11 reorganization."); *In re Beker Indus. Corp.*, 58 B.R. at 736; *In re Hubbard Power & Light*, 202 B.R. 680, 685 (Bankr. E.D.N.Y. 1996).

Further, courts in this district and others have approved similar forms of adequate protection for prepetition secured creditors. *See, e.g., In re Duke and King Acquisition Corp.*, No. 10-38652 (GFK) (Bankr. D. Minn. Jan. 24, 2011) [ECF No. 138] (authorizing replacement liens to prepetition secured creditors for the use of cash collateral); *In re Otter Tail AG Enters., LLC*, 2009 Bankr. LEXIS 5352, at *10-11 (Bankr. D. Minn. Nov. 20, 2009) (granting, *inter alia*, adequate protection liens for the use of cash collateral); *In re Schwing America, Inc.*, No. 09-36760 (NCD) (Bankr. D. Minn. Oct. 2, 2009) [ECF No. 15] (granting replacement liens in connection with authorizing postpetition financing on an interim basis); *In re Polaroid Corp.,* No. 08-46617 (GFK) (Bankr. D. Minn. Jan. 27, 2009) [ECF No. 70] (authorizing replacement liens to prepetition secured creditors for the use of cash collateral); *In re Premium Protein Prods., LLC*, 2009 Bankr. LEXIS 5285, at *26-27 (Bankr. D. Neb. Nov. 18, 2009) (granting adequate protection liens and superpriority claims pursuant to 507(b) to prepetition lenders); *In re AMF Bowling Worldwide, Inc.*, No. 12-36495 (KRH) Bankr. E.D. Va. Dec. 12, 2012) (granting, inter alia, first and second lien adequate protection liens); *In re Patriot Coal Corp.*, No. 12-12900 (SCC) (Bankr. S.D.N.Y. Aug. 3, 2012) [ECF No. 275] (granting, inter alia, DIP liens, adequate protection liens and superpriority claims to secure DIP obligations); *In re NewPage Corp.*, No. 11-12804 (KG) (Bankr. D. Del. Oct. 5, 2011).

Accordingly, the Court should find that the adequate protection provided to Citizens Bank is fair and reasonable, and satisfies the requirements of section 364(d)(1)(B) of the Bankruptcy Code.

### E.    The Roll-Up of the Prepetition Additional Term Loan Obligations Should be Approved

Upon entry of the Interim Order and the occurrence of the Closing Date (as defined in the DIP Loan Documents), obligations for an Additional Term Loan granted by the DIP Lender to the Debtors prepetition will be immediately, automatically, and irrevocably deemed to have been converted into DIP Roll-Up Obligations, and such DIP Roll-Up Obligations shall constitute DIP Obligations and shall be entitled to all the priorities, privileges, rights, and other benefits afforded to the other DIP Obligations. This "Roll-Up" is necessary, as the DIP Lender is not willing to provide the DIP Facility unless the prepetition Additional Term Loan is granted all the same protections as the postpetition DIP Facility.

Taking into account the nature of this proposed transaction, the Debtors carefully considered its terms, including the "Roll-UP" obligation and determined it was appropriate and in in the best interest of the estaes. The prepetition Additional Term Loan was provided by the DIP Lender prepetition, and used to fund operations and prepare for an orderly chapter 11 process, including providing the Debtors will a runway to implement a lengthy marketing process and prepare other first day pleadings. The DIP Financing is essential to a successful chapter 11 process, and the prepetition DIP Lender is the only viable source of this crucial financing. The Debtors submit that the roll-up is appropriate and in the best interests of their estates.

Moreover, such roll-ups of prepetition debt are often approved at the outset of a chapter 11 case. *See, e.g., In re Patriot Coal Corp.*, No. 12-12900 (ALG) (Bankr. S.D.N.Y. July 11, 2012); *In re Eastman Kodak Co*., No. 12-10202 (ALG) (Bankr. S.D.N.Y. Jan. 20, 2012); *In re NewPage Corp.*, No. 11-12804 (KG) (Bankr. D. Del. Oct 5, 2011); *In re The Great Atl. & Pac. Tea Co*., No. 10-24549 (RDD) (Bankr. S.D.N.Y. Jan. 11, 2011); *In re Bear Island Paper Co., L.L.C.,* No. 10-31202 (DOT) (Bankr. E.D. Va. Feb. 26, 2010); *In re Calpine Corp*., No. 05-60200 (BRL) (Bankr.

S.D.N.Y. 2007); *In re Rowe Cos.*, No. 06-11142 (KRH) (Bankr. E.D. Va. Oct. 16, 2006). Given

the exigent need for liquidity here, this Court can and should authorize the Roll-Up transaction.

## III.    THE DEBTORS SHOULD BE AUTHORIZED TO USE THE CASH COLLATERAL

Section 363(c) of the Bankruptcy Code governs a debtor's use of a secured creditor's cash

collateral. Specifically, that provision provides, in pertinent part, that: "The trustee may not use,

sell, or lease cash collateral . . . unless—

> (A)    each entity that has an interest in such cash collateral
> consents; or
> (B)    the court, after notice and a hearing, authorizes such use,
> sale, or lease in accordance with the provisions of [section 363].

11 U.S.C. § 363(c)(2). Further, section 363(e) provides that "on request of an entity that has an

interest in property . . . proposed to be used, sold or leased, by the trustee, the court, with or without

a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate

protection of such interest." 11 U.S.C. § 363(e).

The Debtors have satisfied the requirements of sections 363(c)(2) and (e), and should be

authorized to use the Cash Collateral. First, as explained above, the DIP Lender and Citizens Bank

have consented to the use of its Cash Collateral on the terms set forth in the DIP Orders. Second,

as described above, the Debtors are providing the Prepetition Secured Parties with (i) the Adequate

Protection Liens (as defined in the DIP Orders) to secure the prepetition secured obligations; (ii)

superpriority claims to the extent that the Adequate Protection Liens do not adequately protect

against any diminution in value of Citizens Bank's Prepetition Collateral; (iii) contemporaneous

access to all post-petition financial reporting provided to the DIP Lender under the DIP Credit

Agreement; and (iv) carve-outs and designation as Permitted Prior Liens for other prepetition

Secured Lenders.

14

## IV.    THE DEBTORS SHOULD BE AUTHORIZED TO PAY THE FEES IN CONNECTION WITH THE DIP FINANCING

The Debtors have agreed, subject to Court approval, to pay certain fees to the DIP Lender in connection with the DIP financing. Specifically, the Debtors will pay a 1% Commitment Fee, a 2% Funding Fee, a 3% Exit fee, and a $50,000.00 non-refundable work fee. The fees the Debtors have agreed to pay to the DIP Lender and other obligations under the DIP Credit Agreement represent the most favorable terms on which the DIP Lender would agree to make the DIP Financing Available. The fees are in line with market rates and other DIP facilities approved in recent hospitality cases. The fees are also lower than what had been offered by other potential lenders in connection with the Debtors' efforts to locate such financing prepetition. The Debtors considered the fees when determining in their sound business judgment that the DIP Loan Documents constituted the best terms on which the Debtors could obtain the postpetition financing necessary to continue their operations and prosecute these Cases, and paying these fees in order to obtain the DIP Financing is in the best interests of the Debtors' estates and creditors and other parties in interest.

## V.    THE SCOPE OF THE DIP CARVE-OUT IS APPROPRIATE

The DIP Financing subjects the security interests and administrative expense claims of the DIP Lender to the DIP Carve-Out. Such carve-outs for professional fees have been found to be reasonable and necessary to ensure that a debtor's estate and any statutory committee can retain assistance from their professionals in certain circumstances during an event of default under the terms of the debtor's postpetition financing. *See Ames*, 115 B.R. at 40. The DIP Financing does not directly or indirectly deprive the Debtors' estates or other parties in interest of possible rights and powers by restricting the services for which professionals may be paid in these cases. *Id*. at 38 (observing that courts insist on carve-outs for professionals representing parties-in-interest because

15

"[a]bsent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced"). Additionally, the DIP Carve-Out protects against administrative insolvency during the course of these Cases by ensuring that assets remain for the payment of U.S. Trustee fees and professional fees of the Debtors and the Creditors' Committee notwithstanding the grant of superpriority claims and the DIP Liens and Adequate Protection Liens.

Courts in this district and others routinely approve of carve-outs agreed to by the debtors and their DIP financing lenders. *See, e.g., In re Genmar Holdings, Inc*., No. 09-43537 (Bankr. D. Minn. June 4, 2009) [ECF No. 23]; *In re US Fidelis, Inc.,* 2010 Bankr. LEXIS 5837, at *18 (Bankr. E.D. Mo. 28, 2010); *In re Trilogy Dev. Co*., 2009 Bankr. LEXIS 5178, at *18-19 (Bankr. W.D. Mo. July 14, 2009); *In re AMF Bowling Worldwide, Inc*., No. 12-36495 (KRH) (Bankr. E.D. Va. Dec. 18, 2012); *In re The Great Atl. & Pac. Tea Co*., No. 10-24549 (RDD) (Bankr. S.D.N.Y. Jan. 11, 2011). This Court should do so as well.

## VI.   THE DIP LENDER AND PREPETITION SECURED PARTIES SHOULD BE DEEMED TO HAVE ACTED IN GOOD FAITH UNDER SECTION 364(e)

Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal. Section 364(e) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

16

As explained in detail herein and in the Lynch Declaration, the DIP Loan Documents and proposed DIP Orders are the result of the Debtors' reasonable and informed determination that the DIP Lender offered the most favorable terms on which to obtain needed postpetition financing, and of arm's-length, good faith negotiations between the Debtors, the DIP Lender, and the Prepetition Secured Parties. The terms and conditions of the DIP Loan Documents are fair and reasonable, the adequate protection provided to the Prepetition Secured Parties is fair and reasonable, and the proceeds of the DIP Financing will be used only for purposes that are permissible under the Bankruptcy Code. Further, no consideration is being provided to any party to the DIP Loan Documents other than as described herein. Accordingly, the Court should find that the DIP Lender and Prepetition Secured Parties are "good faith" lenders within the meaning of section 364(e) of the Bankruptcy Code, and are entitled to all of the protections afforded by that section.

## VII.   MODIFICATION OF THE AUTOMATIC STAY IS WARRANTED

The DIP Loan Documents contemplate that the automatic stay arising under section 362 of the Bankruptcy Code shall be vacated or modified to the extent necessary to permit the DIP Lender to exercise, upon the occurrence and during the continuation of any Event of Default, all rights and remedies provided for in the DIP Credit Agreement, and to take various other actions without further order of or application to the Court, subject to a required notice period. Specifically, the proposed interim order provides that the DIP Lender must provide five (5) business days' notice to counsel to the Debtors, counsel to the Committee, and the U.S.Trustee before the DIP Lender may exercise any default-related rights and remedies against the DIP Collateral and that during the five (5) business day notice period any party in interest may file a pleading in opposition to the DIP Lender's exercise of rights and remedies based on the sole issue of whether an Event of Default has occurred and is continuing.

17

Stay modification provisions of this sort are ordinary features of DIP financing and, in the Debtors' business judgment, are reasonable under the circumstances. *See, e.g., In re Premium Protein Prods., LLC*, 2009 Bankr. LEXIS 5285, at *31-32 (Bankr. D. Neb. Nov. 18, 2009); *In re Trilogy Dev. Co.*, 2009 Bankr. LEXIS 5178, at *19 (Bankr. W.D. Mo. July 14, 2009); *In re AMF Bowling Worldwide, Inc.*, No. 12-36495 (KRH) (Banbkr. E.D. Va. Dec. 18, 2012); *In re Patriot Coal Corp.*, No. 12-12900 (SCC) (Bankr. S.D.N.Y. Aug. 3, 2012); *In re Eastman Kodak Co.*, No. 12-10202 (ALG) (Bankr. S.D.N.Y. Feb. 16, 2012); *In re Roomstore, Inc.*, No. 11-37790 (KLP) (Bankr. E.D. Va. Jan. 5, 2012); *In re The Great Atl. & Pac Tea Co.*, No. 10-24549 (RDD) (Bankr. S.D.N.Y. Jan. 11, 2011); *In re Canal Corp. f/k/a Chesapeake Corp.*, No. 08-36642 (DOT) (Bankr. E.D. Va. Feb. 3, 2009); *In re Circuit City Stores, Inc.*, No. 08-35653 (KRH) (Bankr. E.D. Va. Dec. 23, 2008).

## VIII.    THE DEBTORS REQUIRE IMMEDIATE ACCESS TO THE DIP FINANCING

The Court may grant interim relief in respect of a motion filed pursuant to section 363(c) or 364 of the Bankruptcy Code where, as here, interim relief is "necessary to avoid immediate and irreparable harm to the estate pending a final hearing." Fed. R. Bankr. P. 4001(b)(2), (c)(2). In examining requests for interim relief under this rule, courts generally apply the same business judgment standard applicable to other business decisions. *See Ames Dep't Stores*, 115 B.R. at 36.

The Debtors and their estates will suffer immediate and irreparable harm if the interim relief requested herein, including authorizing the Debtors to borrow up to $5 million under the DIP Financing, is not granted promptly after the Petition Date. Further, the Debtors anticipate that the commencement of these cases will significantly and immediately increase the demands on their free cash as a result of, among other things, the costs of administering these cases and addressing key constituents' concerns regarding the Debtors' financial health and ability to continue operations in light of these cases. Accordingly, the Debtors have an immediate need for access to

18

liquidity to, among other things, continue the operation of their businesses, maintain their

relationships with customers, meet payroll, pay capital expenditures, procure goods and services

from vendors and suppliers and otherwise satisfy their working capital and operational needs, all

of which is required to preserve and maintain the Debtors' enterprise value for the benefit of all

parties in interest.

The importance of a debtor's ability to secure postpetition financing to prevent immediate

and irreparable harm to its estate has been repeatedly recognized in this district and others in

similar circumstances. *See, e.g, In re Genmar Holdings, Inc.,* No. 09-43537 (Bankr. D. Minn. June

4, 2009) [ECF No. 23] (approving DIP loan with granting of senior lien); *In re US Fidelis, Inc.*,

2010 Bankr. LEXIS 5837, at *10 (Bankr. E.D. Mo. May 28, 2010) (authorizing secured

postpeititon financing on a superpriority basis); *In re Premium Protein Prods., LLC*, 2009 Bankr.

LEXIS 5285, at *6-9 (Bankr. D. Neb. Nov. 18, 2009) (authorizing debtor to incur postpetition

secured indebtedness on an interim basis); *In re Trilogy Dev. Co*., 2009 Bankr. LEXIS 5178, at *7

(Bankr. W.d. Mo. July 14, 2009) (authorizing postpetition secured financing with superpriority

DIP liens priming prepetition secured construction loan); *In re Va. United Methodist Homes of

Williamsburg, Inc*., No. 13-31098 (KRH) (Bankr. E.D. Va. Mar. 6, 2013) (approving postpetition

financing on an interim basis); *In re AMF Bowling Worldwide, Inc*, No. 12-36495 (KRH)

(Bankr.E.D. Va. Nov.. 14, 2012); *In re Patriot Coal Corp.,* No. 12-12900 (ALG) (Bankr. S.D.N.Y.

July 12, 2012); *In re Eastman Kodak Co*., No. 12-10202 (ALG) (Bankr. S.D.N.Y. Jan. 20, 2012);

*In re Roomstore, Inc*., No. 11-37790 (KLP) (Bankr. E.D. Va. Dec. 14, 2011); *In re Bear Island

Paper Co., L.L.C*., No. 10-31202 (DOT) (Bankr. E.D. Va. Feb. 26, 2010); *In re Lyondell Chem.

Co*., No. 09-10023 (REG) (Bankr. S.D.N.Y. Jan. 8, 2009). Likewise, for the reasons set forth

above, prompt entry of the Interim Order is necessary to avert immediate and irreparable harm to

19

the Debtors' estates and is consistent with, and warranted under, Bankruptcy Rules 4001(b)(2) and

(c)(2).

## CONCLUSION

For the foregoing reasons, the Debtors respectfully request that the Court grant the relief

requested in this Motion.

**BRIGGS AND MORGAN, P.A.**

/e/ James M. Jorissen

Dated: December 17, 2019                 By: _____
                                          James M. Jorissen, #262833
                                          Karl J. Johnson, #391211
                                          2200 IDS Center
                                          80 South Eighth Street
                                          Minneapolis, MN 55402
                                          Telephone: 612-977-8400
                                          Facsimile: 612-977-8650
                                          jjorissen@briggs.com
                                          kjohnson@briggs.com

**PROPOSED COUNSEL FOR THE
DEBTORS**

**UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MINNESOTA**

---

| | |
|---|---|
| In re: | Joint Administration Pending |
| Granite City Food & Brewery Ltd. | Case No. 19-43756 |
| Debtor. | Chapter 11 Cases |

---

| | |
|---|---|
| In re: | Joint Administration Pending |
| Granite City Restaurant Operations, Inc. | Case No. 19-43757 |
| Debtor. | Chapter 11 Cases |

---

| | |
|---|---|
| In re: | Joint Administration Pending |
| Granite City of Indiana, Inc. | Case No. 19-43758 |
| Debtor. | Chapter 11 Cases |

---

| | |
|---|---|
| In re: | Joint Administration Pending |
| Granite City of Maryland, Inc. | Case No. 19-43760 |
| Debtor. | Chapter 11 Cases |

---

| | |
|---|---|
| In re: | Joint Administration Pending |
| Granite City of Kansas Ltd. | Case No. 19-43759 |
| Debtor. | Chapter 11 Cases |

---

**INTERIM ORDER (I) AUTHORIZING THE DEBTORS TO OBTAIN
POSTPETITION FINANCING (II) GRANTING SECURITY INTERESTS AND
SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS; (III) GRANTING
ADEQUATE PROTECTION TO CERTAIN PREPETITION SECURED CREDIT
PARTIES; (IV) MODIFYING THE AUTOMATIC STAY; (V) AUTHORIZING**

**THE DEBTORS TO ENTER INTO AGREEMENTS WITH JMB CAPITAL PARTNERS
LENDING, LLC; (VI) AUTHORIZING USE OF CASH COLLATERAL; (VII)
SCHEDULING A FINAL HEARING AND (VIII) GRANTING RELATED RELIEF**

THIS MATTER having come before the Court upon the motion (the "**Motion**")[1] of the above-captioned debtors (the "**Debtors**" or the "**Borrowers**") in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**"), pursuant to sections 105, 361, 362, 363, 364 and 507 of title 11 of the United States Code, (11 U.S.C. §§ 101 *et seq.*, as amended, the "**Bankruptcy Code**"), Rules 2002 and 4001 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Local Rules 2002-1 and 4001-2, seeking entry of an interim order (the "**Interim Order**") and a final order (the "**Final Order**") granting *inter alia*:

i.        authority, pursuant to sections 105, 363, and 364(c) and 364(d) of the Bankruptcy Code, for each of the Debtors, jointly and severally, to obtain senior secured postpetition financing ("**DIP Facility**") in an aggregate principal amount of up to $5,000,000 (the "**Delayed Draw Commitment**") (of which (x) upon entry of this Interim Order and satisfaction or waiver of the borrowing conditions set forth in the DIP Loan Documents (as defined below), $4,000,000 (the "**Interim Advance**") shall be made available to the Debtors and may be drawn in a single draw on the Closing Date and the Additional Term Loan Obligations (as defined below) shall be rolled up into the DIP Facility and  (y) subject to entry of the Final Order, the balance shall be made available to the Debtors upon entry of the Final Order in amount set forth in the DIP Credit Agreement (as defined below));

ii.        authority (a) for the Debtors to enter into that certain Senior Secured, Super-Priority Debtor-in-Possession Loan and Security Agreement, among the Debtors as Borrowers, the

---

[1] Unless stated otherwise, capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion or the DIP Credit Agreement (as defined below), as applicable.

Guarantors party thereto, as Guarantors and JMB Capital Partners Lending, LLC, as Lender (the "**DIP Lender**") in substantially the same form as attached hereto as **Exhibit 1** (as amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof, the "**DIP Credit Agreement**" and, together with any ancillary, collateral or related documents and agreements, the "**DIP Loan Documents**");

iii.         authority for the Debtors to use the DIP Facility and the proceeds thereof in accordance with the DIP Loan Documents to (a) fund the postpetition working capital needs of the Debtors during the pendency of the Chapter 11 Cases, (b) pay fees, costs and expenses of the DIP Facility on the terms and conditions described in the DIP Loan Documents,  (c) roll-up of outstanding Additional Term Loan Obligations held by the Prepetition Secured Parties that become the DIP Lender into DIP Obligations (the "**Roll-Up Loan**"), subject to the rights preserved in paragraph 16 of this Interim Order, and (d) pay the allowed administrative costs and expenses of the Chapter 11 Cases, in each case, solely in accordance with the DIP Loan Documents, this Interim Order and the Final Order;

iv.         authority for the Debtors to grant to the DIP Lender valid, enforceable, non-avoidable, automatically and fully perfected security interests, liens and superpriority claims, including allowed superpriority administrative expense claims pursuant to sections 364(c)(1) and 507(b) of the Bankruptcy Code, subject only to the Carve-Out and liens pursuant to sections 364(c)(2), 364(c)(3) and 364(d)(1) of the Bankruptcy Code in the Collateral (as defined below) (and all proceeds thereof), including, without limitation, all property constituting "Cash Collateral," as defined in section 363(a) of the Bankruptcy Code, ("**Cash Collateral**"), to secure all DIP Obligations (as defined below), as more fully set forth in this Interim Order, subject only to the Carve-Out (as defined below);

3

v.       authority for the Debtors to grant the Prepetition Secured Parties (as defined below) valid, enforceable, non-avoidable, automatically and fully perfected security interests, liens and superpriority claims, including allowed superpriority administrative expense claims pursuant to section 507(b) of the Bankruptcy Code, subject only to the Carve-Out, and liens pursuant to sections 361, 362, 363(c)(2) and 363(e) of the Bankruptcy Code in the Collateral to secure any diminution in value of the Prepetition Collateral, as more fully set forth in this Interim Order, subject only to the Carve-Out and senior lien and superpriority claims of the DIP Lender;

vi.       subject to and only effective upon entry of the Final Order, waiver by the Debtors of all rights to surcharge against the collateral of the DIP Lender and the Prepetition Secured Parties pursuant to section 506(c) of the Bankruptcy Code;

vii.       subject to and only effective upon entry of the Final Order, waiver of the equitable doctrine of marshaling or any other similar doctrine with respect to any collateral of the DIP Lender and the Prepetition Secured Parties;

viii.       modification of the automatic stay to the extent hereinafter set forth and waiving the 14-day stay provisions of Bankruptcy Rules 4001(a)(3) and 6004(h);

ix.       the scheduling of a final hearing (the "**Final Hearing**") on the Motion for January 22, 2020 to consider entry of the Final Order *inter alia,* authorizing borrowings under the DIP Facility on a final basis and approving notice procedures with respect thereto; and

x.       related relief.

The Court having considered the Motion and the exhibits attached thereto, the evidence submitted or adduced and the arguments of counsel made at the interim hearing held on December 19, 2019 (the "**Interim Hearing**") and having found that due and proper notice (the "**Notice**") of the Motion and the Interim Hearing having been served by the Debtors in accordance with

4

Bankruptcy Rule 4001 and 9006 and Local Rule 2002-1 on (1) counsel for the Citizens Secured

Parties; (2) the Office of the United States Trustee for the District of Minnesota; (3) counsel for

the DIP Lender; (4) the parties included on the Debtors' consolidated list of unsecured creditors;

(5) the Internal Revenue Service; and (6) the United States Attorney for the District of Minnesota;

and the Interim Hearing to consider the interim relief requested in the Motion having been held

and concluded; and all objections, if any, to the interim relief requested in the Motion having been

withdrawn, resolved or overruled by the Court; and it appearing to the Court that granting the

interim relief requested is necessary to avoid potential immediate and irreparable harm to the

Debtors and their estates and otherwise is fair and reasonable and in the best interests of the

Debtors, their estates, and their creditors and equity holders, and is essential for the continued

operation of the Debtors' businesses and represents a sound exercise of the Debtors' business

judgment; and after due deliberation and consideration, and for good and sufficient cause

appearing therefor;

**THIS COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND
CONCLUSIONS OF LAW BASED UPON THE MOTION, THE REPRESENTATIONS OF
COUNSEL AND EVIDENCE SUBMITTED DURING THE INTERIM HEARING**:[2]

A.     *Petition Date*.  On December 16, 2019 (the "**Petition Date**"), the Debtors filed

voluntary petitions under chapter 11 of the Bankruptcy Code in the United States Bankruptcy

Court for the District of Minnesota (the "**Court**") commencing these Chapter 11 Cases.

B.     *Debtors in Possession*.  The Debtors are continuing in the management and

operation of their businesses and properties as debtors in possession pursuant to sections 1107 and

---

[2]     To the extent, any findings of fact constitute conclusions of law, they are adopted as such, and vice versa, pursuant
to Fed. R. Bankr. P. 7052.

1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in these Chapter 11

Cases.

C.      _Notice_.  Notice of the Interim Hearing and the relief requested in the Motion has

been provided by the Debtors to certain parties in interest, including on (1) counsel for the Citizens

Secured Parties (as defined below); (2) the Office of the United States Trustee for the District of

Minnesota; (3) counsel for the DIP Lender; (4) the parties included on the Debtors' consolidated

list of unsecured creditors; (5) the Internal Revenue Service; (6) the United States Attorney for the

District of Minnesota; and (7) any party that has requested notice pursuant to Bankruptcy Rule

2002.

D.      _Jurisdiction and Venue_.  This Court has core jurisdiction over the persons and

property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334.  Consideration of the Motion

constitutes a core proceeding under 28 U.S.C. § 157(b)(2).  Venue for the Chapter 11 Cases and

proceedings on the Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

E.      _No Credit Available on More Favorable Terms_.  The Debtors are unable to procure

financing in the form of unsecured credit allowable as an administrative expense under §§ 364(a),

364(b), or 503(b)(1) of the Bankruptcy Code and have been unable to procure the necessary

financing on terms more favorable, taken as a whole, than the financing offered by DIP Lender

pursuant to the DIP Loan Documents.

F.      _Best Interests of Estates_.  It is in the best interests of the Debtors' estates and

creditors that the Debtors be allowed to enter into the DIP Facility to obtain postpetition secured

financing from the DIP Lender under the terms and conditions set forth herein and in the DIP Loan

Documents, as such financing is necessary to avoid immediate and irreparable harm to the Debtors'

estates and for the continued operation of the Debtors' businesses.

6

G.      *Good Faith*.  The extension of credit and financial accommodations under the DIP Loan Documents are fair, reasonable, in good faith, negotiated at arm's length, reflect the Debtors' exercise of prudent business judgment, and are supported by reasonably equivalent value and fair consideration.  Accordingly, the DIP Lender is entitled to the protections of Bankruptcy Code section 364(e).

H.      *Good Cause*. The relief requested in the Motion is necessary, essential and appropriate, and is in the best interest of and will benefit the Debtors, their creditors and their estates, as its implementation will, among other things, provide the Debtors with the necessary liquidity to (1) minimize disruption to the Debtors' businesses and ongoing operations, (2) preserve and maximize the value of the Debtors' estates for the benefit of all the Debtors' creditors, and (3) avoid potential immediate and irreparable harm to the Debtors, their creditors, their businesses, their employees, and their assets.

I.      *Necessity of DIP Facility Terms*.  The terms of the DIP Loan Documents and the Interim Order assuring that the liens and the various claims, superpriority claims, and other protections granted in the Interim Order will not be affected by any subsequent reversal or modification of the Interim Order or any other order, as provided in section 364(e) of the Bankruptcy Code, which is applicable to the postpetition financing arrangement contemplated in the DIP Loan Documents, are necessary in order to induce the DIP Lender to provide postpetition financing to the Debtors.

J.      *Need for Postpetition Financing*.  The Debtors do not have sufficient and reliable sources of working capital, including Cash Collateral, to continue to operate their businesses in the ordinary course of business without the financing requested in the Motion.  The Debtors' ability to maintain business relationships with their vendors, suppliers and customers, to pay their

7

employees, and to otherwise fund their operations is essential to the Debtors' continued viability as the Debtors seek to maximize the value of the assets of their estates for the benefit of all creditors of the Debtors. The ability of the Debtors to obtain sufficient and stable working capital and liquidity through the proposed postpetition financing arrangements with the DIP Lender as set forth in the Interim Order and the DIP Loan Documents is vital to the preservation and maintenance of the going concern value of each Debtor. Accordingly, the Debtors have an immediate need to obtain the postpetition financing in order to, among other things, permit the orderly continuation of the operation of their businesses, minimize the disruption of their business operations, and preserve and maximize the value of the assets of the Debtors' bankruptcy estates in order to maximize the recovery to all creditors of the estates.

K.      *Need to Use Cash Collateral*. The Debtors need to use Cash Collateral, in order to, among other things, preserve, maintain and maximize the value of their assets and businesses. The ability of the Debtors to maintain liquidity through the use of Cash Collateral is vital to the Debtors and their efforts to maximize the value of their assets. Accordingly, the Debtors have demonstrated good and sufficient cause for the relief granted herein.

L.      *Sections 506(c) and 552(b)*. As material inducement to the DIP Lender to agree to provide the DIP Facility and the Prepetition Secured Parties to agree to the use of Cash Collateral, and in exchange for agreement by the DIP Lender and the Prepetition Secured Parties to subordinate their superpriority claims to the Carve-Out, subject to entry of a Final Order, the DIP Lender and the Prepetition Secured Parties are entitled to a waiver of any "equities of the case" exception under section 552(b) of the Bankruptcy Code, and (b) subject to entry of a Final Order, the DIP Lender and the Prepetition Secured Parties are entitled to a waiver of the provisions of section 506(c) of the Bankruptcy Code.

8

M.     *Priming of Prepetition Credit Liens*.  The priming of the Prepetition Credit Liens by the DIP Lender under section 364(d)(1) of the Bankruptcy Code, solely to the extent set forth in the DIP Loan Documents and as further described below, will enable the Debtors to obtain the DIP Facility and, among other benefits, continue to operate its business for the benefit of its estate and stakeholder.

N.     *Debtors' Acknowledgments and Agreements*. Without prejudice to the rights of any creditors' committee appointed in these chapter 11 cases (the "**Committee**") or other parties-in-interest as and to the extent set forth in Section 4.1.1 of this Interim Order, the Debtors admit, stipulate, acknowledge and agree that:

> (a)     *Prepetition Loan Documents*.  Prior to the Petition Date, Citizens Bank, N.A. (formerly known as RBS Citizens, N.A.), as Administrative Agent (the "**Prepetition Agent**") and as a lender (the "**Prepetition Citizens Lenders**"), and the other lenders party thereto, including JMB Capital Partners Lending, LLC ("**Prepetition JMB Lender**" and together with the Prepetition Citizens Lenders, the "**Prepetition Lenders**") made loans, advances and provided other financial accommodations to the Debtors pursuant to the terms and conditions set forth in: (a) that certain Credit Agreement dated as of May 15, 2014, as amended by the First Amendment to Credit Agreement dated as of September 1, 2016, and the Second Amendment to Credit Agreement dated as of October 23, 2019 (as amended, supplemented or otherwise modified from time to time through the Petition Date, the "**Prepetition Credit Agreement**"), by and among Granite City Food & Brewery Ltd., as a Borrower and as Borrower Representative, each of the other Borrowers party thereto, the other Loan Parties party thereto, the Prepetition Agent and the Prepetition Lenders; and (b) all other agreements, documents and instruments executed and/or delivered with, to, or in favor of Prepetition Agent or Prepetition Lenders, including, without limitation, the Subordination Agreement, all security agreements, notes, guarantees, mortgages, Uniform Commercial Code financing statements and all other related agreements, documents and instruments executed and/or delivered in connection therewith or related thereto (all of the foregoing, together with the Prepetition Credit Agreement, as all of the same have heretofore been amended, supplemented, modified, extended, renewed, restated and/or replaced at any time prior to the Petition Date, collectively, the "**Prepetition Loan Documents**").
>
> (b)     *Prepetition Secured Obligations*.  As of the Petition Date, the Debtors were

9

indebted under the Prepetition Loan Documents: (a) to the Prepetition Agent and Prepetition Citizens Lenders (the "**Citizens Secured Parties**") (i) in an aggregate outstanding principal amount of not less than $6,000,000 plus interest accrued and accruing thereon, together with all costs, fees, expenses (including attorneys' fees and legal expenses) and other charges accrued, accruing or chargeable with respect thereto (the "**Prepetition Revolving Loan Obligations**"), (ii) in an aggregate outstanding principal amount of not less than $29,000,000 plus interest accrued and accruing thereon, together with all costs, fees, expenses (including attorneys' fees and legal expenses) and other charges accrued, accruing or chargeable with respect thereto in outstanding principal balance of a Term Loan (the "**Prepetition Term Loan Obligations**"), (iii) in an aggregate outstanding principal amount of not less than $5,000,000 plus interest accrued and accruing thereon, together with all costs, fees, expenses (including attorneys' fees and legal expenses) and other charges accrued, accruing or chargeable with respect thereto (the "**Prepetition Development Loan Obligations**," and together with the Prepetition Revolving Loan Obligations and the Prepetition Term Loan Obligations, the "**Prepetition Citizens Loan Obligations**"), and (b) to the Prepetition Agent and Prepetition JMB Lender in an aggregate outstanding principal amount of not less than $1,500,000 plus interest accrued and accruing thereon, together with all costs, fees, expenses (including attorneys' fees and legal expenses) and other charges accrued, accruing or chargeable with respect thereto (the "**Prepetition Additional Term Loan Obligations**" and together with the Prepetition Citizens Loan Obligations, the "**Prepetition Secured Obligations**"). The Prepetition Secured Obligations constitute allowed, legal, valid, binding, enforceable and non-avoidable obligations of Debtors, and are not subject to any offset, defense, counterclaim, avoidance, recharacterization or subordination pursuant to the Bankruptcy Code or any other applicable law, and Debtors do not possess, shall not assert, hereby forever release, and are forever barred from bringing any claim, counterclaim, setoff or defense of any kind, nature or description which would in any way affect the validity, enforceability and non-avoidability of any of the Prepetition Secured Obligations.

(c)     *Prepetition Collateral*. As of the Petition Date, the Prepetition Secured Obligations were secured pursuant to the Prepetition Loan Documents by valid, perfected, enforceable and non-avoidable first-priority security interests and liens (the "**Prepetition Citizens Liens**") granted by Debtors to Prepetition Agent, for the benefit of itself and the Prepetition Lenders under the Prepetition Loan Documents, in substantially all of the existing and after-acquired assets of the Debtors and the other Loan Parties as more fully set forth in the Prepetition Loan Documents (the "**Prepetition Collateral**"), and such security interest is perfected and has priority over all other security interests. The Debtors do not possess and will not assert any claim, counterclaim, setoff or defense of any kind, nature or description which would in any way affect the validity, enforceability and non-

10

avoidability of any of the Prepetition Agent or Prepetition Lenders' liens, claims or security in the Prepetition Collateral.

(d) *Subordination Agreements*.    Pursuant to the (a) Subordination and Intercreditor Agreement dated September 30, 2015 (the "**Great Western Intercreditor Agreement**") between the Debtors, Great Western Bank, a South Dakota banking corporation ("**Great Western**") and the Prepetition Agent, the Prepetition Agent agreed to subordinate any lien of the Prepetition Agent  to the prior existing liens of Great Western solely with respect to the real property and fixtures located at 1001 102nd Street, Omaha, Nebraska 68114 (the "**Great Western Senior Liens**"), and (b) Prepetition Credit Agreement and a Subordination Agreement dated as of October 23, 2019 (the "**JMB Subordination Agreement**") between the Debtors, the Prepetition Citizens Lenders and the Prepetition JMB Lender, the parties agreed that the payment of the Prepetition Additional Term Loan Obligations to the Prepetition JMB Lender is senior in priority to payment of the Prepetition Citizens Loan Obligations to the Prepetition Citizens Lenders.

(e) *Proof of Claim*. The acknowledgment by Debtors of the Prepetition Secured Obligations and the liens, rights, priorities and protections granted to or in favor of Prepetition Agent and Prepetition Lenders (collectively, the "**Prepetition Secured Parties**") in respect of the Prepetition Collateral as set forth herein and in the Prepetition Loan Documents shall be deemed a timely filed proof of claim on behalf of the Prepetition Secured Parties in these Chapter 11 Cases.

O.    Roll-up Loan.  Upon entry of the Interim Order and the occurrence of the Closing Date (as defined in the DIP Loan Documents), without further action by the Debtors or any other party, all Additional Term Loan Obligations held by the Prepetition JMB Lender shall be converted into DIP Obligations.  The Roll-Up Loan as provided for under the DIP Facility and this Interim Order is appropriate and the DIP Lenders would not be willing to provide the DIP Facility or extend credit to the Debtors thereunder without the inclusion of the Roll-Up Loan.  The Roll-Up Loan is subject to the reservation of rights in paragraph 16 below and will not prejudice any other party in interest.  Notwithstanding any other provisions of this Interim Order, the DIP Loan Documents or the JMB Subordination Agreement, all rights of the Prepetition JMB Lender shall be fully preserved.

11

P.    *Adequate Protection*.  The Prepetition Secured Parties are entitled to receive adequate protection on account of their interests in the Prepetition Collateral pursuant to sections 361, 362, and 363 of the Bankruptcy Code solely to the extent of any diminution in the value of their interests in the Prepetition Collateral (including Cash Collateral).  As part of the adequate protection provided by this Interim Order, the Prepetition Secured Parties shall receive, among other things, replacement liens, superpriority claims and reporting information.  The terms of the Adequate Protection Obligations (as defined in paragraph 13 below) are fair and reasonable, reflect the Debtors' prudent exercise of business judgment and are sufficient to allow the Debtors' use of the Prepetition Collateral (including the Cash Collateral) and to permit the  relief granted in this Interim Order.

Q.    <u>Immediate Entry</u>.  Sufficient cause exists for immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(c)(2).

Based upon the foregoing findings and conclusions, the Motion and the record before the Court with respect to the Motion, and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED** that:

1.    <u>DIP Facility Approval</u>.  The DIP Facility, including the DIP Roll-Up Obligations, is hereby approved.  Any objections to the interim relief requested in the Motion that have not been withdrawn, waived or settled, and all reservations of rights included therein, are hereby denied and overruled.  The Debtors are authorized, pursuant to section 364 of the Bankruptcy Code, to enter into and be a party to the DIP Facility pursuant to the DIP Loan Documents (with such changes, if any, as were authorized to be made as amendments to the DIP Loan Documents in accordance with this Interim Order), to perform under the DIP Loan Documents and such other and additional documents necessary or desired to implement the DIP Facility or the DIP Loan

Documents, and to obtain postpetition secured financing from the DIP Lender, to avoid immediate and irreparable harm to the Debtors' estates.

2.      <u>DIP Obligations</u>.  The DIP Loan Documents shall constitute and evidence the valid and binding effect of the Debtors' obligations under the DIP Facility, which DIP Obligations shall be legal, valid, and binding obligations of the Debtors party thereto and enforceable against the Debtors, their estates, any successors thereto, including, without limitation, any trustee appointed in any of the Debtors' cases, or in any case under chapter 7 of the Bankruptcy Code upon the conversion of any such cases, or in any other proceedings superseding or related to any of the foregoing, any successors thereto, and any party determined to be the beneficial owner of the DIP Collateral by this Court.  The Debtors and their successors shall be jointly and severally liable for repayment of any funds advanced pursuant to the DIP Loan Documents, together with interest thereon, at the times and in the amounts set forth in the DIP Loan Documents and all Obligations as defined and provided for in the DIP Credit Agreement (collectively, the "**<u>DIP Obligations</u>**"). No obligation, payment, transfer or grant of security under the DIP Loan Documents or the Interim Order, with respect to the DIP Facility shall be stayed, restrained, voided, voidable or recoverable under the Bankruptcy Code or under any applicable non-bankruptcy law, or subject to any defense, reduction, setoff, recoupment or counterclaim.

3.      <u>Authorization to Borrow</u>.  Upon entry of this Interim Order and during the period prior to entry of the Final Order, the Debtors are immediately authorized to borrow from the DIP Lender under the DIP Facility, the Interim Advance of up to $4,000,000, subject to the terms and conditions set forth in the DIP Loan Documents and this Interim Order.  Once repaid, the DIP Facility Loans incurred may not be re-borrowed.

13

4.      Use of DIP Facility Proceeds.  The Debtors shall use advances of credit under the

DIP Facility (the "**DIP Facility Loans**") only for the express purposes specifically set forth in this

Interim Order and the DIP Loan Documents.  The Debtors are authorized to use the proceeds of

the DIP Facility Loans to (a) fund the postpetition working capital needs of the Debtors during the

pendency of the Chapter 11 Cases, (b) pay fees, costs and expenses of the DIP Facility on the terms

and conditions described in the DIP Loan Documents, (c) roll-up the outstanding Additional Term

Loan Obligations into DIP Obligations, subject to the rights preserved in paragraph 16 of this

Interim Order, and (d) pay the allowed administrative costs and expenses of the Chapter 11 Cases,

in each case, solely in accordance with the DIP Loan Documents (including, but not limited to, the

Budget) and this Interim Order.  Notwithstanding anything herein, the extensions of credit under

the DIP Facility shall not constitute Cash Collateral of the Prepetition Secured Parties.

5.      Roll-up Loan.  Upon entry of the Interim Order and the occurrence of the Closing

Date (as defined in the DIP Loan Documents), without further action by the Debtors or any other

party, all Additional Term Loan Obligations will be immediately, automatically, and irrevocably

deemed to have been converted into DIP Roll-Up Obligations, and such DIP Roll-Up Obligations

shall constitute DIP Obligations and shall be entitled to all the priorities, privileges, rights, and

other benefits afforded to the other DIP Obligations under this Interim Order and the DIP Loan

Documents (subject to the rights of the Debtors and other parties in interest pursuant to paragraph

16 of this Interim Order). The conversion of the DIP Roll-Up Obligations as described in this

paragraph 5 shall be authorized as compensation for, in consideration for, as a necessary

inducement for, and on account of the agreement of the DIP Lender to fund amounts under the

DIP Facility and not as payments under, adequate protection for, or otherwise on account of, any

Prepetition Obligations. As used herein, the term "**DIP Roll-Up Obligations**" shall mean the Roll-

14

Up Loan and all interest accrued and accruing thereon after the conversion into DIP Roll-Up Obligations and all other amounts owing by the respective Debtors in respect thereof after the conversion into the DIP Roll-Up Obligations.

6.        Budget and DIP Facility Reporting.  Except as otherwise provided herein or approved by the DIP Lender, the proceeds from the DIP Facility shall be used only in compliance with the terms of the DIP Loan Documents.  The Debtor shall comply with the reporting requirements and obligations set forth in the DIP Credit Agreement.

7.        Payment of DIP Facility Fees and Expenses.

(a)        The (a) Commitment Fee; (b) Funding Fee; (c) Work Fee, which shall serve as a retainer for the DIP Lender's counsel; (d) Exit Fee; and (e) Stated Maturity Fee are each hereby approved and the Debtors are hereby authorized and directed to and shall pay such fees in accordance with, and on the terms set forth in this Interim Order and the DIP Loan Documents.

(b)        The Debtors are also hereby authorized and directed to pay upon demand, all other fees, costs, expenses and other amounts payable under the terms of this Interim Order and the DIP Loan Documents and all other reasonable fees and out-of-pocket costs and expenses of the DIP Lender in accordance with the terms of this Interim Order and the DIP Loan Documents (including, without limitation, the reasonable and documented postpetition fees and out-of-pocket costs and expenses of Arent Fox LLP as counsel and local counsel to the DIP Lender to the extent not covered by the portion of the Work Fee paid prior to the Petition Date), subject to receiving a written invoice therefor.  None of such fees, costs, expenses or other amounts shall be subject to Court approval except as otherwise provided herein or required to be submitted in any particular format, and no recipient of any such payment shall be required to file with respect thereto any interim or final fee application with this Court; provided, however, that copies of any such invoices

15

shall be provided contemporaneously to the U.S. Trustee, any official committee of unsecured creditors appointed in these Chapter 11 Cases (the "**Committee**") and the Citizens Secured Parties; provided further, however, that such invoices may be redacted to the extent necessary to delete any information subject to the attorney-client privilege, any information constituting attorney work product, or any other confidential information (the "**Redactions**"), and the provision of such invoices shall not constitute a waiver of the attorney-client privilege or any benefits of the attorney work product doctrine.  If the U.S. Trustee, the Committee or the Citizens Secured Parties objects to the reasonableness of the fees and expenses of the DIP Lender, and such objection cannot be resolved within ten (10) days of receipt of such invoices, the objecting party may file with the Court and serve on the DIP Lender, an objection to the reasonableness of such fees and expenses (each, a "**Reasonableness Fee Objection**").  Without limiting the foregoing, if any party objects to the Redactions and such objection cannot be resolved within ten (10) days of receipt of such invoices, the DIP Lender shall file with the Court and serve on the Debtors, the Committee, the U.S. Trustee and the Citizens Secured Parties a request for Court resolution of the disputes concerning the propriety of the disputed Redactions (each, a "**Redaction Fee Objection**," and each Reasonableness Fee Objection and Redaction Fee Objection may be referred to herein generally as a "**Fee Objection**"). The Debtors shall pay, in accordance with the terms and conditions of this Interim Order and the Final Order, within ten (10) days after receipt of the applicable invoice (a) the full amount invoiced if no Fee Objection has been timely filed, and (b) the undisputed fees, costs, and expenses reflected on any invoice to which a Fee Objection has been timely filed.  All such unpaid fees, costs, expenses and other amounts owed or payable to the DIP Lender shall be secured by the DIP Collateral and afforded all of the priorities and protections afforded to the DIP Obligations  under this Interim Order, and the DIP Loan Documents.

16

8.    <u>Indemnification</u>.    The Debtors are hereby authorized to and hereby agree to indemnify and hold harmless the DIP Lender and its affiliates, directors, officers, employees, agents, attorneys, or any other Person affiliated with or representing the DIP Lender (collectively, an "**<u>Indemnified Party</u>**") from and against: (a) all obligations, demands, claims, damages, losses and liabilities (including, without limitation, reasonable fees and disbursements of counsel) (collectively, "**<u>Indemnity Claims</u>**") as set forth in the DIP Loan Documents including those asserted by any other party in connection with the transactions contemplated by the DIP Loan Documents; and (b) all losses or expenses incurred, or paid by the DIP Lender from, following, or arising from the transactions contemplated by the DIP Loan Documents (including reasonable and documented attorneys' fees and expenses), except for Indemnity Claims and/or losses directly caused by the DIP Lender's gross negligence, or willful misconduct or bad faith of the DIP Lender. In the case of an investigation, litigation or other proceeding to which the indemnity in this paragraph applies, such indemnity shall be effective whether or not such investigation, litigation or proceeding is brought by any of the Debtors or any of their respective directors, security holders or creditors, an Indemnified Party or any other Person or an Indemnified Party is otherwise a party thereto and whether or not the transactions contemplated hereby are consummated.    No Indemnified Party shall have any liability (whether direct or indirect, in contract, tort or otherwise) to any Debtor or any of its subsidiaries or any shareholders or creditors of the foregoing for or in connection with the transactions contemplated hereby, except to the extent such liability is determined by a court of competent jurisdiction in a final non-appealable judgment or order to have resulted solely from such Indemnified Party's gross negligence or willful misconduct.    All indemnities of the Indemnified Parties shall constitute DIP Obligations secured by the DIP

17

Collateral and afforded all of the priorities and protections afforded to the DIP Obligations under this Interim Order, the Final Order and the DIP Loan Documents.

9.  <u>DIP Superpriority Claims</u>.  In accordance with section 364(c)(1) of the Bankruptcy Code, the DIP Obligations shall constitute allowed senior administrative expense claims against each Debtor and their estates (the "**DIP Superpriority Claims**") with priority in payment over any and all administrative expenses at any time existing or arising, of any kind or nature whatsoever, including, without limitation, the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including, but not limited to, sections 105, 326, 328, 330, 331, 503(b), 506(c) (subject to the entry of the Final Order with respect to section 506(c) only), 507(a), 507(b), 726, 1113 and 1114 of the Bankruptcy Code or otherwise, including those resulting from the conversion of any of the Chapter 11 Cases pursuant to section 1112 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment; <u>provided</u>, <u>however</u>, that the DIP Superpriority Claims shall be subject to and subordinate to only the Carve-Out; <u>provided</u>, <u>further</u> that the DIP Superpriority Claims shall have recourse to and be payable from all prepetition and postpetition property and assets of the Debtors and the estates and all DIP Collateral and all proceeds thereof, and (a) any and all avoidance power claims or causes of action under sections 544, 545, 547, 548 through 551 and 553(b) of the Bankruptcy Code (the "**Avoidance Actions**") and the proceeds thereof, (b) prepetition tort claims, including claims against the Debtors' current and former directors and officers (if any) and the proceeds thereof; and (c) any deposit in connection with a proposed Sale (whether terminated or otherwise) that becomes property of the Debtors' estates (a "**Sale Deposit**") subject, however, only to the senior lien rights of a stalking horse purchaser and such stalking horse bid protections as may be approved by this Court.

18

10.    <u>DIP Liens</u>.

(a)    Effective immediately as of the entry of this Interim Order, as security for
the DIP Obligations, the DIP Lender is granted continuing, valid, binding, enforceable, non-
avoidable, and automatically and properly perfected security interests in and liens (collectively,
the "**<u>DIP Liens</u>**") on all DIP Collateral as collateral security for the prompt and complete
performance and payment when due (whether at the Stated Maturity Date (i.e. March 31, 2020),
by acceleration, or otherwise) of the DIP Obligations.   The term "**<u>DIP Collateral</u>**" means
collectively all prepetition and postpetition real property and all prepetition and postpetition
tangible and intangible personal property of each Borrower, in each case wherever located and
whether now owned or hereafter acquired, including, but not limited to, all accounts, contracts
rights, chattel paper, cash, general intangibles, investment property, machinery, equipment, goods,
inventory, furniture, fixtures, letter of credit rights, books and records, deposit accounts,
documents, instruments, commercial tort claims, leases and leaseholds and rents, avoidance
actions under section 549 and related recoveries under section 550 of the Bankruptcy Code,
together with all proceeds of each of the following, including insurance proceeds (as each such
term above is defined in the UCC, to the extent applicable), and, subject to Final Order, including
the proceeds and recoveries from Avoidance Actions (the "**<u>Avoidance Action Proceeds</u>**").

(b)    Subject to the entry of the Final Order, to the fullest extent permitted by the
Bankruptcy Code or applicable law, and except as otherwise set forth herein, any provision of any
lease other than a real property lease, loan document, easement, use agreement, proffer, covenant,
license, contract, organizational document, or other instrument or agreement that requires the
consent or the payment of any fees or obligations to any entity in order for any of the Debtors to
pledge, grant, mortgage, sell, assign, or otherwise transfer any fee or leasehold interest or the

19

proceeds thereof or other DIP Collateral, shall have no force or effect with respect to the DIP Liens

on such leasehold interests or other applicable DIP Collateral or the proceeds of any assignment

and/or sale thereof by any Debtor, in favor of the DIP Lender in accordance with the terms of the

DIP Loan Documents, or this Interim Order.

11.    <u>Priority of DIP Liens</u>.

(a)    To secure the DIP Obligations, immediately upon and effective as of entry

of this Interim Order, the DIP Lender, is hereby granted on a final basis, continuing, valid, binding,

enforceable, non-avoidable, and automatically and properly perfected first priority DIP Liens in

the DIP Collateral as follows, in each case subject to the Carve-Out:

(i)    *Liens Priming the Prepetition Citizens Liens*.  Pursuant to section 364(d)(1) of the Bankruptcy Code, valid, binding, continuing, enforceable, non-avoidable automatically and fully perfected first priority senior priming liens and security interests in all DIP Collateral, regardless of where located, which senior priming liens and security interests in favor of the DIP Lender shall be senior to all Prepetition Citizens Liens.  For the avoidance of doubt, as a result of the priming of the Prepetition Citizens Liens pursuant to this Interim Order, the DIP Lender shall have a first priority senior priming lien and security interest in, among other things, (A) all of the assets of Debtors and its debtor and non-debtor Subsidiaries, including, but not limited to, the "Collateral" as defined in the Prepetition Credit Agreement, and (B) the Debtors' prepetition and postpetition commercial tort claims, including but not limited to all claims and causes of action (i) against the Debtors' officers and directors, and (ii) all other prepetition tort claims, and the proceeds thereof (regardless of whether such proceeds arise from damages to the Prepetition Collateral);

(ii)    *Liens on Unencumbered Property*.  Pursuant to section 364(c)(2) of the Bankruptcy Code, valid, binding, continuing, enforceable, non-avoidable automatically and fully perfected first priority liens on and security interests in all DIP Collateral that is not otherwise subject to any valid, enforceable, and non-avoidable liens on and security interests in the DIP Collateral that (A) were perfected prior to the Petition Date (or perfected on or after the Petition Date to the extent permitted by Section 546(b) of the Bankruptcy Code), (B) are not subject to avoidance, disallowance, or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law, and (C) are senior in priority to the DIP  Liens under applicable law and after giving effect to any lien release, subordination or inter-creditor agreements, including the Great Western Senior Liens (each a

"**Permitted Prior Lien**"); provided, however, that the DIP Liens shall have priority over all Prepetition Citizens Liens; and

(iii)    *Liens Junior to Certain Other Liens*.  Pursuant to section 364(c)(3) of the Bankruptcy Code, valid, enforceable, non-avoidable automatically and fully perfected junior liens on and security interests in all DIP Collateral (other than as set forth in clauses (i) and (ii)) subordinate only to the Permitted Prior Liens.

(b)    Except as expressly set forth herein, the DIP Liens and the DIP Superiority Claims shall not be made junior to or *pari passu* with (1) any lien, security interest or claim heretofore or hereinafter granted in any of the Chapter 11 Cases or any successor cases, and shall be valid and enforceable against the Debtors, their estates, any trustee or any other estate representative appointed or elected in the Chapter 11 Cases or any successor cases and/or upon the dismissal or conversion of any of the Chapter 11 Cases or any successor cases, (2) any lien that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or otherwise, (3) any intercompany or affiliate lien or claim, and (4) subject to entry of the Final Order, any liens arising after the Petition Date excluding any liens or security interests granted in favor of any federal, state, municipal or other governmental unit, commission, or board for any liability of the Debtors.

12.    <u>Use of Cash Collateral</u>.  The Debtors are authorized to use Cash Collateral to fund the postpetition working capital needs of the Debtors during the pendency of the Chapter 11 Cases that are not funded with the DIP Facility Loans and to pay the allowed administrative costs and expenses of the Chapter 11 Cases not funded by the DIP Facility Loans, each solely in accordance with the Budget and this Interim Order, provided that the Debtors' variance from the line items on the Budget shall be no more than: 20% of the line items set forth in the Budget for the first week after the Petition Date, 15% of the line items set forth in the Budget for the second week of the Budget after the Petition Date, and thereafter, 10% of the average of the line items set forth in the

21

Budget for the prior four week period.  The initial Budget is attached hereto as **Exhibit 2**.  The Debtors shall: (a) commencing on the first Wednesday to occur after the entry of this Interim Order and on the Wednesday of each week thereafter, prepare and deliver to the DIP Lender and the Citizens Secured Parties (x) a report showing actual cash receipts and disbursements for the line items set forth in the Budget for the preceding Wednesday through the following Tuesday and (y) a written explanation of all material variances; and (b) update and roll-forward the proposed Budget no less frequently than every four (4) weeks or at such other interval as agreed to by the DIP Lender and the Citizens Secured Parties, each such amended Budget shall be delivered no later than Wednesday of each week for the week immediately prior.  Each proposed Budget shall only become a Budget for the use of Cash Collateral and DIP Obligations as set forth in this Interim Order when it is agreed upon by the Debtors and DIP Lender, in consultation with the Prepetition Secured Parties, provided, however, any modifications to the Case Professionals' fees and expenses in the Budget shall require the consent of the Prepetition Secured Parties. After the payment in full of the DIP Obligations, each proposed Budget shall only become a Budget for the use of Cash Collateral as set forth in this Interim Order when it is agreed upon by the Debtors and the Prepetition Secured Parties. The Debtors' use of Cash Collateral shall automatically terminate upon the occurrence of an Event of Default (as defined below).

13.     Adequate Protection of Prepetition Secured Parties.  The Prepetition Secured Parties are entitled, pursuant to sections 361, 362, 363(c)(2), 363(e) and 507 of the Bankruptcy Code, to adequate protection of their interests in all the Prepetition Collateral, including Cash Collateral, in an amount equal to the aggregate diminution in value of the Prepetition Secured Parties' interests in the Prepetition Collateral (including Cash Collateral) from and after the Petition Date, if any, for any reasons provided under the Bankruptcy Code.  In consideration for

22

the foregoing, the Prepetition Secured Parties, are hereby granted the following in the amount of such diminution (collectively, the "**Adequate Protection Obligations**"):

      (a)    *Adequate Protection Liens.* The Prepetition Agent, on behalf of itself and the Prepetition Lenders, is hereby granted (effective and perfected upon the date of this Interim Order and without the necessity of any mortgages, security agreements, pledge agreements, financing statement or other agreements), in the amount equal to the aggregate diminution in value of the interests in the Prepetition Collateral (including Cash Collateral) from and after the Petition Date, if any, for any reasons provided under the Bankruptcy Code (the "**Adequate Protection Claim**"), a valid, perfected replacement security interest in and lien on all prepetition and postpetition property and assets of the Debtors and the estates, including the DIP Collateral and all proceeds thereof (the "**Adequate Protection Collateral**"), subordinate only to (A) the DIP Liens and any liens to which the DIP Liens are junior and (B) the Carve-Out (the "**Adequate Protection Liens**").

      (b)    *507(b) Claims.* The Prepetition Agent, on behalf of itself and the Prepetition Lenders, is hereby granted, an allowed superpriority administrative expense claim as provided in section 507(b) of the Bankruptcy Code in the amount of the Adequate Protection Claim with, except as set forth in this Interim Order, priority in payment over any and all administrative expenses of the kind specified or ordered pursuant to any provision of the Bankruptcy Code (the "**507(b) Claims**"); which 507(b) Claims shall have recourse to and be payable from the Adequate Protection Collateral. The 507(b) Claims shall, in all instances, be subject and subordinate only to (A) the Carve-Out and (B) the DIP Superpriority Claims. The Prepetition Secured Parties shall not receive or retain any payments, property or other amounts in respect of the 507(b) Claims unless and until the DIP Obligations (other than contingent indemnification obligations as to which

23

no claim has been asserted) have indefeasibly been paid in cash in full and all DIP Commitments have been terminated.

(c)     *Citizens Secured Parties Information.*  As additional adequate protection of the Citizens Secured Parties' security interests in the Prepetition Collateral, the Debtors shall contemporaneously provide the Citizens Secured Parties with any reporting provided to the DIP Lender under the DIP Credit Agreement.

(d)     *Citizens Secured Parties Fees.*  The Debtors are also hereby authorized and directed to pay upon demand, all reasonable fees and out-of-pocket costs and expenses of the Citizens Secured Parties which amount shall not exceed the aggregate amount per month as set forth in the Budget, in accordance with the terms of this Interim Order and the Prepetition Loan Documents (including, without limitation, the reasonable and documented postpetition fees and out-of-pocket costs and expenses of counsel and financial advisors to the Citizens Secured Parties), subject to receiving a written invoice therefor.  None of such fees, costs, expenses or other amounts shall be subject to Court approval except as otherwise provided herein or required to be submitted in any particular format, and no recipient of any such payment shall be required to file with respect thereto any interim or final fee application with this Court; provided, however, that copies of any such invoices shall be provided contemporaneously to the U.S. Trustee, the Committee and the DIP Lender; provided further, however, that such invoices may include the Redactions and the provision of such invoices shall not constitute a waiver of the attorney-client privilege or any benefits of the attorney work product doctrine.  If the U.S. Trustee, the Committee or the DIP Lender objects to the reasonableness of the fees and expenses of the Citizens Secured Parties, and such objection cannot be resolved within ten (10) days of receipt of such invoices, the objecting party may file with the Court and serve on the Citizens Secured Parties, a Reasonableness

24

Objection. Without limiting the foregoing, if any party objects to the Redactions and such objection cannot be resolved within ten (10) days of receipt of such invoices, the Citizens Secured Parties shall file with the Court and serve on the Debtors, the Committee, the U.S. Trustee and the DIP Lender a request for Court resolution a Redaction Fee Objection. The Debtors shall pay, in accordance with the terms and conditions of this Interim Order and the Final Order, within ten (10) days after receipt of the applicable invoice (a) the full amount invoiced if no Fee Objection has been timely filed, and (b) the undisputed fees, costs, and expenses reflected on any invoice to which a Fee Objection has been timely filed. All such unpaid fees, costs, expenses and other amounts owed or payable to the Citizens Secured Parties shall be secured by the Collateral and afforded all of the priorities and protections afforded to the Adequate Protection Obligations under this Interim Order.

14.    Carve-Out.

(a)    *Carve-Out*. As used in this Interim Order, the term "**Carve-Out**" means, collectively, the sum of: (i) all fees required to be paid to the Clerk of the Court and to the U.S. Trustee pursuant to 28 U.S.C. §1930(a) and section 31 U.S.C. § 3717; (ii) the reasonable fees and expenses up to $15,000 incurred by a trustee under section 726(b) of the Bankruptcy Code; and (iii) the aggregate amount of unpaid, but funded into the Escrow per the terms below, fees and expenses of the Debtors and the Committee (which order has not been reversed, vacated or stayed unless such stay is no longer effective) under sections 327(a), 328 or 1103(a) of the Bankruptcy Code (the "**Case Professionals**"), to the extent such fees and expenses are allowed and payable pursuant to an order of the Court (which order has not been reversed, vacated or stayed) ("**Allowed Professional Fees**"), and $2,500 of the aggregate unpaid out-of-pocket expenses allowed by the Court and incurred by the members of the Committee in the performance of their duties (but

25

excluding fees and expenses of third party professionals employed by such members) ("**Committee Expenses**"), which amount under this clause (iii) shall not exceed the sum of: (x) an aggregate amount per week limited to the amount set forth in the Budget for Allowed Professional Fees and Committee Expenses incurred prior to the delivery of a Carve-Out Trigger Notice and escrowed each month with counsel for Debtors, provided (i) the Maturity Date has not occurred or (ii) Event of Default has not occurred or continuing (the "**Pre Carve-Out Notice Trigger Cap**") plus (y) $75,000 for Allowed Professional Fees and Committee Expenses incurred from and after the delivery of the Carve-Out Trigger Notice (defined below), less any outstanding amount of retainers received by the Case Professionals prior to the Petition Date (the "Post Carve-Out Notice Cap" together, with the Pre Carve-Out Notice Trigger Cap, the "**Carve-Out Cap**"). Each month, Debtors shall pay the amount of the fees and expenses incurred by the Case Professionals (so long as such amounts are equal to or less than the amounts set forth in the Budget for such month), into the client trust account maintained by the Debtors' counsel (the "**Escrow**"). Once such fees and expenses are deemed Allowed Professional Fees they shall be distributed to the respective recipients from the Escrow.  No portion of the Carve-Out or any Cash Collateral may be used in violation of this Interim Order.  Nothing in this Interim Order or otherwise shall be construed to increase the Carve-Out if actual (i) Allowed Professional Fees of any Case Professional or (ii) Committee Expenses are higher in fact than Carve-Out Cap amount.

(b)      *Carve-Out Trigger Notice*.  As used herein, the term "Carve-Out Trigger Notice" means a written notice provided by the DIP Lender or the Prepetition Secured Parties to the Debtors, counsel to the Committee, and the U.S. Trustee that the Post Carve-Out Notice Trigger Cap is invoked, which notice may be delivered following the occurrence and during the continuance of an Event of Default and/or acceleration of the DIP Obligations under the DIP Loan

26

Documents, provided the Prepetition Secured Parties may only deliver such notice when an Event of Default occurs under paragraph 25(b) below.  Upon delivery of the Carve-Out Trigger Notice to the Debtors (the "Termination Declaration Date"), the Debtors shall provide notice by email and facsimile to all Case Professionals, at the email addresses and facsimile numbers set forth in each Professional's notice of appearance filed with the Bankruptcy Court (or, if there is no such notice of appearance, at such Professional's last known email address and facsimile number) within one (1) day after the Debtors' receipt of a Carve-Out Trigger Notice informing them that such Carve-Out Trigger Notice has been received and further advising them that the Debtors' ability to pay such Case Professionals is subject to and limited by the Post Carve-Out Notice Trigger Cap.

(c)     *Payment of Allowed Professional Fees Prior to Termination Declaration Date*.  Any payment or reimbursement made prior to the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall not reduce the Carve Out.

(d)     *Payment of Carve-Out on or After the Termination Declaration Date*.  Any payment or reimbursement made on or after the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall permanently reduce the Carve-Out on a dollar-for-dollar basis.  Any funding of the Carve-Out by funds from the DIP Facility Loans shall be added to, and made a part of, the DIP Obligations secured by the DIP Collateral and shall be otherwise entitled to the protections granted under this Interim Order, the DIP Loan Documents, the Bankruptcy Code and applicable law.

(e)     *Objection Rights*.  Nothing contained herein is intended to constitute, nor shall be construed as consent to the allowance of any Case Professional's fees, costs and expenses by any party and shall not affect the rights of the Debtors, the DIP Lender, the Citizens Secured

27

Parties or any other party in interest to object to the allowance and/or payment of any such amounts incurred or requested.

15.     <u>Limitations on Use of DIP Proceeds, Cash Collateral and Carve-Out.</u> The DIP Facility, the DIP Collateral, the Prepetition Collateral, the Adequate Protection Collateral, the Cash Collateral and the Carve-Out may not be used in connection with: (a) preventing, hindering, or delaying any of the DIP Lender or the Prepetition Secured Parties' enforcement or realization upon any of the DIP Collateral, Adequate Protection Collateral or Prepetition Collateral; (b) using or seeking to use Cash Collateral without the permission of the DIP Lender and the Prepetition Secured Parties or selling or otherwise disposing of DIP Collateral without the consent of the DIP Lender or as permitted by the DIP Loan Documents; (c) after payment in full of the DIP Obligations, selling or otherwise disposing of Adequate Protection Collateral without the consent of the Prepetition Secured Parties; (d) using or seeking to use any insurance proceeds constituting DIP Collateral without the consent of the DIP Lender and the Prepetition Secured Parties; (e) seeking to amend or modify any of the rights granted to the DIP Lender or the Prepetition Secured Parties under this Interim Order, the DIP Loan Documents, or the Prepetition Loan Documents, including seeking to use Cash Collateral, Adequate Protection Collateral and/or DIP Collateral on a contested basis; (f) litigating, objecting to, challenging or contesting in any manner in any way the DIP Liens, DIP Obligations, DIP Superpriority Claims, the Prepetition Secured Obligations, DIP Collateral (including Cash Collateral) or, as the case may be, Prepetition Collateral, the Adequate Protection Obligations,  the Adequate Protection Claims, the 507(b) Claims, the Adequate Protection Collateral (including Cash Collateral), the Adequate Protection  Liens or any other claims, held by or on behalf of any of the DIP Lender or the Prepetition Secured Parties, respectively; (g) asserting, commencing or prosecuting any claims or causes of action whatsoever,

28

including, without limitation, Avoidance Actions or applicable state law equivalents or actions to recover or disgorge payments, against any of the DIP Lender, the Prepetition Secured Parties, or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors and employees; (h) litigating, objecting to, challenging, or contesting in any manner, or raising any defenses to, the validity, extent, amount, perfection, priority, or enforceability of any of the DIP Obligations, the DIP Liens, the Prepetition Secured Obligations, the Prepetition Citizens Liens, the Adequate Protection Liens or any other liens or interests of any of the DIP Lender or the Prepetition Secured Parties; or (i) seeking to subordinate, recharacterize, disallow or avoid the DIP Obligations, the Adequate Protection Obligations or the Prepetition Secured Obligations; provided, however, that the Carve Out and such collateral proceeds and loans under the DIP Loan Documents may be used for allowed fees and expenses, in an amount not to exceed $10,000 in the aggregate (the "**Investigation Budget Amount**"), incurred solely by a Committee (if appointed), in investigating (but not prosecuting or challenging) the validity, enforceability, perfection, priority or extent of the Prepetition Citizens Liens within thirty (30) calendar days following appointment of the Committee.  Notwithstanding anything to the contrary, any fees, expenses or costs incurred by the Committee or its professionals in excess of the Investigation Budget Amount or in excess of the amount budgeted for Committee's Case Professionals set forth in the Budget shall not constitute an allowable administrative expense claim, including for purposes of section 1129(a)(9)(A) of the Bankruptcy Code.

16.   Effect of Stipulation on Third Parties.

(a)   *Generally*. The admissions, stipulations, agreements, releases, and waivers set forth in this Interim Order (collectively, the "**Prepetition Lien and Claim Matters**") are and shall be binding on the Debtors, any subsequent trustee, responsible person, examiner with

expanded powers, any other estate representative, and all creditors and parties in interest and all

of their successors in interest and assigns, including, without limitation, a Committee (if

appointed), unless, and solely to the extent that, a party in interest that has sought and obtained

standing and the requisite authority to commence a Challenge (as defined below) (other than the

Debtors, as to which any Challenge is irrevocably waived and relinquished) (i) has timely filed the

appropriate pleadings, and timely commenced the appropriate proceeding required under the

Bankruptcy Code and Bankruptcy Rules, including, without limitation, as required pursuant to Part

VII of the Bankruptcy Rules (in each case subject to the limitations set forth in this paragraph 16

of this Interim Order) challenging the Prepetition Lien and Claim Matters (each such proceeding

or appropriate pleading commencing a proceeding or other contested matter, a "**Challenge**") by

no later than (1) thirty (30) days from the date of formation of a Committee (if appointed), or (2)

forty-five (45) days following the entry of the Interim Order for any other party in interest with

requisite standing (each the "**Challenge Deadline**"), as such applicable date may be extended in

writing from time to time in the sole discretion of the Prepetition Secured Parties, or by this Court

for good cause shown pursuant to an application filed by a party in interest prior to the expiration

of the Challenge Deadline, and (ii) this Court enters judgment in favor of the plaintiff or movant

in any such timely and properly commenced Challenge proceeding and any such judgment has

become a final judgment that is not subject to any further review or appeal.

(b)     *Binding Effect.* To the extent no Challenge is timely and properly

commenced by the Challenge Deadline, or to the extent such proceeding does not result in a final

and non-appealable judgment or order of this Court that is inconsistent with the Prepetition Lien

and Claim Matters, then, without further notice, motion, or application to, order of, or hearing

before, this Court and without the need or requirement to file any proof of claim, the Prepetition

Lien and Claim Matters shall, pursuant to this Interim Order, become binding, conclusive, and final on any person, entity, or party in interest in the Chapter 11 Cases, and their successors and assigns, and in any successor case for all purposes and shall not be subject to challenge or objection by any party in interest, including, without limitation, a trustee, responsible individual, examiner with expanded powers, or other representative of the Debtors' estates. Notwithstanding anything to the contrary herein, if any such proceeding is properly and timely commenced, the Prepetition Lien and Claim Matters shall nonetheless remain binding on all other parties in interest and preclusive as provided in subparagraph (a) above except to the extent that any of such Prepetition Lien and Claim Matters is expressly the subject of a timely and properly filed Challenge, which Challenge is successful as set forth in a final judgment as provided in subparagraph (a) above, and only as to plaintiffs or movants that have complied with the terms hereof. To the extent any such Challenge proceeding is timely and properly commenced, the Prepetition Secured Parties shall be entitled to payment of the reasonable related costs and expenses, including, but not limited to reasonable attorneys' fees, incurred under the Prepetition Loan Documents in defending themselves in any such proceeding as adequate protection. Upon a successful Challenge brought pursuant to this paragraph 16, the Court may fashion any appropriate remedy.

17.    Bankruptcy Code Sections 506(c) and 552(b) Waivers.  Subject to entry of a Final Order, without limiting the Carve-Out, the Debtors irrevocably waive and shall be prohibited from asserting (i) any surcharge claim, under section 506(c) of the Bankruptcy Code or otherwise, for any costs and expenses incurred in connection with the preservation, protection or enhancement of, or realization by the DIP Lender upon the DIP Collateral or by the Prepetition Secured Parties upon the Adequate Protection Collateral and no costs or expenses of administration that have been or may be incurred in any of the Chapter 11 Cases at any time shall be charged against the DIP

31

Lender, the Prepetition Secured Parties or their respective claims or liens (including any claims or liens granted pursuant to this Interim Order), and (ii) the "equities of the case" exception under section 552(b) of the Bankruptcy Code in connection with the DIP Facility and the use of Cash Collateral.

18.    <u>Application of Proceeds</u>.  Subject to the entry of the Final Order, in no event shall the DIP Lender, with respect to the DIP Collateral, or the Prepetition Secured Parties, with respect to the Adequate Protection Collateral, be subject to the equitable doctrine of "marshaling" or any other similar doctrine, and all proceeds of such DIP Collateral and Adequate Protection Collateral shall be received and used in accordance with this Interim Order.

19.    <u>Disposition of Collateral</u>.  The Debtors shall not sell, transfer, lease, encumber or otherwise dispose of any portion of the DIP Collateral, other than in the ordinary course of business or in connection with the payments contemplated under this Interim Order, without the prior written consent of the DIP Lender (and no such consent shall be implied from any other action, inaction or acquiescence by the DIP Lender or from any order of this Court); provided for the avoidance of doubt the Debtors shall comply with Section 6.4 of the DIP Credit Agreement. Notwithstanding anything otherwise provided herein, 100% of any net cash proceeds of any sale of  DIP Collateral outside of the ordinary course of business shall, subject to the satisfaction of the Carve-Out and the lien priorities outlined in paragraph 11 herein, be used to immediately satisfy the DIP Obligations.  Following payment in full of the DIP Obligations, the Debtors shall not sell, transfer, lease, encumber or otherwise dispose of any portion of the Adequate Protection Collateral, other than in the ordinary course of business or in connection with the payments contemplated under this Interim Order, without the prior written consent of the Prepetition Secured Parties (and no such consent shall be implied from any other action, inaction or acquiescence by

32

the Prepetition Secured Parties or from any order of this Court).  Notwithstanding anything otherwise provided herein, following payment in full of the DIP Obligations, 100% of any net cash proceeds of any sale of Adequate Protection Collateral outside of the ordinary course of business shall, subject to the satisfaction of the Carve-Out and the lien priorities outlined in paragraph 11 herein, be used to immediately satisfy the Adequate Protection Obligations and next to satisfy the Prepetition Secured Obligations.

20.     <u>Restrictions on Granting Postpetition Liens</u>.  Other than the Carve-Out or as otherwise provided in this Interim Order, the Final Order or the DIP Loan Documents, no claim or lien having a priority superior or *pari passu* with those granted by this Interim Order to the Prepetition Secured Parties and the DIP Lender shall be granted or permitted by any order of this Court in the Chapter 11 Cases heretofore or hereafter, and the Debtors will not grant any such mortgages, security interests or liens in the DIP Collateral (or any portion thereof) or the Adequate Protection Collateral (or any portion thereof) or to any other parties pursuant to section 364(d) of the Bankruptcy Code or otherwise, while (i) any portion of the DIP Facility, any DIP Facility Loans or any other DIP Obligations, are outstanding, (ii) the DIP Lender has any Commitment under the DIP Loan Documents or (iii) the Prepetition Secured Obligations and/or the Adequate Protection Obligations are outstanding.  For avoidance of doubt, there shall be no restriction and this paragraph shall not apply to and excludes any liens or security interests granted in favor of any federal, state, municipal or other governmental unit, commission, board or court for any liability of the Debtors.

21.     <u>Automatic Effectiveness of Liens</u>.  The DIP Liens and the Adequate Protection Liens shall not be subject to a challenge and shall attach and become valid, perfected, binding, enforceable, non-avoidable and effective by operation of law as of the date of the entry of this

Interim Order on a final basis, without any further action by the Debtors, the DIP Lender or the

Prepetition Secured Parties, respectively, and without the necessity of execution by the Debtors or

the filing or recordation, of any financing statements, security agreements, deposit control

agreements, vehicle lien applications, mortgages, filings with a governmental unit (including,

without limitation, the U.S. Patent and Trademark Office or the Library of Congress), or other

documents or the taking of any other actions.  All DIP Collateral shall be free and clear of other

liens, claims and encumbrances, except as provided in the DIP Loan Documents, and this Interim

Order.  All Adequate Protection Collateral shall be free and clear of other liens, claims and

encumbrances, except as provided in this Interim Order.  If the DIP Lender or the Prepetition

Secured Parties hereafter requests that the Debtors execute and deliver to such party financing

statements, security agreements, pledge agreements, control agreements, collateral assignments,

mortgages, or other instruments and documents considered by the DIP Lender or the Prepetition

Secured Parties to be reasonably necessary or desirable to further evidence the perfection of the

DIP Liens or the Adequate Protection Liens, as applicable, the Debtors are hereby authorized and

directed to execute and deliver such financing statements, security agreements, pledge agreements,

control agreements, mortgages, collateral assignments, instruments, and documents, and the DIP

Lender and/or the Prepetition Secured Parties, as appropriate, are hereby authorized to file or

record such documents in its discretion without seeking modification of the automatic stay under

section 362 of the Bankruptcy Code, in which event all such documents shall be deemed to have

been filed or recorded at the time and on the date of the entry of this Interim Order; provided,

however, no such filing or recordation shall be necessary or required in order to create or perfect

the DIP Liens or the Adequate Protection Liens.  The DIP Lender and the Prepetition Secured

Parties, in their respective sole discretion, may file a photocopy of this Interim Order as a financing

34

statement with any filing or recording office or with any registry of deeds or similar office, in addition to, or in lieu of, such financing statements, notices of liens or similar statements.[3]

22.      <u>Protection Under Section 364(e) of the Bankruptcy Code</u>.  The DIP Lender and the Prepetition Secured Parties have acted in good faith in connection with this Interim Order and their reliance on this Interim Order is in good faith.  The reversal or modification on appeal of the authorizations under section 364 of the Bankruptcy Code contained in this Interim Order does not affect the validity of any DIP Obligation or the DIP Liens, or the Adequate Protection Liens whether or not the DIP Lender or Prepetition Secured Parties (as applicable) knew of the pendency of the appeal, unless such authorization and incurrence of DIP Obligations and DIP Lien and advance of the DIP Facility Loan under 364 of the Bankruptcy Code in this Interim Order and the Final Order, were stayed pending appeal.

23.      <u>Reservation of Rights of the DIP Lender and the Prepetition Secured Parties</u>. Notwithstanding any other provision of this Interim Order to the contrary, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, or otherwise impair: (i) any of the rights of the DIP Lender or the Prepetition Secured Parties under the Bankruptcy Code or under non-bankruptcy law, including, without limitation, the right of any of such parties to (a) request modification of the automatic stay of section 362 of the Bankruptcy Code, (b) request dismissal of any of these Chapter 11 Cases, conversion of any of these Chapter 11 Cases to cases under chapter 7, or appointment of a chapter 11 trustee or examiner with expanded powers in any of these Chapter 11 Cases, (c) seek to propose, subject to the provisions of section 1121 of the Bankruptcy Code, a chapter 11 plan or plans; or (ii) any other rights, claims, or privileges (whether legal or equitable or otherwise) of the DIP Lender or the Prepetition Secured

---

[3] The provisions of section 1146(a) of the Bankruptcy Code do not apply herein.

Parties.  The delay in or failure of the DIP Lender or the Prepetition Secured Parties to seek relief

or otherwise exercise their respective rights and remedies shall not constitute a waiver of any of

the DIP Lender's or the Prepetition Secured Parties' rights and remedies.

24.     <u>Right to Credit Bid</u>.  Pursuant to section 363(k) of the Bankruptcy Code, unless the

Court orders otherwise for cause as provided under section 363(k) of the Bankruptcy Code, the

DIP Lender shall have the right to credit bid the total of the DIP Obligations for any or all of the

DIP Collateral at a sale, lease or other disposition of such DIP Collateral outside the ordinary

course of business (including any auction or similar sales), whether pursuant to a plan of

reorganization or a motion pursuant to section 363 of the Bankruptcy Code or otherwise (which

credit bid rights under section 363(k) of the Bankruptcy Code or otherwise shall not be impaired

in any manner).  Pursuant to section 363(k) of the Bankruptcy Code, unless the Court orders

otherwise for cause as provided under section 363(k) of the Bankruptcy Code, the Prepetition

Secured Parties shall have the right to credit bid the total of the Prepetition Secured Obligations

and the Adequate Protection Obligations for any or all of the Adequate Protection Collateral and

the Prepetition Collateral at a sale, lease or other disposition of such Adequate Protection Collateral

and/or Prepetition Collateral outside the ordinary course of business (including any auction or

similar sales), whether pursuant to a plan of reorganization or a motion pursuant to section 363 of

the Bankruptcy Code or otherwise (which credit bid rights under section 363(k) of the Bankruptcy

Code or otherwise shall not be impaired in any manner), provided, however any such credit bid

submitted by the Prepetition Secured Parties must include either (i) provisions for the satisfaction

of any secured claims of the DIP Lender that are senior to the secured claim that forms the basis

of the credit bid or (ii) evidence that the DIP Lender has affirmatively consented to any other

treatment of its senior secured claim.  A credit bid may be applied only to reduce the cash

36

consideration with respect to those assets in which the party submitting such credit bid holds a perfected security interest.  The DIP Lender and the Prepetition Secured Parties shall each be considered a "Qualified Bidder" with respect to their rights to acquire all or any of the assets by credit bid.

25.    <u>Remedies and Notice Upon the Occurrence of Maturity Date or Event of Default</u>.

(a)    Prior to payment in full of the DIP Obligations, upon prior written notice by the DIP Lender to counsel for the Debtors, counsel for the Committee, counsel to the Citizens Secured Parties, and the U.S. Trustee of the occurrence of an Event of Default (each as defined in the DIP Loan Documents and incorporated herein by reference) and without further order of the Court, the DIP Lender may (i) declare the DIP Obligations to be immediately due and payable; (ii) terminate the DIP Lender's commitment under the DIP Facility (other than the Carve-Out) or use of Cash Collateral; (iii) charge default rate interest; and/or (iv) upon five (5) business days' notice to counsel to the Debtors, counsel to the Committee and the U.S. Trustee, exercise all default-related rights and remedies against the DIP  Collateral, without further order of or application or motion to the Bankruptcy Court, and without restriction or restraint by any stay under sections 362 and 105 of the Bankruptcy Code or otherwise, <u>provided</u> <u>however</u>, that during the five (5) business day notice period, any party in interest shall have the right to file a pleading in opposition to the DIP Lender's exercise of rights and remedies including the delivery of the Carve-Out Trigger Notice; provided further that, unless otherwise ordered by the Court the only issue that may be raised by any party in such pleading shall be whether in fact, an Event of Default has occurred and is continuing; but provided further that, if an Event of Default occurs as a result of the Debtors' failure to indefeasibly satisfy the DIP Obligations by the Stated Maturity Date (as defined in the

37

DIP Loan Documents), the above referenced five (5) day notice period shall not apply and the Debtors and all other interested parties shall not have any challenge rights.

(b) Following the payment in full of the DIP Obligations, an "Event of Default" shall occur hereunder on the earliest to occur of: (i) the effective date of a chapter 11 plan for each of the Debtors; (ii) the entry of an order by this Court terminating the use of Cash Collateral; (iii) the conversion of any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code; (iv) the appointment of a trustee or examiner or other representative with expanded powers for the Debtors; (v) the dismissal of the Chapter 11 Cases; (vi) the Debtors' failure to perform any of their obligations under this Interim Order or their failure to comply with any of the terms or conditions of this Interim Order; provided that no Event of Default shall have occurred under this subsection (vi) until the Prepetition Secured Parties has provided two business days' written notice of any such purported failure to perform to the Debtors, (vii) modification (without the express written consent of the Prepetition Secured Parties), reversal or vacatur of this Interim Order; (viii) the filing of a chapter 11 plan that does not provide for the indefeasible payment in full in cash of all amounts due and owing under the Prepetition Loan Documents and all of the Adequate Protection Obligations on the effective date of such plan, or that provides for the impairment of the Prepetition Secured Parties' claims or liens; (ix) the Court entering an order granting relief from the automatic stay imposed by section 362 of the Bankruptcy Code to any entity other than Citizens Secured Parties, with respect to the Adequate Protection Collateral and/or the Prepetition Collateral having a value in excess of $150,000 without the written consent of the Prepetition Secured Parties, which consent may not be unreasonably withheld; (x) a filing by any Debtor of any motion, pleading, application or adversary proceeding challenging the amount, validity, enforceability, perfection, priority or extent of the Prepetition Credit Liens, the Adequate Protection Liens, or asserting any

38

12256869v1

other claims, counterclaims, causes of action, objections, contests or defenses against the Prepetition Credit Obligations, the Prepetition Collateral, the Prepetition Citizens Liens, the Adequate Protection Liens, and/or the 507(a) Claims; (xi) a filing of a motion for bidding procedures or a motion for the sale of any or all of a Debtors' assets that has not been made in consultation with the Prepetition Secured Parties; or (xii) the Debtors' failure to preserve or impair the right of the Prepetition Secured Parties to credit bid on any sale of the Adequate Protection Collateral and/or the Prepetition Collateral.  Upon the occurrence of an Event of Default under this subparagraph (b), the Citizens Secured Parties may file a motion for relief from the automatic stay upon fourteen (14) days' notice to exercise all default-related rights and remedies against the Adequate Protection Collateral and/or the Prepetition Collateral, without further order of or application or motion to the Bankruptcy Court, and without restriction or restraint by any stay under sections 362 and 105 of the Bankruptcy Code or otherwise, provided however, the only issue that may be raised by any party in opposition to such motion for relief from the automatic stay shall be whether in fact, an Event of Default has occurred and is continuing.

26.    Modification of Stay.  Subject to the terms set forth herein, the automatic stay imposed under section 362(a) of the Bankruptcy Code is hereby modified as necessary to effectuate all of the terms, rights, benefits, privileges, remedies and provisions of this Interim Order, and the DIP Loan Documents including without limitation, to permit the DIP Lender to exercise all rights and remedies provided for in the DIP Loan Documents and take any and all actions provided therein, in each case, without further notice, application to, order of or hearing before this Court, including those set forth in paragraph 25 of this Interim Order.

27.    Survival of DIP Liens, DIP Superpriority Claims, Adequate Protection Liens, Adequate Protection Obligations and Other Rights.  If, in accordance with section 364(e) of the

Bankruptcy Code, this Interim Order does not become a final non-appealable order, if a trustee terminates this Interim Order, or if any of the provisions of this Interim Order are hereafter modified, amended, vacated or stayed by subsequent order of this Court or any other court, such termination or subsequent order shall not affect the priority, validity, enforceability or effectiveness of (or subordination to the Carve-Out of) any lien, security interests or any other benefit or claim authorized hereby with respect to any DIP Obligations or Adequate Protection Obligations incurred prior to the effective date of such termination or subsequent order.  All such liens, security interests, claims and other benefits shall be governed in all respects by the original provisions of this Interim Order, and the DIP Lender and Citizens Secured Parties shall be entitled to all the rights, remedies, privileges and benefits granted herein, including the liens and priorities granted herein, with respect to any DIP Loan and Adequate Protection Obligations, subject to the Carve-Out.

28.    <u>Survival of this Interim Order</u>.

(a)    The provisions of this Interim Order and any actions taken pursuant hereto shall survive the entry of any order: (i) confirming any plan of reorganization in any of the Chapter 11 Cases; (ii) converting any of the Chapter 11 Cases to a chapter 7 case; or (iii) dismissing any of the Chapter 11 Cases, and the terms and provisions of this Interim Order as well as the DIP Superpriority Claims, the DIP Liens in DIP Collateral granted pursuant to this Interim Order and the DIP Loan Documents, the Adequate Protection Liens, the 507(a) Claims, and the Adequate Protection Obligations shall continue in full force and effect notwithstanding the entry of any such order.

(b)    The DIP Liens and the DIP Superpriority Claims shall maintain their priority as provided by this Interim Order and the DIP Loan Documents, and to the maximum

40

extent permitted by law, until all of the DIP Obligations are indefeasibly paid in full in cash and discharged or otherwise treated under a plan of reorganization, which is reasonably acceptable to the DIP Lender.  In no event shall any plan of reorganization be allowed to alter the terms of repayment of any of the DIP Obligations from those set forth in the DIP Loan Documents unless agreed to by and among the Debtors and the DIP Lender.

29.     <u>Modifications of DIP Loan Documents</u>.  The Debtors and the DIP Lender are hereby authorized to implement, in accordance with the terms of the DIP Loan Documents, any non-material modifications of the DIP Loan Documents without further notice, motion or application to, order of or hearing before, this Court.  Any material modification or amendment to the DIP Loan Documents shall only be permitted pursuant to an order of this Court, after being submitted to this Court upon five (5) days' notice to the U.S. Trustee, Citizens Secured Parties, and counsel to the Committee; <u>provided</u>, that any forbearance from, or waiver of, (i) a breach by the Debtors of a covenant representation or any other agreement or (ii) a default or an Event of Default, in each case under the DIP Loan Documents shall not require an order of this Court.  In the event of any inconsistency between this Interim Order and the DIP Credit Agreement, this Interim Order shall control.

30.     <u>Insurance Policies</u>.  Upon entry of this Interim Order, on each insurance policy maintained by the Debtors which in any way relates to the DIP Collateral: (i) the DIP Lender shall be, and shall be deemed to be, without any further action by or notice to any person, named as additional insureds; and (ii) the DIP Lender shall be and shall be deemed to be, without any further action by or notice to any person, named as loss payee for DIP Collateral on which the DIP Lien holds a first priority lien.  The Debtors are hereby authorized on a final basis, to and shall take any actions necessary to have the DIP Lender be added as an additional insured and loss payee on each

41

insurance policy maintained by the Debtors consistent with this Interim Order and DIP Credit Agreement which in any way relates to the DIP Collateral.

31.     <u>Financial Information</u>.  The Debtors shall deliver to the DIP Lender and the Citizens Secured Parties such financial and other information concerning the business and affairs of the Debtors and any of the DIP Collateral and the Adequate Protection Collateral as may be required pursuant to the DIP Loan Documents, the Prepetition Loan Documents and/or as the DIP Lender or the Citizens Secured Parties shall reasonably request from time to time.  The Debtors shall allow the DIP Lender and the Citizens Secured Parties access to the premises in accordance with the terms of the DIP Loan Documents and the Prepetition Loan Documents for the purpose of enabling such parties to inspect and audit the DIP Collateral, the Adequate Protection Collateral and the Debtors' books and records.

32.     <u>Proofs of Claim</u>.  Notwithstanding any order entered by the Bankruptcy Court in relation to the establishment of a bar date in the Chapter 11 Cases to the contrary, or otherwise, the DIP Lender and the Prepetition Secured Parties shall not be required to file proofs of claim in the Chapter 11 Cases for any claim allowed herein.

12256869v1

33.    <u>Immediate Effect of Order</u>.  The terms and conditions of this Interim Order shall be effective and immediately enforceable upon its entry by the Clerk of the Court notwithstanding any potential application of Bankruptcy Rule 6004(h) or otherwise.  Furthermore, to the extent applicable, the notice requirements and/or stays imposed by Bankruptcy Rules 4001(a)(3), 6003(b), and 6004(a) are hereby waived for good and sufficient cause. The requirements of Bankruptcy Rules 4001, 6003, and 6004, in each case to the extent applicable, are satisfied by the contents of the Motion.

Dated:                                  _____

                                         William J. Fisher
                                         United States Bankruptcy Judge

43

**<u>Exhibit 1</u>**

**DIP Credit Agreement**

44

**<u>Exhibit 2</u>**

**Approved Budget**

AFDOCS/21216102.1

12256869v1