# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| In re: | Jointly Administered under 19-43756 (WJF) |
| Granite City Food & Brewery Ltd. | 19-43756 |
| Granite City Restaurant Operations, Inc. | 19-43757 |
| Granite City of Indiana, Inc. | 19-43758 |
| Granite City of Kansas Ltd. | 19-43759 |
| Granite City of Maryland, Inc. | 19-43760 |
| Debtors. | Chapter 11 Cases |

## NOTICE OF HEARING AND MOTION FOR AN ORDER: (I) GRANTING EXPEDITED HEARING; (II) APPROVING BID PROCEDURES AND RELATED BID PROTECTIONS FOR STALKING HORSE BIDDER; (III) APPROVING THE SALE OF ASSETS FREE AND CLEAR OF ALL LIENS, INTERESTS, CLAIMS AND ENCUMBRANCES; (IV) APPROVING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES IN CONNECTION WITH THE SALE; AND (V) GRANTING OTHER, RELATED RELIEF

TO: THE OFFICE OF THE UNITED STATES TRUSTEE AND OTHER PARTIES-IN-INTEREST AS SPECIFIED IN LOCAL RULE 9013-3.

1.     The above-named Debtors ("Debtors"), through their undersigned attorneys, Briggs and Morgan P.A., respectfully request that the Court enter an order pursuant to 11 U.S.C. §§ 105(a), 365 and Rule 2002, 6004, 6006 and 9014(a) of the Federal Rules of Bankruptcy Procedure (a) granting an expedited hearing; (b) approving bid procedures and related bid protections for the stalking horse bidder; (c) approving the sale of assets free and clear of all liens, interests, claims and encumbrances; (d) approving the assumption and assignment of certain executory contracts and unexpired leases in connection with the sale; and (e) granting related relief in the above-captioned bankruptcy cases and give notice of hearing.

2.     PLEASE TAKE NOTICE that the court will hold a hearing on the expedited relief and bid procedures portion of this motion (the "Bid Procedures Motion"), including the

Debtors' requests for approval of bid procedures related to an auction process for the sale of substantially all of the Debtors' assets, the approval of a proposed stalking horse asset purchase agreement, and the approval of a breakup fee and other buyer protections at 2:00 p.m. on January 14, 2020 before the Honorable William J. Fisher, Courtroom 2B, U.S. Courthouse, 316 North Robert Street, St. Paul, Minnesota.

3.      PLEASE TAKE FURTHER NOTICE that the Court will hold a hearing on the remaining portions of this motion addressing the sale of assets, including the proposed process for assumption and assignment of certain executory contracts and unexpired leases in connection with the sale (the "Sale Motion"), at 1:30 p.m. on February 18, 2020 before the Honorable William J. Fisher, Courtroom 2B, U.S. Courthouse, 316 North Robert Street, St. Paul, Minnesota.

4.      The deadline to file a response to the Bid Procedures Motion is Thursday, January 9, 2020.  **UNLESS A RESPONSE OPPOSING THE MOTION IS TIMELY FILED, THE COURT MAY GRANT THE MOTION WITHOUT A HEARING.**

5.      The deadline to file a response to the Sale Motion is Thursday, February 13, 2020.  **UNLESS A RESPONSE OPPOSING THE MOTION IS TIMELY FILED, THE COURT MAY GRANT THE MOTION WITHOUT A HEARING.**

**JURISDICTION AND VENUE**

6.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, Fed. R. Bankr. P. 5005, and Local Rule 1070-1.

7.      This matter is a core proceeding pursuant to 28 U.S.C. § 157(2)(A), (M), (N) and (O).

8.      This motion arises under 11 U.S.C. §§ 105, 363 and 365 and Fed. R. Bankr. P.

2

2002, 6004 and 6006.  This motion is filed under Fed. R. Bankr. P. 9013 and 9014 and Local

Rule 9013.

## **SUMMARY OF REQUESTED RELIEF**

9.      By this Motion, the Debtors seek entry of an order (a) granting expedited relief

on approval of Bid procedures, (b) approving Bid Procedures; and (c) approval of the final sale.

The Debtors propose to sell substantially all of their assets free and clear of liens, claims,

encumbrances and interests pursuant to 11 U.S.C. § 363(f) and to assign specified unexpired

leases and contracts pursuant to 11 U.S.C. § 365 to KRG Granite, LLC, a Nevada limited

liability company (the "Proposed Purchaser"), or another, higher and better bidder.

10.      The Debtors and the Proposed Purchaser, as a stalking horse, have entered into

an Asset Purchase Agreement dated December 16, 2019 (the "APA" or "Purchase Agreement"),

a copy of which is attached to this motion as **Exhibit A.**   The Debtors will propose, by a

subsequent motion, to reject any leases not assumed and assigned to the Proposed Purchaser in

accordance with certain "Designation Rights" afforded the Proposed Purchaser under the APA,

or alternatively, the Debtors will propose to reject any leases not assumed and assigned to

another, higher and better bidder or bidders.

11.      The Debtors believe that a sale of their restaurant business assets is the best way

to maximize the value of those assets for the benefit of creditors and parties in interest.    The

Debtors thus respectfully request that the Court: (a) authorize the Debtors to solicit bids and

conduct an auction for the sale of the Debtors' restaurant assets; (b) approve the bid procedures

(the "Bid Procedures") attached as **Exhibit B**; (c)  approve the proposed Order implementing the

Bid Procedures (the "Bid Procedures Order") and attached as **Exhibit C**; (d) approve the break-

up fee, expense reimbursement and other bid protections afforded the Proposed Purchaser under

3

the Purchase Agreement; (e) authorizing the sale of assets free and clear of liens, claims and encumbrances, subject to higher or better offers; (f) approving the form and manner of notice and the procedure for assumption and assignment of executory contracts and unexpired leases; (g) scheduling a hearing on the Sale Motion for February 18, 2020, at 1:30 p.m., or as soon thereafter as counsel may be heard (the "Sale Hearing") as the date and time for the Sale Hearing to approve the sale of assets to the Successful Bidder (as defined below) at the auction free and clear of any and all liens, claims, interests and encumbrances; and (h) granting related relief.

12.     The Debtors further request that the Court enter an Order, upon the conclusion of the Sale Hearing, substantially in the form attached hereto as **Exhibit D** (the "Sale Order") (a) authorizing the Debtors to sell certain assets to the Proposed Purchaser, or to another bidder or bidders submitting the Successful Bid, free and clear of all liens, claims, interests and encumbrances; (b) approving the Purchase Agreement and authorizing the Debtors to perform their obligations and comply with the terms of the Purchase Agreement and all other documents and agreements and transactions contemplated therein; and (c) granting related relief.

13.     The APA entered into with the Proposed Purchaser, which will serve as the Stalking Horse bid, is an important step toward achieving the ultimate goal of the chapter 11 process – maximizing value available to stakeholders – by selling the Debtors' assets for their going concern value. To that end, the Debtors seeks this Court's approval of the sale transaction reflected in the APA and related Bid Procedures to enable the Debtor, with the assistance of a qualified investment banker and financial advisory, Duff & Phelps Securities, LLC ("Duff & Phelps"), to solicit competing offers for substantially all of its assets and, if appropriate, to conduct an auction. To secure the benefits of the Stalking Horse bid and to maximize the

AFDOCS/21474434.2

12129348v6

Debtor's chances of success in a competitive bidding process, it is imperative that the Sale Motion be approved and implemented expeditiously.

## BACKGROUND

### I.    PROCEDURAL STATUS

14.    On December 16, 2019 (the "Petition Date"), the Debtors each filed separate voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States District Court for the District of Minnesota.

15.    Each Debtor remains in possession of its assets and continues to operate as a debtor in possession in accordance with 11 U.S.C.§§ 1107 and 1108.

16.    On December 19, 2019, the Court entered an order approving the joint administration of the above-referenced bankruptcy cases.  The Court has also authorized the Debtors to obtain debtor-in-possession financing and to use cash collateral to fund operating expenses that are necessary to continue normal business operations and preserve the value of the bankruptcy estates.

17.    As of the date of this filing, no trustee, examiner, or committee of unsecured creditors has been appointed in these proceedings.

### II.    THE DEBTORS' RESTAURANT BUSINESS

18.    As described in detail in the December 16, 2019 *Declaration of Richard H. Lynch in Support of Chapter 11 Petitions and First Day Filings* ("Lynch Dec.")｛Doc. # 4｝, the Debtors own and operate casual dining restaurants under the names Granite City Food & Brewery® and Cadillac Ranch American Bar & Grill®.  Each features a unique set of attributes.

19.    On the Petition Date, the Debtors employed over 2200 restaurant and front office workers.  The Debtors currently operate 25 Granite City restaurants in 13 states and four Cadillac

AFDOCS/21474434.2

12129348v6

Ranch restaurants in four states:

| Granite City Food & Brewery | | | | Cadillac Ranch |
|---|---|---|---|---|
| St. Cloud, MN<br>St. Louis, MO<br>Naperville, IL<br>Schaumburg, IL<br>Davenport, IA<br>Troy, MI<br>Rockford, IL | Eagan, MN<br>Fargo, ND<br>Des Moines, IA<br>Cedar Rapids, IA<br>Roseville, MN<br>Detroit, MI | Sioux Falls, SD<br>Kansas City, KS<br>Olathe, KS<br>Omaha, NE<br>National Harbor, MD<br>Maple Grove, MN | Kansas City, MO<br>Fort Wayne, IN<br>Toledo, OH<br>Northville, MI<br>Lincoln, NE<br>Franklin, TN | Bloomington, MN<br>Miami, FL<br>Oxon Hill, MD<br>Pittsburgh, PA |

20.     A confluence of factors, including increased and evolving competition in the casual dining and craft beer sectors, changes in consumer preferences and spending patterns, and declining mall foot traffic, all negatively impacted the profitability of the Debtors' business, and eventually led to an inability to meet financial obligations as they arose in the ordinary course of business.

21.     As detailed herein, this led to a series of financial covenant and payment defaults under secured credit facilities described below.

## IV.     PRE-PETITION SECURED DEBT

22.     Each of the Debtors is a borrower or guarantor under a Credit Agreement with Citizens Bank N.A. (f/k/a RBS Citizens, N.A.) ("Citizens Bank") dated as of May 15, 2014, as amended by a First Amendment to Credit Agreement dated as of September 1, 2016 (together the "Credit Agreement").  Pursuant to the Credit Agreement, Citizens agreed to make the following loans and extensions of credit to the Debtors: (a) a secured term loan in the original principal amount of $29.0 million; (b) a revolving line of credit in the original principal amount of $6.0 million; and (c) a development line of credit in the original principal amount of $5.0 million (together the "Citizens' Loans").

23.     As more fully set forth in the Credit Agreement, to secure repayment of the

6

Citizens' Loans, each of the Debtors granted to Citizens first priority liens and security interests in and to all or substantially all of the assets of the Debtors, including all of their personal property, fixtures, and in real estate owned or to be acquired (with the exception of the Great Western Collateral).

24.     In addition to the Citizens' Loans, pursuant to a Second Amendment to Credit Agreement dated as of October 23, 2019 (the "Second Amendment"), JMB Capital Partners Lending, LLC ("JMB"), as a participant under the Credit Agreement, agreed to provide the Debtors with bridge financing in the form of a priming $1.5 million LIFO term loan secured by all of the Debtors' assets (with the exception of the Great Western Collateral) (the "JMB Loan"). Pursuant to a Prepetition Credit Agreement and a Subordination Agreement dated as of October 23, 2019 (the "JMB Subordination Agreement") Citizens, as agent for the lenders under the Credit Agreement, agreed that the obligations under the JMB Loan are senior in priority to the payment of the obligations under the Citizen's Loan.

25.     Granite City Restaurant Operations, CRO is indebted to Great Western Bank ("Great Western"), a South Dakota banking corporation, pursuant to a Business Loan Agreement and Promissory Note dated as of September 30, 2015 in the original principal amount of $1,080,000.00 (the "Great Western Loan").   Granite City Food & Brewery Ltd. has unconditionally guaranteed repayment of the Great Western Loan.

26.     The Great Western Loan is secured by liens on the real property, improvements and fixtures that comprise the Debtors' Omaha Granite City operation, which is located at 1001 102nd Street, Omaha, Nebraska  68114 (the "Great Western Collateral").   Pursuant to a Subordination and Intercreditor Agreement dated September 30, 2015 (the "Intercreditor Agreement"), Citizens, as agent for the lenders under the Credit Agreement, agreed to

7

subordinate to Great Western any lien Citizens might possess with respect to any real and/or personal property comprising the Great Western Collateral.

## V.    REASONS FOR THE BANKRUPTCY

27.    As of December 27, 2016, the Debtors failed to meet certain financial covenants under secured credit facilities with Citizens Bank, N.A. (f/k/a RBS Citizens, N.A.) ("Citizens Bank").  On January 31, 2017, the Debtors failed to make a $5 million principal payment to Citizens Bank in connection with a development loan line of credit.  From and after March 31, 2018, the Debtors have not made any principal payments and have missed all but two interest payments to Citizens Bank under a separate credit facility.  That credit facility matured and became immediately due and payable on May 15, 2019.

28.    The Debtors' failure to make payments of principal, interest and other amounts due and owing to Citizens Bank gave rise to numerous events of default under those facilities.

29.    The same defaults relative to the Citizens Bank debt caused events of default to occur under a subordinate debt agreement with one of the Debtors' other secured lenders, Great Western Bank ("Great Western").

30.    The Debtors received notices of default and reservation of rights letters from Citizens and Great Western.  In the aggregate, the Debtors currently owe Citizens $40 million in principal together with accrued interest, fees and other amounts payable under the Citizens credit facilities.  The Debtors currently owe Great Western over $1 million in principal together with accrued interest, fees and other amounts payable under the Great Western credit facility.

31.    Following protracted discussions during the spring and summer of 2019, Citizens notified the Debtors that it would be unable to lend additional amounts to facilitate a restructuring of the existing indebtedness.

8

AFDOCS/21474434.2

12129348v6

32.     The Debtors' inability to restructure their secured indebtedness ultimately led to the decision to file these bankruptcy cases.  By the date of the Petitions, the Debtors had no reasonable alternative but to seek bankruptcy protection in order to stave off eviction proceedings and avoid deterioration in the value of the assets comprising Debtors' restaurant operations.

## IV.   POST-PETITION FINANCING

33.     Shortly after the filing of the Petition, on December 20, 2018, the Bankruptcy Court entered an *Interim Order (I) Authorizing the Debtors to Obtain PostPetition Financing (II) Granting Security Interests and Superpriority Administrative Expense Status; (III) Granting Adequate Protection to Certain Prepetition Secured Credit Parties; (IV) Modifying the Automatic Stay; (V) Authorizing the Debtors to Enter Into Agreements with JMB Capital Partners Lending, LLC; (VI) Authorizing the Use of Cash Collateral; (VII) Scheduling a Final Hearing and (VIII) Granting Related Relief*   {Doc. # 48} in the above-captioned jointly administered cases (the "Interim Financing Order").

34.     Pursuant to the Interim Financing Order, the Court authorized the Debtors, *inter alia*, to obtain from JMB up to $4 million in interim postpetition financing secured by first priority priming liens on substantially all of the Debtors' assets (the "DIP Collateral"), with the exception of the Great Western Collateral.  To that end, on December 23, 2019, JMB and the Debtors, along with certain of the Debtors' non-bankrupt affiliates, entered into a Senior Secured, Super-Priority Debtor-in-Possession Loan and Security Agreement, among the Debtors as Borrowers and Guarantors and JMB, as Lender (the "DIP Loan Agreement").

35.     In accordance with the Interim Financing Order and DIP Loan Agreement, the $1.5 million prepetition JMB Loan has been rolled up into the postpetition DIP Loan Agreement,

AFDOCS/21474434.2

12129348v6

and the Debtors have the right – pending entry of a final Order – to draw down, on an interim basis, an additional $2.5 million in loan proceeds to cover the envisioned sale process and other budgeted expenses associated with these bankruptcy cases.

36.    The DIP Loan Agreement and the Interim Financing Order contemplate that upon entry of a final Order, the Debtors will be able to access up to an additional $1 million in financing from JMB to ensure adequate liquidity to meet budgeted expenses incurred in the administration of the estates.

37.    Pursuant to the DIP Loan Agreement and Paragraph 19 of the Interim Financing Order, upon consummation of the contemplated sale, 100% of any net cash proceeds – after funding of a Carve-Out detailed in Paragraph 14 of the Interim Financing Order and subject to the lien priorities outlined in Paragraph 11 thereof – are to be used to immediately satisfy the DIP Obligations through repayment of principal, interest and other amounts due as may become due and owing under the terms of the DIP Loan Agreement.

## V.    THE PREPETITION MARKETING AND SALE PROCESS

38.    Before the Petitions were filed, the Debtors, with the assistance of renowned investment banking firm Duff & Phelps, engaged in a robust marketing program aimed at securing debt or equity financing or a sale of the Debtors' restaurant assets.  To that end, in mid-September 2019, the Debtors established a due diligence data room populated with information related to the Debtors assets, liabilities, financial condition and business operations.

39.    Duff & Phelps then began outreach to potential financing parties, investors and buyers, initiating communications with 299 parties Duff believed might have an interest in pursuing a transaction with the Debtors.

40.    More than 60 parties signed nondisclosure agreements and thereafter received an

10

80-page confidential information memorandum regarding the Debtors and their businesses and a process letter outlining the process for submitting indications of interest ("IOI"). The Debtors received three IOI prior to the submission deadline, and thereafter received marked-up asset purchase agreements from several parties interested in buying some or all of the Debtors' restaurants.

41.     Management participated in face-to face-meetings with several potential buyers during October and November 2019. The Debtors subsequently engaged in protracted negotiations with potential buyers and, following an exhaustive process, determined that the APA represented the highest and best available offer to purchase that the Debtors had received. Accordingly, on December 13, 2019, the Debtors' board authorized entry into the APA.

## VI.     THE STALKING HORSE BID AND APA

42.     As noted above, the Debtors' and their professionals' efforts culminated in the APA with the Proposed Purchaser. The Proposed Purchaser is an affiliate of Kelly Restaurant Group ("KRG"). KRG is not an "insider" or "affiliate" (as defined in the Bankruptcy Code) and the APA is the result of vigorous arm's-length negotiations. KRG's portfolio boasts a number of venerable restaurant chains including Champps, Joe's Crab Shack, McCormick & Schmick, and Bubba Gump Shrimp Co.

43.     The assets to be sold include 25 Granite City and 4 Cadillac Ranch restaurant locations, including associated leasehold interests and related designation rights, and furniture, fixtures, equipment, inventory, vehicles, other personal property, cash and accounts receivable. The Proposed Purchaser has also agreed to assume select liabilities and cure obligations with respect to unexpired real property leases that designated for assumption and assignment, as well

11

as to cover interim rental obligations for all of the sites during a sixty (60) day post-closing designation period.

## THE ASSET PURCHASE AGREEMENT

44.    A summary of key provisions of the APA appears below.[1]  Capitalized terms have the meaning ascribed to them in the APA.

| **Purchase Price** | The aggregate consideration for the Acquired Assets will be: (a) an aggregate amount in cash equal to Seven Million Five Hundred Thousand Dollars ($7,500,000.00) (the "**Unadjusted Purchase Price**") subject to adjustment for the Price Adjustment Costs (as adjusted, the "**Final Purchase Price**"); *plus* (b) the assumption by Buyer of the Assumed Liabilities (such assumption, together with the Final Purchase Price, the "**Total Consideration**").  *See* APA § 2.1. |
|---|---|
| **Deposit** | A cash deposit in the amount of $225,000 has been deposited into an escrow account with the Escrow Agent, Wilmington Trust, N.A., to be applied at the Closing as a credit against the Purchase Price or to be returned to the Buyer if the Agreement is terminated pursuant to Section 7.1(b).  *See* APA § 2.2(a)-(b). |
| **Acquired Assets** | All of Seller's right, title and interest in, to and under the following properties, assets and rights free and clear of all Liens (other than Permitted Liens and Assumed Liabilities) (collectively the "Acquired Assets"): |
| | (a)  All real property: (i) owned by any Seller, including but not limited to Seller's facility in Ellsworth, IA; or (ii) leased to any Seller pursuant to the Real Property Leases listed on Schedule 1.1(a) to the APA, to which such Seller is a party, including all Leasehold Improvements thereon (collectively, the "Leased Real Property"); |
| | (b)  All cash, cash equivalents and similar cash items at each Leased Real Property location on the Closing Date in cash registers, safes, strongboxes and lock boxes consistent with past practice; |
| | (c)  All Inventory (other than alcoholic beverage inventories in jurisdictions where the Law does not permit Buyer to take title to such inventories until it obtains the requisite Liquor License approvals from the relevant Governmental Authority; provided, however, Sellers shall transfer, assign, convey and deliver to Buyer such alcoholic beverage inventories in each instance upon issuance of the relevant Liquor License approval or other authorization from the relevant Governmental Authority (whichever |

---

[1] In the event of a conflict between the below summary and the APA, the terms of the APA shall control.

12

occurs first));

(d)  All tangible personal property, including machinery, equipment, furniture, fixtures, office equipment, computer hardware, computers, computer equipment, tools, information technology infrastructure, supplies, office supplies, and other tangible personal property of any kind owned by Sellers, and all warranties and licenses of Sellers thereunder or related thereto;

(e)  All prepaid expenses of Sellers related to the Acquired Assets ("Prepaid Expenses");

(f)  All deposits paid or held by Sellers related to or arising from the Acquired Assets, including, without limitation, any deposits under the Real Property Leases ("Acquired Deposits"), but excluding Utility Deposits;

(g)  The Contracts listed on Schedule 1.1(g) to the APA to which any Seller is a party (collectively, the "Acquired Contracts");

(h)  All permits, authorizations and licenses (collectively, the "Permits") issued to any Seller by any Government, to the extent assignable, arising out of or relating to the Acquired Assets, other than alcohol permits (including Liquor Licenses) in jurisdictions where the Law does not permit Buyer to take title to such Permits until it obtains the requisite approvals from the pertinent Governmental Authority (in which case Sellers shall transfer, assign, convey and deliver to Buyer such Permits in each instance upon issuance of the requisite approvals from the relevant Governmental Authority);

(i)  All insurance benefits, rights and proceeds arising from or relating to any event or incident that affects, impacts or alters any Acquired Asset between the Execution Date and the Closing Date;

(j)  All cars, trucks, forklifts, other industrial vehicles and other motor vehicles owned by Sellers;

(k)  All Intellectual Property owned by Sellers, including the items set forth on Schedule 4.1(l) to the APA;

(l)  All Improvements;

(m) All marketing materials;

(n)  All rights to the telephone and facsimile numbers, websites, URLs, internet domain names, social media accounts, and email addresses used by Sellers;

(o)  All Records, related to the Acquired Assets and Assumed

13

Liabilities, other than Records related to income Taxes of Sellers (provided that Sellers are entitled to retain copies of all Records);

(p)   All goodwill associated with the Business or the Acquired Assets, including all goodwill associated with the Intellectual Property Rights owned by Sellers and all rights under any confidentiality agreements executed by any third party for the benefit of any of Sellers to the extent relating to the Acquired Assets and/or the Assumed Liabilities (or any portion thereof);

(q)   All rights of Sellers under noncompete or non-solicitation agreements with current or former employees, directors, consultants, independent contractors and agents of any of Sellers to the extent relating to the Acquired Assets and/or the Assumed Liabilities (or any portion thereof);

(r)   All other rights, demands, claims, credits, allowances, rebates or other refunds (including any vendor or supplier rebates) and rights in respect of promotional allowances or rights of setoff (whether or not known or unknown or contingent or non-contingent), other than against Sellers, arising out of or relating to the Business as of the Closing;

(s)   All rights under or pursuant to all warranties, representations and guarantees made by suppliers, manufacturers, contractors and any other Person to the extent relating to equipment purchased, products sold, or services provided, to Sellers or to the extent affecting any Acquired Assets and/or Assumed Liabilities;

(t)   Except as otherwise excluded under Section 1.2 to the APA, all rights, claims, rights of offset, causes of action, lawsuits, judgments and other claims or demands of any nature against any third party arising out of, and only with respect to, the Acquired Assets or Assumed Liabilities; and

(u)   all other assets that are related to or used in connection with the Acquired Assets or the Business (but excluding all of the Excluded Assets).

Notwithstanding anything herein to the contrary and in addition to Buyer's designation rights pursuant to Section 1.6, Buyer may, from time to time (but in no event later that sixty (60) days following the Closing Date) (such period, the "Designation Rights Period"), amend the Acquired Assets so as to include additional assets in its sole and absolute discretion (except that Buyer may not add as an Acquired Asset anything specifically listed as an Excluded Asset below); provided, however, that (i) Buyer shall be solely responsible for all cost and expenses associated with any asset which is designated as an Acquired Asset pursuant to this section and (ii) no such addition shall result in any adjustment to the Purchase Price. Furthermore, Buyer may, from time to time, remove any Acquired Asset from this Section 1.1 in its sole and absolute discretion until the period ending sixty

14

| | |
|---|---|
| | (60) days following the Closing Date and elect to treat such Contract, Permit or other asset as an Excluded Asset; *provided*, *however*, that no such removal will result in any adjustment to the Purchase Price. *See* APA § 1.1. |
| **Excluded Assets** | Notwithstanding anything to the contrary in the Purchase Agreement, each Seller will retain its right, title and interest in, to and under all of its properties, assets and rights not otherwise an Acquired Asset (collectively, the "Excluded Assets"), including: |
| | (a)      Except as set forth in Section 1.1(b) of the APA, all Sellers' cash, checks, cash equivalents, and cash in-transit; |
| | (b)      All trade accounts receivable of Sellers in existence as of the Closing Date (collectively, the "Accounts Receivable"); |
| | (c)      All amounts and funds (rebates and dividends) on account of, accrued by or due to Sellers pursuant to any agreement or arrangement with such companies for all periods prior to the Closing (collectively, the "Rebates"); |
| | (d)      All equity ownership interests in each Seller; |
| | (e)      All rights to refunds of or credits for Taxes of Sellers previously paid by Sellers prior to the Closing Date, and any records relating to Taxes of Sellers; |
| | (f)      Subject to Section 1.1(i) of the APA, all insurance premiums, policies, contracts and coverage obtained by Sellers and all rights to insurance proceeds or other Contracts of insurance or indemnity (or similar agreement) recoveries; |
| | (g)      All avoidance claims and causes of action arising under Chapter 5 of the Bankruptcy Code and any related claims and causes of action under applicable non-bankruptcy law arising out of the same set of facts, and the proceeds from any of the foregoing; |
| | (h)      All rights of and benefits to Sellers under this Agreement, the Ancillary Agreements or any other agreements or instruments otherwise delivered, executed or made in connection with this Agreement; |
| | (i)      The Contracts to which any Seller is a party that is not an Acquired Contract; |
| | (j)      All Utility Deposits; |
| | (k)      The assets listed on Schedule 1.2 to the APA; and |
| | (l)      Corporate seals, minute books, charter documents, stock |

| | |
|---|---|
| | transfer records, record books, original Tax and financial records and such other files, books and records relating to any of the Excluded Assets or to the organization, existence or capitalization of any Seller. *See* APA § 1.2. |
| **Assumed Liabilities** | At the Closing, Buyer will assume, and thereafter pay, perform and discharge when due, the following liabilities of Sellers (collectively, the "Assumed Liabilities"): |
| | (a)     All liabilities and obligations under the Acquired Contracts, including, without limitation, all pre-petition cure costs required to be paid pursuant to Section 365 of the Bankruptcy Code in connection with the assumption and assignment of the Acquired Contracts (such pre-petition cure costs are, collectively, the "Cure Costs"); |
| | (b)     All liabilities and obligations in respect of any gift cards, gift certificates, loyalty programs or similar items relating to the business of Sellers; |
| | (c)     All liabilities and obligations under the Worker Adjustment and Retraining Notification Act of 1988, or similar state or local law regarding employee terminations, if any, arising out of or resulting solely from layoffs or termination of employees by Buyer after the Closing; |
| | (d)     All liabilities and obligations related to accrued store-level bonuses, vacation days, sick days or other paid time-off, that is earned or accrued by, but not yet payable to, employees, officers, directors or contractors of Sellers that Buyer hires as an employee as part of this Transaction; |
| | (e)     All accrued but unpaid Property Taxes, if any, related to or arising from the ownership of the Acquired Assets; and |
| | (f)     Those liabilities and obligations assumed by or made the responsibility of Buyer as set forth elsewhere in this Agreement. |
| **Excluded Liabilities** | Notwithstanding anything to the contrary in this Agreement, each Seller will retain, and remain liable and obligated for any of its respective liabilities not otherwise included in the Assumed Liabilities and the Parties expressly acknowledge and agree that Buyer shall not assume, be obligated to pay, perform or otherwise discharge or in any other manner be liable or responsible for any liabilities of Sellers of any nature, whether existing on the Closing Date or arising thereafter, other than the Assumed Liabilities (all such liabilities that Buyer is not assuming being referred to collectively as the "Excluded Liabilities"), |

16

including without limitation:

(a)      Any liability arising from or related to the Excluded Assets, including without limitation the Excluded Contracts;

(b)      Any and all claims, charges, lawsuits and causes of action based on:

(i)      age, race, color, sex (including sexual harassment), national origin, ancestry, disability, religion, sexual orientation, marital status, parental status, veteran status, military status, citizenship status, genetic information, source of income, entitlement to benefits, or any other status protected by local, state or federal laws, constitutions, regulations, ordinances or executive orders;

(ii)      violations of personnel policies, handbooks or any covenant of good faith and fair dealing or breaches of any written or implied contract of employment; violations of public policy or common law, including, but not limited to, claims for: personal injury; invasion of privacy; retaliatory or wrongful discharge; whistle blowing; negligent hiring, retention or supervision; defamation; intentional or negligent infliction of emotional distress and/or mental anguish; intentional interference with contract; negligence; detrimental reliance; loss of consortium to you or any member of your family; and/or promissory estoppel;

(iii)      obligations for any reason to pay damages, expenses, litigation costs (including attorneys' fees), wages, bonuses, commissions, disability, retirement or welfare benefits, unemployment or worker's compensation, vacation pay and sick pay, compensatory damages, penalties, liquidated damages, punitive damages, other payments, and/or interest; any obligations for compensation or payments in connection with any ideas, information, inventions, processes, procedures, systems, methods, intellectual property or other materials that may have been developed, produced, created, designed, modified, improved, enhanced or revised, including, without limitation, any trademarks, service marks, trade dress, copyrights, patents and/or trade secrets;

(iv)      violations of any applicable foreign, federal, state or local law currently in effect relating to pollution, the protection of the environment or natural resources; and

(v)      violations of any other federal, state or local law to the extent arising prior to the Closing Date, including, but not limited to, the Age Discrimination in Employment Act, 29 U.S.C. Section 621 et seq., as amended, Title VII of the Civil Rights Act of 1964, as

17

amended in 1991, the Civil Rights Act of 1866, as amended (42 U.S.C. Section 1981), the Civil Rights Act of 1991, as amended (42 U.S.C. Section 1981a), the Americans with Disabilities Act, as amended, the Employee Retirement Income Security Act, as amended, the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended, the Worker Adjustment and Retraining Notification Act of 1988, the Family and Medical Leave Act, as amended, the Uniformed Services Employment and Reemployment Rights Act, the Genetic Information Nondiscrimination Act, the Fair Labor Standards Act, the Equal Pay Act, the National Labor Relations Act, the Fair Credit Reporting Act, the Immigration Reform Control Act, the Occupational Safety and Health Act, the Sarbanes-Oxley Act, and the Employee Polygraph Protection Act.

(c)     All Employee Benefit Plan liabilities and obligations, including, without limitation, (i) for continuation coverage under any Employee Benefit Plan pursuant to the requirements of Section 4980B of the Code and COBRA, and (ii) all liabilities and obligations of Sellers relating to employees, former employees, persons laid-off or on inactive status, or their respective dependents, heirs or assigns, who have received, who are receiving as of the Closing Date, or who are or could become eligible to receive any short-term or long-term disability benefits or any other benefits of any kind arising out of or related in any way to the employment of persons by Sellers.

(d)     Any liabilities and obligations that relate solely to Sellers' Corporate Level operations and employees;

(e)     Any liability for Taxes, including but not limited to income, franchise, sales, or similar, arising out of or resulting from Sellers' operations prior to the Closing Date;

(f)     Except as otherwise provided for herein, any liability and obligation that arises out of Seller's operations prior to the Closing Date;

(g)     Except as set forth in Section 1.3(d) to the APA, all liabilities and obligations related to any wages, bonuses or other compensation or benefits, including without limitation, vacation days, sick days or other paid time-off, that is earned or accrued by, or with respect to, employees, officers, directors or contractors of Sellers prior to the Closing; and

(h)     All liabilities and obligations under the Worker Adjustment and Retraining Notification Act of 1988, or similar state or local law regarding employee terminations, if any, arising out of or

18

| | resulting solely from layoffs or termination of employees by Seller.<br><br>*See* APA § 1.5. |
|---|---|
| **Assumption/Assignment of Contracts** | (a)      Schedule 1.5(a) to the APA (the "Acquired Contract List") sets forth a list of all Contracts to which a Seller is a party and which Buyer has designated to be included as an Acquired Contract, together with estimated Cure Amounts for each Acquired Contract. From and after the Execution Date until the date of the auction contemplated by the Bidding Procedures, Sellers shall make such additions, deletions, and amendment to Schedule 1.5(a) to the APA as Buyer shall request in writing. Any such deleted Contract shall be deemed to no longer be an Acquired Contract. Any such added Contract shall be deemed an Acquired Contract. Only Contracts listed on Schedule 1.5(a) to the APA shall be designated as an Acquired Contract or Acquired Asset and any Contract of Sellers not listed on Schedule 1.5(a) to the APA shall be deemed "Rejected Contracts." For the avoidance of doubt, in the event that any Leased Real Property is deemed a Rejected Contract, all assets of Sellers to the extent related to such Leased Real Property shall become Excluded Assets.<br><br>(b)      In connection with the assumption and assignment to Buyer of any Acquired Contract that is executory pursuant to this Section 1.5 of the APA, the cure amounts, if any (such amounts, the "Cure Amounts"), necessary to cure all defaults, if any, and to pay all actual or pecuniary losses that have resulted from such defaults under the Acquired Contracts, shall be paid by Buyer at the Closing, as part of the Total Consideration in Section 2.1 of the APA.<br><br>(c)      Sellers shall use their respective commercially reasonable efforts to obtain an order of the Bankruptcy Court to assign the Acquired Contracts to Buyer (the "Assumption Approval") on the terms set forth in Section 1.5 of the APA.  In the event Sellers are unable to assign any such Acquired Contract to Buyer pursuant to an order of the Bankruptcy Court, then the Parties shall use their commercially reasonable efforts to obtain, and to cooperate in obtaining, all Consents from Governmental Authorities and third parties necessary to assume and assign such Acquired Contracts to Buyer, including, in the case of Buyer, paying any applicable Cure Amounts; provided, however, that Sellers' obligations hereunder shall only continue until the Chapter 11 Cases are closed or dismissed.  *See* APA § 1.5. |

AFDOCS/21474434.2

12129348v6

| | |
|---|---|
| **Designation Rights** | (a)　　During the Designation Rights Period, Sellers shall (A) not reject any Contract unless such Contract is expressly designated by Buyer in writing as an Excluded Contract under Section 1.5 of the APA, Buyer fails to pay amounts owed with respect to such Contract in accordance with subsection (b) of this Section 1.6 of the APA (after having been afforded written notification and an opportunity to cure such failure in accordance with this Agreement) or unless otherwise agreed to in writing by Buyer and (B) hold all Permits and other assets specified by Buyer in writing in abeyance pending designation for assignment or exclusion by Buyer in accordance with this Section 1.6 of the APA.<br><br>(b)　　Any Contract not designated by Buyer in writing as either an Assumed Contract on the Assumed Contract List, or an Excluded Contract by express notice of the same, and any Permits and other assets designated in writing by Buyer, in each case prior to Closing, shall constitute a "Designation Rights Asset." Buyer shall have the right, by written notice to Sellers within the Designation Rights Period, to specify that (A) any Designation Rights Asset that is a Contract shall be held by the Sellers and not rejected pursuant to Section 365 of the Bankruptcy Code for the duration of the Designation Rights Period or earlier as provided in Section 1.6 of the APA, and (B) any Designation Rights Asset that is not a Contract shall be held by Sellers in abeyance during the Designation Rights Period pending designation for assignment or exclusion by Buyer in accordance with Section 1.6 of the APA. With respect to any Designation Rights Asset, (i) Buyer shall be solely responsible for and directly pay for all costs associated with the continuation, operation or holding by Sellers of such Designation Rights Asset, for the period from the Closing through the earlier of (A) the end of the Designation Rights Period and (B) the date of Sellers' receipt of written notice from Buyer designating the assignment or exclusion of such Designation Rights Asset, including but not limited to, the attorney fees and costs arising from preparing, filling and arguing a motion to extend the time period under Section 365(d)(4)(B) of the Bankruptcy Code, provided that Sellers' reimbursable attorney fees and costs under this section shall not exceed $20,000, (ii) for the avoidance of doubt, all consideration received by Sellers in respect of, and other benefits deriving from, such Designation Rights Asset (including Designation Rights Assets sold or assigned to third parties in accordance with clause (c) below) shall be promptly delivered to Buyer, (iii) if such Designation Rights Asset is a Real Property Lease and if Buyer is granted access to and uses such property prior to designating such Real Property Lease as an Assumed Contract, Buyer shall purchase insurance (including liability and casualty policies) covering such real property consistent with Buyer's past practices and shall name Sellers |

AFDOCS/21474434.2

12129348v6

as an additional party under such policies, and (iv) the foregoing shall not affect the validity of the transfer to Buyer of any other Acquired Asset whether or not related to such Designation Rights Asset. For the avoidance of doubt, Buyer shall retain the right to use all furniture, equipment, supplies and Inventory at any restaurant that is a Designation Rights Asset, and to receive one hundred percent (100%) of the proceeds from the sale or use of such furniture, equipment, supplies and Inventory, in each case during the Designation Rights Period. In the event that the costs associated with any Designation Rights Asset exceed the designation rights budget (a "Designation Cost Overage"), Buyer shall not be liable for such Designation Cost Overage, other than as a result of damage or destruction of any Real Property Lease or as a result of the Buyer's gross negligence or willful misconduct.

(c)      As to each Designation Rights Asset, as soon as practical after receiving further written notice(s) (each, a "Designation Notice") from Buyer during the Designation Rights Period requesting assumption, assignment and sale of any Designation Rights Asset to Buyer or a third party, Sellers shall, subject to Buyer or such third party demonstrating adequate assurance of future performance thereunder and Buyer or such third party paying all Cure Amounts to the extent required by Section 365 of the Bankruptcy Code, take all actions required by the Sale Order or otherwise that are reasonably necessary to seek to assume, assign and sell to Buyer or such third party the applicable Designation Rights Asset pursuant to Section 363 of the Bankruptcy Code and, if such Designation Rights Asset is a Contract, Section 365 of the Bankruptcy Code.

(d)      Following the earlier of (A) the end of the Designation Rights Period and (B) the date of Sellers' receipt of written notice from Buyer designating the exclusion of a Designation Rights Asset, a Designation Rights Asset shall be deemed to be an Excluded Asset for all purposes under this Agreement except with respect to Buyer's obligations to pay all amounts associated with such Designation Rights Asset as expressly required by Section 1.6(b) of the APA.

(e)      Sellers and Buyer agree and acknowledge that the covenants set forth in Section 1.6 of the APA shall survive the Closing.

(f)      Notwithstanding anything in this Agreement to the contrary, on the date any Designation Rights Asset is assumed, assigned and sold to Buyer or its designee pursuant to Section 1.6 of the APA, such Designation Rights Asset shall be deemed an Acquired Asset for all purposes under this Agreement and no further consideration (except for the applicable Cure Amount with respect to Designation Rights Assets that are Contracts) shall be required to be

21

paid for any Designation Rights Asset that is assumed, assigned and sold to Buyer or its designee.

(g)      Sellers shall use reasonable best efforts to extend the deadline for assumption or rejection of any Designation Rights Asset that is a Real Property Lease for the maximum permitted period of time under Section 365 of the Bankruptcy Code.

(h)      If the Parties hereto intend for any Assumed Contracts or other assets relating to a specific restaurant that is a Designation Rights Asset to be transferred to Buyer at Closing (and all conditions specified in Article VI have been met with respect to such assets) but Buyer has not obtained Liquor License approvals necessary to sell alcohol at such restaurant and applicable Law prohibits the operation of such restaurant (including the sale of alcohol at such restaurant) pursuant to the terms of a Management Agreement to be entered into in form reasonably satisfactory to Buyer and Sellers, then any Assumed Contracts or other assets associated with such restaurant shall be deemed to be Designation Rights Assets as of the Closing for all purposes and in all respects. Buyer shall notify Sellers of all Assumed Contracts and other assets that Buyer believes may be subject to Section 1.6(h) of the APA prior to the Closing Date; provided, that all Assumed Contracts and other assets associated with such restaurant shall not be deemed to be Designation Rights Assets at Closing if the Liquor License approvals for the applicable restaurant are obtained by Buyer prior to or at Closing, and Sellers shall provide Buyer with a revised designation rights budget reflecting the foregoing one (1) day prior to the Closing Date. Notwithstanding anything to the contrary herein, with respect only to Assumed Contracts or other assets deemed to be Designation Rights Assets at Closing pursuant to Section 1.6(h) of the APA, Buyer shall have the option to extend the Designation Rights Period for an additional thirty (30) days upon written notice to Sellers no later than ten (10) days prior to the date on which the Designation Rights Period would otherwise end. *See* APA § 1.6.

AFDOCS/21474434.2

12129348v6

| | |
|---|---|
| **Representations** | The parties have each made representations and warranties that are customary in connection with a transaction of this size and nature. Except for representations and warranties contained in the APA, the Acquired Assets are conveyed "AS IS," "WHERE IS" and "WITH ALL FAULTS" and that all warranties of merchantability or fitness for a particular purpose are disclaimed. *See* APA §§ 4.1-4.3. |
| **Covenants** | Sellers have made certain covenants to the Buyer relating to the operation of the business, including covenants related to asset preservation, maintenance of pay and benefit levels pending sale, procurement of a sale order, director and officer insurance, business records and certain notices. *See* APA § 5.1. |
| **Alternative Transaction No-Shop Restriction** | Sellers may furnish information concerning Sellers, the Acquired Assets and the Assumed Liabilities to any Person in connection with a potential Alternative Transaction and negotiate, enter into and consummate an Alternative Transaction; provided, however, Sellers covenant that they shall not, and shall cause each of their directors, managers, officers, stockholders, owners, Affiliates or other representatives, directly or indirectly, either solicit, discuss or negotiate with any third party  any Competing Arrangement until such time as the Bidding Procedures Motion has been approved and the Bidding Procedures Order has been entered by the Bankruptcy Court. *See* APA § 9.1. |
| **Closing** | The consummation of the transactions contemplated by the APA (the "**Closing**") will take place on the fifth Business Day following the satisfaction or waiver by the appropriate party of all the conditions contained in Article VI or on such other date or at such other time as may be mutually agreed to by the parties (the "**Closing Date**") and will be effective as of 12:01 a.m. on the Closing Date. *See* APA § 3.1. |
| **Closing Conditions** | Closing is subject to certain conditions, including (i) the continued accuracy of representations and warranties; (ii) the performance by Sellers in all material respects of their obligations under the APA; (iii) entry of the Bid Procedures Order and Sale Order related to the sale of the Acquired Assets; (iv) the absence of a material adverse change in the Business; and (v) delivery of certain items and certificates contemplated under Section 3.2 and 6.2(a)-(c) of the APA.  *See* APA § 6.2. |
| **Transition Services** | If deemed necessary by Buyer, the Sellers and the Buyer may enter into a "Transition Services Agreement" in connection with the Closing, in form acceptable to each of the parties, requiring Sellers to provide certain services requested by Buyer during a transition period in exchange for Buyer's direct payment of costs associated therewith (or the reimbursement by Buyer of Seller's direct costs associated |

AFDOCS/21474434.2

12129348v6

| | therewith) and ensuring that all administrative expenses of Sellers created by virtue of providing such transition services are paid. *See* APA § 3.2. |
|---|---|
| **Break-Up Fee** | $225,000. |
| **Expenses** | $100,000 Expense Reimbursement as provided in Section 5.4(b) of the APA. |
| **Termination** | The APA lists customary termination provisions, including the right of Buyer to terminate if the Closing has not occurred on or prior to Outside Date, defined as the date that is 120 days following the Execution Date of the APA (December 16, 2019). Buyer may also terminate if the Bankruptcy Court dismisses Sellers' Chapter 11 cases or converts the Chapter 11 cases to cases under Chapter 7 of the Bankruptcy Code; if the Bankruptcy Court confirms a Chapter 11 plan in Sellers' Chapter 11 cases; or if the Bankruptcy Court appoints a Chapter 11 trustee or an examiner with expanded powers. The Buyer also has a right to terminate (i) if any of the Sellers files (a) any motion with the Bankruptcy Court seeking an order approving, or (b) any plan involving, any Alternate Transaction; or (ii) if Sellers enter into a definitive agreement with a third party for an Alternate Transaction. Finally, the APA will automatically terminate upon (i) the consummation of an Alternative Transaction or (ii) the issuance of a final and non-appealable order, decree, or ruling by a Governmental Authority to permanently restrain, enjoin or otherwise prohibit the Closing. Termination of the APA may, under certain circumstances, entitle the Buyer to a Break-Up Fee and Expense Reimbursement. *See* APA § 7.1(a)-(g). |

## **BREAK-UP FEE AND EXPENSE REIMBURSEMENT**

45.     As noted above, Section 5.4(b) of the APA provides a Break-Up Fee of $225,000. The Break-Up Fee is payable to the Proposed Purchaser if the Debtor sells the Acquired Assets to a different party or if the APA is terminated in accordance with APA Section 7.1(f) or 7.1(g).

46.     The APA also provides for an Expense Reimbursement of $100,000 to compensate the Seller for out-of-pocket expenses incurred in negotiating the APA appearing and participating in the Bankruptcy Case, and participating in the Auction.

AFDOCS/21474434.2

12129348v6

47.     The Breakup Fee and Expense Reimbursement are to be treated as administrative expense claims in the Bankruptcy Cases, shall be paid to Buyer within three (3) Business Days following the closing of such sale to the third party, and shall be paid to Buyer after the payment in full to the DIP Lender but prior to the payment of the proceeds of such sale to any other third party asserting a Lien on the Acquired Assets.

48.     The Debtors believe that the amount of the Break-Up Fee and Expense Reimbursement and the conditions under which they are payable to the Proposed Purchaser are reasonable under the circumstances. The Break-Up Fee is approximately 3.0% of the stated Purchase Price.  Additional monetary value is also provided through the contemplated assumed liabilities, assumption of contracts and associated cure costs, continued operation of the businesses and attendant preservation of relationships with vendors, suppliers, utility providers, product marketers, employees and other business partners.

49.     The Break-Up Fee and Expense Reimbursement are necessary to ensure that the Proposed Purchaser will continue to pursue its proposed acquisition of the Acquired Assets. Such continued participation allows for the maximization of value of the Debtors' estate by, among other things, establishing a bid standard and minimum bid for other bids and attracting additional bidders.

50.     The amounts of the Break-Up Fee and Expense Reimbursement are also commensurate with the substantial efforts that have been and will be expended by the Proposed Purchaser, the size of the transaction, and benefits to the Debtors' estate.  The Proposed Purchaser conducted extensive due diligence and expended substantial resources in connection with the proposed transaction.  The protections and covenants contained in the APA for the benefit of the Proposed Purchaser, as the stalking-horse for the contemplated public sale process,

AFDOCS/21474434.2

12129348v6

reflect the amount of time and money that the Proposed Purchaser has invested in making its bid and are commensurate with the benefits conferred upon the estates as a result of the bid.

## NO-SHOP REQUIREMENT

51.     Another bid protection afforded the Proposed Purchaser in order to encourage an initial bid and to provide assurance to the Proposed Purchaser that its bid will not be unfairly utilized outside an orderly auction process is the APA's inclusion of a limited No-Shop clause as set forth in APA Section 9.1.

52.     The No-Shop clause temporarily precludes active solicitation of and continued participation in discussions related to an Alternative Transaction.  The Debtors believe the No-Shop clause is reasonable because: (a) it terminates upon entry of the Bid Procedures Order; (b) the APA itself was the product of a robust and comprehensive pre-bankruptcy marketing and solicitation process undertaken by the Debtors' and their consultants with a number of interested parties, many of whom have already had access to the extensive due diligence materials that populate the Debtors' data room.  Prospective bidders at the contemplated auction will not be prejudiced by this temporary cessation of active solicitation efforts.

## PROPOSED BID PROCEDURES

53.     To maximize the value of the Debtors' assets, the Debtors seek authority to conduct the Auction for the Debtors' restaurant operations and related personal property and assets, including the Debtors' unexpired real property leases, executory contracts.  As noted above, the proposed Bid Procedures, which have been agreed upon by the Debtors, the Proposed Purchaser, and the Debtors' pre-petition and post-petition lenders, are attached to this Motion as Exhibit B.

54.     The proposed Bid Procedures are typical for transactions of this nature and are

AFDOCS/21474434.2

12129348v6

designed to ensure a fair and competitive process designed to ensure maximum recovery.  The

Debtors have determined, in the exercise of sound business judgment, that the sale assets to the

highest bidder at the Auction is appropriate and in the best interests of the Debtors' estates and

creditors. The sale of the assets at the Auction will afford the Debtors' estates an opportunity to

attempt to capture the substantial going concern value of the Debtors' business operations and

maximize recoveries for all constituents.

55.     The Bid Procedures are summarized below.  Capitalized terms are as defined in

the Bid Procedures.

56.     The receipt, evaluation and approval of bids shall be conducted under the

supervision of a committee consisting of one representative from each of the following interested

parties: (a) the Debtors; (b) the Debtors' investment bankers Duff & Phelps Securities, LLC; (c)

Citizens Bank, N.A. ("Citizens"); (d) JMB Capital Partners Lending, LLC ("JMB"); and (e) the

Official Committee of Unsecured Creditors ("UCC"), assuming one shall have been appointed

(together the "Consultation Committee").

57.     Any person that wishes to conduct due diligence and participate in the Bidding

Process must first deliver to the Debtors (with copies to other members of the Consultation

Committee) all of the following:

> a.     An executed confidentiality agreement in form and substance to be
> provided by the Debtors on behalf of the Consultation Committee, and which
> confidentiality agreement is at least as restrictive in all material respects as the
> confidentiality agreement entered into between the Debtors and the Proposed Purchaser.

> b.     The most current audited (if in existence) and latest unaudited financial
> statements, and/or such other form of financial disclosure or evidence of the ability to
> consummate the Sale Transaction (the "Financials") of the Potential Bidder or, if the
> Potential Bidder has been formed specifically to enter into a sale transaction, the same
> information from the Potential Bidder's equity holder(s).

> c.     Such other and/or additional information as the Debtors, in their

discretion, deem necessary or desirable to assist in determining whether the Potential Bidder has the financial wherewithal to perform a contemplated sale transaction.

A "Potential Bidder" is a person that delivers the documents described in subparagraphs a.-c. above and that the Consultation Committee determines is reasonably likely (based on the information set forth in the Financials, experience, and other information the Consultation Committee deems relevant) to submit a *bona fide* offer and to be able to consummate the Sale Transaction.

58.    The Debtors intend to afford each Potential Bidder the time and opportunity to conduct due diligence up to the time of the Bid Deadline (as defined in the Bid Procedures).  The Debtors shall furnish Potential Bidders with access to all due diligence information provided to the Proposed Purchaser and any other Potential Bidder.

59.    As set forth in the Bid Procedures, the deadline for a Potential Bidder to submit bids shall be February 6, 2020 at 5:00 p.m. (prevailing Central Daylight Time).  Among other things, to be a "Qualified Bid," the bid must include the following:

- An executed copy of a purchase agreement and any ancillary agreements pursuant to which the Potential Bidder proposes to acquire the Assets or, alternatively, a subset of the Assets consisting of either the Cadillac Ranch Assets or the Granite City Assets.

- The purchase agreement shall be derived from the form approved by the Consultation Committee that formed the baseline for the stalking horse bid, modified to incorporate the Potential Bidder's offer, and shall include a commitment to close by a date no later than thirty (30) days following the approval of the sale by the Bankruptcy Court.

- A written acknowledgement by the Potential Bidder that it agrees to all of the terms for sale set forth in these Bid Procedures.

- A Potential Bidder may bid on all of the Assets, or may submit a bid for the Cadillac Ranch Assets alone or the Granite City Assets alone, as follows.

  o <u>All Asset Bids.</u> With respect to a bid to acquire all of the Assets, a proposed purchase price, in cash, which is determined by the Consultation Committee (after consultation with their professionals and advisors) to be equal to or greater than the sum of (i) the purchase price set forth in the Stalking Horse APA, (ii) the

Expense Reimbursement, (iii) the Break-Up Fee; and (iv) $100,000 (the sum of (i) through (iv) the "Initial Increment Amount").

- o <u>Cadillac Ranch Bids.</u>  With respect to a bid to acquire only the Cadillac Ranch Assets, a proposed purchase price, in cash.

- o <u>Granite City Bids</u>.   With respect to a bid to acquire only the Granite City Assets, a proposed purchase price, in cash.

- o In the event the Consultation Committee determines that separate bids for the Cadillac Ranch Assets and Granite City Assets together represent the highest and best value, the Consultation Committee may select such bids over a competing all-Assets bid, in which event the Expense Reimbursement and Break-Up Fee are to be ratably assessed based on the purchase prices associated with the bids.

- A good faith deposit (the "<u>Deposit</u>") equal to: (a)10% of the Initial Bid Increment Amount with respect to bids for all of the Assets; and (b) 10% of the proposed cash purchase price plus 50% of the Break-Up Fee and the Expense Reimbursement with respect to bids for only part of the Assets.

- Evidence or a statement indicating that the bidder has obtained due and appropriate authorization and approval from its Board of Directors (or comparable governing body) with respect to the submission and consummation of its bid and acceptance of the terms of sale in these Bid Procedures, or a representation that no such authorization or approval is required and that any and all consents required in connection with the submission and consummation of the bid have been obtained and that no other consents are required.

- Evidence of sufficient cash on hand or written evidence of a commitment for financing or other evidence of financial wherewithal and the ability to consummate a sale transaction satisfactory to the Consultation Committee, together with contact information for any financing sources.

- A redline comparison of the bidder's proposed purchase agreement against the Stalking Horse Purchase Agreement.

- A preliminary list of the Debtors' executory contracts and unexpired leases with respect to which the bidder seeks assignment from the Debtors.

- A written disclosure of the identity of each entity that will be bidding or otherwise participating in connection with such bid, and the complete terms of any such participation (including copies of any co-investor agreements, side letters and other similar documents).

- Such other information as may be reasonably requested by the Consultation Committee or the Debtors.

In addition to the foregoing, all bids must

AFDOCS/21474434.2

12129348v6

- be on terms that are not materially more burdensome or conditional than the terms of the Stalking Horse APA;

- not be conditioned on obtaining financing or the outcome of any due diligence by the bidder; and

- not call for payment to the bidder of a break-up fee, expense reimbursement or any other similar type of payment.

60.    The Proposed Purchaser, which approved and consented to the Bid Procedures, is a "Qualified Bidder" and the APA is deemed to be a "Qualified Bid."

61.    Citizens and JMB shall also be permitted to submit credit bids for the Assets and, if any such credit bid is submitted, the submitting party shall be deemed a Qualified Bidder and its bid shall be a Qualified Bid, provided that with respect to any credit bid submitted by Citizens, Citizens must include in its bid either (i) provisions for the satisfaction of any secured claims of JMB that are senior to the secured claim that forms the basis of the credit bid (a "Senior Secured Claim") or (ii) evidence that JMB has affirmatively consented to any other treatment of its Senior Secured Claim.

62.    If Qualified Bids (other than the bid of the Proposed Purchaser) are received by the Bid Deadline, the Consultation Committee shall conduct an auction (the "Auction") commencing on February 13, 2020 at 9:00 a.m. (prevailing Central Time).  The Consultation Committee shall notify all Qualified Bidders of the time and place of the Auction.  If no Qualified Bids are received, no Auction will take place and the Debtors will request that the Bankruptcy Court approve the sale to the Proposed Purchaser at the Sale Hearing.

63.    Bidding at the Auction shall proceed as follows:

- Provided that the Consultation Committee shall have received separate, Qualified Bids (as determined by the Consultation Committee and its professionals) to purchase (i) only the Cadillac Ranch Assets, and (ii) only the Granite City Assets, then (iii) the Cadillac Ranch Assets shall be separately offered for sale first, with bidding to begin with the highest Qualified Bidder and to continue thereafter with

AFDOCS/21474434.2

12129348v6

minimum bid increments of not less than $50,000, and then (iv) the Granite City Assets shall be separately offered for sale, with bidding to begin with the highest Qualified Bidder and to continue thereafter with minimum bid increments of not less than $50,000.

- After completion of the Granite City Assets portion of the Auction, or in the event that the Consultation Committee shall not have received separate, Qualified Bids (as determined by the Consultation Committee and its professionals) to purchase (i) only the Cadillac Ranch Assets, and (ii) only the Granite City Assets, the Assets shall be offered for sale as a package with bidding to begin with the highest Qualified Bidder and continue thereafter with minimum combined bid increments of not less than $50,000.

64.     Upon conclusion of the bidding, the Auction shall be closed, and the Consultation Committee, after consultation with professionals, shall immediately review each Qualified Bid and identify the highest and best offer(s) for all-Assets, the Cadillac Ranch Assets and the Granite City Assets and make a determination regarding which offer or combination of offers will provide the greatest amount of net value to the Debtors and the bankruptcy estates, and advise Qualified Bidders of such determinations.

65.     A Qualified Bidder or Bidders whose bid or bids are determined by the Consultation Committee to be highest or best for the Assets or, alternatively, for the Cadillac Ranch Assets only or the Granite City Assets only, shall, with respect to such assets, be deemed to be a "Successful Bidder."   The bidder or bidders whose bid or bids are determined by the Consultation Committee to be the next highest or best with respect to any of the foregoing asset classifications shall be designated "Back-Up Bidder(s)" and their bid or bids as "Back-Up Bid(s)." Final Documents between the Debtors and any Successful Bidder(s) or Back-Up Bidder(s) will be executed on the same day as the Auction.

66.     In the event the Consultation Committee determines that separate bids for the Cadillac Ranch Assets and Granite City Assets together represent the highest and best value, the Consultation Committee may select such bids over a competing all-Assets bid, in which event

AFDOCS/21474434.2

12129348v6

the Expense Reimbursement and Break-Up Fee shall be ratably assessed against the purchase prices associated with the bids.

67.     If the final bid of the Proposed Purchaser does not succeed for the purchase of the Assets as a whole or for the purchase individually of the Cadillac Ranch Assets and/or the Granite City Assets, then the Break-Up Fee and the Expense Reimbursement shall be paid in accordance with the APA and Bid Procedures Order.

68.     Each bid submitted shall constitute an irrevocable offer and be binding upon the prevailing bidder from the Successful Bidder and the Back-Up Bidder from the time the bid is submitted until the entry of the Sale Approval Order.  If the Successful Bid and Back-Up Bid are approved, as the case may be, as to them until the earlier of two (2) business days after the sale of the Assets has closed or, with respect to the Back-Up Bidder, thirty (30) days after the Sale Approval Order is entered.

69.     The Debtors will be deemed to have accepted a bid only when the bid has been approved by the Bankruptcy Court at the Sale Hearing.  The Debtors will seek approval of the Successful Bid and the Back-Up Bid at the Sale Hearing.  If a Successful Bidder cannot consummate, or refuses to consummate the sale because of such bidder or bidders' breach or failure, the Debtors will seek authorization to close with the Back-Up Bidder(s) based on the Back-Up Bid(s) without further order of the Court.

70.     The proposed Bid Procedures provide a fair and reasonable framework for selling the Debtors' assets and ensuring that the Debtors obtain the highest and best offer or offers obtainable.

## SALE OF THE ASSETS FREE AND CLEAR OF LIENS

71.     The sale of the assets shall be on an "AS IS, WHERE IS" basis and without representation or warranties of any kind, nature or description by Debtors or their agents, except as provided in the APA or in an alternative purchase agreement accepted by the Debtors and approved by the Bankruptcy Court in the Sale Order.  All of the Debtor's right, title and interest in and to the Assets shall be sold free and clear of all liens and encumbrances, claims, interests to the full extent available under Section 363 of the Bankruptcy Code, including, without limitation, the interests of any secured creditor, unsecured creditor, equity interest holder or any other Person holding an interest in said assets with such interest to attach to the net proceeds of the sale.

72.     Section 363(f)(2) of the Bankruptcy Code authorizes a debtor in possession, *inter alia*, to sell property "free and clear of any interest in such property of an entity other than the estate" if  "such entity consents[.]"  11 U.S.C. § 363(f)(2).  To the extent the Debtors' prepetition lenders assert liens in any of the assets to be sold, the Debtors believe that they will obtain the consent of such parties to the sale of such assets free and clear of all liens, claims and encumbrances as such liens will attach to the proceeds of any transaction.  In that regard, the Debtor believes it has the consent of JMB and Citizens Bank to the relief requested in this Motion and that no other consent is necessary.

73.     Accordingly, the Debtors respectfully request that the order approving the sale of the Assets provide that such sale is free and clear of all liens, claims and encumbrances in accordance with Section 363(f).

AFDOCS/21474434.2

12129348v6

## ASSUMPTION AND ASSIGNMENT OF LEASES AND CONTRACTS

74.    Pursuant to Section 541 of the Bankruptcy Code, the Acquired Contracts and the

Leased Real Property (as defined in the APA) constitute property of the Debtors' estates that

may be sold free and clear of liens in a Section 363 sale.

75.    Section 365(f) of the Bankruptcy Code authorizes a trustee or debtor in

possession to assume and assign executory contracts and unexpired leases of real property.

Section 365(f) provides in relevant part as follows:

> (f)(1)    Notwithstanding a provision in an executory contract or unexpired lease
> of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment
> of such contract or lease, the trustee may assign such contract or lease under paragraph
> (2) of this subsection.

> (2)  The trustee may assign an executor contract or unexpired lease of the debtor
> only if—

> > (A)  the trustee assumes such contract or lease in accordance with the
> > provisions of this section; and

> > (B)  adequate assurance of future performance by the assignee of such
> > contract or lease is provided, whether or not there has been a default in such
> > contract or lease.

11 U.S.C. § 365(f)(1)-(2).

76.    In connection with the sale of their restaurant businesses, the Debtors propose to

sell, assume and assign the Acquired Contracts and certain Real Property Leases, subject to

certain Designation Rights afforded the Proposed Purchaser in Section 1.6 of the APA.  During

the Designation Rights Period, which spans the 60-day period following Closing, the Proposed

Purchaser has the exclusive right to designate those contracts and leases which will ultimately be

assumed and assigned.  Contracts and leases not designated as either an Assumed Contract or

Excluded Contract are classified as a Designation Rights Asset.  During the Designation Rights

Period, the Buyer is obliged to cover the Debtors' costs and expenses associated with operating

AFDOCS/21474434.2

12129348v6

and holding a Designation Rights Asset. During the Designation Rights Period, the Buyer can request that the Debtors assume, assign and sell any Designation Rights Asset to the Buyer or to a third party, subject to payment of all Cure Amounts and provision of adequate assurance of future performance. *See* APA § 1.6(a)-(h).

77.    The contemplated assumption and assignment of the Acquired Contracts and Real Property Leases complies in all respects with Section 365. Upon the assumption and assignment of the Acquired Contracts and Real Property Leases, the Proposed purchaser (or the Debtors) will promptly cure existing defaults. In addition, where required, the Debtor will provide adequate assurance of future performance. The Debtors therefore respectfully request authority to assume and assign or, alternatively, to reject executory contracts and unexpired leases in accordance with the Designation Rights afforded to the Proposed Purchaser under Section 1.6 of the APA.

## NOTICE OF SALE AND SALE HEARING

78.    Rule 2002(a) and (c), Rule 6004 and Rule 6006 of the Federal Rules of Bankruptcy Procedure require the Debtors to notify their creditors and other parties in interest of the proposed sale, including a disclosure of the time and place of the Auction, the terms and conditions of the sale, contracts and leases to be assumed and assigned (with Cure Costs) and the deadline for filing objections. The Debtors request that notice of this Motion and the relief requested herein, in addition to the other forms of notice proposed to be furnished and as described herein, be deemed to be adequate and sufficient. The Debtors believe that the notice provided, and to be provided, is adequate and proper notice of the Bid Procedures, the proposed sale of the Acquired Assets, and the intended assumption and assignment of the Acquired

AFDOCS/21474434.2

12129348v6

Contracts and Real Property Leases, and satisfies the requirements of the Bankruptcy Code, the

Federal Rules of Bankruptcy Procedure, and Local Rule 6004-1.

79.     On or about the date of this Motion, the Debtors served this Motion, together

with all Exhibits, upon (i) the entities identified in Local Rule 9013-3(a)(2), including, without

limitation, (a) the United States Trustee, (b) each entity claiming a lien or other interest in the

Debtors' property, including counterparties to unexpired leases, (c) each entity that has filed a

request for notice or appearance under Federal Rule of Bankruptcy Procedure 2002(i) or 9010(b),

(ii) counsel for the Proposed Purchaser, (iii) each entity identified by Duff & Phelps as a

potential purchaser for the Assets, (iv) such other entities as requested by the Proposed

Purchaser; and (v) other entities to be identified in the certificate of service to be filed with the

Court.

80.     The Debtors seek approval of notice of the Sale Notice in substantially the form

attached on **Exhibit E**.  The Sale Notice will be mailed to each entity listed on the creditor

matrix maintained pursuant to Local Rule 1007-2, to the entities listed in Local Rule 9013-

3(a)(2), to counterparties to executory contracts and leases not served pursuant to paragraph 79

above, to each holder of equity (either directly or through the holder's proxy and to each entity

identified by Duff & Phelps as a potential purchaser.

81.     In conjunction with the conduct of the Auction, and to augment the efficacy of

the notice to be provided as set forth above, the Debtors will continue efforts to generate interest

in the Granite City and Cadillac Ranch Assets. Subject to and upon expiration of the No-Shop

restrictions identified above, the Debtors and Duff & Phelps will solicit parties who have

indicated or hereafter indicate an interest in purchasing the Acquired Assets.

82.     The Debtor will also publish notice of this Motion, the Bid Procedures, and the

AFDOCS/21474434.2

12129348v6

Sale Approval Hearing, the time and place of the Auction, and the deadlines for filing objections in the *Minneapolis Star-Tribune* and the *Wall Street Journal.* The solicitation and notice of the Auction will provide cost effective and sufficient publicity to apprise interested parties of the Auction. The Debtor, subject to the No-Shop restrictions, will also afford all interested parties an opportunity to conduct due diligence with respect to the assets.

83.     The Debtors request that the Court hold the Sale Hearing to consider the relief requested in the Sale Motion as it pertains to entry of the proposed Sale Order for February 18, 2020, with objections to the sale of the Acquired Assets to the Proposed Purchaser or the Successful Bidder, or the Back-Up Bidder at the Auction (as the case may be) due to be filed with the Court no later than 9:30 a.m. on February 18, 2020 and served in accordance with the Federal Rules of Bankruptcy Procedure and the Local Bankruptcy Rules.  Such dates would provide the Court with an opportunity to consider evidence introduced and legal arguments presented at the Sale Hearing.

84.     The Debtors believe that the notice described in the preceding paragraph complies with Bankruptcy Rule 6004(a) and Local Rules 6004-1(e), 2002-1(b)(2) and 2002-4(a) and should be approved by the Court.

## REQUEST FOR EXPEDITED RELIEF AND WAIVER OF STAY

85.     The Debtors seek expedited hearing on the request for approval of the Bid Procedures on notice that is less than the 21 days' notice provided for pursuant to  Federal Rule of Bankruptcy Procedure 2002(a)(2) for a proposed use, sale, or lease of property of the estate.. The APA between the Debtors and the Proposed Purchaser includes a covenant that the Debtors may not "directly or indirectly, either solicit, discuss or negotiate with any third party any Competing Arrangement until such time as the Bid Procedures Motion has been approved and

AFDOCS/21474434.2

12129348v6

the Bidding Procedures Order has been entered by the Bankruptcy Court." Furthermore, the

hearing on the final sale cannot be pushed out further because (1) the APA allows the Proposed

Purchaser to terminate the transaction if it does not close by the Outside Date, defined as 120

days following the Execution Date of the APA and (2) the Debtors will need the sale proceeds to

pay off the DIP Loan before it matures on March 31, 2020. Expediting approval of the Bid

Procedures by just a week will significantly increase the amount of time during which the

Debtors are permitted to market the sale and solicit higher and better offers.

86.    Additionally, the Debtors seek a waiver of any stay of the effectiveness of the

order approving the Sale. Bankruptcy Rules 6004(h) and 6006(d) provide, in substance, that an

order authorizing the sale of a debtor's property or for the assumption or rejection of a lease or

contract is stayed for a period of 14 days following entry of the order unless the court orders

otherwise.  The Debtors request that any order approving the relief requested herein be effective

immediately, by providing that the 14 day stay is inapplicable.  The failure to consummate the

transactions expeditiously will have a significant adverse impact on the value to be realized upon

disposition of the assets.

## **CONCLUSION**

87.    Pursuant to Local Rule 9013-2(a), this Motion is accompanied by a

memorandum of law, proposed orders, and proof of service.

88.    Pursuant to Local Rule 9013-2(c), the Debtors give notice that they may, if

necessary, call one or more of the following individuals to testify about the factual matters raised

in and relevant to this Motion: Richard H. Lynch, Chief Executive Officer of the Debtors, whose

business address is 3600 American Boulevard West, Suite 400, Bloomington, Minnesota  55431;

Brian Cullen, Managing Director for Duff & Phelps, 10100 Santa Monica Boulevard Suite 1100,

Los Angeles, California 90067.  Other representatives of the Debtors or Duff & Phelps may also be called.

WHEREFORE, the Debtors respectfully request that the Court grant the Motion and enter Orders substantially in the forms attached hereto:

A.      Authorizing, subject to final hearing, the Debtors to sell substantially all of their assets to the Proposed Purchaser, or to another bidder or bidders submitting the Successful Bid(s) or the Back-Up Bid(s), free and clear of all liens, claims, interests and encumbrances, which liens, claims, interests and encumbrances will attach to the net proceeds from the sale ultimately attributable to the property against or in which such liens, claims, interests and encumbrances are asserted, all with the same validity, dignity, priority, effect and to the same extent as existed prior to the Sale and, in all cases, subject to JMB's rights as postpetition lender to be paid out of the proceeds as provided in the DIP Loan Agreement;

B.      Authorizing the Debtors to assume and assign or reject executory contracts and leases as contemplated under, and subject to the Designation Rights afforded, under the APA, free and clear of all liens, claims, encumbrances and interests, all with the same validity, dignity, priority, effect and to the same extent as existed prior to the Sale and, in all cases, subject to JMB's rights as postpetition lender to be paid out of the proceeds as provided in the DIP Loan Agreement;

C.      Approving the No-Shop restrictions;

D.      Approving the Break-Up Fee and Expense Reimbursement;

E.      Approving the Bid Procedures;

E.      Approving the form and manner of the Sale Notice and the procedures for assumption and assignment of executory contracts and unexpired leases;

AFDOCS/21474434.2

12129348v6

F.      Waiving the requirements of Bankruptcy Rules 6004(g) and 6006(d);

G.      Scheduling a final hearing, the Sale Hearing for February 18, 2020 at 1:30 p.m. (prevailing Central Time) or as soon thereafter as counsel and interested parties may be heard, at which time the sale and assignment to the Proposed Purchaser or to the Successful Bidder of the Back-Up Bidder may be approved and at which time the procedures for assumption and assignment or rejection of executory contract and unexpired leases may be approved along with procedures for payment of Cure Amounts and adequate assurance of future performance; and

H.      Granting such other and further relief as is just and proper.

40

**BRIGGS AND MORGAN, P.A.**

/e/ James M. Jorissen

Dated: December 30, 2019

By: _____

James M. Jorissen, #262833
Karl J. Johnson, #391211
2200 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
Telephone: 612-977-8400
Facsimile: 612-977-8650
jjorissen@briggs.com
kjohnson@briggs.com

**PROPOSED COUNSEL FOR THE
DEBTORS**

41

## **VERIFICATION**

I, Richard H. Lynch, Chief Executive Officer of the Debtors named in the foregoing motion, declare under penalty of perjury that the foregoing is true and correct according to the best of my knowledge, information and belief.

Dated this 30th day of December, 2019.

Richard H. Lynch

41

# EXHIBIT A

**Execution Version**

**ASSET PURCHASE AGREEMENT**

**among**

**KRG GRANITE ACQUISITION, LLC**

**as "Buyer,"**

**and**

**GRANITE CITY FOOD & BREWERY LTD.**

**and**

**THOSE PERSONS LISTED ON SCHEDULE A**

**as "Sellers"**

## TABLE OF CONTENTS

**ARTICLE I.      PURCHASE AND SALE OF THE ACQUIRED ASSETS** .........................1

Section 1.1      Transfer of Acquired Assets.................................................................1
Section 1.2      Excluded Assets. .................................................................................4
Section 1.3      Assumption of Liabilities. ...................................................................5
Section 1.4      Excluded Liabilities. ...........................................................................6
Section 1.5      Assumption and Assignment of Contracts.............................................8
Section 1.6      Designation Rights. ..............................................................................8

**ARTICLE II.     CONSIDERATION** ...................................................................11

Section 2.1      Purchase Price. ..................................................................................11
Section 2.2      Deposit. .............................................................................................11
Section 2.3      Purchase Price Adjustment. ...............................................................11
Section 2.4      Closing Payments...............................................................................13
Section 2.5      Payment of Price Adjustment Costs....................................................13
Section 2.6      Transaction Taxes. .............................................................................13
Section 2.7      Purchase Price Allocation. .................................................................13

**ARTICLE III.    CLOSING AND DELIVERIES** ...........................................13

Section 3.1      Closing. .............................................................................................13
Section 3.2      Sellers' Deliveries. .............................................................................14
Section 3.3      Buyer's Deliveries..............................................................................15

**ARTICLE IV.     REPRESENTATIONS AND WARRANTIES** ...............................15

Section 4.1      Representations and Warranties of Each Seller. ...................................15
Section 4.2      Representations and Warranties of Buyer.............................................22
Section 4.3      Warranties Are Exclusive. ..................................................................23

**ARTICLE V.      COVENANTS AND OTHER AGREEMENTS** ...........................................23

Section 5.1      Covenants of Sellers...........................................................................24
Section 5.2      Name Change. ....................................................................................27
Section 5.3      Covenants of Buyer.............................................................................27
Section 5.4      Other Covenants.................................................................................28

**ARTICLE VI.     CONDITIONS PRECEDENT TO PERFORMANCE BY PARTIES** .......31

Section 6.1      Conditions Precedent to the Performance by Sellers. ...................................31
Section 6.2      Conditions Precedent to the Performance by Buyer. ...................................31

**ARTICLE VII.    TERMINATION** .................................................................32

Section 7.1      Conditions of Termination. .................................................................32
Section 7.2      Effect of Termination; Remedies. .......................................................33
Section 7.3      Exclusive Remedy; Waiver..................................................................34

**ARTICLE VIII. SURVIVAL AND INDEMNIFICATION** ...........................................34

Section 8.1      Survival; Indemnification.....................................................................34

**ARTICLE IX.    MISCELLANEOUS**..................................................................................**35**

Section 9.1    Alternative Transaction. ............................................................35
Section 9.2    Further Assurances. ..................................................................35
Section 9.3    Successors and Assigns. ...........................................................35
Section 9.4    Governing Law; Jurisdiction. ...................................................35
Section 9.5    Expenses. ..................................................................................35
Section 9.6    Broker's and Finder's Fees. ......................................................35
Section 9.7    Severability. .............................................................................36
Section 9.8    Notices. .....................................................................................36
Section 9.9    Amendments; Waivers. .............................................................37
Section 9.10    Public Announcements...............................................................37
Section 9.11    Entire Agreement. .....................................................................38
Section 9.12    No Third Party Beneficiaries. ...................................................38
Section 9.13    Headings....................................................................................38
Section 9.14    Counterparts; Delivery. ............................................................38
Section 9.15    Construction. .............................................................................38
Section 9.16    Bulk Sales.................................................................................38

**ARTICLE X.    DEFINITIONS** ...............................................................................**38**

<u>**EXHIBITS**</u>

Exhibit A...................................................................................................Bid Procedures

<u>**SCHEDULES**</u>

Schedule A ..............................................................................................................Sellers

Schedule 1.1(a) ................................................................... Acquired Leased Real Property

Schedule 1.1(g) ........................................................................... Acquired Contracts List

Schedule 1.2 ................................................................................................Excluded Assets

Schedule 1.5(a) .......................................................................... Acquired Contracts List

Schedule 4.1(j) .....................................................................Employee Benefit Plans

Schedule 4.1(k) ..................................................................................Liquor Licenses

Schedule 4.1(l) ................................................................................Intellectual Property

Schedule 4.1(l)(i) ...........................................Intellectual Property Infringement by Third-Parties

Schedule 4.1(l)(ii) ..................................Intellectual Property Infringement by Sellers

Schedule 4.1(m) ....................................................................Environmental Matters

Schedule 4.1(n) ................................................................................................ Malware

Schedule 4.1(o) ................................................................................................ Contracts

Schedule 4.1(p) .................................................................................................Leases

Schedule 4.1(r) ................................................................................................. Financials

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "**Agreement**"), dated as of December 16, 2019 (the "**Execution Date**"), is made by and among those persons listed on Schedule A attached to this Agreement (each individually, "**Seller**", and collectively, "**Sellers**"), and KRG Granite Acquisition, LLC, a Nevada limited liability company ("**Buyer**"). Unless otherwise set forth in this Agreement, capitalized terms used in this Agreement are defined or cross-referenced in Article X.

## RECITALS

WHEREAS, Sellers own and operate a portfolio of two restaurant brands, Granite City Food & Brewery and Cadillac Ranch (the "**Business**");

WHEREAS, on December 16, 2019 (the "**Petition Date**"), Sellers anticipate commencing voluntary cases under Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101-1532 (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Minnesota (the "**Bankruptcy Court**");

WHEREAS, this Agreement will constitute an APA (as such term is defined in the Bid Procedures);

WHEREAS, Buyer desires to purchase the Acquired Assets and assume the Assumed Liabilities from Sellers, and Sellers desire to sell, assign, transfer and deliver to Buyer the Acquired Assets together with the Assumed Liabilities, all in the manner and subject to the terms and conditions set forth in this Agreement;

WHEREAS, the transactions contemplated by this Agreement (the "**Transactions**") will be consummated pursuant to a Sale Order in accordance with Sections 105, 363, 365, 1146 and all other applicable provisions of the Bankruptcy Code and the Transactions and this Agreement are subject to the approval of the Bankruptcy Court;

WHEREAS, pursuant to the Bidding Procedures Order, Sellers shall conduct an Auction to determine the highest and otherwise best offer for the Acquired Assets; and

WHEREAS, the Transactions are subject to the approval of the Bankruptcy Court and will be consummated only pursuant to the Sale Order to be entered by the Bankruptcy Court.

NOW, THEREFORE, in consideration of the foregoing and their respective representations, warranties, covenants and agreements contained in this Agreement, and other good and valuable consideration, the receipt and sufficiency of which are acknowledged, Sellers and Buyer agree as follows:

## ARTICLE I.          PURCHASE AND SALE OF THE ACQUIRED ASSETS

**Section 1.1      Transfer of Acquired Assets**. At the Closing, and upon the terms and conditions set forth in this Agreement and pursuant to sections 105, 363 and 365 of the Bankruptcy Code, each Seller will sell, assign, transfer and deliver to Buyer, and Buyer will purchase from

12226612v6

each Seller, all of such Seller's right, title and interest in, to and under the following properties, assets and rights free and clean of all Liens (other than Permitted Liens and Assumed Liabilities) (collectively the "**Acquired Assets**"):

(a)    All real property: (i) owned by any Seller, including but not limited to Seller's facility in Ellsworth, IA; or (ii) leased to any Seller pursuant to the Real Property Leases listed on <u>Schedule 1.1(a)</u>, to which such Seller is a party, including all Leasehold Improvements thereon (collectively, the "**Leased Real Property**");

(b)    All cash, cash equivalents and similar cash items at each Leased Real Property location on the Closing Date in cash registers, safes, strongboxes and lock boxes consistent with past practice;

(c)    All Inventory (other than alcoholic beverage inventories in jurisdictions where the Law does not permit Buyer to take title to such inventories until it obtains the requisite Liquor License approvals from the relevant Governmental Authority; <u>provided</u>, <u>however</u>, Sellers shall transfer, assign, convey and deliver to Buyer such alcoholic beverage inventories in each instance upon issuance of the relevant Liquor License approval or other authorization from the relevant Governmental Authority (whichever occurs first));

(d)    All tangible personal property, including machinery, equipment, furniture, fixtures, office equipment, computer hardware, computers, computer equipment, tools, information technology infrastructure, supplies, office supplies, and other tangible personal property of any kind owned by Sellers, and all warranties and licenses of Sellers thereunder or related thereto;

(e)    All prepaid expenses of Sellers related to the Acquired Assets ("**Prepaid Expenses**");

(f)    All deposits paid or held by Sellers related to or arising from the Acquired Assets, including, without limitation, any deposits under the Real Property Leases ("**Acquired Deposits**"), but excluding Utility Deposits;

(g)    The Contracts listed on <u>Schedule 1.1(g)</u> to which any Seller is a party (collectively, the "**Acquired Contracts**");

(h)    All permits, authorizations and licenses (collectively, the "**Permits**") issued to any Seller by any Government, to the extent assignable, arising out of or relating to the Acquired Assets, other than alcohol permits (including Liquor Licenses) in jurisdictions where the Law does not permit Buyer to take title to such Permits until it obtains the requisite approvals from the pertinent Governmental Authority (in which case Sellers shall transfer, assign, convey and deliver to Buyer such Permits in each instance upon issuance of the requisite approvals from the relevant Governmental Authority);

2

(i)    All insurance benefits, rights and proceeds arising from or relating to any event or incident that affects, impacts or alters any Acquired Asset between the Execution Date and the Closing Date;

(j)    All cars, trucks, forklifts, other industrial vehicles and other motor vehicles owned by Sellers;

(k)    All Intellectual Property owned by Sellers, including the items set forth on Schedule 4.1(l);

(l)    All Improvements;

(m)    All marketing materials;

(n)    All rights to the telephone and facsimile numbers, websites, URLs, internet domain names, social media accounts, and email addresses used by Sellers;

(o)    All Records, related to the Acquired Assets and Assumed Liabilities, other than Records related to income Taxes of Sellers (provided that Sellers are entitled to retain copies of all Records);

(p)    All goodwill associated with the Business or the Acquired Assets, including all goodwill associated with the Intellectual Property Rights owned by Sellers and all rights under any confidentiality agreements executed by any third party for the benefit of any of Sellers to the extent relating to the Acquired Assets and/or the Assumed Liabilities (or any portion thereof);

(q)    All rights of Sellers under noncompete or non-solicitation agreements with current or former employees, directors, consultants, independent contractors and agents of any of Sellers to the extent relating to the Acquired Assets and/or the Assumed Liabilities (or any portion thereof);

(r)    All other rights, demands, claims, credits, allowances, rebates or other refunds (including any vendor or supplier rebates) and rights in respect of promotional allowances or rights of setoff (whether or not known or unknown or contingent or non-contingent), other than against Sellers, arising out of or relating to the Business as of the Closing;

(s)    All rights under or pursuant to all warranties, representations and guarantees made by suppliers, manufacturers, contractors and any other Person to the extent relating to equipment purchased, products sold, or services provided, to Sellers or to the extent affecting any Acquired Assets and/or Assumed Liabilities;

(t)    Except as otherwise excluded under Section 1.2, all rights, claims, rights of offset, causes of action, lawsuits, judgments and other claims or demands of any nature

3

against any third party arising out of, and only with respect to, the Acquired Assets or Assumed Liabilities; and

(u)     all other assets that are related to or used in connection with the Acquired Assets or the Business (but excluding all of the Excluded Assets).

Notwithstanding anything herein to the contrary and in addition to Buyer's designation rights pursuant to <u>Section 1.6</u>, Buyer may, from time to time (but in no event later that sixty (60) days following the Closing Date) (such period, the "**Designation Rights Period**"), amend the Acquired Assets so as to include additional assets in its sole and absolute discretion (except that Buyer may not add as an Acquired Asset anything specifically listed as an Excluded Asset below); <u>provided</u>, <u>however</u>, that (i) Buyer shall be solely responsible for all cost and expenses associated with any asset which is designated as an Acquired Asset pursuant to this section and (ii) no such addition shall result in any adjustment to the Purchase Price.  Furthermore, Buyer may, from time to time, remove any Acquired Asset from this <u>Section 1.1</u> in its sole and absolute discretion until the period ending sixty (60) days following the Closing Date and elect to treat such Contract, Permit or other asset as an Excluded Asset; <u>provided</u>, <u>however</u>, that no such removal will result in any adjustment to the Purchase Price.

      **Section 1.2     Excluded Assets**.   Notwithstanding anything to the contrary in this Agreement, each Seller will retain its right, title and interest in, to and under all of its properties, assets and rights not otherwise an Acquired Asset (collectively, the "**Excluded Assets**"), including:

(a)     Except as set forth in <u>Section 1.1(b)</u>, all Sellers' cash, checks, cash equivalents, and cash in-transit;

(b)     All trade accounts receivable of Sellers in existence as of the Closing Date (collectively, the "**Accounts Receivable**");

(c)     All amounts and funds (rebates and dividends) on account of, accrued by or due to Sellers pursuant to any agreement or arrangement with such companies for all periods prior to the Closing (collectively, the "**Rebates**");

(d)     All equity ownership interests in each Seller;

(e)     All rights to refunds of or credits for Taxes of Sellers previously paid by Sellers prior to the Closing Date, and any records relating to Taxes of Sellers;

(f)     Subject to <u>Section 1.1(i)</u>, all insurance premiums, policies, contracts and coverage obtained by Sellers and all rights to insurance proceeds or other Contracts of insurance or indemnity (or similar agreement) recoveries;

4

(g)     All avoidance claims and causes of action arising under Chapter 5 of the Bankruptcy Code and any related claims and causes of action under applicable non-bankruptcy law arising out of the same set of facts, and the proceeds from any of the foregoing;

(h)     All rights of and benefits to Sellers under this Agreement, the Ancillary Agreements or any other agreements or instruments otherwise delivered, executed or made in connection with this Agreement;

(i)     The Contracts to which any Seller is a party that is not an Acquired Contract;

(j)     All Utility Deposits;

(k)     The assets listed on Schedule 1.2; and

(l)     Corporate seals, minute books, charter documents, stock transfer records, record books, original Tax and financial records and such other files, books and records relating to any of the Excluded Assets or to the organization, existence or capitalization of any Seller.

    **Section 1.3    Assumption of Liabilities**. At the Closing, Buyer will assume, and thereafter pay, perform and discharge when due, the following liabilities of Sellers (collectively, the "**Assumed Liabilities**"):

(a)     All liabilities and obligations under the Acquired Contracts, including, without limitation, all pre-petition cure costs required to be paid pursuant to Section 365 of the Bankruptcy Code in connection with the assumption and assignment of the Acquired Contracts (such pre-petition cure costs are, collectively, the "**Cure Costs**");

(b)     All liabilities and obligations in respect of any gift cards, gift certificates, loyalty programs or similar items relating to the business of Sellers;

(c)     All liabilities and obligations under the Worker Adjustment and Retraining Notification Act of 1988, or similar state or local law regarding employee terminations, if any, arising out of or resulting solely from layoffs or termination of employees by Buyer after the Closing;

(d)     All liabilities and obligations related to accrued store-level bonuses, vacation days, sick days or other paid time-off, that is earned or accrued by, but not yet payable to, employees, officers, directors or contractors of Sellers that Buyer hires as an employee as part of this Transaction;

(e)     All accrued but unpaid Property Taxes, if any, related to or arising from the ownership of the Acquired Assets; and

5

(f)      Those liabilities and obligations assumed by or made the responsibility of Buyer as set forth elsewhere in this Agreement.

**Section 1.4      Excluded Liabilities**.  Notwithstanding anything to the contrary in this Agreement, each Seller will retain, and remain liable and obligated for any of its respective liabilities not otherwise included in the Assumed Liabilities and the Parties expressly acknowledge and agree that Buyer shall not assume, be obligated to pay, perform or otherwise discharge or in any other manner be liable or responsible for any liabilities of Sellers of any nature, whether existing on the Closing Date or arising thereafter, other than the Assumed Liabilities (all such liabilities that Buyer is not assuming being referred to collectively as the "**Excluded Liabilities**"), including without limitation:

(a)      Any liability arising from or related to the Excluded Assets, including without limitation the Excluded Contracts;

(b)      Any and all claims, charges, lawsuits and causes of action based on:

(i)      age, race, color, sex (including sexual harassment), national origin, ancestry, disability, religion, sexual orientation, marital status, parental status, veteran status, military status, citizenship status, genetic information, source of income, entitlement to benefits, or any other status protected by local, state or federal laws, constitutions, regulations, ordinances or executive orders;

(ii)      violations of personnel policies, handbooks or any covenant of good faith and fair dealing or breaches of any written or implied contract of employment; violations of public policy or common law, including, but not limited to, claims for: personal injury; invasion of privacy; retaliatory or wrongful discharge; whistle blowing; negligent hiring, retention or supervision; defamation; intentional or negligent infliction of emotional distress and/or mental anguish; intentional interference with contract; negligence; detrimental reliance; loss of consortium to you or any member of your family; and/or promissory estoppel;

(iii)      obligations for any reason to pay damages, expenses, litigation costs (including attorneys' fees), wages, bonuses, commissions, disability, retirement or welfare benefits, unemployment or worker's compensation, vacation pay and sick pay, compensatory damages, penalties, liquidated damages, punitive damages, other payments, and/or interest; any obligations for compensation or payments in connection with any ideas, information, inventions, processes, procedures, systems, methods, intellectual property or other materials that may have been developed, produced, created, designed, modified, improved, enhanced or revised, including, without limitation, any trademarks, service marks, trade dress, copyrights, patents and/or trade secrets;

6

(iv) violations of any applicable foreign, federal, state or local law currently in effect relating to pollution, the protection of the environment or natural resources; and

(v) violations of any other federal, state or local law to the extent arising prior to the Closing Date, including, but not limited to, the Age Discrimination in Employment Act, 29 U.S.C. Section 621 et seq., as amended, Title VII of the Civil Rights Act of 1964, as amended in 1991, the Civil Rights Act of 1866, as amended (42 U.S.C. Section 1981), the Civil Rights Act of 1991, as amended (42 U.S.C. Section 1981a), the Americans with Disabilities Act, as amended, the Employee Retirement Income Security Act, as amended, the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended, the Worker Adjustment and Retraining Notification Act of 1988, the Family and Medical Leave Act, as amended, the Uniformed Services Employment and Reemployment Rights Act, the Genetic Information Nondiscrimination Act, the Fair Labor Standards Act, the Equal Pay Act, the National Labor Relations Act, the Fair Credit Reporting Act, the Immigration Reform Control Act, the Occupational Safety and Health Act, the Sarbanes-Oxley Act, and the Employee Polygraph Protection Act.

(c) All Employee Benefit Plan liabilities and obligations, including, without limitation, (i) for continuation coverage under any Employee Benefit Plan pursuant to the requirements of Section 4980B of the Code and COBRA, and (ii) all liabilities and obligations of Sellers relating to employees, former employees, persons laid-off or on inactive status, or their respective dependents, heirs or assigns, who have received, who are receiving as of the Closing Date, or who are or could become eligible to receive any short-term or long-term disability benefits or any other benefits of any kind arising out of or related in any way to the employment of persons by Sellers.

(d) Any liabilities and obligations that relate solely to Sellers' Corporate Level operations and employees;

(e) Any liability for Taxes, including but not limited to income, franchise, sales, or similar, arising out of or resulting from Sellers' operations prior to the Closing Date;

(f) Except as otherwise provided for herein, any liability and obligation that arises out of Seller's operations prior to the Closing Date;

(g) Except as set forth in <u>Section 1.3(d)</u>, all liabilities and obligations related to any wages, bonuses or other compensation or benefits, including without limitation, vacation days, sick days or other paid time-off, that is earned or accrued by, or with respect to, employees, officers, directors or contractors of Sellers prior to the Closing; and

7

(h)     All liabilities and obligations under the Worker Adjustment and Retraining Notification Act of 1988, or similar state or local law regarding employee terminations, if any, arising out of or resulting solely from layoffs or termination of employees by Seller.

**Section 1.5    Assumption and Assignment of Contracts.**

(a)     Schedule 1.5(a) (the "**Acquired Contract List**") sets forth a list of all Contracts to which a Seller is a party and which Buyer has designated to be included as an Acquired Contract, together with estimated Cure Amounts for each Acquired Contract.  From and after the Execution Date until the date of the auction contemplated by the Bidding Procedures, Sellers shall make such additions, deletions, and amendment to Schedule 1.5(a) as Buyer shall request in writing. Any such deleted Contract shall be deemed to no longer be an Acquired Contract. Any such added Contract shall be deemed an Acquired Contract. Only Contracts listed on Schedule 1.5(a) shall be designated as an Acquired Contract or Acquired Asset and any Contract of Sellers not listed on Schedule 1.5(a) shall be deemed "**Rejected Contracts.**"  For the avoidance of doubt, in the event that any Leased Real Property is deemed a Rejected Contract, all assets of Sellers to the extent related to such Leased Real Property shall become Excluded Assets.

(b)     In connection with the assumption and assignment to Buyer of any Acquired Contract that is executory pursuant to this Section 1.5, the cure amounts, if any (such amounts, the "**Cure Amounts**"), necessary to cure all defaults, if any, and to pay all actual or pecuniary losses that have resulted from such defaults under the Acquired Contracts, shall be paid by Buyer at the Closing, as part of the Total Consideration in Section 2.1.

(c)     Sellers shall use their respective commercially reasonable efforts to obtain an order of the Bankruptcy Court to assign the Acquired Contracts to Buyer (the "**Assumption Approval**") on the terms set forth in this Section 1.5.  In the event Sellers are unable to assign any such Acquired Contract to Buyer pursuant to an order of the Bankruptcy Court, then the Parties shall use their commercially reasonable efforts to obtain, and to cooperate in obtaining, all Consents from Governmental Authorities and third parties necessary to assume and assign such Acquired Contracts to Buyer, including, in the case of Buyer, paying any applicable Cure Amounts; provided, however, that Sellers' obligations hereunder shall only continue until the Chapter 11 Cases are closed or dismissed.

**Section 1.6    Designation Rights.**

(a)     During the Designation Rights Period, Sellers shall (A) not reject any Contract unless such Contract is expressly designated by Buyer in writing as an Excluded Contract under Section 1.5, Buyer fails to pay amounts owed with respect to such Contract in accordance with subsection (b) of this Section 1.6 (after having been

8

afforded written notification and an opportunity to cure such failure in accordance with this Agreement) or unless otherwise agreed to in writing by Buyer and (B) hold all Permits and other assets specified by Buyer in writing in abeyance pending designation for assignment or exclusion by Buyer in accordance with this <u>Section 1.6</u>.

(b)    Any Contract not designated by Buyer in writing as either an Assumed Contract on the Assumed Contract List, or an Excluded Contract by express notice of the same, and any Permits and other assets designated in writing by Buyer, in each case prior to Closing, shall constitute a "**Designation Rights Asset**." Buyer shall have the right, by written notice to Sellers within the Designation Rights Period, to specify that (A) any Designation Rights Asset that is a Contract shall be held by the Sellers and not rejected pursuant to Section 365 of the Bankruptcy Code for the duration of the Designation Rights Period or earlier as provided in this <u>Section 1.6</u>, and (B) any Designation Rights Asset that is not a Contract shall be held by Sellers in abeyance during the Designation Rights Period pending designation for assignment or exclusion by Buyer in accordance with this <u>Section 1.6</u>. With respect to any Designation Rights Asset, (i) Buyer shall be solely responsible for and directly pay for all costs associated with the continuation, operation or holding by Sellers of such Designation Rights Asset, for the period from the Closing through the earlier of (A) the end of the Designation Rights Period and (B) the date of Sellers' receipt of written notice from Buyer designating the assignment or exclusion of such Designation Rights Asset, including but not limited to, the attorney fees and costs arising from preparing, filling and arguing a motion to extend the time period under Section 365(d)(4)(B) of the Bankruptcy Code, provided that Sellers' reimbursable attorney fees and costs under this section shall not exceed $20,000, (ii) for the avoidance of doubt, all consideration received by Sellers in respect of, and other benefits deriving from, such Designation Rights Asset (including Designation Rights Assets sold or assigned to third parties in accordance with clause (c) below) shall be promptly delivered to Buyer, (iii) if such Designation Rights Asset is a Real Property Lease and if Buyer is granted access to and uses such property prior to designating such Real Property Lease as an Assumed Contract, Buyer shall purchase insurance (including liability and casualty policies) covering such real property consistent with Buyer's past practices and shall name Sellers as an additional party under such policies, and (iv) the foregoing shall not affect the validity of the transfer to Buyer of any other Acquired Asset whether or not related to such Designation Rights Asset. For the avoidance of doubt, Buyer shall retain the right to use all furniture, equipment, supplies and Inventory at any restaurant that is a Designation Rights Asset, and to receive one hundred percent (100%) of the proceeds from the sale or use of such furniture, equipment, supplies and Inventory, in each case during the Designation Rights Period. In the event that the costs associated with any Designation Rights Asset exceed the designation rights budget (a "**Designation Cost Overage**"), Buyer shall not be liable for such Designation Cost Overage, other than

9

as a result of damage or destruction of any Real Property Lease or as a result of the Buyer's gross negligence or willful misconduct.

(c)     As to each Designation Rights Asset, as soon as practical after receiving further written notice(s) (each, a "**Designation Notice**") from Buyer during the Designation Rights Period requesting assumption, assignment and sale of any Designation Rights Asset to Buyer or a third party, Sellers shall, subject to Buyer or such third party demonstrating adequate assurance of future performance thereunder and Buyer or such third party paying all Cure Amounts to the extent required by Section 365 of the Bankruptcy Code, take all actions required by the Sale Order or otherwise that are reasonably necessary to seek to assume, assign and sell to Buyer or such third party the applicable Designation Rights Asset pursuant to Section 363 of the Bankruptcy Code and, if such Designation Rights Asset is a Contract, Section 365 of the Bankruptcy Code.

(d)     Following the earlier of (A) the end of the Designation Rights Period and (B) the date of Sellers' receipt of written notice from Buyer designating the exclusion of a Designation Rights Asset, a Designation Rights Asset shall be deemed to be an Excluded Asset for all purposes under this Agreement except with respect to Buyer's obligations to pay all amounts associated with such Designation Rights Asset as expressly required by Section 1.6(b) above.

(e)     Sellers and Buyer agree and acknowledge that the covenants set forth in this Section 1.6 shall survive the Closing.

(f)     Notwithstanding anything in this Agreement to the contrary, on the date any Designation Rights Asset is assumed, assigned and sold to Buyer or its designee pursuant to this Section 1.6, such Designation Rights Asset shall be deemed an Acquired Asset for all purposes under this Agreement and no further consideration (except for the applicable Cure Amount with respect to Designation Rights Assets that are Contracts) shall be required to be paid for any Designation Rights Asset that is assumed, assigned and sold to Buyer or its designee.

(g)     Sellers shall use reasonable best efforts to extend the deadline for assumption or rejection of any Designation Rights Asset that is a Real Property Lease for the maximum permitted period of time under Section 365 of the Bankruptcy Code.

(h)     If the Parties hereto intend for any Assumed Contracts or other assets relating to a specific restaurant that is a Designation Rights Asset to be transferred to Buyer at Closing (and all conditions specified in Article VI have been met with respect to such assets) but Buyer has not obtained Liquor License approvals necessary to sell alcohol at such restaurant and applicable Law prohibits the operation of such restaurant (including the sale of alcohol at such restaurant) pursuant to the terms of a Management Agreement to be entered into in form reasonably satisfactory to Buyer and Sellers, then any Assumed Contracts or other assets associated with such

10

restaurant shall be deemed to be Designation Rights Assets as of the Closing for all purposes and in all respects. Buyer shall notify Sellers of all Assumed Contracts and other assets that Buyer believes may be subject to this Section 1.6(h) prior to the Closing Date; provided, that all Assumed Contracts and other assets associated with such restaurant shall not be deemed to be Designation Rights Assets at Closing if the Liquor License approvals for the applicable restaurant are obtained by Buyer prior to or at Closing, and Sellers shall provide Buyer with a revised designation rights budget reflecting the foregoing one (1) day prior to the Closing Date. Notwithstanding anything to the contrary herein, with respect only to Assumed Contracts or other assets deemed to be Designation Rights Assets at Closing pursuant to this Section 1.6(h), Buyer shall have the option to extend the Designation Rights Period for an additional thirty (30) days upon written notice to Sellers no later than ten (10) days prior to the date on which the Designation Rights Period would otherwise end.

## ARTICLE II.   CONSIDERATION

### Section 2.1    Purchase Price.

The aggregate consideration for the Acquired Assets will be: (a) an aggregate amount in cash equal to Seven Million Five Hundred Thousand Dollars ($7,500,000.00) (the "**Unadjusted Purchase Price**") subject to adjustment for the Price Adjustment Costs (as adjusted, the "**Final Purchase Price**"); plus (b) the assumption by Buyer of the Assumed Liabilities (such assumption, together with the Final Purchase Price, the "**Total Consideration**").

### Section 2.2    Deposit.

(a)    Simultaneously with the execution of this Agreement, Buyer and Sellers shall execute the Escrow Agreement and Buyer shall deposit with the Escrow Agent cash in immediately available federal funds by wire transfer to an account designated by the Escrow Agent, an amount equal to Two Hundred Twenty-Five Thousand Dollars ($225,000.00) (the "**Deposit**"), to be applied as provided in Section 2.2. The Deposit shall be held in escrow by the Escrow Agent in an interest-bearing bank account.

(b)    The Parties shall cause the Escrow Agent to disburse the Deposit and interest earned thereon to Sellers (i) at the Closing as a credit against the Purchase Price, or (ii) if this Agreement is terminated pursuant to Section 7.1(b). Except as described in the previous sentence, the Parties shall cause the Escrow Agent to return the Deposit to Buyer within two (2) Business Days after any termination of the Agreement pursuant to Section 7.1.

### Section 2.3    Purchase Price Adjustment.

(a)    As promptly as practicable, but in no event later than twenty (20) days prior to the Closing Date, Sellers will prepare and deliver to Buyer a calculation of:

11

(i)     The estimate of the amount of cash to be transferred pursuant to Section 1.1(b) ("**Store Cash**");

(ii)    Accrued but unpaid rent under the Acquired Contracts prorated as between the parties through the Closing Date for the month in which Closing occurs ("**Rent Costs**"); and

(iii)   Accrued but unpaid Property Taxes prorated as between the parties through the Closing Date ("**Property Tax Costs**" and together with the Rent Costs shall be referred to as the "**Property Costs**").

(b)     If Buyer disagrees with Sellers' calculation of Store Cash, Rent Costs and/or Property Tax Costs (collectively "**Price Adjustment Costs**"), Buyer may, within ten (10) days after receipt of the Price Adjustment Costs, deliver a notice to Sellers disagreeing with such calculation and setting forth Buyer's calculation of such amount ("**Buyer's Notice**").  Buyer's Notice will specify those items or amounts as to which Buyer specifically disagrees and the reasons for Buyer's disagreements, and Buyer will be deemed to have agreed with all other items and amounts contained in the Price Adjustment Costs.

(c)     If Buyer's Notice is duly delivered, Buyer and Sellers will work in good faith and use their commercially reasonable efforts to reach agreement on the disputed items or amounts in order to determine, as may be required, the amount of Price Adjustment Costs as of the close of business on the Closing Date.  If Buyer and Sellers are unable to reach such agreement within five (5) days from Sellers' receipt of Buyer's Notice, the Bankruptcy Court will determine the amount of the disputed items and the final Price Adjustment Costs; and the Closing Date will be extended until such time as the Bankruptcy Court determines the amount of the disputed items and the final Price Adjustment Costs.

(d)     Buyer and Sellers will, and will cause their respective Related Persons to, cooperate and assist in the calculation of Price Adjustment Costs, and in the conduct of the reviews referred to in this Section 2.2, including, without limitation, making available, to the extent necessary, their respective books, records, work papers and personnel.  All amounts to be determined pursuant to this Section 2.2 will be determined in accordance with generally accepted accounting principles in the United States consistently applied using Sellers' historical methodologies and practices.

(e)     The date upon which the Price Adjustment Costs will be deemed final will be the earlier to occur of the following:  (i) Buyer's failure to provide a Buyer's Notice within ten (10) days of its receipt of the Price Adjustment Costs from Sellers; (ii) the mutual written agreement of Buyer and Sellers; or (iii) a final determination by the Bankruptcy Court in accordance with Section 2.3(c).

12

(f)      The Final Purchase Price will be equal to the Unadjusted Purchase Price less the Price Adjustment Costs.

**Section 2.4      Closing Payments**  At the Closing, Buyer will pay the Final Purchase Price as follows:

(a)      by instruction to the Escrow Agent to release the Deposit, by wire transfer of immediately available funds to an account specified by Sellers, or by the Bankruptcy Court, as the case may be; and

(b)      by wire transfer of immediately available funds of the remaining balance of the Final Purchase Price (after credit for the Deposit) to an account specified by Sellers, or the Bankruptcy Court, as the case may be.

**Section 2.5      Payment of Price Adjustment Costs**.Following the Closing Date (and no sooner than the Closing Date), Buyer will pay the Cure Costs as determined by the Bankruptcy Court in the Assignment Order directly to the appropriate counterparties to the Acquired Contracts when due, for each of the Acquired Contracts sold, assigned and transferred to it, and Seller shall pay to Buyer the Rent Costs and the Property Tax Costs upon the entry by the Bankruptcy Court of an Assignment Order for each Acquired Contract. On the Closing Date, Buyer shall pay to Seller the amount of the Store Cash.

**Section 2.6      Transaction Taxes**.All Taxes (excluding income taxes), including without limitation all state and local Taxes (excluding income taxes) in connection with the transfer of the Acquired Assets and all recording and filing fees (collectively, "**Transaction Taxes**"), that may be imposed by reason of the sale, transfer, assignment and delivery of the Acquired Assets, and that are not exempt under §1146(a) of the Bankruptcy Code, will be borne by Buyer.  Buyer and Sellers will cooperate to (a) determine the amount of Transaction Taxes payable in connection with the transactions contemplated under this Agreement; (b) provide all requisite exemption certificates; and (c) prepare and file any and all required Tax Returns for or with respect to such Transaction Taxes with any and all appropriate Government taxing authorities.

**Section 2.7      Purchase Price Allocation**.  Buyer and Sellers agree to allocate the Total Consideration and all other relevant items among the Acquired Assets in accordance with Section 1060 of the Code and the treasury regulations thereunder.

## ARTICLE III.      CLOSING AND DELIVERIES

**Section 3.1      Closing**.  The consummation of the transactions contemplated by this Agreement (the "**Closing**") will take place on the fifth Business Day following the satisfaction or waiver by the appropriate party of all the conditions contained in Article VI or on such other date or at such other time as may be mutually agreed to by the parties (the "**Closing Date**") and will be effective as of 12:01 a.m. on the Closing Date.  Subject to such different procedures agreed upon by the parties, the Closing will take place via a "paper" close wherein Buyer and Sellers will exchange such documents and instruments or copies thereof sufficient to effect the Closing by

13

electronic or other means without the use of a "roundtable" closing at a particular location. All proceedings to be taken and all documents to be executed and delivered by all parties at the Closing will be deemed to have been taken and executed simultaneously and no proceedings will be deemed to have been taken nor documents executed or delivered until all have been taken, executed and delivered.

**Section 3.2    Sellers' Deliveries**.Each Seller, or Sellers collectively, as the case may be, will deliver to Buyer at or prior to the Closing or such other time as set forth in this Agreement in a form reasonably acceptable to Buyer:

(a)    A bill of sale, in form reasonably acceptable to Buyer and Sellers, for all of the Acquired Assets that are tangible personal property;

(b)    An agreement for the assumption of the Acquired Contracts and Assumed Liabilities, in form reasonably acceptable to Buyer and Sellers;

(c)    For all intangible Acquired Assets, including all Acquired Contracts, (i) an agreement of assumption and assignment for each registered trademark, registered copyright and domain name, respectively, transferred or assigned hereby and for each pending application therefor, or (ii) an Assignment Order effecting the same, in each case in form reasonably acceptable to Buyer and Sellers;

(d)    A certificate, dated as of the Closing Date, signed by its Secretary, certifying to the accuracy of the matters set forth in Section 6.2(a);

(e)    Originals (or, to the extent originals are not available, copies) of all Acquired Contracts (together with all material amendments, supplements or modifications thereto) to the extent not already located at the offices of Seller;

(f)    Physical possession of all of the Acquired Assets capable of passing by delivery with the intent that title in such Acquired Assets shall pass by and upon delivery;

(g)    Certificates of title and title transfer documents to all titled motor vehicles included within the Acquired Assets;

(h)    If deemed necessary by Buyer, a Transition Services Agreement in form reasonably acceptable to Buyer and Sellers;

(i)    A Management Services Agreement in form reasonably acceptable to Buyer and Sellers;

(j)    A duly executed IRS Form W-9 from each Seller and a non-foreign affidavit from each Seller dated as of the Closing Date, sworn under penalty of perjury and in form and substance required under Treasury Regulations issued pursuant to Section 1445 of the IRC stating that such Seller is not a "foreign person" as defined in Section 1445 of the IRC;

14

(k)  The officer's certificate required by Section 6.2; and

(l)  Such other agreements, documents or instruments of assignment and transfer that Buyer may reasonably request; the form and substance of which are acceptable to Sellers.

**Section 3.3  Buyer's Deliveries**.  Buyer will deliver to Sellers at or prior to the Closing or such other time as set forth:

(a)  The Final Purchase Price in accordance with Section 2.4;

(b)  A duly executed counterpart of Buyer to each of the documents listed in Section 3.2(b), (c),(h) and (i);

(c)  A certificate, dated as of the Closing Date, signed by its Secretary, certifying the accuracy of the matters set forth in Section 6.1(a); and

(d)  Such other agreements, documents or instruments of assignment and transfer that Sellers may reasonably request; the form and substance of which are acceptable to Buyer.

## ARTICLE IV.    REPRESENTATIONS AND WARRANTIES

**Section 4.1    Representations and Warranties of Each Seller**.Each Seller severally represents and warrants to Buyer as of the Execution Date and the Closing Date as follows:

(a)  Organization of Sellers; Good Standing.  Each Seller is a corporation or limited liability company, as applicable, duly organized, validly existing and in good standing under the laws of the state of its incorporation or formation, as applicable, and has, subject to the necessary authority from the Bankruptcy Court, all requisite corporate or limited liability company (as applicable) power and authority to own, lease and operate its assets and to carry on its business as now being conducted and is duly qualified or licensed to do business and is in good standing in each jurisdiction where the character of its business or the nature of its properties makes such qualification or licensing necessary. Seller is duly qualified to do business as a foreign corporation or foreign limited liability company and is in good standing in every jurisdiction in which the Business is conducted.

(b)  Authorization and Validity. Subject to the Bankruptcy Court's entry of the Sale Order, (i) Seller has all requisite power and has been duly authority to enter into this Agreement and any Ancillary Agreements to which Seller is a party and to perform its obligations under this Agreement and under the Ancillary Agreements; and (ii) this Agreement constitutes Seller's valid and binding obligation, enforceable against Seller in accordance with its respective terms.

15

(c)     No Conflict or Violation. The execution, delivery and performance by Seller of this Agreement and any Ancillary Agreements to which Seller is a party does not violate or conflict with any provision of Seller's certificate of incorporation or bylaws or similar organizational documents; and, subject to the Bankruptcy Court's entry of the Sale Order, does not (i) violate any provision of law, or any order, judgment or decree of any court or Government applicable to Seller or any of its properties or assets; or (ii) violate or result in a breach of or constitute (with due notice or lapse of time or both) a default under any Contract to which Seller is party or by which Seller is bound or to which any of Seller's properties or assets is subject.

(d)     Title to Assets.  Seller owns, and has good, valid, and marketable title to or, with respect to leased locations, a valid leasehold interest in, all of the Acquired Assets owned by it free and clear of all Liens (other than Assumed Liabilities and Permitted Liens) to the maximum extent permitted by Section 363 of the Bankruptcy Code.

(e)     Consents and Approvals.  With the exception of the Bankruptcy Court issuing a Sale Order approving this Agreement, no consent, waiver, authorization or approval of any Person or declaration, filing or registration with any Government is required in connection with the execution and delivery by Seller of this Agreement or any Ancillary Agreement to which Seller is a party or the performance by Seller of its obligations under this Agreement or under the Ancillary Agreements.

(f)     Litigation.  Other than the bankruptcy proceeding, there are no claims, actions, suits, proceedings or investigations pending, threatened in writing, involving or against Seller, the Acquired Assets or any Related Person of Seller, that could affect the ability of Seller to consummate the transactions contemplated by this Agreement, each Ancillary Agreement or seek to prevent, enjoin, alter or materially delay the Transactions.

(g)     Compliance with Law.  The business of Sellers is being conducted in all material respects in compliance with all applicable laws and orders promulgated by any Government applicable to Seller**s.**

(h)     Books and Records.  The books and records of Sellers, all of which have been made available to Buyer, are complete and correct and have been maintained in accordance with sound business practices. The minute books of Sellers contain accurate and complete records of all meetings, and actions taken by written consent, of the stockholders, the board of directors and any committees of the board of directors of Sellers, and no meeting, or action taken by written consent, of any such stockholders, board of directors or committee has been held for which minutes have not been prepared and are not contained in such minute books. At the Closing, all of those books and records will be in the possession of Sellers.

(i)     Employees and Employment Matters. No Seller is a party to or bound by any collective bargaining agreement covering the Current Employees (as determined as

16

of the date of this Agreement and the Closing) or former employees of Sellers, nor is there any ongoing strike, walkout, work stoppage, or other material collective bargaining dispute affecting any Seller with respect to the Business.    To the knowledge of Sellers', there is no organizational effort being made or threatened by or on behalf of any labor union with respect to the Current Employees (as determined as of the date of this Agreement). Within ten (10) days of the date hereof, Sellers shall make available to Buyer a list of all Current Employees.

(j)    <u>Employee Benefit Plan</u>.

(i)    <u>Schedule 4.1(j)</u> sets forth a complete and accurate list of Sellers' Employee Benefit Plans.  Sellers have provided to, or made available to, Buyer true and correct copies of each Employee Benefit Plan (including all plan documents and amendments thereto).  Each Employee Benefit Plan has been established, maintained, funded and administered in material compliance with its terms and all applicable requirements of ERISA, the Code, and other applicable Laws.  Each Employee Benefit Plan which is intended to be qualified within the meaning of Code § 401(a) is so qualified and has received a favorable determination letter from the Internal Revenue Service upon which it may rely, or is comprised of a master or prototype plan that has received a favorable opinion letter from the Internal Revenue Service, and to the knowledge of Sellers nothing has occurred that is reasonably likely to adversely affect the qualified status of such Employee Benefit Plan.   No Employee Benefit Plan is subject to Title IV or Section 302 of ERISA or Section 412 of the Code, and no Seller or any ERISA Affiliate contributes to or has any liability with respect to any such plan.

(ii)    No Seller or ERISA Affiliate is a party to any Multiemployer Plan.  As of the date of this Agreement, no Seller or ERISA Affiliate has incurred any unsatisfied withdrawal liability with respect to any Multiemployer Plan, and no Seller or ERISA Affiliate is bound by any contract or has any liability described in Section 4204 of ERISA.

(iii)    All payments, premiums, contributions, distributions, reimbursements or accruals for all periods (or partial periods) ending prior to or as of the Closing Date shall have been timely made in accordance with the terms of the applicable Employee Benefit Plan and applicable Law.

(iv)    As of the date hereof, there is no pending or, to the knowledge of Sellers, threatened, legal proceeding relating to any Employee Benefit Plan.

(v)    Notwithstanding any requirements imposed by the COBRA regulations or otherwise, Sellers shall retain responsibility for all Employee Benefit Plan liabilities and obligations, including, without limitation, (A) for

17

continuation coverage under any Employee Benefit Plan pursuant to the requirements of Section 4980B of the Code and COBRA, and (B) all liabilities and obligations of Sellers relating to employees, former employees, persons laid-off or on inactive status, or their respective dependents, heirs or assigns, who have received, who are receiving as of the Closing Date, or who are or could become eligible to receive any short-term or long-term disability benefits or any other benefits of any kind arising out of or related in any way to the employment of persons by Sellers. Provided, however, that Sellers are retaining such responsibility only so long as Sellers maintain a group health plan.

(k)     Liquor Licenses.  Schedule 4.1(k) sets forth a complete and correct list as of the date of this Agreement of all liquor licenses included in the Acquired Assets (including beer and wine licenses) held or used by each Seller, including the Person in whose name such license is issued, issuing agency and location (collectively, the "**Liquor Licenses**").  Each of the Sellers is in material compliance with all applicable Laws with respect to the sale of liquor and all alcoholic beverages and has the right to sell liquor at retail for consumption within each of the restaurant locations of such Seller, subject to and in accordance with all applicable provisions of the Liquor Licenses. To the knowledge of Sellers, since January 1, 2018, (a) there have been no legal proceedings brought or threatened to be brought by or before a Governmental Authority in respect of any such Liquor License, (b) no such Liquor License is subject to any due but unpaid tax obligation owed to a Governmental Authority, the outstanding nature of which would preclude transfer of such Liquor License from any of the Sellers to Buyer, and (c) no such Liquor License has been threatened by a Governmental Authority to be revoked, limited or not renewed.

(l)     Intellectual Property Rights.

(i)     Schedule 4.1(l) sets forth an accurate and complete list of (i) all registered Intellectual Property Rights included in the Acquired Assets, and (ii) all material Contracts pursuant to which any Seller obtains the right to use any Intellectual Property Rights.  Sellers own all such registered Intellectual Property free and clear of all Liens (except for Permitted Liens), and all such registered Intellectual Property is valid, subsisting and, to the knowledge of Sellers, enforceable, and is not subject to any outstanding Order adversely affecting Sellers' use thereof or rights thereto. Except as set forth in Schedule 4.1(l)(i), there exist no pending or, to the knowledge of Sellers, threatened challenges to the ownership and use by Sellers of such Intellectual Property Rights, nor any alleged infringements of such Intellectual Property Rights by third parties.  None of the Intellectual Property Rights included in the Acquired Assets have been licensed by Sellers to any other Person.

18

(ii)     Except as set forth on <u>Schedule 4.1(l)(ii)</u>, to the knowledge of Sellers, none of the use of the Intellectual Property Rights included in the Acquired Assets, the conduct of the Business as currently conducted, nor any of the products sold or services provided by Sellers or any of their Affiliates in connection therewith, infringes upon or otherwise violates the intellectual property rights of any other Person.

(m)     <u>Environmental Matters</u>.  Other than as may be set forth in the reports described on <u>Schedule 4.1(m)</u>, Sellers have not received written notice from any Governmental Authority or third party of any violation of or failure to comply with any environmental Laws (x) with respect to the Leased Real Property which, to the knowledge of Sellers, remains uncorrected, or (y) of any obligation to undertake or bear the cost of any remediation with respect to the Leased Real Property, which to the knowledge of Sellers, remains unperformed.

(n)     <u>Data Security</u>. Other than as may be set forth on <u>Schedule 4.1(n)</u>, Sellers have not received any notice, written, oral or otherwise, from any bank, payment processor, Governmental Authority or other third party of any successful or attempted network intrusion, data breach, hack, loss of customer data, loss of customer credit card data or similar intrusion or loss of data. Other than as may be set forth on <u>Schedule 4.1(n)</u>, Sellers have not found or been notified of any malicious software, malware, malicious code on any of Seller's point of sale terminals, front of house computers, back of house computers or other computers.

(o)     <u>Contracts</u>.

(i)     <u>Schedule 4.1(o)</u> sets forth an accurate list, as of the date hereof, of all Contracts to which a Seller is a party with respect to the Business as of the date hereof (and Sellers have made available, or within ten (10) days of the date hereof shall make available, to Buyer true and complete copies of all such Contracts).

(ii)     Except as to matters which would not reasonably be expected to have a material adverse effect on the Business, each of the Contracts is in full force and effect and is the legal, valid and binding obligation of the applicable Seller and of the other parties thereto, enforceable against each of them in accordance with its terms and, upon consummation of the Transactions, shall continue in full force and effect without penalty or other adverse consequence.  Except as previously disclosed to Buyer or otherwise arising out of pre-Petition Date obligations, no Seller is in default under any Contract, nor, to the knowledge of Sellers, is any other party to any Contract in breach of or default thereunder, and no event has occurred that with the lapse of time or the giving of notice or both would constitute a breach or default by any Seller or any other party thereunder. Except as previously disclosed to Buyer (i) no party to any of the Contracts has exercised any

19

termination rights with respect thereto, and (ii) no party has given written notice of any significant dispute with respect to any Contract. Sellers have and will transfer to Buyer at the Closing, good and valid title to the Acquired Contracts, free and clear of all Liens other than Permitted Liens.

(p)     <u>Real Property</u>.

(i)      The (i) Leased Real Property and (ii) brewing facility located in Ellsworth, Iowa, constitutes all of the real property used by Sellers in connection with the Business.

(ii)     Sellers do not own any real property (other than Improvements being acquired hereunder and the brewing facility located in Ellsworth, Iowa).

(iii)    To the knowledge of Sellers, none of the Leased Real Property is subject to an eminent domain or condemnation proceeding.

(iv)     <u>Schedule 4.1(p)</u> lists each Real Property Lease. Sellers have delivered (or otherwise made available) to Buyer a correct and complete copy of each Real Property Lease.

(v)      Sellers have a valid, binding and enforceable leasehold interest under each of the Real Property Leases under which any Seller is a lessee, free and clear of all Liens other than Permitted Liens. Sellers have all certificates of occupancy and Permits of any Governmental Authority necessary or useful for the current use and operation of each Real Property Lease, and Sellers have fully complied with all material conditions of the Permits applicable to them. Except as to matters which would not reasonably be expected to have a material adverse effect, no default or violation, or event that with the lapse of time or giving of notice or both would become a default or violation, has occurred in the due observance of any Permit.

(vi)     Sellers have not received any notice from any insurance company that has issued a policy with respect to any Real Property Lease requiring performance of any structural or other repairs or alterations to such Real Property Lease. Sellers do not own or hold, nor is any Seller obligated under or a party to, any option, right of first refusal or other contractual right to purchase, acquire, sell, assign or dispose of any real estate or any portion thereof or interest therein, except as may be set forth under the Real Property Leases.

(q)     <u>Taxes</u>.

(i)      Each Seller has timely filed all material Tax returns required to be filed by it with the appropriate Governmental Authorities in all jurisdictions in

20

which such Tax returns are required to be filed (taking into account any extension of time to file granted or to be obtained on behalf of such Seller); (ii) all Taxes shown as due on such Tax returns and all other material Taxes otherwise due and owing by Sellers or their Affiliates have been timely paid (other than any Taxes not due as of the date of the filing of the Bankruptcy Case as to which subsequent payment was prohibited by reason of the Bankruptcy Case); and (iii) each Seller has withheld and paid over to the appropriate Governmental Authority all Taxes which it is required to withhold from amounts paid or owing to any employee, vendor, customer, stockholder, creditor or other Person;

(ii)     No Seller is a foreign person within the meaning of Code Section 1445, and Buyer shall not be required to withhold any amount for Taxes of Sellers from the Purchase Price or other consideration provided herein;

(iii)    There are no Liens for Taxes on any of the Acquired Assets, other than Liens for Property Taxes not yet due and payable;

(iv)    No Seller has waived any statute of limitations with respect to any Taxes relating to the Business or agreed to any extension of time for filing any Tax return with respect to the Business which has not been filed or consented to extend to a date later than the regular statutory date in which any Tax may be assessed or collected by any Governmental Authority, and to the knowledge of Sellers, no Tax audit, contest, examination, or other proceeding with respect to, or relating to, the Taxes of the Business is ongoing or planned;

(v)     No Seller has any branch, permanent establishment, office, or other place of business outside the United States, and the Business has solely been operated in the United States;

(vi)    Each Seller and each subsidiary thereof has properly classified for Tax purposes any service providers as employees or independent contractors;

(vii)   None of the Acquired Assets (i) is property that is required to be treated as being owned by any other Person pursuant to the "safe harbor lease" provisions of Section 168(f)(8) of the Code, (ii) is "tax-exempt use property" within the meaning of Section 168(h) of the Code, or (iii) directly or indirectly secured any debt the interest of which is tax-exempt under Code Section 103(a); or

(viii)  No Acquired Contract or assumed employee obligation (i) provides for nonqualified deferred compensation within the meaning of Code Section 409A (and similar state or local law) that is not compliant with Code Section 409A (and similar state or local law) or (ii) gives rise to any "parachute

21

payment" that is not deductible under Code Section 280G or subject to excise tax under Code Section 4999.

(r)     Financial Statements. Schedule 4.1(r) contains the unaudited consolidated balance sheet of the Business as of June 25, 2019 (the "**Balance Sheet**") and the related unaudited statement of operations for the six month period then ended. The financial statements referred to in the foregoing sentence are collectively referred to as the "**Financial Statements**." The Financial Statements have been prepared from the books and records of Sellers on an accrual basis consistent with Sellers' internal accounting practices. Such Financial Statements were prepared in accordance with GAAP.

**Section 4.2     Representations and Warranties of Buyer**.     Buyer represents and warrants to Sellers as of the Execution Date and the Closing Date as follows:

(a)     Corporate Organization. Buyer is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Nevada and has all requisite corporate power and authority to own its properties and assets and to conduct its business as now conducted.

(b)     Authorization and Validity.  Buyer has all requisite corporate power and authority to enter into this Agreement and any Ancillary Agreement to which Buyer is a party and to perform its obligations under this Agreement and under the Ancillary Agreement.  The execution and delivery of this Agreement and any Ancillary Agreement to which Buyer is a party and the performance of Buyer's obligations under this Agreement and under the Ancillary Agreements have been, or on the Closing Date will be, duly authorized by all necessary corporate action of Buyer, and no other corporate proceedings on the part of Buyer are necessary to authorize such execution, delivery and performance. This Agreement has been, and any Ancillary Agreement to which Buyer is a party has been duly executed by Buyer and constitutes Buyer's valid and binding obligations, enforceable against it in accordance with their respective terms.

(c)     No Conflict or Violation.  The execution, delivery and performance by Buyer of this Agreement and any Ancillary Agreement to which Buyer is a party does not (i) violate or conflict with any provision of Buyer's certificate of incorporation or bylaws or similar organizational documents; (ii) violate any provision of law, or any order, judgment or decree of any court or Government applicable to Buyer or any of its properties or assets; or (iii) violate or result in a breach of or constitute (with due notice or lapse of time or both) a default under any material Contract to which Buyer is party or by which Buyer is bound or to which any of Buyer's properties or assets is subject.

(d)     Consents and Approvals.  No consent, waiver, authorization or approval of any Person or declaration, filing or registration with any Government is required in

22

connection with the execution and delivery by Buyer of this Agreement or any Ancillary Agreement to which Buyer is a party or the performance by Buyer of its obligations under this Agreement or under the Ancillary Agreements.

(e)     <u>Adequate Assurances Regarding Acquired Contracts</u>.  As of the Closing, Buyer will be capable of satisfying the conditions contained in Sections 365(b) and 365(f) of the Bankruptcy Code with respect to the Acquired Contracts.

(f)     <u>Litigation</u>.    There are no claims, actions, suits, proceedings or investigations pending, threatened in writing or against Buyer, or any Related Person of Buyer, that could affect the ability of Buyer to consummate the transactions contemplated by this Agreement and each Ancillary Agreement.

(g)     <u>Adequacy of Funds</u>.  Buyer has cash on hand, existing availability under existing lines of credit, or other immediately available financial resources sufficient to pay the Unadjusted Purchase Price, Cure Cost, and all other obligations under <u>Section 1.3(d)</u> at the Closing.

**Section 4.3    <u>Warranties Are Exclusive</u>**.    The parties acknowledge that the representations and warranties contained in this <u>Article IV</u> are the only representations or warranties given by the parties and that all other express or implied warranties are disclaimed. Without limiting the foregoing, Buyer acknowledges that, except for the representations and warranties contained in <u>Section 4.1</u>, the Acquired Assets are conveyed "AS IS," "WHERE IS" and "WITH ALL FAULTS" and that all warranties of merchantability or fitness for a particular purpose are disclaimed. WITHOUT LIMITING THE FOREGOING, BUYER ACKNOWLEDGES THAT, EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES CONTAINED IN <u>SECTION 4.1</u>, SELLERS AND THEIR RELATED PERSONS AND AFFILIATES HAVE MADE NO REPRESENTATION OR WARRANTY CONCERNING ANY (A) USE TO WHICH THE ACQUIRED ASSETS MAY BE PUT, (B) FUTURE REVENUES, COSTS, EXPENDITURES, CASH FLOW, RESULTS OF OPERATIONS, FINANCIAL CONDITION OR PROSPECTS THAT MAY RESULT FROM THE OWNERSHIP, USE OR SALE OF THE ACQUIRED ASSETS OR THE ASSUMPTION OF THE ASSUMED LIABILITIES OR (C) OTHER INFORMATION OR DOCUMENTS MADE AVAILABLE TO BUYER OR ITS AFFILIATES OR RELATED PERSONS. Buyer further acknowledges that Buyer has conducted, or has had an adequate opportunity to conduct, all necessary due diligence related to Sellers' business, the Acquired Assets, the Assumed Liabilities, and all such other matters relating to or affecting any of the foregoing. In proceeding with the transactions contemplated in this Agreement, except for any representations and warranties expressly set forth in <u>Section 4.1</u>, Buyer is doing so based solely upon its own due diligence and review, all of which has been completed to the satisfaction of Buyer, and Buyer has not relied upon any oral or written statements, representations or guaranties whatsoever, whether express or implied, made by Sellers or its agents and representatives.

**ARTICLE V.      <u>COVENANTS AND OTHER AGREEMENTS</u>**

23

**Section 5.1     Covenants of Sellers**.Sellers covenant to Buyer that, during the period from the Execution Date through and including the Closing Date or the earlier termination of this Agreement, and to the extent applicable to the Acquired Assets:

(a)     Conduct of Business Before the Closing.  Except as set forth on Schedule 5.1(b) or unless otherwise agreed by Sellers and Buyer, Sellers will use commercially reasonable efforts to conduct their business in all material respects in the manner in which it has been conducted since the Petition Date and to preserve intact their respective business or organization and relationships with third parties; provided, however, that Sellers will not, without Buyer's prior approval (which such approval shall not be unreasonably withheld, conditioned or delayed), amend, exercise any option with regard to, or otherwise modify any Real Property Lease.  Sellers further agree to forward all correspondence with regard to any Leased Real Property and/or Real Property Lease and to not take any action with respect to any such correspondence without first obtaining Buyer's written consent to any such action. Notwithstanding this covenant, Sellers may, with Buyer's approval not to be unreasonably withheld, take steps to wind down its operations at the locations listed on Schedule 1.1(a) so long as such steps do not increase any of the liabilities being assumed by Buyer in Section 1.3. Without limiting the generality of the foregoing, during the period from the date of this Agreement to the Closing, except as otherwise contemplated by this Agreement, set forth on Schedule 5.1(b) or as Buyer shall otherwise consent in writing, each Seller shall, and shall cause each of its respective Affiliates to, do the following: (i) pay all post-petition bills and invoices for post-petition goods or services promptly when due; (ii) notify Buyer of any material adverse change in its condition (financial or otherwise), business, properties, assets or liabilities, or of the commencement of or any material development or disposition with respect to any material governmental complaints, investigations, or hearings (or any written threats thereof); (iii) maintain in the ordinary course customary amounts of cash, cash equivalents and similar cash items at the location of each restaurant in cash registers, safes, strongboxes and lock boxes consistent with past practice; (iv) use its commercially reasonable efforts to keep and maintain possession of and compliance with the terms of all Permits (including Liquor Licenses) necessary or required by Law to own, lease and operate its respective properties (and the Acquired Assets) and to carry on the Business or that are material to the operation of the Business or the Acquired Assets, including by taking all commercially reasonable actions and submitting all payments, applications, and filings necessary to renew any such Permit due to expire at any time before the Closing Date (or 60 days thereafter); and (v) maintain insurance coverage with financially responsible insurance companies substantially similar in all material respects to the insurance coverage maintained by the Business and Sellers on the Petition Date.

(b)     Certain Restricted Conduct. Except as set forth on Schedule 5.1(b) and except as otherwise set forth in this Agreement or as Buyer shall otherwise consent in advance in writing, during the period from the date of this Agreement to the Closing, no

24

Seller shall, and each Seller shall cause each of its respective Affiliates not to, with respect to the Acquired Assets:

(i)     sell, lease, license, transfer, or dispose of other than in the ordinary course of business any Acquired Assets;

(ii)    authorize or enter into any Contract, arrangement, or commitment other than a Contract that is both (x) in the ordinary course of business and (y) not a Contract that would constitute a material Contract if it were effective as of the date of this Agreement;

(iii)   dispose of or permit to lapse any rights in, to or for the use of any material Intellectual Property Right;

(iv)    other than in the ordinary course, authorize, undertake, make, or enter into any commitments obligating any Seller to (x) make or accelerate any capital expenditures or (y) undertake or approve any material renovation or rehabilitation of any Leased Real Property;

(v)     (w) increase any compensation or enter into or amend any employment, severance or other agreement with any of its officers, directors or employees, (x) adopt any new Employee Benefit Plan or amend or terminate or increase the benefits under any existing Employee Benefit Plan, except for changes which are required by Law and changes which are not more favorable to participants than provisions presently in effect, (y) hire any employee or individual independent contractor with annual compensation in excess of $75,000, or enter into any new employment or severance agreements that would result in post-termination payments becoming due or payable upon termination of employment or of the individual independent contractor, or (z) assume or enter into any labor or collective bargaining agreement relating to the Business, any employee, or any Acquired Asset;

(vi)    take any action that would constitute or result in an event of default under any debtor-in-possession financing facility agreement or order, and/or cash collateral agreement;

(vii)   permit, offer, agree or commit (in writing or otherwise) to permit, any of the Acquired Assets to become subject, directly or indirectly, to any Lien, except for Permitted Liens, Liens existing on the date of this Agreement and Liens granted before a Closing in connection with any debtor-in-possession financing facility agreement or order, and/or cash collateral agreement;

(viii)  do any other act that would, to the knowledge of Sellers, cause any representation or warranty of any Seller in this Agreement to be or become

25

untrue in any material respect or intentionally omit to take any action necessary to prevent any such representation or warranty from being untrue in any material respect; or authorize or enter into any Contract, agreement, or commitment with respect to any of the foregoing.

(c)   Except as set forth on Schedule 5.1(b), no Seller nor any of its Affiliates shall, with respect to the Acquired Assets: (i) except pursuant to any Order governing the use of cash collateral entered by the Bankruptcy Court in the Bankruptcy Cases, voluntarily, by operation of law, or otherwise, renew, assign, transfer, sublease, mortgage, pledge, hypothecate or otherwise encumber any lease or the leasehold estate constituting a portion of the Business upon which Buyer, Seller or an Affiliate of either has any continuing financial or other obligation (contingent or otherwise) except for Permitted Liens; (ii) renew any lease nor suffer any person other than such Seller, its employees, agents, servants and invitees to occupy or use the premises or any portion thereof, without in any case the express written consent of Buyer, which consent shall not be unreasonably withheld or (iii) terminate, amend, extend, renew, modify, breach or waive any rights under any Real Property Lease or Contract. Any attempt to do any of the foregoing without such written consent shall be null and void. If Sellers request such a consent from Buyer, the request shall be in writing specifying the terms of the renewal; the identity of the proposed assignee or sublessee; the duration of said desired sublease or renewal, the date same is to occur, the exact location of the space affected thereby and the proposed rentals on a square foot basis chargeable thereunder. Such request for Buyer consent shall be submitted to Buyer at least three (3) days in advance of the date on which Sellers desire to make such event occur.

(d)   Cooperation.  Sellers will use commercially reasonable efforts to (i) take, or cause to be taken, all action and to do, or cause to be done, all things necessary or proper, consistent with applicable law, to consummate and make effective as soon as possible the transactions contemplated by this Agreement; and (ii) assist Buyer's efforts to transfer any Permits required to own the Acquired Assets.

(e)   Sale Order.  Without limiting Section 5.1(d)(ii), Sellers will use commercially reasonable efforts to obtain entry of the Sale Order by the Bankruptcy Court as soon as reasonably practicable.

(f)   D&O Policy.  At or prior to the Closing, a D&O insurance policy, or similar insurance policy acceptable to the Buyer, shall be bound, at Buyer's sole expense, providing coverage to the directors and officers of Sellers prior to the Closing Date in the same amounts and for at least three (3) years following the Closing Date.

(g)   Access to Records. From the date hereof until the earlier of the termination of this Agreement or the Closing Date, Sellers shall reasonably afford, and shall cause their officers, employees, attorneys and other agents to reasonably afford, to Buyer and its counsel, accountants and other representatives, access (at reasonable times during

26

normal business hours) to officers and other employees of Sellers for the purposes of evaluating the Business and all corporate offices, restaurants, warehouses or other facilities, properties, books, accounts, records and documents of, or relating to, the Business, subject to the terms of the Confidentiality Agreement.

(h)    <u>Notices of Certain Events</u>. Sellers shall promptly notify Buyer and deliver copies to Buyer of:

(i)    any notice or other written communication from any Person alleging that the consent of such Person is or may be required in connection with the consummation of the Transactions;

(ii)    any material written communication from any Governmental Authority in connection with or relating to the Transactions, including with respect to Liquor License approvals and any condemnation or eminent domain event affecting any of the Real Property Leases;

(iii)    any correspondence, report or notice required to be given by Sellers to any party under a debtor-in-possession financing facility agreement or order, and/or cash collateral agreement or order, or any other related document, including any variance reports, weekly budget compliance reports, or notice of default; or

(iv)    the commencement of any actions, suits, investigations or proceedings relating to Sellers or the Business that, if pending on the date of this Agreement, would have been required to have been disclosed pursuant to <u>Section 4.1</u>.

(i)    <u>Payroll</u>. Promptly following the Closing, the Sellers shall use the proceeds of the Purchase Price to pay all payroll expenses incurred through the date immediately prior to Closing.

**Section 5.2    <u>Name Change</u>**.  Beginning six (6) months after the Closing, Sellers shall take steps necessary to effect a change in any of its corporate names to remove "Granite City" or "Cadillac Ranch" from such names.  As all Intellectual Property Rights of Sellers are Acquired Assets, Sellers agree after Closing to cease use of any service marks, trademarks, trade names, logos, emblems, signs or insignia related to the Intellectual Property Rights owned by Sellers prior to Closing and, immediately after Closing, to cease holding themselves out as having any affiliation with the Business (other than for the arrangements under this Agreement and the related Agreements).

**Section 5.3    <u>Covenants of Buyer</u>**.Buyer covenants to Sellers that, during the period from the Execution Date through and including the Closing Date or the earlier termination of this Agreement:

27

(a) <u>Cooperation</u>. Buyer will use commercially reasonable efforts to take, or cause to be taken, all action and to do, or cause to be done, all things necessary or proper, consistent with applicable law, to consummate and make effective as soon as possible the transactions contemplated by this Agreement.

(b) <u>Adequate Assurances Regarding Acquired Contracts and Required Orders</u>. With respect to each Acquired Contract, Buyer will provide adequate assurance of the future performance of such Acquired Contract by Buyer. Buyer will promptly take such actions as may be reasonably requested by Sellers to assist Sellers in obtaining the Bankruptcy Court's entry of an assumption and assignment order and any other order of the Bankruptcy Court reasonably necessary to consummate the transactions contemplated by this Agreement.

**Section 5.4 <u>Other Covenants</u>**.

(a) <u>Improper Receipt of Payment</u>. From and after the Closing, (i) each Seller will promptly forward to Buyer any and all payments received by it that constitutes part of the Acquired Assets; and (ii) Buyer will promptly forward to the respective Seller any and all payments received by Buyer that constitute part of the Excluded Assets.

(b) <u>Bankruptcy Issues</u>. Buyer and Seller agree that:

(i) <u>Filing of Sale and Bidding Procedures Motion</u>. Within seven (7) Business Days of the Petition Date, Sellers shall file with the Bankruptcy Court a motion (the "**Bidding Procedures Motion**") seeking, among other things, the entry of (i) the Sale Order, and (ii) an Order (the "**Bidding Procedures Order**") approving the bidding procedures substantially in the form of <u>Exhibit A</u> attached hereto (the "**Bidding Procedures**").

(A) Auction. In the event that Sellers timely receive a conforming Initial Overbid (as defined in the Bidding Procedures Order) from a prospective purchaser as described above (a "**Qualified Bidder**"), then Sellers will conduct an auction (the "**Auction**") with respect to the sale of the Acquired Assets. In order to participate in the Auction, each prospective purchaser shall be required to comply with the requirements of the Bidding Procedures and to submit an Initial Overbid that is timely and that complies in all respects with the Bidding Procedures. At the Auction, Qualified Bidders and/or Buyer may submit successive bids in increments of at least $100,000 greater than the prior bid (the "**Incremental Bid Amount**") for the purchase of the Acquired Assets until there is only one offer that Sellers determine, subject to Bankruptcy Court approval, is the highest and best offer (the "**Prevailing Bid**"). When bidding at the Auction, Buyer shall receive a "credit" in the amount of the Breakup Fee and Expense Reimbursement. All bidding for the Acquired Assets will be concluded at the Auction and there will be no further bidding at the Bankruptcy Court hearing held in the

28

Bankruptcy Cases to approve the highest and best bid for the Acquired Assets (the "**Approval Hearing**"). If no conforming Initial Overbid from a Qualified Bidder shall have been received at or prior to the Bid Deadline (as defined in the Bidding Procedures Order), the Auction will not be held and the Approval Hearing will proceed with respect to this Agreement. The Auction shall be conducted on an open-outcry and not on any sealed bid basis without the prior written consent of Buyer.

(B) Breakup Fee. Upon the consummation of a sale of all or substantially all of the Acquired Assets to any third party (other than Buyer) who submits a Prevailing Bid for the Acquired Assets or termination of this Agreement pursuant to Section 7.1(f) or 7.1(g) below, Sellers shall pay to Buyer cash or other immediately available funds in an amount equal to the sum of (A) Two Hundred Twenty Five Thousand Dollars ($225,000) (the "**Breakup Fee**"); and (B) reimbursement to Buyer of all costs and expenses incurred by Buyer in connection with the negotiation of this Agreement, applicable filings, amounts paid or payable to financing sources and any due diligence undertaken in connection herewith and therewith, in an amount equal to One Hundred Thousand Dollars ($100,000) (the "**Expense Reimbursement**"). The Parties agree that the Breakup Fee and Expense Reimbursement shall be the full and liquidated damages of Buyer arising out of any termination of this Agreement pursuant to Section 7.1(f). The provisions of this Section 5.3 shall survive any termination of this Agreement pursuant to Section 7.1(f). The Breakup Fee and Expense Reimbursement shall be treated as administrative expense claims in the Bankruptcy Cases, shall be paid to Buyer within three (3) Business Days following the closing of such sale to the third party, and shall be paid to Buyer prior to the payment of the proceeds of such sale to any third party asserting a Lien on the Acquired Assets (and, for the avoidance of doubt, (x) no Lien of any third party shall attach to the portion of the sale proceeds representing the Breakup Fee and Expense Reimbursement and (y) the Breakup Fee and Expense Reimbursement shall be payable first from unencumbered cash held by Sellers).

(C) Backup Bid. At the conclusion of the Auction, Sellers shall identify and certify the bid that constitutes the second highest and best offer for the Acquired Assets (the "**Backup Bid**" and the Qualified Bidder submitting such bid, the "**Backup Bidder**"). The Backup Bidder may be required by Sellers to close on the Backup Bid within sixty (60) days of the conclusion of the Auction. In the event that the Backup Bidder fails to close on the transaction contemplated in the Backup Bid, Sellers shall be permitted to retain the Backup Bidder's good faith deposit as liquidated damages. Buyer is not obligated to be a Backup Bidder.

29

(ii)    <u>Bankruptcy Court Approval of Sale</u>.  Sellers and Buyer shall each use their commercially reasonable efforts, and shall cooperate, assist and consult with each other, to secure the entry of an Order (the "**Sale Order**") of the Bankruptcy Court in the Bankruptcy Cases which shall be in the form agreed by the Parties and which Sale Order (i) approves this Agreement, (ii) authorizes the sale of the Acquired Assets pursuant to Sections 363 of the Bankruptcy Code, (iii) authorizes the assumption and assignment of the Acquired Contracts pursuant to Section 365 of the Bankruptcy Code, (iv) on the Closing Date, the Acquired Assets shall be sold to Buyer free and clear of any and all Liens (except for Permitted Liens), including any liens granted during the Chapter 11 Cases, (v) authorizes the Transactions, and (vi) includes findings (x) providing that Buyer is a purchaser in good faith for fair value within the meaning of Section 363(m) of the Bankruptcy Code and entitled to the protection of Section 363(m) of the Bankruptcy Code, and (y) that the consideration for the Acquired Assets constitutes reasonably equivalent value and fair consideration; provided, however, Sellers shall be entitled to take such actions as may be required in connection with the discharge of their fiduciary duties in the Bankruptcy Cases (including soliciting higher and better offers for the Acquired Assets).  In connection with the assumption and assignment of the Acquired Contracts pursuant to Section 365 of the Bankruptcy Code, Buyer shall take all actions required to provide "adequate assurance of future performance" by Buyer under the Acquired Contracts after the Closing.  The Sale Order shall contain findings by the Bankruptcy Court that (a) Buyer is a good-faith buyer under section 363(m) of the Bankruptcy Code, (b) Buyer is not a successor to the Sellers, and (c) the sale of the Acquired Assets contemplated hereby did not involve any improper conduct, including collusion, and cannot be avoided under grounds set forth under section 363(n) of the Bankruptcy Code, unless in the reasonable judgment of Sellers' professionals, after consultation with Buyer, Sellers believe there exists a factual basis that would preclude the Bankruptcy Court from making such a finding. Sellers and Buyer shall consult with one another in good faith regarding pleadings that either of them intends to file, or positions either of them intend to take, with the Bankruptcy Court in connection with or that might reasonably affect the Bankruptcy Court's entry of the Sale Order.

(iii)    <u>Liquor Licenses</u>. Sellers shall seek to have included in the Sale Order a provision that immediately upon the Closing, Buyer shall be entitled to continue to sell alcoholic beverages at the premises included in the Acquired Assets upon the same terms as Sellers were selling such alcoholic beverages until such time as Buyer has had the time and opportunity to obtain its own Liquor Licenses.

(c)    <u>License to Use Name</u>.  Following the Closing, in accordance with the provisions of this <u>Section 5.4(c)</u>, Buyer agrees to grant Sellers an exclusive, worldwide, royalty

30

free, fully paid and irrevocable license to use the Intellectual Property Rights related to the Cadillac Ranch and Granite City brands to the extent relating to any Excluded Assets, provided that, any Seller (or any assignee thereof) using the Cadillac Ranch or Granite City brand names shall pay to Buyer a license fee equal to three percent (3%) of such Seller's annual gross sales.  Any use of the Cadillac Ranch or Granite City brand names shall be subject to a mutually agreeable license agreement, which shall be entered into by Buyer with such Sellers determined by Buyer at its sole discretion.

### ARTICLE VI.    CONDITIONS PRECEDENT TO PERFORMANCE BY PARTIES

**Section 6.1    Conditions Precedent to the Performance by Sellers**.  The obligation of Sellers to consummate the transactions contemplated by this Agreement is subject to the fulfillment, at or before the Closing, of the following conditions, any one or more of which, other than the condition contained in Section 6.1(c), may be waived by Sellers, in their discretion:

(a)    Representations and Warranties of Buyer.  The representations and warranties of Buyer made in Section 4.2 of this Agreement, in each case, will be true and correct in all material respects as of the Execution Date and as of the Closing Date as though made by Buyer as of the Closing Date, except to the extent such representations and warranties expressly relate to an earlier date, in which case such representations and warranties will be true and correct on and as of such earlier date.

(b)    Performance of the Obligations of Buyer.  Buyer has performed in all material respects all obligations required under this Agreement and any Ancillary Agreement to which Buyer is party to be performed by Buyer on or before the Closing Date.

(c)    Governmental Consents and Approvals.  The Bankruptcy Court will have entered the Sale Order and the Assignment Order, and such orders will be in full force and effect, and no order staying, reversing, modifying, vacating or amending such orders will be in effect on the Closing Date.

(d)    Closing Deliveries.  Buyer will have made the deliveries contemplated under Section 3.3.

**Section 6.2    Conditions Precedent to the Performance by Buyer**.  The obligations of Buyer to consummate the transactions contemplated by this Agreement are subject to the fulfillment, at or before the Closing, of the following conditions, any one or more of which, other than the condition contained in Section 6.2(c), may be waived by Buyer, in its discretion:

(a)    Representations and Warranties of Sellers.  The representations and warranties of Sellers made in Section 4.1 of this Agreement will be true and correct in all material respects as of the Execution Date and as of the Closing Date as though made by Sellers as of the Closing Date, except to the extent such representations and

31

warranties expressly relate to an earlier date, in which case such representations and warranties will be true and correct on and as of such earlier date.

(b)   <u>Performance of the Obligations of Sellers</u>.   Sellers will have performed in all material respects all obligations required under this Agreement or any Ancillary Agreement to which Sellers are party to be performed by Sellers on or before the Closing Date.

(c)   <u>Governmental Consents and Approvals</u>.   The Bankruptcy Court will have entered the Sale Order, which shall include a waiver of the fourteen (14) day stay set forth in Rule 6004(h) of the Federal Rules of Bankruptcy Procedure, and the Assignment Order, and such orders will be in full force and effect.

(d)   <u>Closing Deliveries</u>.   Sellers will have made the deliveries contemplated under <u>Section 3.2</u>.

(e)   From the date of this Agreement until the Closing Date, there shall not have occurred and be continuing any material adverse effect on the Business.

(f)   Sellers shall have delivered a certificate from an authorized officer of Sellers to the effect that each of the conditions specified in <u>Section 6.2(a)</u>, <u>(b)</u> and <u>(e)</u> have been satisfied.

(g)   The Bankruptcy Court shall have entered the Sale Order which shall have become final and non-appealable and shall have confirmed the sale of the Acquired Assets described in this Agreement and in accordance with this Agreement to Buyer by the Seller.

## ARTICLE VII.   <u>TERMINATION</u>

**Section 7.1**   **<u>Conditions of Termination</u>**.   This Agreement may be terminated only in accordance with this <u>Section 7.1</u>.   This Agreement may be terminated at any time before the Closing as follows:

(a)   By mutual consent of Sellers and Buyer;

(b)   By Sellers, by notice to Buyer, if Sellers have provided Buyer with notice of any material inaccuracy of any representation or warranty contained in <u>Section 4.2</u>, or of a material failure to perform any covenant or obligation of Buyer contained in this Agreement or any Ancillary Agreement to which Buyer is party, and Buyer has failed, within ten (10) Business Days after such notice, to remedy such inaccuracy or perform such covenant or provide reasonably adequate assurance to Sellers of Buyer's ability to remedy such inaccuracy or perform such covenant or obligation; <u>provided</u>, <u>however</u>, that Sellers will not have the right to terminate this Agreement under this <u>Section 7.1(b)</u> if Sellers are then in material breach of this Agreement;

32

(c)     By Sellers, if the Bankruptcy Court dismisses Sellers' Chapter 11 cases or converts the Chapter 11 cases to cases under Chapter 7 of the Bankruptcy Code; if the Bankruptcy Court confirms a Chapter 11 plan in Sellers' Chapter 11 cases; or if the Bankruptcy Court appoints a Chapter 11 trustee or an examiner with expanded powers;

(d)     By Buyer, by notice to Sellers, if Buyer has previously provided Sellers with notice of any material inaccuracy of any representation or warranty of Sellers contained in Section 4.1 or a material failure to perform any covenant or obligation of Sellers contained in this Agreement or any Ancillary Agreement to which Sellers are party, and Sellers have failed, within ten (10) Business Days after such notice, to remedy such inaccuracy or perform such covenant or provide reasonably adequate assurance to Buyer of Sellers' ability to remedy such inaccuracy or perform such covenant; provided, however, that Buyer will not have the right to terminate this Agreement under this Section 7.1(d) if Buyer is then in material breach of this Agreement;

(e)     By any party by giving written notice to the other parties if the Closing shall not have occurred on or prior to the Outside Date; provided, however, that if the Closing shall not have occurred on or before the Outside Date due to a material breach of any representations, warranties, covenants or agreements contained in this Agreement by Buyer or Sellers, then the breaching party may not terminate this Agreement pursuant to this Section 7.1(e);

(f)     Automatically, upon (i) the consummation of an Alternative Transaction or (ii) the issuance of a final and non-appealable order, decree, or ruling by a Governmental Authority to permanently restrain, enjoin or otherwise prohibit the Closing; or

(g)     By Buyer, by notice to Seller, if (i) if any of the Sellers files (y) any motion with the Bankruptcy Court seeking an order approving, or (z) any plan involving, any Alternate Transaction; or (ii) if Sellers enter into a definitive agreement with a third party for an Alternate Transaction;

**Section 7.2     Effect of Termination; Remedies**.

(a)     In the event of termination pursuant to Section 7.1, this Agreement will become null and void and have no effect (other than Article VII, Article VIII and Article IX, which will survive termination), with no liability on the part of Sellers, Buyer, or their respective Affiliates or respective Related Persons, with respect to this Agreement or any Ancillary Agreement, except for any liability provided for in this Article VII.

(b)     If this Agreement is terminated pursuant to Section 7.1(a), (c), (d), (e), (f) or (g) then, within two (2) Business Days after such termination, the Deposit will be returned to Buyer, without interest.

33

(c)     If this Agreement is terminated pursuant to <u>Section 7.1(b)</u> then all right, title and interest to the Deposit will automatically vest in Sellers. The Parties hereby agree that it is impossible to determine accurately the amount of damages that Sellers would suffer if the transactions contemplated hereby were not consummated as a result of a breach of this Agreement by Buyer or termination of this Agreement pursuant to <u>Section 7.1(b)</u>.  As a result, notwithstanding anything in this Agreement to the contrary, Sellers hereby agree that, in the event of a termination of this Agreement by Sellers under <u>Section 7.1</u>, (i) the Deposit shall be delivered to Sellers as liquidated damages against Buyer for all liabilities of Buyer under this Agreement and (ii) such liquidated damages shall be the sole and exclusive remedy, at Law and equity, of Sellers against Buyer for Buyer's breach and such termination and Buyer shall have no further liability of any kind to Sellers, any of their Affiliates, or any third party on account of this Agreement.

(d)     If this Agreement is terminated pursuant to <u>Section 7.1(g)</u>, then, (i) the Deposit will be returned to Buyer, without interest; and (ii) subject to the approval of the Bankruptcy Court, Sellers will pay to Buyer the Breakup Fee and Expense Reimbursement. Any payment of the Breakup Fee and Expense Reimbursement under this <u>Section 7.2</u> will be made by Sellers from the proceeds of the Alternative Transaction by wire transfer of immediately available funds to an account designated in writing by Buyer upon the closing of such Alternative Transaction.

(e)     Sellers acknowledge that the Breakup Fee and the Expense Reimbursement (or any portion thereof) are necessary and appropriate expenses for the administration of their estates, pursuant to Sections 503 and 507 of the Bankruptcy Code, and that the Breakup Fee and Expense Reimbursement (or any portion thereof) are allowed administrative expenses.

**Section 7.3**     **Exclusive Remedy; Waiver**. Prior to the Closing, the parties' sole and exclusive remedies for any claim arising out of or in connection with this Agreement will be termination in accordance with, and obtaining the remedies provided in, this <u>Article VII</u>. The failure by either Sellers or Buyer to pursue or foreclose on any right or remedy against the other party, by itself, will not constitute a waiver, and any waiver under this <u>Article VII</u> will be effective only if made in writing.

## ARTICLE VIII.  <u>SURVIVAL AND INDEMNIFICATION</u>

**Section 8.1**     **Survival; Indemnification**.  None of the representations and warranties of each Seller and of Buyer made in this Agreement will survive the Closing Date, and all of such representations and warranties will be extinguished by the Closing.  All covenants and agreements of the parties contained in this Agreement will survive Closing, unless otherwise expressly stated therein.  If the Closing occurs, Buyer will indemnify and hold harmless Sellers and their respective Affiliates and Related Persons against any and all losses, liability, expense or damage that result from or arise out of the Assumed Liabilities, and will promptly pay such Assumed Liabilities as they become due and payable.

34

# ARTICLE IX.   MISCELLANEOUS

**Section 9.1    Alternative Transaction**.Notwithstanding anything in this Agreement or in any Ancillary Agreement to the contrary, Sellers may furnish information concerning Sellers, the Acquired Assets and the Assumed Liabilities to any Person in connection with a potential Alternative Transaction and negotiate, enter into and consummate an Alternative Transaction; provided, however, Sellers covenant that they shall not, and shall cause each of their directors, managers, officers, stockholders, owners, Affiliates or other representatives, directly or indirectly, either solicit, discuss or negotiate with any third party  any Competing Arrangement until such time as the Bidding Procedures Motion has been approved and the Bidding Procedures Order has been entered by the Bankruptcy Court.  For purposes of this Agreement, the term "Competing Arrangement" means any transaction or potential transaction whereby any party other than Buyer would (x) act as a "stalking horse", become a plan sponsor, be a competing initial bidder or otherwise be pre-qualified as a bidder for any sale of the Sellers' Business, assets or operations, or (y) receive any form of breakup fee, expense reimbursement or other bid protections as a component of or condition to their agreement to purchase all or any of the Sellers' Business, assets or operations, in each case for clause (x) and (y) whether in a sale through the Bankruptcy Court or otherwise..

**Section 9.2    Further Assurances**.  At the request and the sole expense of the requesting party, Buyer or Sellers, as applicable, will execute and deliver, or cause to be executed and delivered, such documents as Buyer or Sellers, as applicable, or their respective counsel may reasonably request to effectuate the purposes of this Agreement and the Ancillary Agreements.

**Section 9.3    Successors and Assigns**.  This Agreement will inure to the benefit of and will be binding upon the successors and assigns of the parties to this Agreement.

**Section 9.4    Governing Law; Jurisdiction**.   This Agreement will be construed, performed and enforced in accordance with, and governed by, the laws of the State of Delaware (without giving effect to the principles of conflicts of laws thereof), except to the extent that the laws of such State are superseded by the Bankruptcy Code or other applicable federal law.  For so long as Sellers are subject to the jurisdiction of the Bankruptcy Court, the parties irrevocably elect, as the sole judicial forum for the adjudication of any matters arising under or in connection with the Agreement, and consent to the exclusive jurisdiction of, the Bankruptcy Court.

**Section 9.5    Expenses**.  Except as otherwise provided in this Agreement, Sellers and Buyer will pay their own expenses in connection with this Agreement and the transactions contemplated by this Agreement, including, without limitation, any legal and accounting fees, whether or not the transactions contemplated by this Agreement are consummated.

**Section 9.6    Broker's and Finder's Fees**.  Neither Sellers nor Buyer has engaged any broker or finder in connection with any of the transactions contemplated by this Agreement other than Duff & Phelps Securities, LLC, as Sellers' investment banker, and Hilco Real Estate, LLC, as Sellers' leasing agent, whose fees and expenses will, as between the parties, be the sole responsibility of Sellers, and, insofar as such party knows, no other broker or other Person is

35

entitled to any commission or finder's fee in connection with any of the transactions contemplated by this Agreement.

**Section 9.7**   **Severability**.   In the event that any part of this Agreement is declared by any court or other judicial or administrative body to be null, void or unenforceable, such provision will survive to the extent it is not so declared, and all of the other provisions of this Agreement will remain in full force and effect only if, after excluding the portion deemed to be unenforceable, the remaining terms provide for the consummation of the transactions contemplated by this Agreement in substantially the same manner as set forth on the Execution Date.

**Section 9.8**   **Notices**.   (a)  All notices, requests, demands, consents and other communications under this Agreement will be in writing and will be deemed to have been duly given: (i) on the date of service, if served personally on the party to whom notice is to be given; (ii) on the day of transmission, if sent via facsimile transmission to the facsimile number given below or by electronic mail to the electronic mail address given below; (iii) on the day after delivery to Federal Express or similar overnight courier or the Express Mail service maintained by the United States Postal Service addressed to the party to whom notice is to be given; or (iv) on the fifth day after mailing, if mailed to the party to whom notice is to be given, by first class mail, registered or certified, postage prepaid and properly addressed, to the party as follows:

If to Sellers:

      **Granite City Food & Brewery Ltd.**
      3600 American Boulevard West
      Suite 400
      Bloomington, MN 55431
      Attention:  Nathan G. Hjelseth
      Email:  nhjelseth@gcfb.net
      Facsimile:  (952) 215-0671

With a copy to (which will not constitute notice):

      Briggs and Morgan, P.A.
      2200 IDS Center
      80 South 8th Street
      Minneapolis, MN 55402
      Attention:  Brett D. Anderson
      Email: banderson@briggs.com
      Facsimile:  (612) 977-8400

If to Buyer:

    c/o Kelly Investment Group, LLC
    12730 High Bluff Drive, Suite 250
    San Diego, CA 92130
    Attention:  Michael Kelly
    Facsimile: 619-687-5010
    Email: michael@kellycompanies.com

With a copy to (which will not constitute notice):

    c/o Kelly Investment Group, LLC
    12730 High Bluff Drive, Suite 250
    San Diego, CA 92130
    Attention: Legal Department
    Facsimile:
    Email: luke@kellyinvestmentgroup.com

(b)  Any party may change its address, facsimile number or email address for the purpose of this Section 9.8 by giving the other parties written notice of its new address in the manner set forth above.

**Section 9.9** **Amendments; Waivers**.  This Agreement may only be amended or modified, and any of the terms, covenants, representations, warranties or conditions of this Agreement may only be waived, by a written instrument executed by Buyer and Sellers, or in the case of a waiver, by the party waiving compliance.  Any waiver by any party of any condition, or of the breach of any provision, term, covenant, representation or warranty contained in this Agreement, in any one or more instances, will not be deemed to be or construed as a furthering or continuing waiver of any such condition, or of the breach of any other provision, term, covenant, representation or warranty of this Agreement.

**Section 9.10** **Public Announcements**.Promptly following the Execution Date, Sellers will make a press release in form and substance reasonably satisfactory to Sellers and Buyer regarding the transactions contemplated in this Agreement.  Promptly after the Closing, the parties will make a joint press release in form and substance reasonably satisfactory to both of them regarding the transactions contemplated in this Agreement.  Except as provided in the foregoing sentence, no party will make any press release or public announcement concerning the transactions contemplated by this Agreement without first coordinating their communications strategy with the other party, unless a press release or public announcement is required by law, the rules of any stock exchange, or is permitted by, or required by an order of, the Bankruptcy Court.  If any such announcement or other disclosure is required by law, the rules of any stock exchange or is permitted by, or required by an order of, the Bankruptcy Court, the disclosing party will use reasonable efforts to give the non-disclosing party or parties prior notice of, and an opportunity to comment on, the proposed disclosure; provided, there will be no liability to the disclosing party for failure to notify the other party.  The parties acknowledge that Sellers will file this Agreement with the Bankruptcy Court in connection with obtaining the Sale Order.

37

**Section 9.11    Entire Agreement**.  This Agreement and the Ancillary Agreements contain the entire understanding between the parties with respect to the transactions contemplated by this Agreement and supersede and replace all prior and contemporaneous agreements and understandings, oral or written, with regard to such transactions.  The Recitals and all Exhibits and Schedules to this Agreement and any documents and instruments delivered pursuant to any provision of this Agreement are expressly made a part of this Agreement as fully as though completely set forth in this Agreement.

**Section 9.12    No Third Party Beneficiaries**.  Nothing in this Agreement is intended to or will confer any rights or remedies under or by reason of this Agreement on any Persons other than Sellers and Buyer and their respective successors and permitted assigns.  Nothing in this Agreement is intended to or will relieve or discharge the obligator of liability of any third Persons to Sellers or to Buyer.  This Agreement is not intended to give and will not give any third Persons any right of subrogation or action over or against Sellers or Buyer.

**Section 9.13    Headings**.  The article and section headings in this Agreement are for reference purposes only and will not affect the meaning or interpretation of this Agreement.

**Section 9.14    Counterparts; Delivery**.    This Agreement may be executed in counterparts, each of which will be deemed an original, and all of which will constitute the same agreement.  The signature of any of the parties may be delivered and made by facsimile, portable document format ("pdf") or other electronic means capable of creating a printable copy, and each such signature will be treated as original signatures for all purposes.

**Section 9.15    Construction**.  Any reference to any law will be deemed also to refer to all rules and regulations promulgated thereunder, unless the context requires otherwise.  The word "including" means including without limitation.  Any reference to the singular in this Agreement will also include the plural and vice versa. The phrase "to which any Seller is a party," or similar construction, is intended to limit the applicable listing of any items, properties, assets, or Contracts to only those items that a Seller actually owns or to which any Seller is actually a party, as the case may be, and is meant to exclude any listed property or Contract otherwise.

**Section 9.16    Bulk Sales**.  Buyer waives compliance with any laws governing bulk sales, including any applicable provisions of the Uniform Commercial Code.

**ARTICLE X.        DEFINITIONS**

As used in this Agreement, the following terms have the following meanings:

**"Accounts Receivable"** has the meanings set forth in Section 1.2(b).

**"Acquired Assets"** has the meaning set forth in Section 1.1.

**"Acquired Contracts"** has the meaning set forth in Section 1.1(g).

**"Acquired Deposits"** has the meaning set forth in Section 1.1(f).

38

**"Affiliate"** means, with respect to any Person, any other Person directly or indirectly controlling, controlled by or under direct or indirect common control with such Person.

**"Agreement"** has the meaning set forth in the Preamble.

**"Allocation Adjustment Notice"** has the meaning set forth in Section 2.7.

**"Alternative Transaction"** means any transaction or series of transactions (regardless of the form thereof) involving a sale of all or any substantial portion of the Acquired Assets by Sellers, or any one or more of them, to a purchaser or purchasers other than Buyer; provided, that such transaction is undertaken pursuant to Section 363 of the Bankruptcy Code.

**"Ancillary Agreements"** means the Confidentiality Agreement, any bill of sale, assignment or assumption agreement, transition services agreement, management services agreement or other related agreements by and between Sellers and Buyer effecting or evidencing the transactions contemplated under this Agreement.

**"Approval Hearing"** has the meaning set forth in Section 5.4(b)(i)(A).

**"Assignment Order"** means an order of the Bankruptcy Court pursuant to Sections 105 and 365 of the Bankruptcy Code, which order will (i) authorize the assumption by Sellers and assignment to Buyer of the Acquired Contracts, (ii) establish the Cure Costs relating to the Acquired Contracts, and (iii) provide that Buyer has demonstrated adequate assurance of future performance under the Acquired Contracts.

**"Assumed Liabilities"** has the meaning set forth in Section 1.3.

**"Auction"** has the meaning set forth in Section 5.4(b).

**"Backup Bid"** has the meaning set forth in Section 5.4(b)(i)(C).

**"Backup Bidder"** has the meaning set forth in Section 5.4(b)(i)(C).

**"Balance Sheet"** has the meaning set forth in Section 4.1(r).

**"Bankruptcy Code"** has the meaning set forth in the Recitals.

**"Bankruptcy Court"** has the meaning set forth in the Recitals.

**"Bid Procedures"** means the Bid Procedures in substantially the form attached to this Agreement as Exhibit A.

**"Bidding Procedures"** has the meaning set forth in Section 5.4(b)(i).

**"Bidding Procedures Motion"** has the meaning set forth in Section 5.4(b)(i).

"**Bidding Procedures Order**" has the meaning set forth in <u>Section 5.4(b)(i)</u>.

"**Breakup Fee**" has the meaning set forth in <u>Section 5.4(b)(i)(B)</u>.

"**Business**" has the meaning set forth in the Recitals.

"**Business Day**" means any day other than Saturday, Sunday and any day that is a federal legal holiday.

"**Buyer**" has the meaning set forth in the Preamble.

"**Buyer's Notice**" has the meaning set forth in <u>Section 2.3(b)</u>.

"**Closing**" has the meaning set forth in <u>Section 3.1</u>.

"**Closing Date**" has the meaning set forth in <u>Section 3.1</u>.

"**COBRA**" means Part 6 of Subtitle B of Title I of ERISA.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Confidentiality Agreement**" means the confidentiality agreement Buyer executed in conjunction with its review of Sellers' records.

"**Contract**" means any contract, agreement, lease or sublease, license or sublicense, instrument, indenture, commitment or undertaking, whether in written form or otherwise.

"**Corporate Level**" means, as applicable, any assets, properties, expenses, costs, commitments, Contracts, obligations, liabilities or other operational activities or items conducted or owned by Sellers primarily for the collective benefit of all restaurant locations and their employees, including, but not limited to, all Sellers' Employee Benefit Plans, if any, and all liabilities and obligations of Sellers thereunder.

"**Cure Costs**" has the meaning set forth in <u>Section 1.3(a)</u>.

"**Current Employees**" means all employees of Sellers employed immediately prior to the discharge of employees required by the closing of the Transactions, whether active or not (including those on short-term disability, leave of absence, paid or unpaid, or long-term disability).

"**Deposit**" has the meaning set forth in <u>Section 2.2(a)</u>.

"**Designation Cost Overage**" has the meaning set forth in <u>Section 1.6(b)</u>.

"**Designation Notice**" has the meaning set forth in <u>Section 1.6(c)</u>.

40

**"Designation Rights Asset"** has the meaning set forth in <u>Section 1.6(b)</u>.

**"Designation Rights Period"** has the meaning set forth in <u>Section 1.1</u>.

**"Employee Benefit Plans"** means (i) all employee benefit plans as defined in section 3(3) of ERISA; (ii) all compensation, pay, severance pay, salary continuation, bonus, incentive, stock option, retirement, pension, profit sharing or deferred compensation plans, Contracts, programs, funds or arrangements of any kind; and (iii) all other employee benefit plans, programs, funds or arrangements (whether written or oral, qualified or nonqualified, funded or unfunded, foreign or domestic, currently effective or terminated, and whether or not subject to ERISA) and any trust, escrow or similar agreement related thereto, whether or not funded.

**"ERISA"** means the Employee Retirement Income Security Act of 1974, as amended.

"**Escrow Agent**" means Wilmington Trust, N.A.

**"Excluded Assets"** has the meaning set forth in <u>Section 1.2</u>.

**"Excluded Contracts"** means any Contract to which a Seller is a party that is not an Acquired Contract.

**"Excluded Liabilities"** has the meaning set forth in <u>Section 1.4</u>.

**"Execution Date"** has the meaning set forth in the Preamble.

**"Final Purchase Price"** has the meaning set forth in <u>Section 2.1</u>.

**"Financial Statements"** has the meaning set forth in <u>Section 4.1(r)</u>.

**"Government"** means any agency, division, subdivision or governmental or regulatory authority, or any adjudicatory body thereof, of the United States or any state or territory thereof.

**"Governmental Authority"** means any federal, state, local, municipal, foreign, supranational or other governmental or quasi-governmental authority of any nature (including any governmental agency, branch, bureau, commission, department, official or entity and any court or other tribunal), or any administrative, executive, judicial, legislative, police, regulatory or Taxing Authority, or arbitral body.

**"Improvements"** means all leasehold improvements located, placed, constructed or installed on or under any parcel of Leased Real Property, including all utilities, fire protection, security, surveillance, telecommunications, computer, wiring, cable, heat, exhaust, ventilation, air conditioning, electrical, mechanical, plumbing and refrigeration systems, facilities, lines, installations and conduits.

**"Incremental Bid Amount"** has the meaning set forth in <u>Section 5.4(b)(i)(A)</u>.

41

**"Intellectual Property Rights"** means all of Sellers' intellectual property, including: (i) patents, patent applications and patent rights; (ii) trademarks (registered and at common law), trademark registrations and applications, trade names, logos, trade dress, brand names, service marks (registered and at common law), service mark registrations and applications, websites, domain names and other indicia of source and all goodwill associated therewith (subject to those restrictions under the Franchise Agreements); (iii) works of authorship, copyrights, copyright registrations and applications for registration, and moral rights; (iv) know-how, trade secrets, customer lists, proprietary information, proprietary processes and formulae, databases and data collections; (v) all source and object code, software, algorithms, architecture, structure, display screens, layouts, inventions, development tools; (vi) all documentation and media constituting, describing or relating to the above, including manuals, memoranda and records; and (vii) all other intellectual property rights related to the Business.

**"Inventory"** means all supplies, goods, finished goods, materials, raw materials, work in process, perishable inventory and stock in trade owned by any Seller, whether or not prepaid, and wherever located, held or owned, including all fresh and frozen foodstuffs, alcoholic beverages, non-alcoholic beverages, disposable paper goods (such as napkins and paper towels), silverware, plates and dining ware, cups, glassware, mugs, cooking utensils, packaging materials, ingredients soaps and detergents, condiments, retail merchandise, replacement and spare parts and fuels and other similar items.

**"Law"** means any law, statute, regulation, rule, code, constitution, ordinance, treaty, rule of common law, or Order of, administered or enforced by or on behalf of, any Governmental Authority**.**

**"Leased Real Property"** has the meaning set forth in <u>Section 1.1(a)</u>.

**"Leasehold Improvements"** means those fixtures, structures and other improvements located on any Leased Real Property used in the operation of Sellers' business.

"**Lien**" means, with respect to any property or asset, any mortgage, deed of trust, lien (statutory or otherwise), hypothecation, pledge, security interest, claim, encumbrance, restriction, charge, instrument, preference, priority, option, or right of first refusal, of any kind or nature, whether secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, recorded or unrecorded, contingent or non-contingent, material or non-material, known or unknown (including real property, tangible property and intangible property and including any "Lien" as defined in the Bankruptcy Code).

**"Liquor Licenses"** has the meaning set forth in <u>Section 4.1(k)</u>.

**"Outside Date"** means the date that is one hundred twenty (120) days following the Execution Date.

**"Permits"** has the meaning set forth in <u>Section 1.1(h)</u>.

42

"**Permitted Liens**" means (i) Liens granted by Buyer at or after the Closing in connection with any financing of Buyer related to the purchase of the Acquired Assets pursuant to this Agreement; (ii) non-monetary Liens that do not materially interfere with the ability of Buyer to own and operate the Acquired Assets in substantially the manner as operated immediately prior to the execution of this Agreement; (iii) Liens that arise under zoning, building codes, land use and other similar laws, none of which would materially interfere with the ownership or operation by Buyer of any of the Acquired Assets following the Closing in substantially the manner as owned and operated immediately prior to the execution of this Agreement; (iv) Liens for Taxes not yet due and payable in respect of Acquired Assets; and (v) with respect to leased or licensed property, the terms and conditions of the lease or license applicable thereto.

"**Person**" means any individual, corporation, partnership, limited liability company, joint venture, association, joint-stock company, trust, unincorporated organization or Government.

"**Petition Date**" has the meaning set forth in the Recitals.

"**Prepaid Expenses**" has the meaning set forth in <u>Section 1.1(e)</u>.

"**Prevailing Bid**" has the meaning set forth in <u>Section 5.4(b)(i)(A)</u>.

"**Price Adjustment Costs**" has the meaning set forth in <u>Section 2.3(b)</u>.

"**Property Costs**" has the meaning set forth in <u>Section 2.3(a)(iii)</u>,

"**Property Tax Costs**" has the meaning set forth in <u>Section 2.3(a)(iii)</u>.

"**Property Taxes**" means all real estate and personal property Taxes, and other related assessments and fees, arising from the Acquired Assets.

"**Qualified Bidder**" has the meaning set forth in <u>Section 5.4(b)(i)(A)</u>.

"**Real Property Lease**" means any lease arrangement or agreement for the Leased Real Property identified and included in the Acquired Contracts.

"**Rebates**" has the meaning set forth in <u>Section 1.2(c)</u>.

"**Records**" means the books, records, information, ledgers, files, invoices, documents, work papers, correspondence, lists (including customer lists, supplier lists and mailing lists), plans (whether written, electronic or in any other medium), drawings, designs, specifications, creative materials, advertising and promotional materials, marketing plans, studies, reports, data and similar materials related to the Business.

"**Rejected Contracts**" has the meaning set forth in <u>Section 1.5(a)</u>.

**"Related Person"** means, with respect to any Person, all present directors, officers, members, managers, stockholders, employees, controlling persons, agents, professionals, attorneys, accountants, lenders, investment bankers or representatives of any such Person.

**"Rent Costs"** has the meaning set forth in <u>Section 2.3(a)(ii)</u>.

**"Sale Order"** means an order of the Bankruptcy Court approving the sale and transfer of the Acquired Assets and Assumed Liabilities to Buyer pursuant to Sections 105 and 363 of the Bankruptcy Code, which order will include: (i) authorization of the assumption by Sellers and assignment to Buyer of the Acquired Contracts; (ii) terms and conditions consistent with the terms and conditions of this Agreement; and (iii) such other terms and conditions acceptable to Sellers and Buyer.

**"Seller"** and "**Sellers**" have the meaning set forth in the Preamble.

**"Store Cash"** has the meaning set forth in <u>Section 2.3(a)(i)</u>.

**"Tax Return"** means any report, return, information return, filing or other information, including any schedules, exhibits or attachments thereto, and any amendments to any of the foregoing required to be filed or maintained in connection with the calculation, determination, assessment or collection of any Taxes (including estimated Taxes).

**"Taxes"** means all taxes, however denominated, including any interest, penalties or additions to tax that may become payable in respect thereof, imposed by any Government, whether payable by reason of contract, assumption, transferee liability, operation of law or Treasury Regulation Section 1.1502-6(a) (or any predecessor or successor thereof or any analogous or similar provision under state, local or foreign law), which taxes will include all income taxes, payroll and employee withholding, unemployment insurance, social security (or similar), sales and use, excise, franchise, gross receipts, occupation, real and personal property, stamp, transfer, workmen's compensation, customs duties, registration, documentary, value added, alternative or add-on minimum, estimated, environmental (including taxes under Section 59A of the Code) and other assessments or obligations of the same or a similar nature, whether arising before, on or after the Closing Date.

**"Total Consideration"** has the meaning set forth in <u>Section 2.1</u>.

**"Transaction Taxes"** has the meaning set forth in <u>Section 2.6</u>.

**"Transactions"** has the meaning set forth in the Recitals.

**"Transition Services Agreement"** means a transition services agreement in a form acceptable to Buyer and Sellers, which requires Sellers to provide certain services requested by Buyer during a transition period in exchange for Buyer's direct payment of costs associated therewith (or the reimbursement by Buyer of Seller's direct costs associated therewith) and ensuring that all administrative expenses of Sellers created by virtue of providing such transition services are paid.

**"Unadjusted Purchase Price"** has the meaning set forth in <u>Section 2.1</u>.

"**Utility Deposits**" means all utility deposits paid by Sellers prior to the Closing Date and all rights to the refund of all or any portion thereof.

[Signature Pages Follow]

45

**IN WITNESS WHEREOF**, the parties have caused this Asset Purchase Agreement to be executed as of the Execution Date.

**BUYER:**

**KRG Granite Acquisition, LLC**

By:_____
Name:_____
Title:_____


**SELLERS:**

**Granite City Food & Brewery Ltd.**


By:_____
　　Richard H. Lynch, President


**Granite City – Arkansas, Inc.**


By:_____
　　Richard H. Lynch, President

**Granite City – Orland Park, Inc.**


By:_____
　　Richard H. Lynch, President

**Granite City – Creve Coeur, Inc.**


By:_____
　　Richard H. Lynch, President

*[Signature Page - Asset Purchase Agreement]*

**IN WITNESS WHEREOF**, the parties have caused this Asset Purchase Agreement to be executed as of the Execution Date.

**BUYER:**

**KRG Granite Acquisition, LLC**

By:_____
Name:_____
Title:_____


**SELLERS:**

**Granite City Food & Brewery Ltd.**

By: _____
     Richard H. Lynch, President

**Granite City – Arkansas, Inc.**

By: _____
     Richard H. Lynch, President

**Granite City – Orland Park, Inc.**

By: _____
     Richard H. Lynch, President

**Granite City – Creve Coeur, Inc.**

By: _____
     Richard H. Lynch, President

*[Signature Page - Asset Purchase Agreement]*

**Granite City – Rockford, Inc.**

By: _____
      Richard H. Lynch, President

**Granite City – Peoria, Inc.**

By: _____
      Richard H. Lynch, President

**Granite City of Indiana, Inc.**

By: _____
      Richard H. Lynch, President

**Granite City of Ohio, Inc.**

By: _____
      Richard H. Lynch, President

**Granite City Restaurant Operations, Inc.**

By: _____
      Richard H. Lynch, President

**Granite City of Kansas, Ltd.**

By: _____
      Richard H. Lynch, President

**Granite City of Maryland, Inc.**

By: _____
      Richard H. Lynch, President

*[Signature Page - Asset Purchase Agreement]*

## Exhibit A

**Bid Procedures**

Please see attached.

# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| In re: | Joint Administration Pending |
| Granite City Food & Brewery Ltd., et al.[1] | Case No. _____ |
| Debtors. | Chapter 11 Cases |

## BID PROCEDURES

## <u>BACKGROUND</u>

Granite City Food & Brewery Ltd. ("<u>Granite City</u>") and certain of its subsidiaries ("<u>Debtors</u>" or together "<u>Granite City</u>") are debtors-in possession in Chapter 11 cases presently pending in the United States District Court for the District of Minnesota (the "<u>Bankruptcy Court</u>"). Prior to filing their petitions for relief, Granite City and the Debtors entered into the following stalking horse asset purchase agreement to sell substantially all of the Debtors' operating assets:

- An Asset Purchase Agreement (the "<u>APA</u>") with [_____] or an affiliated purchaser to be named (the "<u>Proposed Purchaser</u>") for the purchase and sale of:
    - The Debtors' Cadillac Ranch restaurant properties, consisting of four Cadillac Ranch restaurants and all real and personal property of the Debtors exclusively attributable to operating such restaurants (the "<u>Cadillac Ranch Assets</u>"); and
    - The Debtors' Granite City restaurant properties, consisting of _____ Granite City restaurants and all real and personal property of the Debtors exclusively attributable to operating such restaurants and a brewery in Ellsworth, Iowa (together the "<u>Granite City Assets</u>").

The Cadillac Ranch Assets and Granite City Assets are together referred to as the "<u>Assets</u>".

The purchase and sale transactions contemplated under the APA are conditioned upon the Debtors' ability to sell the Assets free and clear of all liens, claims, interests and encumbrances, except for liabilities expressly assumed, as contemplated under Section 363 of the United States Bankruptcy Code (the "<u>Bankruptcy Code</u>"). The purchase and sale transactions contemplated under the APA are subject to any higher and better offers that may be submitted in accordance with these Bid Procedures.

---

[1] The Debtors in these Chapter 11 cases are the following: Granite City Food & Brewery Ltd. (Case No. _____), Granite City Restaurant Operations, Inc. (Case No. _____), Granite City of Indiana, Inc. (Case No. _____), Granite City of Kansas Ltd. (Case No. _____), Granite City of Maryland, Inc. (Case No. _____).

## KEY DATES

The key dates for the sale process are as follows:

| Date and Time | Event |
|---|---|
| _____, 20__ at _____ _.m. CDT | Bid Procedures Hearing |
| ___, 2020 at 5:00 p.m. CDT | Due Date for Bids and Deposits |
| ____, 2020 at 9:00 a.m. CDT | Auction |
| __, 2020 at _____ _.m. CDT | Sale Hearing |

## BID AND SALE PROCEDURES

Set forth below are the bidding and sale procedures (the "Bid Procedures") to be employed with respect to any proposed sales of the Cadillac Ranch Assets and/or the Granite City Assets (each a "Proposed Sale" and together the "Proposed Sales"). The Debtors will seek entry of an Order from the Bankruptcy Court (the "Bid Procedures Order") as follows:

(i) authorizing and approving the Debtors' sale of the Assets to the Proposed Purchaser upon the terms and conditions set forth in the APA, but subject to any higher or better offers submitted in accordance with these Bid Procedures;

(ii) approving stalking horse bid protections for the Proposed Purchaser; and

(iii) approving the Proposed Sale of the Assets to the Proposed Purchaser or to one or more Qualified Bidders (as defined below) that are determined to have made the highest or best offer for the Assets, as a whole or in parts (the "Sale Transaction").

Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the APA.

## THE ASSET PURCHASE AGREEMENTS

### The Stalking Horse APA

On December ___, 2019, the Debtors entered into the APA with the Proposed Purchaser. Pursuant to the APA, the Proposed Purchaser, to the maximum extent permitted under Section 363 of the Bankruptcy Code, proposes to acquire free and clear of all liens, claims and encumbrances the Assets, including, but not limited to, the Debtors accounts receivable, inventory, leases, trade names, trademarks, copyrights, and other intellectual property and license rights owned by the Debtors, as more fully set forth in Section 1.1 of the APA (the "Acquired Assets"), but excluding those assets expressly identified as Excluded Assets under the terms of the APA.

## THE BIDDING PROCESS

     *1.*    **The Consultation Committee.** The receipt, evaluation and approval of bids shall be conducted under the supervision of a committee consisting of one representative from each of the following interested parties: (a) the Debtors; (b) the Debtors' investment bankers Duff & Phelps Securities, LLC; (c) Citizens Bank, N.A. ("Citizens"); (d) JMB Capital Partners Lending, LLC ("JMB"); and (e) the Official Committee of Unsecured Creditors ("UCC"), assuming one shall have been appointed (together the "<u>Consultation Committee</u>").

     *2.*    **The Bidding Process.** The Consultation Committee is charged with overseeing the bidding process in connection with the sale of the Debtors' assets and shall do all of the following:

     a.    Determine, in its sole discretion, whether any bid for the Assets is a Qualified Bid (as defined below);

     b.    Coordinate the efforts of the Potential Bidders (as defined below) in conducting their due diligence investigations;

     c.    Receive and evaluate offers from Potential Bidders (as defined below); and

     d.    Negotiate in good faith any offers to purchase the Assets

(together the "<u>Bidding Process</u>").

     *3.*    **Participation Requirements**. Any person that wishes to participate in the Bidding Process must be a Potential Bidder (as defined in Paragraph 4 below). Neither the Consultation Committee members nor their representatives shall be obligated to furnish information of any kind whatsoever to any person that is not a Potential Bidder. The Consultation Committee and their professionals shall use commercially reasonable efforts to provide all Potential Bidders with substantially similar access and information. Any person that wishes to conduct due diligence and participate in the Bidding Process must first deliver to the Debtors (with copies to other members of the Consultation Committee) all of the following:

     a.    An executed confidentiality agreement in form and substance to be provided by the Debtors on behalf of the Consultation Committee, and which confidentiality agreement is at least as restrictive in all material respects as the confidentiality agreement entered into between the Debtors and the Proposed Purchaser.

     b.    The most current audited (if in existence) and latest unaudited financial statements, and/or such other form of financial disclosure or evidence of the ability to consummate the Sale Transaction (the "<u>Financials</u>") of the Potential Bidder or, if the Potential Bidder has been formed specifically to enter into a sale transaction, the same information from the Potential Bidder's equity holder(s).

     c.    Such other and/or additional information as the Debtors, in their discretion, deem necessary or desirable to assist in determining whether the Potential Bidder has the financial wherewithal to perform a contemplated sale transaction.

*4.* ***Definition of Potential Bidder.*** A "Potential Bidder" is a person that delivers the documents described in Paragraphs 3a through 3c above and that the Consultation Committee determines is reasonably likely (based on the information set forth in the Financials, experience, and other information the Consultation Committee deems relevant) to submit a *bona fide* offer and to be able to consummate the Sale Transaction, if selected as a Successful Bidder or Back-Up Bidder (as such terms are defined below).

*5.* ***Due Diligence.*** The Debtors may afford any Potential Bidder the opportunity to conduct reasonable due diligence, including by gaining access to the due diligence data room created by the Debtors and their advisors to facilitate the evaluation of current and historical information concerning the Debtors and their business operations. Neither the Debtors nor their advisors shall be obligated to furnish any due diligence information (i) at any time to any person other than a Potential Bidder; or (ii) after the Bid Deadline (as hereafter defined) to any Potential Bidder.

*6.* ***Deadline for Submission of Bids***. The deadline for a Potential Bidder to submit one or more bids for the Assets, in whole or in part, shall be **January 8, 2020 at 5:00 p.m. (prevailing Central Time)** (the "Bid Deadline"). Any Potential Bidder who fails to submit a bid so as to be received by the parties listed below in advance of the Bid Deadline shall not be deemed a Qualified Bidder.

*7.* ***Manner of Submission of Bids.*** Prior to the Bid Deadline, a Potential Bidder that desires to make a bid shall deliver written copies of its bid in writing and executed by an individual authorized to bind the Potential Bidder. Each bid shall be served by courier, facsimile, email, or as otherwise specified by the Debtors (as representative for the Consultation Parties) to the following: (i) Duff & Phelps, LLC, 10100 Santa Monica Blvd., Suite 1100, Los Angeles, California  90067 (Attn: Brian J. Cullen; Brian.Cullen@duffandphelps.com; Darren Gange, Darren.Gange@duffandphelps.com; Matthew Gates; Matthew.Gates@duffandphelps.com, financial advisors to the Debtors); (ii) Briggs & Morgan P.A., 2200 IDS Center, 80 South Eighth Street, Minneapolis, Minnesota  55402 (Attn: James M. Jorissen, Esq.; jjorissen@briggs.com; Brett D. Anderson, Esq. banderson@briggs.com; and Karl Johnson, Esq.; kjohnson@briggs.com, counsel to Debtors); (iii) Blank Rome LLP, 444 West Lake Street, Suite 1650, Chicago, Illinois 606056 (Attn: Kenneth Ottaviano, Esq.; kottaviano@BlankRome.com; Paige Barr Tinkham, Esq., ptinkham@BlankRome.com, counsel to Citizens Bank, N.A.); (iv) Arent Fox LLP, 1301 Avenue of the Americas, Floor 42, New York, New Nork  10019 (Attn: Robert M. Hirsh, Esq., robert.hirsh@arentfox.com; Jordana Renert, Esq., jordana.renert@arentfox.com; Dennis Henderson, Esq., dennis.henderson@arentfox.com, counsel to JMB Capital Partners Lending, LLC; and (v) one or more representatives of the UCC should one be constituted.

*8.* ***Bid Requirements***. All bids must include the following items (the "Required Bid Materials"):

- An executed copy of a purchase agreement and any ancillary agreements pursuant to which the Potential Bidder proposes to acquire the Assets or, alternatively, a subset of the Assets consisting of either the Cadillac Ranch Assets or the Granite City Assets.

- The purchase agreement shall be derived from the form approved by the Consultation Committee that formed the baseline for the stalking horse bid, modified to incorporate the Potential Bidder's offer, and shall include a commitment to close by a date no later than thirty (30) days following the approval of the sale by the Bankruptcy Court.

- A written acknowledgement by the Potential Bidder that it agrees to all of the terms for sale set forth in these Bid Procedures.

- A Potential Bidder may bid on all of the Assets, or may submit a bid for the Cadillac Ranch Assets alone or the Granite City Assets alone, as follows.

  - All Asset Bids. With respect to a bid to acquire all of the Assets, a proposed purchase price, in cash, which is determined by the Consultation Committee (after consultation with their professionals and advisors) to be equal to or greater than the sum of (i) the purchase price set forth in the Stalking Horse APA, (ii) the Expense Reimbursement, (iii) the Break-Up Fee; and (iv) $100,000 (the sum of (i) through (iv) the "Initial Increment Amount").

  - Cadillac Ranch Bids. With respect to a bid to acquire only the Cadillac Ranch Assets, a proposed purchase price, in cash.

  - Granite City Bids. With respect to a bid to acquire only the Granite City Assets, a proposed purchase price, in cash.

  - In the event the Consultation Committee determines that separate bids for the Cadillac Ranch Assets and Granite City Assets together represent the highest and best value, the Consultation Committee may select such bids over a competing all-Assets bid, in which event the Expense Reimbursement and Break-Up Fee are to be ratably assessed based on the purchase prices associated with the bids.

- A good faith deposit (the "Deposit") equal to: (a)10% of the Initial Bid Increment Amount with respect to bids for all of the Assets; and (b) 10% of the proposed cash purchase price plus 50% of the Break-Up Fee and the Expense Reimbursement with respect to bids for only part of the Assets.

- Evidence or a statement indicating that the bidder has obtained due and appropriate authorization and approval from its Board of Directors (or comparable governing body) with respect to the submission and consummation of its bid and acceptance of the terms of sale in these Bid Procedures, or a representation that no such authorization or approval is required and that any and all consents required in connection with the submission and consummation of the bid have been obtained and that no other consents are required.

- Evidence of sufficient cash on hand or written evidence of a commitment for financing or other evidence of financial wherewithal and the ability to consummate a sale transaction satisfactory to the Consultation Committee, together with contact information for any financing sources.

- A redline comparison of the bidder's proposed purchase agreement against the Stalking Horse Purchase Agreement.

- A preliminary list of the Debtors' executory contracts and unexpired leases with respect to which the bidder seeks assignment from the Debtors.

- A written disclosure of the identity of each entity that will be bidding or otherwise participating in connection with such bid, and the complete terms of any such participation (including copies of any co-investor agreements, side letters and other similar documents).

- Such other information as may be reasonably requested by the Consultation Committee or the Debtors.

In addition to the foregoing, all bids must

- be on terms that are not materially more burdensome or conditional than the terms of the Stalking Horse APA;

- not be conditioned on obtaining financing or the outcome of any due diligence by the bidder; and

- not call for payment to the bidder of a break-up fee, expense reimbursement or any other similar type of payment.

**9.** **_Qualified Bids_**.  A bid received from a Potential Bidder that includes all of the Required Bid Materials and satisfies all of the other criteria outlined in Section 8 above constitutes a "Qualified Bid."  A Potential Bidder that submits a Qualified Bid (a "Qualified Bidder") shall be entitled to participate in the Auction.  The Consultation Committee shall have the right but not the obligation to contact bidders to discuss or clarify the terms and to indicate any terms which may need to be modified in order to conform the bid to a Qualified Bid or to evaluate the bid.

**10.** **_The Proposed Purchaser and Credit Bids._**  For purposes of the Auction, should one occur, the Proposed Purchaser is a Qualified Bidder, and the Proposed APA is a Qualified Bid. Citizens and JMB shall also be permitted to submit credit bids for the Assets and, if any such credit bid is submitted, the submitting party shall be deemed a Qualified Bidder and its bid shall be a Qualified Bid, provided that with respect to any credit bid submitted by Citizens, Citizens must include in its bid either (i) provisions for the satisfaction of any secured claims of JMB that are senior to the secured claim that forms the basis of the credit bid (a "Senior Secured Claim") or (ii) evidence that JMB has affirmatively consented to any other treatment of its Senior Secured Claim. None of the Proposed Purchaser, JMB or Citizens shall be required to take any further action in order to participate in the Auction, and if any of them submits what turns out to be a Successful Bid (as defined below) or a "Back-Up Bid", no further action will be required on their part in order to be named a Successful Bidder (as defined below) or Back-Up Bidder at the Sale Hearing (as defined below).

## THE AUCTION

If a Qualified Bid for the Assets other than that submitted by the Proposed Purchaser has been received by the Consultation Committee and/or that Qualified Bids for only the Cadillac Ranch Assets and only the Granite City Assets considered together have a value equal to or greater than the Initial Increment Amount, then the Consultation Committee will conduct an auction (the "Auction") commencing on January __, 2020 at 9:00 a.m. (prevailing Central Time). The Consultation Committee shall notify all Qualified Bidders of the time and place of the Auction. Only a Qualified Bidder who is designated as such by the Consultation Committee is eligible to participate at the Auction.

If no Qualified Bids as required in the foregoing paragraph are received, no Auction will take place and the Debtors will request that the Bankruptcy Court approve the sale to the Proposed Purchaser at the Sale Hearing.

***Sequence of the Auction.*** Bidding at the auction will proceed as follows:

If the Consultation Committee receives one or more Qualified Bids (as determined by the Consultation Committee and its professionals) to purchase the Assets, which Qualified Bid includes the Initial Increment Amount, the Assets shall be offered at the Auction, in the following sequence:

1.  Provided that the Consultation Committee shall have received separate, Qualified Bids (as determined by the Consultation Committee and its professionals) to purchase (i) only the Cadillac Ranch Assets, and (ii) only the Granite City Assets, then (iii) the Cadillac City Assets shall be separately offered for sale first, with bidding to begin with the highest Qualified Bidder and to continue thereafter with minimum bid increments of not less than $50,000, and then (iv) the Granite City Assets shall be separately offered for sale, with bidding to begin with the highest Qualified Bidder and to continue thereafter with minimum bid increments of not less than $50,000.

2.  After completion of the Granite City Assets portion of the Auction, or in the event that the Consultation Committee shall not have received separate, Qualified Bids (as determined by the Consultation Committee and its professionals) to purchase (i) only the Cadillac Ranch Assets, and (ii) only the Granite City Assets, the Assets shall be offered for sale as a package with bidding to begin with the highest Qualified Bidder and continue thereafter with minimum combined bid increments of not less than $50,000.

***Rules Applicable to the Auction.*** The Consultation Committee may adopt rules for the conduct of the Auction consistent with any applicable order of the Bankruptcy Court. Such rules shall minimally specify as follows:

1.  All bids shall be made and received in one room on an open basis, with all other bidders entitled to be present for the presentation of all bids.

2. The identity of each bidder (including its principals) shall be fully disclosed to all other bidders.

3. All material terms of each Qualified Bid shall be disclosed to all other bidders for the same assets throughout the Auction.

4. The Debtors shall arrange for a Court reporter to be present at and to prepare a transcript of the Auction.

5. Unless otherwise agreed to by the Consultation Committee, bidders shall be limited to a one-hour period in which to respond to the previous bid submitted at the Auction, and if no responsive bid is presented during such one-hour period, the bidder who shall have failed to respond shall be precluded from further participation in the Auction.

6. In the event no responsive bids are received in response to a bid, the Auction as it relates to the assets being sold, shall conclude.

7. Upon conclusion of the bidding, the Auction shall be closed, and the Consultation Committee, after consultation with professionals, shall immediately:

   a. Review each Qualified Bid on the basis of financial and contractual terms and other factors relevant to the sales process, including factors affecting the speed and certainty of consummating a Proposed Sale.

   b. Identify the highest and best offer(s) for all-Assets, the Cadillac Ranch Assets and the Granite City Assets and make a determination regarding which offer or combination of offers will provide the greatest amount of net value to the Debtors and the bankruptcy estates, and

   c. Advise the Qualified Bidders of such determinations.

8. A Qualified Bidder or Bidders whose bid or bids are determined by the Consultation Committee to be highest or best for the Assets or, alternatively, for the Cadillac Ranch Assets only or the Granite City Assets only, shall, with respect to such assets, be deemed to be a "Successful Bidder."

9. The bidder or bidders whose bid or bids are determined by the Consultation Committee to be the next highest or best with respect to any of the foregoing asset classifications shall be designated "Back-Up Bidder(s)" and their bid or bids as "Back-Up Bid(s)."

10. Final Documents between the Debtors and any Successful Bidder(s) or Back-Up Bidder(s) will be executed on the same day as the Auction.

11. In the event the Consultation Committee determines that separate bids for the Cadillac Ranch Assets and Granite City Assets together represent the highest and best value, the Consultation Committee may select such bids over a competing all-Assets bid, in which

event the Expense Reimbursement and Break-Up Fee shall be ratably assessed against the purchase prices associated with the bids.

12. If the final bid of the Proposed Purchaser does not succeed for the purchase of the Assets as a whole or for the purchase individually of the Cadillac Ranch Assets and/or the Granite City Assets, then the Break-Up Fee and the Expense Reimbursement shall be paid in accordance with the Stalking Horse APA and the Bid Procedures Order.

EACH BID SUBMITTED SHALL CONSTITUTE AN IRREVOCABLE OFFER AND BE BINDING ON THE PREVAILING BIDDER AND THE BACK-UP BIDDER FROM THE TIME THE BID IS SUBMITTED UNTIL THE ENTRY OF THE SALE APPROVAL ORDER AND IF THE PREVAILING BID AND BACK-UP BID ARE APPROVED, AS THE CASE MAY BE, AS TO THEM UNTIL THE EARLIER OF TWO (2) BUSINESS DAYS AFTER THE SALE OF THE ASSETS HAS CLOSED OR, WITH RESPECT TO THE BACK-UP BIDDER, THIRTY (30) DAYS AFTER THE SALE APPROVAL ORDER IS ENTERED.

## ACCEPTANCE OF QUALIFIED OFFERS

The Debtors may sell the Assets (or any applicable subset of the Assets) only if the Bankruptcy Court authorizes the transaction by approving any Successful Bid(s) and Back-Up Bid(s) after a hearing (the "Sale Hearing"). The Debtors' presentation of a particular Successful Bid(s) and Back-Up Bid(s) to the Bankruptcy Court for approval does not constitute acceptance of the bid; the Debtors will be deemed to have accepted a bid only once it has been approved by the Bankruptcy Court at or after the Sale Hearing.

## SALE HEARING

The Sale Hearing shall be conducted by the Bankruptcy Court on _____ __, 2020 at _____ _.m. (prevailing Central Time). During the Sale Hearing, the Debtors will seek Bankruptcy Court approval of the Prevailing Bid(s) and Back-Up Bid(s). There will be no further bidding at the hearing. In the event that a Successful Bidder(s) cannot consummate, or refuses to consummate the sale because of such bidder or bidders' breach or failure, the Debtors will seek authorization to close with the Back-Up Bidder(s) based on the Back-Up Bid(s) without further order of the Court.

## TERMS OF SALE

Except to the extent provided in any executed purchase agreement related to the sale of the Assets (or subset thereof), the sale of assets shall be on an "AS IS, WHERE IS, WITH ALL FAULTS" basis and without representations or warranties of any kind, nature or description by the Debtors, the Consultation Committee, or their agents. By submitting a bid, each bidder is deemed to acknowledge and agree to the foregoing.

All of the Debtors right, title and interest in and to any of the acquired assets shall be sold free and clear of all liens, claims, encumbrances and interests to the fullest extent permissible under Section 363 of the Bankruptcy Code, provided, however, that all such liens, claims, encumbrances

and interests, if any, shall attach to the net proceeds (e.g., the gross proceeds received from the sale(s) less any Break-Up Fee, Expense Reimbursement, payment of a Transaction Fee to Duff & Phelps, and payment to JMB on account of its senior, secured post-petition liens) in the same order, and having the same dignity and priority as existed immediately prior to the commencement of the Debtors' Chapter 11 cases.

## RETURN OF DEPOSITS

Each Deposit submitted pursuant to the Bid Procedures will be held in escrow until the selection of the Successful Bidder(s) and the Back-Up Bidder(s), at which time all other bidders shall be entitled to the return of any Deposit(s).  The Back-Up Bidder(s) shall be entitled to return of any Deposit forty-eight (48) hours after the Back-Up Bidder is relieved of its obligations as contemplated above.

If the Successful Bidder(s) or Back-Up Bidder(s) fail to consummate an approved sale due to their own breach or failure to perform, then the Debtors shall be entitled to retain the Deposit as damages for the breach.  The Debtors may credit the amount of any Deposit toward payment of the purchase price upon the closing of the sale of assets.

## Schedule A

**Sellers**

1. Granite City Food & Brewery Ltd., a Minnesota corporation.

2. Granite City – Arkansas, Inc., an Arkansas corporation.

3. Granite City – Orland Park, Inc., an Illinois corporation.

4. Granite City – Creve Coeur, Inc., a Missouri corporation.

5. Granite City – Rockford, Inc., an Illinois corporation.

6. Granite City – Peoria, Inc., an Illinois corporation.

7. Granite City of Indiana, Inc., an Indiana corporation.

8. Granite City of Ohio, Inc., a Ohio corporation.

9. Granite City Restaurant Operations, Inc., a Minnesota corporation.

10. Granite City of Kansas, Ltd., a Kansas corporation.

11. Granite City of Maryland, Inc., a Minnesota corporation.

## Schedule 1.1(a)

**Acquired Leased Real Property**

| Location | State | Landlord |
|---|---|---|
| St. Cloud | MN | Store Master Funding I, LLC |
| Sioux Falls | SD | Doug Johnson |
| Fargo | ND | WEST ACRES DEVELOPMENT LLP |
| Des Moines | IA | Francis Properties LLC |
| Cedar Rapids | IA | Rainmaker Management Inc. |
| Davenport | IA | Store Master Funding I, LLC |
| Lincoln | NE | Star-West Gateway LLC c/o Starwood Retail Partners, LLC |
| Maple Grove | MN | Todd and Lori Hanson |
| Eagan | MN | Store Master Funding I, LLC |
| Zona Rosa | MO | Doug Johnson |
| Legends | KS | Westrim Properties LLC |
| Olathe | KS | Store Master Funding I, LLC |
| Roseville | MN | PPF RTL ROSEDALE SHOPPING CENTER LLC |
| Rockford | IL | Cherryvale Mall LLC CBL Center #500 |
| Creve Coeur | MO | CAPLACO NINE INC. |
| Ft. Wayne | IN | Brookfield Property REIT Inc. |
| Troy | MI | Store Master Funding I, LLC |
| Toledo | OH | Fallen Timbers Ohio LLC c/o NAMCO Realty LLC |
| Franklin | TN | DRURY DEVELOPMENT CORP |
| Naperville | IL | Store Master Funding I, LLC |
| Northville | MI | The Indland Real Estate Groupo, Inc. |

| Schaumburg | IL | Store Master Funding I, LLC |
|---|---|---|
| National Harbor - GC | MD | Peterson Companies |
| Detroit - Ren Center | MI | Riverfront Holdings, Inc. c/o CBRE, Inc. Lease Administration |
| Mall of America | MN | MOAC Mall Holdings LLC |
| Kendall | FL | Weingarten Realty |
| National Harbor | MD | Peterson Companies |
| Pittsburgh | PA | Indland Commercial Real Estate |
| Bloomington | MN | KBS/GK Fund II LP |

## Schedule 1.1(g)

### Acquired Contracts

1. Advertiser Agreement, dated as of November 7, 2019, by and between Cadillac Ranch @MOA and OUTFRONT Media.

2. Service Agreements between Granite City Restaurant Operations, Inc. and the following suppliers:

   a. Interstate Cleaning Management, Inc.

   b. Brinks Incorporated

   c. D & M Enterprises LLP

   d. Ruth Elizabeth Moreno de Ochoa

   e. Blueline Security Services LLC

   f. Paid Ins/Outs Security Service

   g. National Cinemedia LLC

   h. LCD Builders LLC

   i. Lodovico Window Cleaning Inc.

   j. Ecoroq USA, Inc.

3. Agreement, dated as of November 5, 2008, by and between Bix Produce Company and Granite City Food & Brewery Ltd.

4. Supply Agreement, dated as of April 22, 2013, by and between Restaurant Technologies, Inc. and Granite City Food & Brewery Ltd., together with the Addendum, dated as of April 22, 2013.

5. Product and Services Supply Agreement, dated as of May 1, 2018, by and between Ecolab, Inc. and Granite City Food & Brewery Ltd.

6. Service Agreement, dated as of October 25, 2011, by and between Aramark Uniform Services and Granite City Food & Brewery Ltd., as amended by the Amendment, dated as of July 16, 2018.

7. Amended and Restated Master Distribution Agreement, dated as of May 1, 2018, by and between Sysco Corporation and Granite City Food & Brewery Ltd.

8. Distribution Agreement, dated as of July 13, 2009, by and between Edward Don & Company and Granite City Food & Brewery Ltd.

9.  New Product/Special Order Notification and Agreement, dated as of February 5, 2015, by and between U.S. Foodservice, Inc., d/b/a/ U.S. Foodservice Culinary Equipment & Supplies and Granite City Food & Brewery Ltd.

10. Fifth Third Processing Solutions Bank Card Merchant Agreement, dated as of May 10, 201l, by and among Fifth Third Processing Solutions, LLC, Fifth Third Bank and Granite City Food & Brewery Ltd., as amended by Amendment No. 1, dated as of May 10, 2011, as further amended by Amendment No. 2, dated as of December 27, 2011.

11. Beverage Marketing Agreement, dated as of November 19, 2012, by and between The Coca-Cola Company and Granite City Food & Brewery Ltd.

12. Fountain Support Agreement, dated as of July 22, 2015, by and between Dr. Pepper/Seven Up, Inc. and Granite City Food & Brewery Ltd.

13. Pricing Agreement, dated as of May 31, 2019, by and between Mazzetta Company, LLC and Granite City Food & Brewery Ltd.

14. Operator Agreement, dated as of September 20, 2019, by and between Ventura Foods, LLC and Granite City Food & Brewery Ltd.

15. Agreement, dated as of August 19, 2019, by and between Kidzsmart and Granite City Food & Brewery Ltd.

## **Schedule 1.5(a)**

### **Acquired Contracts List**

1.   The items listed on Schedule 1.1(g) are incorporated by reference herein.

**Schedule 1.2**
**Excluded Assets**

1.  The lease and all assets of Sellers to the extent related to the restaurant located at 1001 N. 102nd St., Omaha, NE 68114.

2.  The leases and all assets of Sellers to the extent related to the following closed restaurant locations of Sellers:

    a.  14035 South La Grange Rd, Orland Park, IL 60462

    b.  992 Willow Road, Suite 20, Northbrook, IL 60062

    c.  230 Conference Center Dr., East Peoria, IL 61611

    d.  25001 Cedar Road, Suite #E-34, Lyndhurst, OH 44124

    e.  University Park Shopping Center, 6501 Grape Road, Mishawaka, IN 46545

    f.  150 W. 96th Street, Indianapolis, IN 46290

    g.  49 West Maryland Street, Room B03A, Indianapolis, IN 46240

3.  The following liquor licenses:

| Location | Nameholder(s) | Issuing Agency |
|---|---|---|
| Carmel | Granite City Restaurant Operations, Inc., d/b/a Granite City Food & Brewery | Alcohol and Tobacco Commission – Indianapolis, IN |
| Carmel Small Brewer | Granite City Restaurant Operations, Inc., d/b/a Granite City Food & Brewery | Alcohol and Tobacco Commission – Indianapolis, IN |
| Downtown Indy | Granite City Restaurant Operations, Inc., d/b/a Granite City Food & Brewery | Alcohol and Tobacco Commission |
| East Peoria | Granite City Restaurant Operations, Inc., d/b/a Granite City Food & Brewery | City of East Peoria |
| East Peoria | Granite City Restaurant Operations, Inc.<br><br>Granite City Food & Brewery | State of Illinois Liquor Control Commission |
| Lyndhurst | Granite City Restaurant Operations, d/b/a<br><br>Granite City Food & Brewery | State of Ohio Department of Commerce Division of Liquor Control |

| Mishawaka | Granite City Restaurant Operations, d/b/a Granite City Food & Brewery | Alcohol and Tobacco Commission, Indianapolis |
|---|---|---|
| Mishawaka (small brewer) | Granite City Restaurant Operations, d/b/a Granite City Food & Brewery | Alcohol and Tobacco Commission, Indianapolis |
| Northbrook | Granite City Restaurant Operations, Inc. Granite City Food & Brewery | State of Illinois |
| Northbrook | Granite City Restaurant Operations, Inc., d/b/a Granite City Food & Brewery | Village of Northbrook |
| Omaha | Granite City Restaurant Operations, Inc. Granite City Food & Brewery | State of Nebraska |
| Omaha (brew pub) | Granite City Restaurant Operations, Inc. Granite City Food & Brewery | State of Nebraska |
| Orland Park | Granite City Food & Brewery | Orland Park |
| Orland Park | Granite City Restaurant Operations, Inc., d/b/a Granite City Food & Brewery | Village of Orland Park |

### Schedule 4.1(j)

**Employee Benefit Plans**

1. Medical Insurance, group number 10261239, provided by BlueCross BlueShield Minnesota

2. Medical Insurance, group number A15112, provided by Allied.

3. Dental and Vision Insurance, group number 0158702, provided by MetLife.

4. Life, AD&D and Disability Insurance, group number 470602, provided by Unum.

5. Health Savings Account.

6. Flexible Spending Accounts.

7. 401(k) Retirement Plan, group number 100700, provided by John Hancock.

8. Employee Assistance Program, provided by Ceridian.

**Schedule 4.1(k)**

**Liquor Licenses**

| Location | Nameholder(s) | Issuing Agency | License Number |
|---|---|---|---|
| Creve Coeur | Granite City Restaurant Operations, Inc., d/b/a Granite City Food & Brewery | City of Creve Coeur | 000290 |
| Creve Coeur | Granite City Restaurant Operations, Inc., d/b/a Granite City Food & Brewery | St. Louis County | 97400 |
| Creve Coeur | Granite City Restaurant Operations, Inc., d/b/a Granite City Food & Brewery | Missouri Division of Alcohol and Tobacco Control | 182679<br><br>182680 |
| Creve Coeur (Microbrewery) | Granite City Restaurant Operations, Inc., d/b/a Granite City Food & Brewery | Missouri Division of Alcohol and Tobacco Control | 182688 |
| Cherry Valley | Granite City Restaurant Operations, Inc. | Village of Cherry Valley | 2019-11 |
| Cherry Valley | Granite City Restaurant Operations, Inc., d/b/a Granite City Food & Brewery | Illinois Liquor Control Commission | 1C-0087169<br><br>1B-1142559 |
| Cherry Valley | Granite City Restaurant Operations, Inc., d/b/a Granite City Food & Brewery | City of Rockford, Illinois | 22106 |
| Clive | Granite City Restaurant Operations, Inc., d/b/a Granite City Food & Brewery | State of Iowa Alcoholic Beverages Division | LC0032727 |
| Cedar Rapids | Granite City Restaurant Operations, Inc., d/b/a Granite City Food & Brewery | State of Iowa Alcoholic Beverages Division | LC0032868 |
| Miami (CR) | Granite City Restaurant Operations, Inc.<br><br>Cadillac Ranch All American Bar & Grill | State of Florida Department of Business and Professional Regulation | 2302598 |

| Bloomington (MOA) (CR) | Granite City Restaurant Operations, Inc. | City of Bloomington | LCBL200876 |
|---|---|---|---|
| National Harbor, Maryland (CR) | Granite City Restaurant Operations, Inc.<br><br>Cadillac Ranch All American Bar & Grill | State of Maryland | 17BLX683 |
| Pittsburgh (CR) | Granite City Restaurant Operations, Inc.<br><br>Cadillac Ranch All American Bar & Grill | Pennsylvania Liquor Control Board | R2108 |
| Davenport | Granite City Restaurant Operations, Inc.<br><br>Granite City Food & Brewery | State of Iowa Alcoholic Beverages Division | LC0032969 |
| Eagan (Brew Pub) | Granite City Restaurant Operations, Inc.<br><br>Granite City Food & Brewery | State of Minnesota | 26625 |
| Eagan (Alcohol Caterer's) | Granite City Restaurant Operations, Inc.<br><br>Granite City Food & Brewery | State of Minnesota | 26602 |
| Eagan | Granite City Restaurant Operations, Inc. | City of Eagan | 00002720 |
| Eagan (Sunday Sales) | Granite City Restaurant Operations, Inc. | City of Eagan | 00002757 |
| Fargo | Granite City Restaurant Operations, Inc., d/b/a Granite City Food & Brewery | City of Fargo | None |
| Fargo | Granite City Restaurant Operations, Inc.<br><br>Granite City Food & Brewery | Office of Attorney General, Bismarck, ND | AA-00147 |

| Fargo (microbrew) | Granite City Food & Brewery<br><br>Granite City Restaurant Operations, Inc. | North Dakota Alcoholic Beverage Manufacturing License | 09001 |
|---|---|---|---|
| Franklin | Granite City Food & Brewery<br><br>Granite City Restaurant Operations LLC | City of Franklin, Tennessee | 12-42 |
| Franklin (Beer manufacturer) | Granite City Food & Brewery<br><br>Granite City Restaurant Operations LLC | Tennessee Department of Revenue | 0107967195-BBF |
| Franklin | Granite City Restaurant Operations, Inc., d/b/a Granite City Food & Brewery | State of Tennessee Alcoholic Beverage Commission | LBDRST-WIL-1900113 |
| Fort Wayne | Granite City Restaurant Operations, Inc., d/b/a Granite City Food & Brewery | Alcohol and Tobacco Commission, Indianapolis, IN | RR0203084 |
| Fort Wayne (small brew) | Granite City Restaurant Operations, Inc., d/b/a Granite City Food & Brewery | Alcohol and Tobacco Commission, Indianapolis, IN | M0223546 |
| National Harbor, Maryland | Granite City of Maryland, Inc.<br><br>Granite City Food and Brewery Ltd. | State of Maryland | 17BLX824 |
| National Harbor, Maryland | Granite City of Maryland, Inc.<br><br>Granite City Food and Brewery Ltd. | Comptroller of Maryland | W7-01703 |
| National Harbor, Maryland | Granite City of Maryland, Inc.<br><br>Granite City Food and Brewery Ltd. | Comptroller of Maryland | M7-01702 |
| Kansas City (Legends) | Granite City Food & Brewery Ltd. | Business License Division | 10001500701 |

| Kansas City (Legends) (microbrew) | Granite City Food & Brewery Ltd. | Business License Division | 06980-00000-00011 |
|---|---|---|---|
| Kansas City (Legends) | Granite City of Kansas Ltd., d/b/a Granite City Food & Brewery | Business License Division | 06980-00000-00010 |
| Kansas City (Legends) (microbrew) | Granite City Food & Brewery Ltd. | Kansas Alcoholic Beverage Control Division | 20001015101 |
| Lincoln (brew pub) | Granite City Restaurant Operations, Inc.<br><br>Granite City Food & Brewery Ltd. | State of Nebraska | 062901 |
| Lincoln | Granite City Restaurant Operations, Inc.<br><br>Granite City Food & Brewery Ltd. | State of Nebraska | 062900 |
| Maumee | Granite City Restaurant Operations, d/b/a<br><br>Granite City Food & Brewery Ltd. | State of Ohio Department of Commerce Division of Liquor Control | 3326993 |
| Maple Grove | Granite City Restaurant Operations, Inc.<br><br>Granite City Food & Brewery Ltd. | City of Maple Grove | 19-27 |
| Maple Grove (brew pub) | Granite City Restaurant Operations, Inc.<br><br>Granite City Food & Brewery Ltd. | Minnesota Department of Public Safety Alcohol & Gambling Enforcement Division | 27462 |
| Naperville | Granite City Restaurant Operations, Inc., d/b/a<br><br>Granite City Food & Brewery Ltd. | City of Naperville | 19-00018366 |
| Naperville | Granite City Restaurant Operations, Inc., d/b/a Granite City Food & Brewery | State of Illinois | 1C-1124209 |

12226612v6

| Olathe | Granite City of Kansas Ltd., d/b/a Granite City Food & Brewery | Kansas Alcoholic Beverage Control Division | 10019172101 |
|---|---|---|---|
| Olathe (microbrewery) | Granite City of Kansas Ltd., d/b/a Granite City Food & Brewery | Kansas Alcoholic Beverage Control Division | 20019301801 |
| Olathe | Granite City Food & Brewery Ltd. | City of Olathe, Kansas | 57 |
| Roseville | Granite City Restaurant Operations, Inc. Granite City Food & Brewery | Minnesota Department of Public Safety Alcohol and Gambling Enforcement | 26624<br><br>24758 |
| Roseville | Granite City Restaurant Operations, Inc. Granite City Food & Brewery | City of Roseville | 26630 |
| Roseville (Alcohol Caterer's) | Granite City Restaurant Operations, Inc. Granite City Food & Brewery | City of Roseville | 26630 |
| Schaumburg | Granite City Food & Brewery Ltd. | Village of Schaumburg | 54614 |
| Schaumburg | Granite City Restaurant Operations, Inc. Granite City Food & Brewery Ltd. | State of Illinois | 1C-1125194 |
| Sioux Falls | Granite City Restaurant Operations, Inc. Granite City Food & Brewery Ltd. | South Dakota Department of Revenue | RL-5959 |
| Sioux Falls | Granite City Restaurant Operations, Inc. Granite City Food & Brewery Ltd. | South Dakota Department of Revenue | RB-25124 |
| Sioux Falls (microbrewery) | Granite City Restaurant Operations, Inc. Granite City Food & Brewery Ltd. | South Dakota Department of Revenue | MB-1005 |
| St. Cloud | Granite City Food & Brewery Ltd. | Minnesota Department of Public Safety Alcohol and Gambling Enforcement | BP1920-01 |

| St. Cloud (Brew pub) | Granite City Food & Brewery Ltd. | City of St. Cloud | 15887 |
|---|---|---|---|
| St. Cloud | Granite City Food & Brewery Ltd. | City of St. Cloud | 2245<br><br>HHFS16-0175 |
| Kansas City (Zona Rosa) | Granite City Restaurant Operations, Inc. Granite City Food & Brewery Ltd. | City of Kansas City, Missouri Regulated Industries Division | 10038858-01-2019 |
| Kansas City (Zona Rosa) | Granite City Food & Brewery Ltd.<br><br>Granite City Restaurant Operations, Inc. | Platte County | 630<br><br>632 |
| Kansas City (Zona Rosa) | Granite City Food & Brewery Ltd.<br><br>Granite City Restaurant Operations, Inc. | Missouri – Division of Alcohol and Tobacco Control | 180433<br><br>180434 |
| Kansas City (Zona Rosa) (microbrewery) | Granite City Food & Brewery Ltd.<br><br>Granite City Restaurant Operations, Inc. | Missouri – Division of Alcohol and Tobacco Control | 180432 |
| Troy | Granite City Restaurant Operations, Inc. | State of Michigan – Liquor Control Commission | 212067<br><br>212068<br><br>212069 |
| Northville | Granite City Restaurant Operations, Inc. | State of Michigan – Liquor Control Commission | 246200<br><br>246201<br><br>246202 |
| Detroit | Granite City Restaurant Operations, Inc. | State of Michigan – Liquor Control Commission | 258521<br><br>258522<br><br>258523 |

## Schedule 4.1(l)

**Intellectual Property**

Domain Names

| Name |
| --- |
| Cadillacranchgroup.com |
| Cadillacranchgroup.net |
| Cadillacranchmallofamerica.com |
| Cadillacranchmugclub.com |
| Cadillacranchpittsburgh.com |
| Gcbrewrewards.com |
| Cadillacranchmiami.com |
| Gcfoodandbrewery.com |
| Gcfb.com |
| Gcfb.net |
| Granitecitydiningclub.com |
| Gcbrewlab.com |

Trademarks or Servicemarks

| Name | Registration Number | Registration Date |
| --- | --- | --- |
| CADILLAC RANCH ALL AMERICAN BAR & GRILL | 3725513 | December 15, 2009 |
| CADILLAC RANCH ROCK-N-COUNTRY BAR & GRILL | 3439214 | June 3, 2008 |
| CADILLAC RANCH | Serial No. 85-300173 | April 20, 2011 |
| BARTINIS | 5186024 | April 18, 2017 |

| BROTHER BENEDICT'S MAI BOCK | 29434 | December 17, 1999 |
|---|---|---|
| BROTHER BENEDICT'S MAI BOCK & DESIGN | 29433 | December 17, 1999 |
| DUKE OF WELLINGTON | 29435 | December 17, 1999 |
| DUKE OF WELLINGTON & DESIGN | 29442 | December 17, 1999 |
| FERMENTUS INTERRUPTUS | 3522448 | October 21, 2008 |
| GC | 3380882 | February 12, 2008 |
| GC GRANITE CITY FOOD & BREWERY & DESIGN | 2550836 | March 19, 2002 |
| GRANITE CITY | 3384527 | February 19, 2008 |
| GRANITE CITY FOOD & BREWERY | 3384528 | February 19, 2008 |
| GRANITE CITY FOOD & BREWERY & DESIGN | 29432 | December 17, 1999 |
| NORTHERN LIGHT | 29437 | December 17, 1999 |
| NORTHERN LIGHT & DESIGN | 29436 | December 17, 1999 |
| PRIDE OF PILSEN | 29439 | December 17, 1999 |
| PRIDE OF PILSEN & DESIGN | 29438 | December 17, 1999 |
| VICTORY LAGER | 29441 | December 17, 1999 |
| VICTORY LAGER & DESIGN | 29440 | December 17, 1999 |

Patents

| Owner | Patent Number | Registration Date | Title |
|---|---|---|---|
| Granite City Food & Brewery Ltd. | 7214402 | May 8, 2007 | Method and Apparatus for Distributed Production of Beer |

12226612v6

| Granite City Food & Brewery Ltd. | 7735412 | June 15, 2010 | Apparatus for Distributed Production of Beer |
|---|---|---|---|

## Schedule 4.1(l)(i)

**Intellectual Property Infringement by Third-Parties**

1. On October 14, 2019, Sellers provided notice to Outstate Brewing Company, LLC regarding can art released by Outstate Brewing Company, LLC that used the trademark NORTHERN LIGHT LAGER, which Sellers alleged infringed upon Sellers' trademark rights in NORTHERN LIGHT.  On December 6, 2019, Outstate Brewing Company, LLC agreed to change its trademark.

## Schedule 4.1(l)(ii)

### Intellectual Property Infringement by Sellers

1. On November 13, 2019, Adlife Marketing & Communications notified Sellers that an image used on Sellers' website was the intellectual property of Adlife Marketing & Communications, and that Sellers may be using the intellectual property without a proper license.  Sellers are in the process of determining whether its use of the image is in fact infringing upon such intellectual property rights.

## **Schedule 4.1(m)**

### **Environmental Matters**

None.

**<u>Schedule 4.1(n)</u>**

**Malware**

None.

**<u>Schedule 4.1(o)</u>**

**Contracts**

See Schedule 1.1(g).

**<u>Schedule 4.1(p)</u>**

**Leases**

1.   The items included on Schedule 1.1(a) are incorporated by reference herein.

2.   The items included on Schedule 1.2 are incorporated by reference herein.

## **Schedule 4.1(r)**

### **Financial Statements**

See attached.

## Schedule 5.1(b)

### Operations of Sellers Prior to the Closing Date

1. Renewal of the Leased Real Property located at the Mall of America, Bloomington, Minnesota.

2. Approval and adoption of a Key Employee Incentive Plan providing incentives for key executives, and a Key Employee Retention Plan providing retention benefits to key employees.

# EXHIBIT B

# UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| In re: | Jointly Administered under 19-43756 (WJF) |
| | |
| Granite City Food & Brewery Ltd. | 19-43756 |
| Granite City Restaurant Operations, Inc. | 19-43757 |
| Granite City of Indiana, Inc. | 19-43758 |
| Granite City of Kansas Ltd. | 19-43759 |
| Granite City of Maryland, Inc. | 19-43760 |
| | |
| Debtors. | Chapter 11 Cases |

## BID PROCEDURES

## BACKGROUND

Granite City Food & Brewery Ltd. ("Granite City") and certain of its subsidiaries ("Debtors" or together "Granite City") are debtors-in possession in Chapter 11 cases presently pending in the United States District Court for the District of Minnesota (the "Bankruptcy Court"). Prior to filing their petitions for relief, Granite City and the Debtors entered into the following stalking horse asset purchase agreement to sell substantially all of the Debtors' operating assets:

- An Asset Purchase Agreement (the "APA") with KRG Granite, LLC, a Nevada limited liability company, or an affiliated purchaser to be named (the "Proposed Purchaser") for the purchase and sale of:

    o The Debtors' Cadillac Ranch restaurant properties, consisting of four Cadillac Ranch restaurants and all real and personal property of the Debtors exclusively attributable to operating such restaurants (the "Cadillac Ranch Assets"); and

    o The Debtors' Granite City restaurant properties, consisting of 25 Granite City restaurants and all real and personal property of the Debtors exclusively attributable to operating such restaurants and a brewery in Ellsworth, Iowa (together the "Granite City Assets").

The Cadillac Ranch Assets and Granite City Assets are together referred to as the "Assets".

The purchase and sale transactions contemplated under the APA are conditioned upon the Debtors' ability to sell the Assets free and clear of all liens, claims, interests and encumbrances, except for liabilities expressly assumed, as contemplated under Section 363 of the United States Bankruptcy Code (the "Bankruptcy Code"). The purchase and sale transactions contemplated

under the APA are subject to any higher and better offers that may be submitted in accordance with these Bid Procedures.

## KEY DATES

The key dates for the sale process are as follows:

| Date and Time | Event |
|---|---|
| January 14, 2020 at 2:00 p.m. CDT | Bid Procedures Hearing |
| February 6, 2020 at 5:00 p.m. CDT | Due Date for Bids and Deposits |
| February 13, 2020 at 9:00 a.m. CDT | Auction |
| February 18, 2020 at 1:30 p.m. CDT | Sale Hearing |

## BID AND SALE PROCEDURES

Set forth below are the bidding and sale procedures (the "Bid Procedures") to be employed with respect to any proposed sales of the Cadillac Ranch Assets and/or the Granite City Assets (each a "Proposed Sale" and together the "Proposed Sales"). The Debtors will seek entry of an Order from the Bankruptcy Court (the "Bid Procedures Order") as follows:

(i)     authorizing and approving the Debtors' sale of the Assets to the Proposed Purchaser upon the terms and conditions set forth in the APA, but subject to any higher or better offers submitted in accordance with these Bid Procedures;

(ii)    approving stalking horse bid protections for the Proposed Purchaser; and

(iii)   approving the Proposed Sale of the Assets to the Proposed Purchaser or to one or more Qualified Bidders (as defined below) that are determined to have made the highest or best offer for the Assets, as a whole or in parts (the "Sale Transaction").

Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the APA.

## THE ASSET PURCHASE AGREEMENTS

### The Stalking Horse APA

On December 16, 2019, the Debtors entered into the APA with the Proposed Purchaser. Pursuant to the APA, the Proposed Purchaser, to the maximum extent permitted under Section 363 of the Bankruptcy Code, proposes to acquire free and clear of all liens, claims and encumbrances the Assets, including, but not limited to, the Debtors accounts receivable, inventory, leases, trade names, trademarks, copyrights, and other intellectual property and license rights owned by the Debtors, as more fully set forth in Section 1.1 of the APA (the "Acquired Assets"), but excluding those assets expressly identified as Excluded Assets under the terms of the APA.

## THE BIDDING PROCESS

*1.*      *The Consultation Committee.* The receipt, evaluation and approval of bids shall be conducted under the supervision of a committee consisting of one representative from each of the following interested parties: (a) the Debtors; (b) the Debtors' investment bankers Duff & Phelps Securities, LLC; (c) Citizens Bank, N.A. ("Citizens"); (d) JMB Capital Partners Lending, LLC ("JMB"); and (e) the Official Committee of Unsecured Creditors ("UCC"), assuming one shall have been appointed (together the "Consultation Committee").

*2.*      *The Bidding Process.*  The Consultation Committee is charged with overseeing the bidding process in connection with the sale of the Debtors' assets and shall do all of the following:

a.      Determine, in its sole discretion, whether any bid for the Assets is a Qualified Bid (as defined below);

b.      Coordinate the efforts of the Potential Bidders (as defined below) in conducting their due diligence investigations;

c.      Receive and evaluate offers from Potential Bidders (as defined below); and

d.      Negotiate in good faith any offers to purchase the Assets

(together the "Bidding Process").

*3.*      *Participation Requirements*.  Any person that wishes to participate in the Bidding Process must be a Potential Bidder (as defined in Paragraph 4 below).  Neither the Consultation Committee members nor their representatives shall be obligated to furnish information of any kind whatsoever to any person that is not a Potential Bidder.  The Consultation Committee and their professionals shall use commercially reasonable efforts to provide all Potential Bidders with substantially similar access and information.  Any person that wishes to conduct due diligence and participate in the Bidding Process must first deliver to the Debtors (with copies to other members of the Consultation Committee) all of the following:

a.      An executed confidentiality agreement in form and substance to be provided by the Debtors on behalf of the Consultation Committee, and which confidentiality agreement is at least as restrictive in all material respects as the confidentiality agreement entered into between the Debtors and the Proposed Purchaser.

b.      The most current audited (if in existence) and latest unaudited financial statements, and/or such other form of financial disclosure or evidence of the ability to consummate the Sale Transaction (the "Financials") of the Potential Bidder or, if the Potential Bidder has been formed specifically to enter into a sale transaction, the same information from the Potential Bidder's equity holder(s).

c.      Such other and/or additional information as the Debtors, in their discretion, deem necessary or desirable to assist in determining whether the Potential Bidder has the financial wherewithal to perform a contemplated sale transaction.

4.     ***Definition of Potential Bidder.***  A "Potential Bidder" is a person that delivers the documents described in Paragraphs 3a through 3c above and that the Consultation Committee determines is reasonably likely (based on the information set forth in the Financials, experience, and other information the Consultation Committee deems relevant) to submit a *bona fide* offer and to be able to consummate the Sale Transaction, if selected as a Successful Bidder or Back-Up Bidder (as such terms are defined below).

5.     ***Due Diligence.***  The Debtors may afford any Potential Bidder the opportunity to conduct reasonable due diligence, including by gaining access to the due diligence data room created by the Debtors and their advisors to facilitate the evaluation of current and historical information concerning the Debtors and their business operations.  Neither the Debtors nor their advisors shall be obligated to furnish any due diligence information (i) at any time to any person other than a Potential Bidder; or (ii) after the Bid Deadline (as hereafter defined) to any Potential Bidder.

6.     ***Deadline for Submission of Bids***.  The deadline for a Potential Bidder to submit one or more bids for the Assets, in whole or in part, shall be **February 6, 2020 at 5:00 p.m. (prevailing Central Time)** (the "Bid Deadline").  Any Potential Bidder who fails to submit a bid so as to be received by the parties listed below in advance of the Bid Deadline shall not be deemed a Qualified Bidder.

7.     ***Manner of Submission of Bids.***  Prior to the Bid Deadline, a Potential Bidder that desires to make a bid shall deliver written copies of its bid in writing and executed by an individual authorized to bind the Potential Bidder.  Each bid shall be served by courier, facsimile, email, or as otherwise specified by the Debtors (as representative for the Consultation Parties) to the following: (i)  Duff & Phelps, LLC, 10100 Santa Monica Blvd., Suite 1100, Los Angeles, California  90067 (Attn: Brian J. Cullen; Brian.Cullen@duffandphelps.com; Darren Gange, Darren.Gange@duffandphelps.com;   Matthew   Gates;   Matthew.Gates@duffandphelps.com, financial advisors to the Debtors); (ii) Briggs & Morgan P.A., 2200 IDS Center, 80 South Eighth Street, Minneapolis, Minnesota  55402 (Attn: James M. Jorissen, Esq.; jjorissen@briggs.com; Brett D. Anderson, Esq. banderson@briggs.com; and Karl Johnson, Esq.; kjohnson@briggs.com, counsel to Debtors); (iii) Blank Rome LLP, 444 West Lake Street, Suite 1650, Chicago, Illinois 606056 (Attn: Kenneth Ottaviano, Esq.; kottaviano@BlankRome.com; Paige Barr Tinkham, Esq., ptinkham@BlankRome.com, counsel to Citizens Bank, N.A.); (iv) Arent Fox LLP, 1301 Avenue of the Americas, Floor 42, New York, New Nork  10019 (Attn: Robert M. Hirsh, Esq., robert.hirsh@arentfox.com;   Jordana   Renert,   Esq.,   jordana.renert@arentfox.com;   Dennis Henderson, Esq.,   dennis.henderson@arentfox.com, counsel to JMB Capital Partners Lending, LLC; and (v) one or more representatives of the UCC should one be constituted.

8.     ***Bid Requirements***.  All bids must include the following items (the "Required Bid Materials"):

- An executed copy of a purchase agreement and any ancillary agreements pursuant to which the Potential Bidder proposes to acquire the Assets or, alternatively, a subset of the Assets consisting of either the Cadillac Ranch Assets or the Granite City Assets.

- The purchase agreement shall be derived from the form approved by the Consultation Committee that formed the baseline for the stalking horse bid, modified to incorporate the Potential Bidder's offer, and shall include a commitment to close by a date no later than thirty (30) days following the approval of the sale by the Bankruptcy Court.

- A written acknowledgement by the Potential Bidder that it agrees to all of the terms for sale set forth in these Bid Procedures.

- A Potential Bidder may bid on all of the Assets, or may submit a bid for the Cadillac Ranch Assets alone or the Granite City Assets alone, as follows.

  o All Asset Bids. With respect to a bid to acquire all of the Assets, a proposed purchase price, in cash, which is determined by the Consultation Committee (after consultation with their professionals and advisors) to be equal to or greater than the sum of (i) the purchase price set forth in the Stalking Horse APA, (ii) the Expense Reimbursement, (iii) the Break-Up Fee; and (iv) $100,000 (the sum of (i) through (iv) the "Initial Increment Amount").

  o Cadillac Ranch Bids.  With respect to a bid to acquire only the Cadillac Ranch Assets, a proposed purchase price, in cash.

  o Granite City Bids.   With respect to a bid to acquire only the Granite City Assets, a proposed purchase price, in cash.

  o In the event the Consultation Committee determines that separate bids for the Cadillac Ranch Assets and Granite City Assets together represent the highest and best value, the Consultation Committee may select such bids over a competing all-Assets bid, in which event the Expense Reimbursement and Break-Up Fee are to be ratably assessed based on the purchase prices associated with the bids.

- A good faith deposit (the "Deposit") equal to: (a)10% of the Initial Bid Increment Amount with respect to bids for all of the Assets; and (b) 10% of the proposed cash purchase price plus 50% of the Break-Up Fee and the Expense Reimbursement with respect to bids for only part of the Assets.

- Evidence or a statement indicating that the bidder has obtained due and appropriate authorization and approval from its Board of Directors (or comparable governing body) with respect to the submission and consummation of its bid and acceptance of the terms of sale in these Bid Procedures, or a representation that no such authorization or approval is required and that any and all consents required in connection with the submission and consummation of the bid have been obtained and that no other consents are required.

- Evidence of sufficient cash on hand or written evidence of a commitment for financing or other evidence of financial wherewithal and the ability to consummate a sale transaction satisfactory to the Consultation Committee, together with contact information for any financing sources.

12275093v1

- A redline comparison of the bidder's proposed purchase agreement against the Stalking Horse Purchase Agreement.

- A preliminary list of the Debtors' executory contracts and unexpired leases with respect to which the bidder seeks assignment from the Debtors.

- A written disclosure of the identity of each entity that will be bidding or otherwise participating in connection with such bid, and the complete terms of any such participation (including copies of any co-investor agreements, side letters and other similar documents).

- Such other information as may be reasonably requested by the Consultation Committee or the Debtors.

In addition to the foregoing, all bids must

- be on terms that are not materially more burdensome or conditional than the terms of the Stalking Horse APA;

- not be conditioned on obtaining financing or the outcome of any due diligence by the bidder; and

- not call for payment to the bidder of a break-up fee, expense reimbursement or any other similar type of payment.

**9.** ***Qualified Bids***.  A bid received from a Potential Bidder that includes all of the Required Bid Materials and satisfies all of the other criteria outlined in Section 8 above constitutes a "Qualified Bid."  A Potential Bidder that submits a Qualified Bid (a "Qualified Bidder") shall be entitled to participate in the Auction.  The Consultation Committee shall have the right but not the obligation to contact bidders to discuss or clarify the terms and to indicate any terms which may need to be modified in order to conform the bid to a Qualified Bid or to evaluate the bid.

**10.** ***The Proposed Purchaser and Credit Bids.***  For purposes of the Auction, should one occur, the Proposed Purchaser is a Qualified Bidder, and the Proposed APA is a Qualified Bid. Citizens and JMB shall also be permitted to submit credit bids for the Assets and, if any such credit bid is submitted, the submitting party shall be deemed a Qualified Bidder and its bid shall be a Qualified Bid, provided that with respect to any credit bid submitted by Citizens, Citizens must include in its bid either (i) provisions for the satisfaction of any secured claims that are senior to the secured claim that forms the basis of the credit bid (a "Senior Secured Claim") or (ii) evidence that the holder of any Senior Secured Claim has affirmatively consented to any other treatment of its Senior Secured Claim.  None of the Proposed Purchaser, JMB or Citizens shall be required to take any further action in order to participate in the Auction, and if any of them submits what turns out to be a Successful Bid (as defined below) or a "Back-Up Bid", no further action will be required on their part in order to be named a Successful Bidder (as defined below) or Back-Up Bidder at the Sale Hearing (as defined below).

## THE AUCTION

If a Qualified Bid for the Assets other than that submitted by the Proposed Purchaser has been received by the Consultation Committee and/or that Qualified Bids for only the Cadillac Ranch Assets and only the Granite City Assets considered together have a value equal to or greater than the Initial Increment Amount, then the Consultation Committee will conduct an auction (the "Auction") commencing on February 13, 2020 at 9:00 a.m. (prevailing Central Time). The Consultation Committee shall notify all Qualified Bidders of the time and place of the Auction. Only a Qualified Bidder who is designated as such by the Consultation Committee is eligible to participate at the Auction.

If no Qualified Bids as required in the foregoing paragraph are received, no Auction will take place and the Debtors will request that the Bankruptcy Court approve the sale to the Proposed Purchaser at the Sale Hearing.

*Sequence of the Auction.* Bidding at the auction will proceed as follows:

If the Consultation Committee receives one or more Qualified Bids (as determined by the Consultation Committee and its professionals) to purchase the Assets, which Qualified Bid includes the Initial Increment Amount, the Assets shall be offered for sale as a package at the Auction, with bidding to begin with the highest Qualified Bidder and continue thereafter with minimum combined bid increments of not less than $50,000.

After completion of the all-Assets portion of the Auction, and provided that the Consultation Committee shall have received separate, Qualified Bids (as determined by the Consultation Committee and its professionals) to purchase (i) only the Cadillac Ranch Assets, and (ii) only the Granite City Assets, then (iii) the Cadillac Ranch Assets shall be separately offered for sale, with bidding to begin with the highest Qualified Bidder and to continue thereafter with minimum bid increments of not less than $50,000, and (iv) the Granite City Assets shall be separately offered for sale, with bidding to begin with the highest Qualified Bidder and to continue thereafter with minimum bid increments of not less than $50,000. *Rules Applicable to the Auction.* The Consultation Committee may adopt rules for the conduct of the Auction consistent with any applicable order of the Bankruptcy Court. Such rules shall minimally specify as follows:

1. All bids shall be made and received in one room on an open basis, with all other bidders entitled to be present for the presentation of all bids.

2. The identity of each bidder (including its principals) shall be fully disclosed to all other bidders.

3. All material terms of each Qualified Bid shall be disclosed to all other bidders for the same assets throughout the Auction.

4. The Debtors shall arrange for a Court reporter to be present at and to prepare a transcript of the Auction.

5. Unless otherwise agreed to by the Consultation Committee, bidders shall be limited to a one-hour period in which to respond to the previous bid submitted at the Auction, and if

no responsive bid is presented during such one-hour period, the bidder who shall have failed to respond shall be precluded from further participation in the Auction.

6. In the event no responsive bids are received in response to a bid, the Auction as it relates to the assets being sold, shall conclude.

7. Upon conclusion of the bidding, the Auction shall be closed, and the Consultation Committee, after consultation with professionals, shall immediately:

   a. Review each Qualified Bid on the basis of financial and contractual terms and other factors relevant to the sales process, including factors affecting the speed and certainty of consummating a Proposed Sale.

   b. Identify the highest and best offer(s) for all-Assets, the Cadillac Ranch Assets and the Granite City Assets and make a determination regarding which offer or combination of offers will provide the greatest amount of net value to the Debtors and the bankruptcy estates, and

   c. Advise the Qualified Bidders of such determinations.

8. A Qualified Bidder or Bidders whose bid or bids are determined by the Consultation Committee to be highest or best for the Assets or, alternatively, for the Cadillac Ranch Assets only or the Granite City Assets only, shall, with respect to such assets, be deemed to be a "Successful Bidder."

9. The bidder or bidders whose bid or bids are determined by the Consultation Committee to be the next highest or best with respect to any of the foregoing asset classifications shall be designated "Back-Up Bidder(s)" and their bid or bids as "Back-Up Bid(s)."

10. Final Documents between the Debtors and any Successful Bidder(s) or Back-Up Bidder(s) will be executed on the same day as the Auction.

11. In the event the Consultation Committee determines that separate bids for the Cadillac Ranch Assets and Granite City Assets together represent the highest and best value, the Consultation Committee may select such bids over a competing all-Assets bid, in which event the Expense Reimbursement and Break-Up Fee shall be ratably assessed against the purchase prices associated with the bids.

12. If the final bid of the Proposed Purchaser does not succeed for the purchase of the Assets as a whole or for the purchase individually of the Cadillac Ranch Assets and/or the Granite City Assets, then the Break-Up Fee and the Expense Reimbursement shall be paid in accordance with the Stalking Horse APA and the Bid Procedures Order.

EACH BID SUBMITTED SHALL CONSTITUTE AN IRREVOCABLE OFFER AND BE BINDING ON THE PREVAILING BIDDER AND THE BACK-UP BIDDER FROM THE TIME THE BID IS SUBMITTED UNTIL THE ENTRY OF THE SALE APPROVAL ORDER AND IF THE PREVAILING BID AND BACK-UP BID ARE APPROVED, AS THE CASE MAY BE, AS TO THEM UNTIL THE EARLIER OF TWO (2) BUSINESS DAYS AFTER THE SALE OF

THE ASSETS HAS CLOSED OR, WITH RESPECT TO THE BACK-UP BIDDER, THIRTY (30) DAYS AFTER THE SALE APPROVAL ORDER IS ENTERED.

## ACCEPTANCE OF QUALIFIED OFFERS

The Debtors may sell the Assets (or any applicable subset of the Assets) only if the Bankruptcy Court authorizes the transaction by approving any Successful Bid(s) and Back-Up Bid(s) after a hearing (the "Sale Hearing"). The Debtors' presentation of a particular Successful Bid(s) and Back-Up Bid(s) to the Bankruptcy Court for approval does not constitute acceptance of the bid; the Debtors will be deemed to have accepted a bid only once it has been approved by the Bankruptcy Court at or after the Sale Hearing.

## SALE HEARING

The Sale Hearing shall be conducted by the Bankruptcy Court on February 18, 2020 at 1:30 p.m. (prevailing Central Time). During the Sale Hearing, the Debtors will seek Bankruptcy Court approval of the Prevailing Bid(s) and Back-Up Bid(s). There will be no further bidding at the hearing. In the event that a Successful Bidder(s) cannot consummate, or refuses to consummate the sale because of such bidder or bidders' breach or failure, the Debtors will seek authorization to close with the Back-Up Bidder(s) based on the Back-Up Bid(s) without further order of the Court.

## TERMS OF SALE

Except to the extent provided in any executed purchase agreement related to the sale of the Assets (or subset thereof), the sale of assets shall be on an "AS IS, WHERE IS, WITH ALL FAULTS" basis and without representations or warranties of any kind, nature or description by the Debtors, the Consultation Committee, or their agents. By submitting a bid, each bidder is deemed to acknowledge and agree to the foregoing.

All of the Debtors right, title and interest in and to any of the acquired assets shall be sold free and clear of all liens, claims, encumbrances and interests to the fullest extent permissible under Section 363 of the Bankruptcy Code, provided, however, that all such liens, claims, encumbrances and interests, if any, shall attach to the net proceeds (e.g., the gross proceeds received from the sale(s) less any Break-Up Fee, Expense Reimbursement, payment of a Transaction Fee to Duff & Phelps, and payment to JMB on account of its senior, secured post-petition liens) in the same order, and having the same dignity and priority as existed immediately prior to the commencement of the Debtors' Chapter 11 cases.

## RETURN OF DEPOSITS

Each Deposit submitted pursuant to the Bid Procedures will be held in escrow until the selection of the Successful Bidder(s) and the Back-Up Bidder(s), at which time all other bidders shall be entitled to the return of any Deposit(s). The Back-Up Bidder(s) shall be entitled to return of any Deposit forty-eight (48) hours after the Back-Up Bidder is relieved of its obligations as contemplated above.

12275093v1

If the Successful Bidder(s) or Back-Up Bidder(s) fail to consummate an approved sale due to their own breach or failure to perform, then the Debtors shall be entitled to retain the Deposit as damages for the breach.  The Debtors may credit the amount of any Deposit toward payment of the purchase price upon the closing of the sale of assets.

# EXHIBIT C

# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MINNESOTA

In re:                                          Jointly Administered under
                                                19-43756 (WJF)

Granite City Food & Brewery Ltd.                19-43756
Granite City Restaurant Operations, Inc.        19-43757
Granite City of Indiana, Inc.                   19-43758
Granite City of Kansas Ltd.                     19-43759
Granite City of Maryland, Inc.                  19-43760

               Debtors.                         Chapter 11 Cases

**ORDER PURSUANT TO 11 USC §§ 105(a), 363 AND 365 (I) APPROVING AUCTION AND BID PROCEDURES; (II) APPROVING BREAK-UP FEE, EXPENSE REIMBURSEMENT AND OTHER BUYER PROTECTIONS; (III) APPROVING FORM AND MANNER OF NOTICE; (IV) AUTHORIZING SALE OF ASSETS FREE AND CLEAR OF LIENS, CLAIMS AND ENCUMBRANCES, SUBJECT TO HIGHER OR BETTER OFFERS; (V) APPROVING ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (VI) GRANTING RELATED RELIEF**

The motion (the "Motion") of the debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors" or "Granite City") for an Order, pursuant to sections 105(a), 363, and 365 of title 11 of the United States Code (the "Bankruptcy Code"), as well as Rules 2002, 6004, 6006 and 9014(a) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), (1) Approving Auction and Bid Procedures; (2) Approving Break-Up Fee, Expense Reimbursement and Other Protections; (3) Approving Form and Manner of Notice; (4) Authorizing Sale of Assets Free and Clear of Liens, Claims and Encumbrances, Subject to Higher or Better Offers; (5) Approving Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (6) Granting Related Relief came before the undersigned

AFDOCS/21474607.2

12267706v3

on January 14, 2020.  Appearances were noted in the record. Due notice of the Motion having

been given.

Based on the Motion, the arguments of counsel, all the files, records and proceedings

herein, the Court being advised in the premises, and after due deliberation and sufficient cause

appearing therefore:

IT IS HEREBY FOUND AND DETERMINED THAT:

A.      The Court has jurisdiction to consider the Motion and the relief requested therein

pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. §

157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

B.      Due and proper notice of the Motion was provided as set forth in the Motion, and

no other or further notice is required.

C.      The Bid Procedures (as defined below), in the form annexed hereto as <u>Exhibit A</u>,

are fair, reasonable and appropriate and are designed to maximize the value of the Debtors'

estates.

D.      The Debtors have demonstrated a compelling and sound business justification for

authorizing the payment of the Expense Reimbursement and the Break-Up Fee as set forth in the

APA (as defined below).

E.      The Expense Reimbursement (i) is fair and reasonable, (ii) provides a benefit to

the Debtors' estates and parties in interest in these cases, and (iii) will preserve the value of the

Debtors' estates for the benefit of creditors.

F.      The Break-Up Fee (i) is fair and reasonable, (ii) provides a benefit to the

Debtors' estates and parties in interest in these cases, and (iii) will preserve the value of the

Debtors' estates for the benefit of creditors.

2

G.      The Break-Up Fee, among other things: (i) is the result of arm's-length negotiations among the parties that were not tainted by self-dealing or manipulation; (ii) is reasonably tailored to encourage, rather than hamper, bidding for the Debtors' assets; (iii) is reasonable in amount relative to the proposed purchase price; (iv) is reasonably tailored to retain a potentially successful bid, establish a bid standard and minimum bid for other bidders, and attract additional bidders; and (v) correlates with a maximization of value to the Debtors' estates.

H.      If applicable, the Debtors' payment of the Expense Reimbursement and the Break-Up Fee, are reasonable and appropriate, in light of, among other things, (i) the size and nature of the proposed sale, (ii) the substantial efforts that are being expended by the Proposed Purchaser, and (iii) the benefits the Proposed Purchaser is providing to the Debtors' estates and creditors and all parties in interest herein. Furthermore, the granting of the Buyer Protection Liens (as defined below) is appropriate and justified under sections 105(a) and 364(c) of the Bankruptcy Code.

I.      The prohibition on solicitation set forth in Section 9.1 of the APA (the "No-Shop Requirement") is fair and reasonable.

J.      The Debtors have demonstrated a compelling and sound business justification for the No-Shop Requirement in light of the circumstances, timing and proposed Bid Procedures set forth in the Motion. Any actions or omissions taken by the Debtors, their representatives, agents or advisors in accordance with the No-Shop Requirement are supported by sound business judgment.

K.      The entry of this Order is in the best interests of the Debtors and their estates, creditors and interest holders and all other parties in interest herein.

3

IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:

1.      Pursuant to 11 U.S.C. 105(a), 363 and 365 and Bankruptcy Rules 2002, 6004, 6006 and 9006, the Motion is granted as set forth herein.

2.      All objections filed in response to the Motion, to the extent not resolved herein, are hereby overruled.

**The Stalking Horse Bid**

3.      The transaction contemplated by the Asset Purchase Agreement, dated as of December 16, 2019 (the "APA"), by and among the Debtors and KRG Granite, LLC, a Nevada limited liability company (the "Proposed Purchaser") is designated as the "Stalking Horse Bid."

**The Sale Procedures and the Auction**

4.      The procedures for the submission of bids and the conduct of an auction for the sale of certain of the Debtors' Acquired Assets annexed hereto as Exhibit A (the "Bid Procedures," and, together with the Break-Up Fee, the Expense Reimbursement, and the No-Shop Requirement, the "Buyer Protections") are hereby incorporated herein and approved in their entirety.

5.      The Proposed Purchaser shall constitute a Qualified Bidder for all purposes and in all respects with regard to the Auction, the Sale Procedures, and the overall Sale process.

6.      The Debtors are authorized: (a) to conduct the Auction on February 13, 2020 at 10:00 a.m. (prevailing Central Time) at the offices of Briggs and Morgan, P.A. in Minneapolis, Minnesota (or such other time and place as designated by the Debtors on notice to the Notice Parties); and (b) subject to the terms of this Order, to take all actions necessary, in the discretion of the Debtors, to conduct and implement such Auction.

4

8. If the Debtors do not receive any Qualified Bids (other than the Stalking Horse Bid) by 5:00 p.m. (prevailing Central Time) on February 6, 2020, the Debtors are authorized to cancel the Auction on notice to the Notice Parties and seek approval of the APA at a hearing to be held on February 18, 2020 at 1:30 p.m. (prevailing Central Time).

9. The Debtors may, in consultation with the consultation Parties: (a) select, in their business judgment, the highest or otherwise best offer(s), and the Successful Bidder or Bidders and the next highest and best offer(s), and the Back-Up Bidder or Bidders; and (b) reject any bid that, in the Debtors' business judgment, is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code, the Bankruptcy Rules and the Sale Procedures, or (iii) contrary to the best interests of the Debtors and their estates, creditors, interest holders or parties in interest.

**Break-Up Fee and Expense Reimbursement**

10. The Break-Up Fee and the Expense Reimbursement as set forth in the APA are hereby approved.

11. Pursuant to sections 105 and 363 of the Bankruptcy Code, the Debtors shall pay the Expense Reimbursement pursuant to the terms and conditions set forth in Section 5.4 of the APA. The Expense Reimbursement shall constitute an Allowed Termination Claim against the Sellers, which: (a) is secured by (i) a junior lien on property of the Debtors' estates that are subject to a lien, including the liens of the DIP Lender and the liens of Citizens Bank, N.A., the agent for the Debtors' prepetition lenders, to the fullest extent of applicable law, and (ii) a lien on property of the Debtors' estates that is not otherwise subject to a lien or held by a professional as a retainer (collectively, the "Buyer Protection Liens"); and (b) to the extent not secured by the Buyer Protection Liens, has priority over any and all administrative expenses of

AFDOCS/21474607.2

12267706v3

the kind specified in sections 503(b) or 507(b) of the Bankruptcy Code subject only to the super-priority claims granted in favor of the DIP Lender and the super-priority claims granted as adequate protection to Citizens Bank, N.A., the agent for the Debtors' prepetition lenders. The Debtors' obligation to pay the Expense Reimbursement shall not be subject to any defense, claim, counterclaim, offset, recoupment, or reduction of any kind whatsoever and shall not be amended, discharged, expunged or released in any respect pursuant to any plan or plans for the Debtors.

12.    If the Break-Up Fee becomes payable in accordance with the terms set forth in the APA, pursuant to sections 105 and 363 of the Bankruptcy Code, the Debtors shall pay the Break-Up Fee in accordance with the terms set forth in Section 5.4 of the APA. The Debtors' obligation to pay the Break-up Fee shall be joint and several, absolute and unconditional and not subject to any defense, claim, counterclaim, offset, recoupment, or reduction of any kind whatsoever and shall not be amended, discharged, expunged or released in any respect pursuant to any plan or plans for the Debtors. The Break-Up Fee shall have priority over any and all administrative expenses of the kind specified in sections 503(b) or 507(b) of the Bankruptcy Code, subject only to the super-priority claims granted in favor of the DIP Lender and the super-priority claims granted as adequate protection to Citizens Bank, N.A., the agent for the Debtors' prepetition lenders.

**No-Shop Requirement**

14.    The No-Shop Requirement is hereby approved.

**The Sale Hearing**

15.    The Sale Hearing shall be held before this Court on February 18, 2020 at 1:30 p.m. (prevailing Central Time), or as soon thereafter as counsel and interested parties may be

6

heard. The notices set forth in the Motion shall be deemed good and sufficient notice of the Sale and the Sale Hearing. The Sale Hearing may be adjourned, from time to time, without further notice to creditors or other parties in interest other than by announcement of the adjournment before this Court or on this Court's calendar on the date scheduled for the hearing.

16.     Objections, if any, to the Sale must: (a) be in writing; (b) comply with the Bankruptcy Rules and the Local Bankruptcy Rules; (c) be filed with the clerk of the Bankruptcy Court for the District of Minnesota, 301 U.S. Courthouse, 300 South Fourth Street, Minneapolis, Minnesota 55415, on or before 8:00 a.m. (prevailing Central Time) on February 18, 2020, or such later dates and times as the Debtors may agree; and (d) be served upon the following notice parties (collectively, the "Notice Parties"):

(i) the entities identified in Local Rule 9013-3(a)(2), including, without limitation, (a) the United States Trustee, (b) each entity claiming a lien or other interest in the Debtors' property, including counterparties to unexpired leases, (c) each entity that has filed a request for notice or appearance under Federal Rule of Bankruptcy Procedure 2002(i) or 9010(b), (ii) counsel for the Proposed Purchaser, (iii) each entity identified by Duff & Phelps as a potential purchaser for the Assets, (iv) such other entities as requested by the Proposed Purchaser; and (v) other entities to be identified in the certificate of service to be filed with the Court.

AFDOCS/21474607.2

12267706v3

**Additional Provisions**

18.     The automatic stay provision of section 362 of the Bankruptcy Code shall not apply to the Proposed Purchaser's right to terminate the APA in accordance with the terms of the APA.

19.     The Debtors are authorized and empowered to take such steps, expend such sums of money and do such other things as may be necessary to implement and effect the terms of this Order.

20.     This Order shall be binding upon and inure to the benefit of the Successful Bidder or Bidders and any Back-Up Bidder and each of their respective affiliates, successors and assigns, and the Debtors, including any chapter 7 or chapter 11 trustee or other fiduciary appointed for the estates of the Debtors, whether in these cases or subsequent bankruptcy cases or upon dismissal of any of these cases.

21.     As provided by Bankruptcy Rule 6004(h), this Order shall not be stayed for ten (10) days after the entry thereof and shall be effective and enforceable immediately upon its entry on this Court's docket.

22.     This Court shall retain jurisdiction over any matters related to or arising from the implementation of this Order, including, but not limited to, any matter, claim or dispute arising from or relating to the Buyer Protections and the implementation of this Order.

Dated:                                          _____

                                                William J. Fisher
                                                United States Bankruptcy Judge

8

AFDOCS/21474607.2

12267706v3

# EXHIBIT D

# UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF MINNESOTA

In re:

Jointly Administered under
19-43756 (WJF)

Granite City Food & Brewery Ltd.          19-43756
Granite City Restaurant Operations, Inc.  19-43757
Granite City of Indiana, Inc.             19-43758
Granite City of Kansas Ltd.               19-43759
Granite City of Maryland, Inc.            19-43760

Debtors.

Chapter 11 Cases

## ORDER AUTHORIZING: (I) SALE OF ASSETS FREE AND CLEAR OF LIENS, CLAIMS AND ENCUMBRANCES; (II) ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (III) GRANTING RELATED RELIEF

Upon the motion of the debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors" or "Granite City") dated December 30, 2019, for an Order pursuant to sections 105(a), 363, and 365 of title 11 of the United States Code (the "Bankruptcy Code"), as well as Rules 2002, 6004, 6006 and 9014(a) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), (1) Approving Auction and Bid Procedures; (2) Approving Break-Up Fee, Expense Reimbursement and Other Protections; (3) Approving Form and Manner of Notice; (4) Authorizing Sale of Assets Free and Clear of Liens, Claims and Encumbrances, Subject to Higher or Better Offers; (5) Approving Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (6) Granting Related Relief (the "Motion"); and the Court having granted a portion of the relief requested in the Motion at a hearing held on January 14, 2020 (the "Sale Authorization Hearing"); and the Court having heard the statements of counsel and having considered the evidence presented in support of the balance of the relief requested in

the Motion at a hearing before the Court held on February 18, 2020 (the "Sale Hearing"); and

upon the full and complete record of these Chapter 11 cases; and it appearing that the Court has

jurisdiction over this matter; and it further appearing that the legal and factual bases set forth in

the Motion, at the Sale Authorization Hearing, and at the Sale Hearing, establish just cause for

the relief granted herein; and it further appearing that the relief requested in the Motion is in the

best interests of the Debtors, their creditors, and parties in interest in these Chapter 11 cases;

THE COURT HEREBY FINDS AND DETERMINES THAT:

A.     The findings and conclusions set forth herein constitute the Court's findings of

fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this

proceeding by Bankruptcy Rule 9014.

B.     To the extent any of the following findings of fact constitute conclusions of law,

they are hereby adopted as such.

C.     The Court has jurisdiction to grant the relief requested in the Motion pursuant to

28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is

proper in the United States Bankruptcy Court for the District of Minnesota pursuant to 28 U.S.C.

§§ 1408 and 1409.

D.     The statutory predicates for the relief requested in the Motion are Sections 105(a),

363 and 365 of the Bankruptcy Code, as supplemented by Bankruptcy Rules 2002, 6004, 6006

and 9014.

E.     Notice of the Motion has been given to (i) the United States Trustee; (ii) counsel

for the official committee of unsecured creditors appointed in these cases (if any); (iii) counsel

for the postpetition lender, JMB Capital Lenders, LLC ("JMB"); (iv) counsel for secured party

Citizens Bank, N.A., (v) the Internal Revenue Service; (vi) all relevant federal, state and local

2

taxing and licensing authorities at their statutory addresses; (vii) all parties who have filed a request for service of all pleadings pursuant to and in accordance with Bankruptcy Rule 2002 as of the day prior to the service of the Motion; (viii) KRG Granite Acquisition, LLC (the "Buyer"); (ix) all non-Debtor parties to executory contracts, unexpired leases, and other agreements with the Debtors (entered into before or after the Petition Date); (x) the Back-Up Bidder; and (xi) all known creditors of the Debtors.   Furthermore, the Debtors published or posted, pursuant to Bankruptcy Rule 2002(d) and 2002(l), the Sale Notice in or on: (i) the Minneapolis Star Tribune; (ii) the Wall Street Journal; and (iii) on the Debtors' restructuring website at https://dm.epiq11.com/case/GraniteCity/dockets.

F.      As evidenced by the certificates of service and affidavits of publication filed with the Court, and based on the representations of counsel at the Sale Hearing, (i) proper, timely, adequate and sufficient notice of the Motion, the Sale Hearing, and the sale of all or substantially all of the Debtors' assets pursuant to that certain Asset Purchase Agreement dated as of December 16, 2019 (the "APA" or "Purchase Agreement") between the Debtors and the Buyer, and, subject to certain "Designation Rights" as defined in the APA, the assumption and assignment of the Acquired Contracts and Real Property Leases, has been provided in accordance with Sections 102(l), 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 2002(a), 6004(a) and 6006(c), (ii) such notice was good and sufficient and appropriate under the circumstances of the Debtors' cases, and reasonably calculated to reach and apprise all holders of Claims and Interests (as hereafter defined) about the Sale and the assumption and/or assignment of the Acquired Contracts and Real Property Leases, and (iii) no other or further notice of the Motion, the Sale Hearing, the Sale, or of the assumption or assignment of the Acquired Contracts

or unexpired Real Property Leases shall be required, except insofar as such notice is to be given in connection with the Buyer's exercise of Designation Rights.

G.     A reasonable opportunity to object or to be heard with respect to the Motion and the relief requested therein has been afforded to all interested persons and entities in these cases.

H.     As shown by: (i) the evidence proffered or adduced and testimony, if any, at the Sale Hearing; and (ii) the representations of counsel made on the record at the Sale Hearing, the Debtors have marketed and sold the assets being sold to the Buyer in the Sale (collectively  the "Acquired Assets") and conducted the Sale Process (as hereafter defined) in a non-collusive, fair and good faith manner that was in compliance with that certain order of this Court entered on January 14, 2020, establishing bid procedures and certain buyer protections in connection with the sale of the Debtors' assets (the "Bid Procedures Order").  A reasonable opportunity has been given to any interested parties to make a higher and better offer for the Acquired Assets.

I.     The Debtors diligently and in good faith marketed the Acquired Assets to obtain the highest and best offer for their restaurant businesses.  Working with their investment banker, the Debtors conducted a comprehensive, multi-phased prepetition sale process in which they: (i) identified parties potentially interested in purchasing all or a portion of the Acquired Assets; (ii) created and provided prospective buyers with access to a due diligence data room; (iii) circulated a lengthy Confidential Information Memorandum to potential buyers; (iv) solicited indications of interest; (v) considered several asset purchase agreements submitted in connection with the process; and (vi) ultimately determined that the APA, based on all relevant factors, embodied the highest and best offer the Debtors received for the Acquired Assets, and the Debtors according selected the APA to serve as the Stalking Horse Bid as the Debtors entered into Chapter 11. Subsequent to filing, the Debtors – following expiry of the "No-Shop" period – renewed efforts

to solicit indications of interest, shared extensive information with interested parties, and organized a form of auction in which Qualified Bidders (as defined in the Bid Procedures Order and Bid Procedures) were invited to participate (the "Sale Process").

J.      After the Auction, the Debtors and the Consultation Committee deemed the bid submitted by the Buyer, as reflected in the APA, to be the highest and/or best offer and the one most likely to maximize sale proceeds and recoveries for interested parties.  The Debtors further deemed the bid submitted by {_____} (the "Back-Up Bidder"), which is set forth in that certain Asset Purchase Agreement by and among the Debtors and the Back-Up Bidder (the "Back-Up APA") to be the bid most likely to maximize the value of their estates in the event the Sale to the Buyer was unable to close.

K.      The terms and conditions set forth in the APA, and the Sale to the Buyer pursuant thereto, each are fair and reasonable and the Purchase Price payable to the Debtors pursuant to the APA represents the highest and best offer obtainable for the Acquired Assets.

L.      Each of the Debtors, as applicable, (i) has the full corporate or other power to execute, deliver and perform its obligations under the APA and all other documents contemplated thereby or entered into in connection therewith, and the sale of the Acquired Assets by the Debtors has in each case been duly and validly authorized by all necessary corporate or similar action, (ii) has all of the corporate or other power and authority necessary to consummate the transactions contemplated by the APA, and such other documents contemplated thereby or entered into in connection therewith, and (iii) has taken all action necessary to authorize and approve the APA and such other documents contemplated thereby and the consummation by them of the transactions contemplated thereby or entered into in connection

5

therewith.  No third-party consent or approvals, other than those expressly provided for in the

APA, are required for the Debtors to consummate such transactions.

M.      Approval of the Debtors' entry into the APA and consummation of the Sale at this

time are in the best interests of the Debtors, their creditors, their estates, and other parties' in

interest.

N.      The Debtors have demonstrated compelling circumstances and a good, sufficient

and sound business purpose and justification for the sale prior to, and outside of, a plan of

reorganization in that, among other things, the Sale enables the Debtors to yield the highest value

for the Acquired Assets prior to the Outside Date established as the deadline to close the Sale

under the APA and will enable repayment of postpetition indebtedness prior to the maturity date

set forth in the DIP Loan Agreement.

O.       The APA and the Sale were negotiated, proposed and entered into by the Debtors

and the Buyer without collusion, in good faith, and from arm's length bargaining positions.

Neither the Debtors nor the Buyer has engaged in any conduct that would cause or permit the

APA or any other related agreement to be avoided under Section 363(n) of the Bankruptcy Code.

P.      The Buyer is a good faith purchaser under Section 363(m) of the Bankruptcy

Code and, as such, is entitled to all of the protections afforded thereby.  In the absence of a stay

pending appeal, the Buyer will be acting in good faith within the meaning of Section 363(m) in

closing the Sale at any time after the entry of this order, notwithstanding the provisions of

Bankruptcy Rule 6004(g).

Q.      The Buyer is not an "insider" of any of the Debtors, as that term is defined under

Section 101 of the Bankruptcy Code.  The consideration provided by the Buyer pursuant to the

APA (i) is fair and reasonable, (ii) is the highest and best offer for the Acquired Assets being

6

purchased by such Buyer; (iii) will provide a greater recovery to the Debtors' estates than would be provided by any other available alternative; and (iv) constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession or the District of Columbia.

R.     The sale of the Acquired Assets to Buyer will be a legal, valid and effective transfer of the Acquired Assets and, except for the liabilities expressly assumed by Buyer pursuant to the APA (the "Assumed Liabilities"), will vest the Buyer with all right, title and interest of the Debtors to the Acquired Assets free and clear of claims against and interests in the Debtors and Claims, Liens or Encumbrances against the Acquired Assets (together the "Claims and Interests" or alternatively, the "Claims or Interests"), including but not limited to, (1) those that purport to give any party a right or option to effect any forfeiture, modification, right of first refusal, or termination of any Debtor's or Buyer's interest in the Acquired Assets, or any similar rights, (2) those relating to Taxes or assessments arising under or out of, in connection with, or in any way relating to the ownership, operation, or use of the Acquired Assets prior to the consummation of the Sale (the "Closing"), (3)(a) those arising under all mortgages, deeds of trust, security interest, condition sale or other title retention agreements, pledges, liens, judgments, demands, encumbrances, rights of first refusal or charges of any kind or nature, if any, including but not limited to, any restriction on the use, voting, transfer, receipt of income, or other exercise of any attributes of ownership and (b) all debts arising in any way in connection with any agreements, acts, or failures to act, of the Debtors or the Debtors' predecessors or affiliates, including without limitation, Claims, obligations, liabilities, demands, guaranties, options, rights, contractual or other commitments, restrictions, interests and matters of any kind or nature, whether known or unknown, contingent or otherwise, whether arising prior to or in

connection with or subsequent to the commencement of these Chapter 11 cases, and whether imposed by agreement, understanding, law, equity or otherwise, including, but not limited to, claims otherwise arising under doctrines of successor liability, (4) any pension, welfare, compensation, or other employee benefit plans, agreements, practices, and programs, including, without limitation, any pension plan of any Debtor, (5) any other employee, worker's compensation, occupational disease or unemployment or temporary disability-related Claim, including, without limitation, claims that might otherwise arise under or pursuant to (a) the Employee Retirement, Income, Security Act of 1974, as amended, (b) the Fair Labor Standards Acts, as amended, (c) Title VII of the Civil Rights Act of 1964, as amended, (d) the Federal Rehabilitation Act of 1973, as amended, (e) the National Labor Relations Act, as amended, (f) the Worker Adjustment and Retraining Act of 1988, as amended, (g) the Age Discrimination and Employee Act of 1967, as amended or (h) the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended, (6) any products liability or similar Claims, whether pursuant to any state or federal laws or otherwise, (7) environmental Claims or Liens arising from conditions existing on or prior to the Closing (including, without limitation, the presence of hazardous, toxic, polluting, or contaminating substances or waste) that may be asserted on any basis, including, without limitation, under the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601 et seq. or similar state statute, (9) any bulk sales or similar law, and (10) any tax statutes or ordinances, including, without limitation, the Internal Revenue Code of 1986, as amended.

S.      Buyer would not have entered into the APA and Buyer would not consummate the transactions contemplated thereby, thus adversely affecting the Debtors, their estates, and their creditors, if the sale of the Acquired Assets to Buyer were not, except for the Assumed

Liabilities, free and clear of all Claims and Interests of any kind or nature whatsoever, or if Buyer would, or in the future could, be liable for any of the Claims and Interests.

T.      The Debtors may sell the Acquired Assets free and clear of all Claims and Interests of any kind or nature whatsoever, because in each case, one or more of the standards set forth in section 363(f)(1) through (5) of the Bankruptcy Code has been satisfied. Those holders of Claims and Interests and non-Debtors to Acquired Contracts who did not object, or who withdrew their objections, to the Motion are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code to the assumption and assignment of same, subject to Buyer's Designation Rights as specified in the APA. Those holders of Claims and Interests and non-Debtors to Acquired Contracts who did object fall within one or more of the other subsections of 363(f) of the Bankruptcy Code and are adequately protected by having their Claims and Interests that are secured by liens, security interests and similar encumbrances, if any, attach to the Net Proceeds of the Sale ultimately attributable to the property against or in which they assert such Claim or Interest, with the same validity, priority and effect that existed immediately prior to the consummation of the Sale and subject to any and all rights, claims and defenses that the Debtors may have with respect thereto.

U.      The Debtors have demonstrated that it is an exercise of their sound business judgment to sell, assume and assign the Acquired Contracts to Buyer in connection with the Closing, and the assumption and/or assignment of the Acquired Contracts is in the best interests of the Debtors, their estates, and their creditors. The Acquired Contracts being sold and assigned to, and the Liabilities being assumed by, Buyer are an integral part of the Acquired Assets being purchased by Buyer and, accordingly, such assumption and assignment of the Acquired Contracts is reasonable and enhances the value of the Debtors' estates.

9

12268537v4

V.      The Debtors have either cured or provided adequate assurance of cure of all cure obligations under Acquired Contracts and have made appropriate provision for payment of cure costs in relation to the exercise of Designation Rights afforded Buyer relative to Designation Rights Assets (as defined in the APA), to the extent required by section 365 of the Bankruptcy Code and applicable orders of this Court ("Cure Costs").

W.      The Buyer has provided adequate assurance of future performance under the Acquired Contracts and with respect to the prospective exercise of Designation Rights pursuant to section 365 of the Bankruptcy Code.

X.      The consideration provided by the Buyer pursuant to the APA is fair and adequate, represents consideration deemed valuable in law and constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code and other applicable law. The APA has not been entered into with the intent to hinder, delay or defraud any of the Debtors' creditors or other parties in interest.

Y.      This Order constitutes a final and appealable order within the meaning of 28 U.S.C. § 158(a).

Z.      In the event the Debtors are unable to consummate the Sale with the Buyer, this Order shall be deemed to apply to the transaction contemplated by the Back-Up APA and all references herein to (i) the Buyer (other than provisions related to the Buyer protections set forth in the terms of the Bid Procedures Order which are inapplicable to the Back-Up Bidder) shall apply to the Back-Up Bidder and (ii) the APA shall apply to the Back-Up APA, in each case, with equal force and effect.

NOW, THEREFORE, THE COURT HEREBY ORDERS, ADJUDGES AND DECREES AS FOLLOWS:

12268537v4

1.      The Motion, to the extent not already granted by the Bid Procedures Order, is granted in all respects, as further described herein.

2.      The Objections to the Motion or the relief requested therein that have not been withdrawn, waived, or settled, and all reservations of rights included in such Objections, except as explicitly preserved on the record of the Sale Hearing, are overruled on the merits.

3.      The APA, and all of the documents, agreements (including, but not limited to, the Ancillary Agreements to be entered into pursuant to the APA, and transactions contemplated thereby or entered into in connection therewith) be, and hereby are, approved in all respects.

4.      Pursuant to Section 363(b) of the Bankruptcy Code, the Debtors are authorized to perform their obligations under and comply with the terms of the APA and all other documents and agreements contemplated thereby or entered into in connection therewith, including, but not limited to, the Ancillary Agreements to be entered into pursuant to the APA, and to consummate the Sale, pursuant to and in accordance with the terms and conditions of the APA and such documents and agreements.

5.      The Debtors are authorized and empowered to execute and deliver, and are empowered to perform under, consummate and implement, the APA and all other documents and agreements contemplated thereby or entered into in connection therewith, including, but not limited to, the Ancillary Agreements to be entered into pursuant to the APA, together with all additional instruments and documents that the Debtors or the Buyer deem necessary or appropriate to implement of the APA and to effectuate the Sale, and to take all further actions as may be reasonably necessary or desirable for the purpose of assigning, transferring, granting, conveying and conferring to the Buyer or reducing to its possession, the Acquired Assets being sold to Buyer in the Sale, or as may be necessary or appropriate to the performance of the

11

obligations contemplated by the APA, including without limitation Debtors' obligations in relation to any Designation Rights and  Designation Rights Assets.

6.      This Order and the APA shall be binding in all respects upon all creditors of and holders of equity interests in any Debtor (whether known or unknown), any holders of Claims and Interests, all non-Debtors to the Acquired Contracts, all applicable successors and assigns of Buyer, the Debtors, and any subsequent trustees appointed in the Debtors' Chapter 11 cases or upon a conversion to chapter 7 under the Bankruptcy Code and shall not be subject to rejection. Nothing contained in any Chapter 11 plan confirmed in these Chapter 11 cases or the confirmation order confirming any such Chapter 11 plan shall conflict with or derogate from the provisions of the APA and the other agreements and documents entered into in connection therewith (including the Ancillary Agreements or this Order) and no such plan or confirmation order shall discharge the obligations and Liabilities of the Debtors under such agreements and documents.

7.      Notwithstanding anything in this Order or otherwise, on the Closing Date, the portion of the proceeds of the Sale necessary to pay the amount owed to the DIP Lender as of the Closing Date shall be paid to the DIP Lender for permanent application and complete and indefeasible satisfaction of the DIP Obligations described in the *Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing (II) Granting Security Interests and Superpriority Administrative Expense Status; (III) Modifying the Automatic Stay; (IV) Authorizing the Debtors to Enter Into the Agreements with JMB Capital Lending, LLC; (V) Authorizing Use of Cash Collateral; and (VI) Granting Related Relief* (as such order may be amended, modified, supplemented or granted on a final basis) [Docket No. [        ] (the "Final DIP Order") and the DIP Loan Documents as that term is defined in the Final DIP Order.

12

8.     Except for the applicable Assumed Liabilities, pursuant to sections 105(a) and 363(f) of the Bankruptcy Code, the Acquired Assets shall be transferred to Buyer and upon the Closing shall be, free and clear of all Claims and Interests of any kind or nature whatsoever (including, but not limited to, those described in paragraph R of this Order), and all such Claims and Interests that are secured by liens, security interests and similar encumbrances of any kind or nature whatsoever shall attach to the Net Proceeds (i.e., the gross proceeds realized from the Sale of the Acquired Assets after the immediate payment of all amounts due and owing to JMB and its professionals under the DIP Loan Agreement, the payment of the Break-Up Fee and Expense Reimbursement to the Purchaser, to the extent applicable, the payment of the Transaction Fee to Duff & Phelps, and the payment of other unpaid professional fees) of the Sale in the order of their priority, with the same validity, force, and effect which they now have as against the Acquired Assets, subject to any rights, claims or defenses any of the Debtors may possess with respect thereto.

9.     Except for Assumed Liabilities, as applicable, all Persons, including, but not limited to, all holders of debt instruments, equity security holders, governmental, tax, and regulatory authorities, lenders, trade and other creditors, holding Claims or Interests of any kind or nature whatsoever against a Debtor or the Acquired Assets (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, senior or subordinated), arising under or out of, in connection with, or in any way relating to, a Debtor, the Acquired Assets, the operation of the Acquired Assets prior to the Closing, or the Sale are forever barred, estopped, and permanently enjoined from asserting against any Buyer, its affiliates, successors or assigns, its property, or the Acquired Assets, each such Person's Claims and Interests.

13

10.     The sale of the Acquired Assets to Buyer pursuant to the APA constitute legal, valid, and effective transfers of the Acquired Assets, and shall vest the Buyer with all right, title, and interest of the Debtors in and to the Acquired Assets being purchased by the Buyer free and clear of all Claims or Interests of any kind or nature whatsoever other than the applicable Assumed Liabilities. Notwithstanding anything contained herein to the contrary, the Acquired Assets will vest in the Buyer subject to any Permitted Liens as provided in and permitted by the APA; provided, however, that Permitted Liens shall exclude such Claims or Interests that are released and/or removed from the Acquired Assets pursuant to this Order and sections 105, 363 and other applicable provisions of the Bankruptcy Code.

11.     If any Person that has filed financing statements, mortgages, mechanic's liens, lis pendens, or other documents or agreements evidencing Claims or Interests in a Debtor (with respect to an Asset) or the Acquired Assets shall not have delivered to the Debtors prior to the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of all Claims or Interests which the Person has with respect to the Acquired Assets, then (a) the Debtors and the Buyer are hereby authorized and empowered to execute and file such statements, instruments, releases and other documents on behalf of such Person with respect to the Acquired Assets and (b) the Buyer is hereby authorized to file, register, or otherwise record a certified copy of this Order, which shall constitute conclusive evidence of the release of record and otherwise, of all Claims or Interests in or the Acquired Assets of any kind or nature whatsoever.

12.     On the Closing, each of the Debtors' creditors and any other holder of Claims or Interests shall be deemed to have authorized the Buyer to execute such documents and take all other actions as may be necessary to release Claims or Interests in the applicable Acquired

14

Assets purchased by such Buyer, if any, as such Claims or Interests may have been recorded or may otherwise exist.

13.     Pursuant to section 365 of the Bankruptcy Code and subject to and conditioned upon the Closing, the Debtors' assumption and assignment to Buyer of the Acquired Contracts, and (2) Buyer's assumption of the Acquired Contracts on the terms of the APA, are hereby approved, and the requirements of section 365(b)(1) of the Bankruptcy Code with respect thereto are hereby deemed satisfied.

14.     The Debtors are hereby authorized and empowered in accordance with sections 105(a), 363 and 365 of the Bankruptcy Code to (a) sell, assume and assign to Buyer, effective upon Closing, the Acquired Contracts pursuant to the APA free and clear of all Claims or Interests of any kind or nature whatsoever other than the Assumed Liabilities and (b) execute and deliver to Buyer such documents or other instruments as Buyer reasonably deems necessary to assign and transfer the Acquired Contracts and Assumed Liabilities to Buyer.

15.     Upon the Closing, the Acquired Contracts shall be transferred and assigned to, and following the Closing remain in full force and effect for, the benefit of Buyer notwithstanding any provision in any such Acquired Contract (including those of the type described in sections 365(b)(2) and (0 of the Bankruptcy Code) that prohibits, restricts, or conditions such assignment or transfer. The Debtors may assume and assign and sell each Acquired Contract in accordance with sections 105, 363 and 365 of the Bankruptcy Code and any provisions in any Acquired Contract that prohibit, restrict or condition the assignment of such agreement or allow the non-Debtor party to an Acquired Contract to terminate, recapture, impose any penalty, condition renewal or extension, or modify any term or condition upon the assignment of such Acquired Contract, constitute unenforceable anti-assignment provisions

15

which are void and of no force and effect. All other requirements and conditions under sections 363 and 365 of the Bankruptcy Code for the assumption by the Debtors and/or assignment to the applicable Buyer of each such agreement have been satisfied and, upon the Closing, in accordance with sections 363 and 365 of the Bankruptcy Code, the Buyer shall be fully and irrevocably vested in all right, title and interest of each Acquired Contract assigned to such Buyer.

16.    All defaults or other obligations of any Debtor under any Acquired Contract arising or accruing prior to the Closing (without giving effect to any acceleration clauses or any default provisions of the kind specified in section 365(b)(2) of the Bankruptcy Code) shall be cured by the applicable Debtor or the Buyer at Closing or as soon thereafter as practicable by payment of the Cure Costs, in accordance with the APA. Neither Buyer, nor any affiliate of Buyer, shall have any Liability arising or accruing prior to the date of the Closing, except as otherwise expressly provided in the APA. Pursuant to section 365(k) of the Bankruptcy Code, the Debtors and their estates shall not have any Liability for any default or other obligation under an Acquired Contract arising or occurring after the Closing, and all non-Debtors to such Acquired Contracts are forever barred and estopped from asserting any such breaches against the Debtors, their successors or assigns, their property or their assets or estates.

17.    Each non-Debtor party to an Acquired Contract hereby is forever barred, estopped, and permanently enjoined from: (i) asserting against the Debtors or Buyer (except for timely asserted Cure Costs), or the property of any of them (including the Acquired Assets), any default arising prior to or existing as of the Closing or, against Buyer (or any affiliate of Buyer), any counterclaim, defense, setoff or any other Claim asserted or which could be asserted against a Debtor; and (ii) imposing or charging against Buyer (or any affiliate of Buyer) any rent

16

accelerations, assignment fees, increases or any other fees as a result of the Debtors' assumption and assignment to Buyer of the Acquired Contracts. The validity of such assumption and assignment of Acquired Contracts shall not be affected by any dispute between any Debtor and any non-Debtor party to an Acquired Contract.

18.     Notwithstanding anything to the contrary herein (other than protections afforded pursuant to section 365(k) of the Bankruptcy Code and paragraph 18 herein), nothing in this Order shall release or discharge the Debtors from any Liability or obligation to the Buyer under the APA with respect to an Acquired Contract.

19.     Notwithstanding anything to the contrary herein, nothing in this Order shall release or discharge the Buyer from any Liability or obligation to the Sellers under the APA with respect to an Acquired Contract.

20.     The consideration provided by the Buyer for the Acquired Assets pursuant to the APA shall be deemed to constitute reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession, or the District of Columbia.

21.     The consideration provided by Buyer for the Acquired Assets purchased by Buyer pursuant to the applicable APA is fair and reasonable and the Sale may not be avoided under section 363(n) of the Bankruptcy Code.

22.     This Order (a) shall be effective as a determination that, except for the applicable Assumed Liabilities, and subject to the Buyers' exercise of any Designation Rights related to Designation Rights Assets and the Debtors' performance of their obligations, if any, in relation to same, at the Closing, all Claims and Interests of any kind or nature whatsoever existing as to the Debtors or Acquired Assets prior to the Closing have been unconditionally released,

17

discharged and terminated as to the Buyer (including their successors and assigns) and their respective properties (including, without limitation, the Acquired Assets), and that the conveyances described herein have been effected, and (b) shall be binding upon and shall govern the acts of all entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other Persons who may be required by operation of law, the duties of their office, contract, or otherwise, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of the Acquired Assets.

23.    Except as provided in the APA, after the Closing, the Debtors and their estates shall have no further liabilities or obligations with respect to any Assumed Liabilities and all holders of such Claims are forever barred and estopped from asserting such Claims against the Debtors, their successors or assigns, their property or their assets or estates.

24.    Each and every federal, state, and local governmental agency or department is hereby directed to accept any and all documents and instruments necessary and appropriate to record the Sale.

25.    The so-called "bulk sale" laws in all applicable jurisdictions are waived or inapplicable as to the Sale.

26.    Except as otherwise expressly provided in the APA, the Buyer shall have no Liability to pay wages, bonuses, severance pay, benefits (including, without limitation, contributions or payments on account of any under-funding with respect to any and all pension plans) or any other payment with respect to employees or former employees of the Debtors.

Except as otherwise expressly provided in the APA, Buyer shall have no Liability with respect to any collective bargaining agreement, employee pension plan, employee welfare or retention, benefit and/or incentive plan to which any Debtor is a party and relating to the Acquired Assets (including, without limitation, arising from or related to the rejection or other termination of any such agreement), and Buyer shall in no way be deemed a party to or assignee of any such agreement, and no employee of Buyer shall be deemed in any way covered by or a party to any such agreement, and except for Assumed Liabilities of Buyer and except as otherwise expressly provided in the APA, all parties to any such agreement are hereby enjoined from asserting against Buyer any and all Claims arising from or relating to such agreement. All notices, if any, required to be given to the Debtors' employees pursuant to the Workers Adjustment and Relocation Adjustment Act, or any similar federal or state law, shall be the sole responsibility of the Debtors as set forth in the APA.

27.     Except as set forth in the APA and the Bid Procedures Order, any amounts that become payable by the Debtors to Buyer (or any affiliate of Buyer) shall constitute administrative expenses of the Debtors' estates under sections 503(b)(1) and 507(a)(1) of the Bankruptcy Code and be paid by the Debtors at the time and in the manner provided for in the APA or related documents and agreements without further court order.

28.     All Persons who are in possession of some or all of the Acquired Assets on the Closing are hereby directed to surrender possession of the Acquired Assets to the Buyer at Closing.

29.     Except for the Assumed Liabilities, Buyer shall not have any Liability or responsibility for any Liability of the Debtors arising under or related to the Acquired Assets. Without limiting the generality of the foregoing and, except for the Assumed Liabilities assumed

19

by it or as otherwise specifically provided herein and in the APA or any other agreement entered into by it in connection therewith, no Buyer shall be liable for any Claims against the Debtors or any of their predecessors or Affiliates, and Buyer shall not have successor or vicarious liabilities of any kind or character, including, but not limited to, under any theory of antitrust, environmental, successor or transferee liability, labor law, de facto merger, or substantial continuity, whether known or unknown as of the Closing, now existing or hereafter arising, whether fixed or contingent, with respect to the Debtors or any Liabilities of the Debtors arising prior to the Closing, including, but not limited to, Liabilities on account of any Taxes arising, accruing, or payable under, out of, in connection with, or in any way relating to the operation of the Acquired Assets prior to the Closing. The consideration given by the Buyer shall constitute valid and valuable consideration for the releases of any potential claims of successor liability of the Buyer, releases which the Court holds shall be deemed to have been given in favor of the Buyer by all holders of Claims or Interests against or in the Debtors or their respective assets.

30.    Under no circumstances shall Buyer be deemed a successor to any Liability of or to the Debtors for any Claim or Interest against or in the Debtors or the Acquired Assets. Except for the Assumed Liabilities, the sale, transfer, assignment and delivery of the Acquired Assets shall not be subject to any Claims or Interests. Except for the Assumed Liabilities, as applicable, all Persons holding Claims or Interests against or in the Debtors or the Acquired Assets of any kind or nature whatsoever (including, but not limited to, the Debtors and/or their respective successors, including any trustees thereof, creditors, employees, unions, former employees and shareholders, administrative agencies, governmental units, secretaries of state, federal, state and local officials, maintaining any authority relating to any environmental, health and safety laws, and their respective successors or assigns) shall be, and hereby are, forever barred, estopped, and

20

permanently enjoined from asserting, prosecuting, or otherwise pursuing such Claims or Interests of any kind or nature whatsoever against Buyer, its property, successors and assigns, or the Acquired Assets, as an alleged successor or otherwise, with respect to any Claim or Interest of any kind or nature whatsoever such Person had, has or may have against or in the Debtors, the Debtors' estates, their respective officers, directors, shareholders, or the Acquired Assets. Following the Closing, no holder of any Claim or Interest in the Debtors shall interfere with Buyer's title to or use and enjoyment of the Acquired Assets based on or related to such Claim or Interest, or any actions that the Debtors may take in their Chapter 11 cases.

31.    This Court retains jurisdiction to enforce and implement the terms and provisions of this Order, the APA, any waivers and consents thereunder, and of each of the agreements and documents executed pursuant to or in connection therewith in all respects, including, but not limited to, retaining jurisdiction to (a) compel delivery of the Acquired Assets to Buyer, (b) compel delivery of the Purchase Price or performance of other obligations under the APA owed by or to the Debtors, (c) resolve any disputes arising under or related to the APA, except as otherwise provided therein, or any of the agreements and documents executed pursuant thereto or in connection therewith, (d) interpret, implement, and enforce the provisions of this Order, and (e) protect Buyer against (i) any of the Excluded Liabilities or (ii) the assertion of any Claims and Interests against the Acquired Assets (other than Assumed Liabilities, as applicable), of any kind or nature whatsoever; provided, however, with respect to a governmental unit's exercise of its police or regulatory powers other than the enforcement of a money judgment, the jurisdiction of any other tribunal shall not be reduced or impaired from that as set forth in any applicable, valid statutory grant of jurisdiction.

21

32.     The transactions contemplated by the APA are undertaken by Buyer without collusion and in good faith, as that term is used in section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale shall not affect the validity of the Sale (including, without limitation, the assumption and assignment of any of the Acquired Contracts), unless such authorization is duly stayed pending such appeal. Buyer is a purchaser in good faith of the Acquired Assets, and is entitled to all of the protections afforded by section 363(m) of the Bankruptcy Code.

33.     The terms and provisions of the APA and all related ancillary documents shall be binding on the parties thereto, and the provisions of this Order shall be binding in all respects upon, and shall inure to the benefit of, the Debtors, their estates, and their creditors, the Buyer and its affiliates, successors, and assigns, and any affected third parties including, but not limited to, all Persons asserting a Claim or Interest in the Acquired Assets, notwithstanding any subsequent appointment of any trustee(s) under any chapter of the Bankruptcy Code, as to which trustee(s) such terms and provisions likewise shall be binding. Nothing in this Order shall relieve Buyer or any Debtor from any Liability it may have to the other under any express, unambiguous writing by either party in connection with the APA or the transactions contemplated thereby.

34.     In the event of a conflict between this Order and the APA, the APA shall control.

35.     In the event of a conflict between this Order or the APA, on one hand, and the terms of any plan of reorganization confirmed in the Debtors' Chapter 11 cases or any order confirming such plan, on the other hand, this Order or the APA, as applicable, shall control.

36.     The failure specifically to include any particular provisions of any of the APA in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the APA be authorized and approved in its entirety.

22

37.    The Debtors are authorized to execute the APA or other related documents and agreements contemplated thereby or entered into in connection therewith and to consummate all transactions, and take any other actions, contemplated by, or necessary or appropriate to effectuate, the APA.

38.    Each and every Debtor shall be jointly and severally liable for any breach or violation of the Debtors' representations, warranties or covenants under the APA, and shall execute and deliver such Contracts and take such further action as may be reasonably requested by either Buyer to evidence the intent and effect of the foregoing. To the extent any obligations of any of the Debtors under the APA are transferred or assigned to, or assumed by, any successor to (or assignee of) the Debtors, including the Debtors as reorganized, (i) such obligations shall be fully enforceable against such successor or assignee and (ii) to the extent provided in the APA, such obligations shall remain fully enforceable against the Debtors, or the Debtors as reorganized, as the case may be, on a joint and several basis.

39.    The APA and any related agreements, documents or other instruments may be modified, amended or supplemented by the parties thereto and in accordance with the terms hereof, without further order of the Court, provided that any such modification, amendment, or supplement does not have a material adverse effect on the Debtors' estates.

40.    The provisions of this Order are non-severable and mutually dependent and, pursuant to Bankruptcy Rules 6004 and 6006, this Order shall not be stayed for 10 days and shall be effective immediately upon entry.

Dated:

_____
William J. Fisher
United States Bankruptcy Judge

23

12268537v4

# EXHIBIT E

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF MINNESOTA**

| | |
|---|---|
| In re: | Jointly Administered under |
| | 19-43756 (WJF) |
| | |
| Granite City Food & Brewery Ltd. | 19-43756 |
| Granite City Restaurant Operations, Inc. | 19-43757 |
| Granite City of Indiana, Inc. | 19-43758 |
| Granite City of Kansas Ltd. | 19-43759 |
| Granite City of Maryland, Inc. | 19-43760 |
| | |
| Debtors. | Chapter 11 Cases |

**NOTICE OF SALE AND BIDDING PROCEDURES**

To: The United States Trustee, the Committee of Unsecured Creditors, all Creditors and Equity Security Holders, and Other Parties in Interest:

**NOTICE:** On February 18, 2020 at 1:30 p.m. (CST) in Courtroom 2B, United States Courthouse, 316 N. Robert Street, St. Paul, Minnesota 55415 (the "Sale Hearing"), the above-captioned Debtors will ask the Court to approve a sale of substantially all of the assets of the Debtors (the "Acquired Assets") free and clear of all liens, claims, interests and encumbrances (collectively, the "Liens"), with all such Liens to attach to the net sale proceeds of the Sale ultimately attributable to the property against or in which such liens, claims, interests and encumbrances are asserted, all with the same validity, dignity, priority and effect and to the same extent as existed prior to the Sale and in all cases subject to any and all rights, claims and defenses that the Debtors may have with respect thereto. The Sale Hearing may be continued from time to time without further notice, except by the announcement in open court of the time and place of such continued Sale Hearing.

The Acquired Assets will be sold pursuant to Bidding Procedures approved by the Court at a hearing that was held on January 14, 2020 at 2:00 p.m. (CST). The Bidding Procedures contemplate the sale of the Acquired Assets to KRG Granite Acquisition, LLC, a Nevada limited liability company and proposed stalking horse that is wholly-owned by Kelly Investment Group (the "Proposed Purchaser"), or such other higher and better bidder(s) at the conclusion of the Auction.

The Bidding Procedures set forth the following deadlines:

| | |
|---|---|
| Due Date for Bids and Deposits | February 6, 2020 |
| Auction | February 13, 2020 |
| Final Hearing to Approve Sale | February 18, 2020 |

If no higher or better bid is obtained, the Debtors will sell the Acquired Assets to the Proposed Purchaser pursuant to an Asset Purchase Agreement ("Purchase Agreement") on file with the Court.

Subject to certain adjustments, the Purchase Price is: (i) cash in the amount of $7,500,000; and (ii) assumption of the Assumed Liabilities. The Purchase Price is payable at Closing. The Purchase Agreement provides a Break-Up Fee of $225,000 and an Expense Reimbursement of up to $100,000 payable to the Proposed Purchaser under certain circumstances detailed in the Purchase Agreement.

The details of the Purchase Agreement govern over this brief summary and are summarized in the Motion that was filed with the Court on or about December 30, 2019. You are encouraged to review the Purchase Agreement, the Bidding Procedures, the related Motion, and other related papers.

The Debtors will give separate notice of any unexpired leases and executory contracts to be rejected by the Debtors or assumed and assigned to the Proposed Purchaser or potentially to another bidder.

Objections, if any, to the relief to be requested at the Sale Hearing must be served on the parties below and must also be served and filed in accordance with Local Rule 9006-1(c) (any responsive documents shall be filed and served or transmitted, as applicable, not later than five days before the hearing date) except shorter periods may apply as to parties who receive late notice as to unexpired leases or executory contracts.

| Debtors' Counsel | Proposed Purchaser's Counsel | United States Trustee's Counsel |
|---|---|---|
| James M. Jorissen, Esq.<br>Karl J. Johnson, Esq.<br>2200 IDS Center<br>80 South Eighth Street<br>Minneapolis, MN 55402<br>Telephone: 612-977-8400<br>Facsimile: 612-977-8650 | Matthew Okin, Esq.<br>Okin Adams LLP<br>1113 Vine St. Suite 240<br>Houston, Texas 77002 | Sarah Wencil, Esq.<br>U.S. Trustee's Office<br>Region 12<br>1015 U.S. Courthouse<br>300 South Fourth Street<br>Minneapolis, MN 55415 |
| Creditors' Committee Counsel | Debtors' Financial Advisors | Proposed Purchaser |
| None | Matthew Gates<br>Duff & Phelps, LLC<br>10100 Santa Monica Blvd.<br>Suite 1100<br>Los Angeles, CA 90067 | Luke Kosters, Esq.<br>Kelly Investment Group<br>12730 High Bluff Drive, Suite 250<br>San Diego CA 92130<br>Fax: 619-687-5010 |

Any objector must also appear at the Sale Hearing.

Copies of the Debtors' Motion, including the Purchase Agreement, the Bidding Procedures and the order approving the Bidding Procedures are available on the court's website at www.mnb.uscourts.gov or on the Case Website https://dm.epiq11.com/case/GraniteCity/dockets or from Debtors' counsel on request. Additional information may be obtained on request from the Debtors' counsel.:

**BRIGGS AND MORGAN, P.A.**

/e/ James M. Jorissen

Dated: December 30, 2019          By: _____
     James M. Jorissen, #262833
     Karl J. Johnson, #391211
     2200 IDS Center
     80 South Eighth Street
     Minneapolis, MN 55402
     Telephone: 612-977-8400
     Facsimile: 612-977-8650
     jjorissen@briggs.com
     kjohnson@briggs.com

**COUNSEL FOR THE DEBTORS**

2

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MINNESOTA

---

| | |
|---|---|
| In re: | Jointly Administered under 19-43756 (WJF) |
| | |
| Granite City Food & Brewery Ltd. | 19-43756 |
| Granite City Restaurant Operations, Inc. | 19-43757 |
| Granite City of Indiana, Inc. | 19-43758 |
| Granite City of Kansas Ltd. | 19-43759 |
| Granite City of Maryland, Inc. | 19-43760 |
| | |
| Debtors. | Chapter 11 Cases |

---

**DEBTORS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR AN ORDER PURSUANT TO 11 USC §§ 105(a), 363 AND 365 (I) APPROVING AUCTION AND BID PROCEDURES; (II) APPROVING BREAK-UP FEE, EXPENSE REIMBURSEMENT AND OTHER BUYER PROTECTIONS; (III) APPROVING FORM AND MANNER OF NOTICE; (IV) AUTHORIZING SALE OF ASSETS FREE AND CLEAR OF LIENS, CLAIMS  AND ENCUMBRANCES, SUBJECT TO HIGHER OR BETTER OFFERS; (V) APPROVING ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (VI) GRANTING RELATED RELIEF**

---

The above-named Debtors (collectively, the "Debtors"), by and through their undersigned counsel, submits this memorandum of law in support of the accompanying motion in the above-entitled matter and in accordance with Local Rule 9013-2(a).

## FACTUAL BACKGROUND

The Debtors rely on the statement of facts set forth in the verified motion and the petition, and the Debtors' Declaration in Support of First Day Motions. Defined terms used in this Memorandum have the same meaning as in the accompanying motion.

## ARGUMENT

## I.    THE DEBTORS' REQUEST FOR EXPEDITED RELIEF SHOULD BE GRANTED.

The Debtors request expedited relief on approval of the Bid Procedures. Bankruptcy Rule 9006(c) provides that the Court may reduce the notice period for a motion "for cause shown." Cause exists here to grant the Motion as it relates to approval of the Bid Procedures on an expedited basis because (1) the Asset Purchase Agreement with the Proposed Purchaser includes a "No-Shop" provision that prohibits the Debtors from soliciting higher and better offers until entry of the order approving the Bid Procedures, (2) the Debtors must close the sale before the Outside Date, defined as the date that is 120 days following the Execute Date of the APA (December 16, 2019), when the buyer is permitted to terminate the APA, and (3) the Debtors will need sale proceeds to pay the DIP Loan before it matures on March 31, 2020. Expediting the hearing on approval of Bid Procedures will allow the Debtors to solicit higher and better offers for a full month before the hearing on the final sale. Furthermore, the expedited relief requested is a relatively small reduction of the notice period from 21 days down to 15 days. The various parties-in-interest will still have sufficient time to evaluate the Bid Procedures and object should they choose to do so. Finally, creditors will not be prejudiced because they will still have more than 21 days' notice of the hearing on the final sale. In fact, creditors will benefit from expedited relief on approval of the Bid Procedures because it will allow the Debtors to market the sale over a longer period of time than they could if approval of the Bid Procedures was delayed. Expedited relief is necessary to avoid this immediate and irreparable harm.

2

## II.   THE PROPOSED SALE SATISFIES THE BUSINESS JUDGMENT TEST, IS IN THE BEST INTERESTS OF THE BANKRUPTCY ESTATES AND SHOULD BE APPROVED.

Section 363 of the Bankruptcy Code governs a debtor's ability to sell property of the estate outside the ordinary course of business. 11 U.S.C. 363(b)(1). Although the Bankruptcy Code does not set forth a standard for when a sale should be approved, courts uniformly hold that a sale should be approved when it is justified by a sound business purpose. *See In re Abbotts Dairies of Pennsylvania, Inc*., 788 F.2d 143 (3d Cir. 1986); *Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.)*, 107 F.3d 558, 567 n.16 (8th Cir. 1997); *Stephens Industries, Inc. v. McClung*, 789 F.2d 386 (6th Cir. 1986); *In re Schipper*, 933 F.2d 513, 515 (7th Cir. 1991); *In re Continental Air Lines, Inc*., 780 F.2d 1223 (5th Cir. 1986); *In re Lionel Corp*., 722 F.2d 1063 (2d Cir. 1983); *In re Crystalin LLC*, 293 B.R. 455, 463-64 (8th Cir. B.A.P. 2003); *In re Delaware & Hudson Ry. Co*., 124 B.R. 169 (D. Del. 1991). The burden of establishing a rational business justification is on the debtor. *Lionel*, 722 F.2d at 1070-71. Once a debtor makes such a showing, a presumption attaches that the decision was made on an informed basis, in good faith and in the honest belief that the action was in the best interest of the company. *See, e.g., Official Committee of Subordinated Bondholders v. Integrated Resources, Inc. (In re Integrated Resources, Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992), appeal dismissed, 3 F.3d 49 (2d Cir. 1993).

In applying section 363, courts grant debtors substantial deference regarding procedures for selling assets. *See, e.g., Integrated Resources*, 147 B.R. at 656-57 (noting that overbid procedures and break-up fee arrangements that have been negotiated by a debtor-in-possession are to be reviewed according to the deferential "business judgment" standard, under which such procedures and arrangements are "presumptively valid"); *In re 995 Fifth Ave. Associates, L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (same). Indeed, courts recognize that procedures

3

intended to enhance competitive bidding are consistent with the goals of maximizing the value received by the estate and are appropriate in the context of bankruptcy sales. See, e.g., Integrated Resources, 147 B.R. at 659 (such procedures "encourage bidding and . . . maximize the value of the Debtor's assets"); In re Financial News Network, Inc., 126 B.R. 152, 156 (S.D.N.Y. 1991) ("court-imposed rules for the disposition of assets . . . [should] provide an adequate basis for comparison of offers, and . . . provide for a fair and efficient resolution of bankrupt estates.").

The proposed Bid Procedures should be approved. The Debtors have determined, after consulting with their financial advisors and careful evaluation of their business prospects and alternatives, that a going concern sale and public auction will yield the greatest return. The Debtors, with the assistance of Duff & Phelps, have marketed the sale and business opportunities associated with the Granite City brand and business to over 288 prospective purchasers. Prior to the Petition Date, the Debtors conducted a robust marketing and sale process over a substantial period of time, involving the solicitation of bids, and culminating in the negotiation of the Stalking Horse Purchase Agreement with the Proposed Purchaser.

The Purchase Agreement represents the highest and best offer for the assets of the business to date. It remains subject to higher and better offers in the auction. The Purchase Agreement is the product of extensive negotiations. It is fair and reasonable under the circumstances. The sale contemplated constitutes a sound exercise of the Debtors' business judgment and has been proposed in good faith. A prompt sale of the assets of the Business should preserve cash and minimize administrative expenses of the Debtors' bankruptcy estates. Further, the sale and public auction process contemplated by the Bid Procedures, which provides other interested parties the opportunity to overbid, represents the best prospect for the Debtors to maximize going concern value for the benefit of the bankruptcy estates, creditors and other

parties in interest. The proposed sale and Bid Procedures are designed to foster an open, competitive and fair sale process, while maximizing the value the estates are trying to obtain for the business assets. In addition, the Proposed Purchaser will be assuming certain liabilities in connection with the transaction and expects to continue to operate the Business in some form.

Ample business justification exists to support the sale and the Purchase Agreement. The proposed sale is reasonable and appropriate under the circumstances of this case. The Bid Procedures will ensure that the bidding process is fair and reasonable and will yield the maximum value for the estates. The Debtors request, therefore, that the court approve the sale and the Bidding Procedures as fair and reasonable under the circumstances and authorize the Debtors to proceed in accordance with them.

## III.   THE COURT SHOULD APPROVE THE BREAK-UP FEE, THE EXPENSE REIMBURSEMENT, THE NO-SHOP REQUIREMENT AND OTHER BUYER PROTECTIONS

In order to induce the Proposed Purchaser to enter into the Purchase Agreement and to serve as a stalking-horse for other potential bidders at the auction, and as a part of extensive negotiations between the Proposed Purchaser and the Debtors, the Proposed Purchaser required and the Debtors agreed to grant a break-up fee in the amount of $225,000 (the "Break-Up Fee") and expense reimbursement in an amount not to exceed $100,000 (the "Expense Reimbursement") as provided in and subject to the terms and conditions set forth in the Purchase Agreement. The Break-Up Fee and the Expense Reimbursement are to be treated as administrative expense claims in the Bankruptcy Cases to be paid within three business days following the closing of a sale to an entity other than the Proposed Purchaser. They are to be paid prior to the payment of the sale proceeds to any third party asserting a lien in the Acquired Assets.

5

In bankruptcy cases, it is appropriate and even customary to grant protections to prospective purchasers. Courts have found break-up fees, expense reimbursements and other protections afforded to stalking horse bidders to be "important tools to encourage bidding and to maximize the value of the debtor's assets. . . ." *Official Committee of Subordinated Bondholders v. Integrated Resources, Inc. (In re Integrated Resources, Inc.)*, 147 B.R. 650, 659-60 (S.D.N.Y. 1992). Buyer protections, including break-up fees and expense reimbursements, are designed to compensate a prospective purchaser for the costs and risks involved in preparing and proposing a bid that will establish a minimum standard for competing bids. *See In re APP Plus, Inc.*, 223 B.R. 870, 874 (Bankr. E.D.N.Y. 1998) (break-up fees compensate a prospective purchaser "for the time, efforts, resources, lost opportunity costs and risks incurred"). Without such protections, "bidders would be reluctant to make an initial bid for fear that their first bid will be shopped around for a higher bid from another bidder who would capitalize on the initial bidder's . . . due diligence." *In re Hupp Indus., Inc.*, 140 B.R. 191, 194 (Bankr. N.D. Ohio 1992).

Courts routinely approve break-up fee and expense reimbursement provisions in recognition of the benefits conferred upon the sale process by a stalking-horse bidder. In *Integrated Resources*, the court identified the following factors in determining whether to approve a break-up fee or expense reimbursement: (1) whether the negotiation of the break-up fee or expense reimbursement is tainted by self-dealing or manipulation; (2) whether the existence of the break-up fee or expense reimbursement hampers rather than encourages other bidding; and (3) whether the amount of the break-up fee or expense reimbursement is reasonable relative to the proposed purchase price.

6

In this case, the Debtors and the Proposed Purchaser negotiated at arms-length for the Break-Up Fee, the Expense Reimbursement, and other buyer protections. Nothing untoward occurred in connection with negotiation of these fees and expenses.

With respect to the second *Integrated Resources* factor, the Purchase Agreement will enhance the bidding for the assets by generating increased interest among other potential bidders and providing a baseline by which the Debtors can evaluate competing bids, including the minimum acceptable terms on which the proposed transaction can proceed. Id. A number of parties have expressed interest in participating in a court-approved auction process. The Puchase Agreement, which sets forth representations, warranties, and disclosure schedules, provides a ready framework for interested parties to bid. Therefore, rather than "chilling" the bidding process, the Debtors believe that the Break-Up Fee and the Expense Reimbursement support the bidding process, will encourage the bidding process, and should be approved by the court. *See In re Wintz Companies*, 230 B.R. 840, 846 (8th Cir. B.A.P. 1999), aff'd, 219 F.3d 807 (8th Cir. 2000) (noting that courts have permitted break-up fees when they encourage rather than discourage bidding and when, taken as a whole, the transaction makes sense).

The Break-Up Fee and the maximum amount of the Expense Reimbursement are not unreasonable in comparison to the size of the proposed transaction. The Break-Up Fee is approximately 3.0% of Purchase Price. Particularly given the nature and extent of due diligence performed by the Proposed Purchaser and the extensive negotiations that have transpired relative to the Purchase Agreement, the maximum amount of the Expense Reimbursement is also fair and reasonable. *See, e.g., Integrated Resources*, 147 B.R. at 662 (break-up fee of up to 3.2%, plus reimbursement of expenses, found to be reasonable; expert testimony acknowledged that average break-up fee is 3.3%); *In re Mid-American Waste Systems, Inc.,* Case No. 97-00104 (PJW)

7

Bankr. D. Del. Jan. 1997) (approving break-up fee of approximately 3.3%, plus up to $1 million in expense reimbursement); *In re Maritime Group, Ltd*., Case No. 95-08153 (ERG) (Bankr. S.D. Miss. Dec. 20, 1995) (approving break-up fee of approximately 2.9%); *In re Smith Corona Corp*., Case No. 95-788 (HSB) (Bankr. D. Del. Nov. 6, 1995) (approving break-up fee of approximately 3.9%); *cf. In re Twenver, Inc.,* 149 B.R. 954 (Bankr. D. Colo. 1992 (rejecting break-up fee, in part, because it exceeded 10% of total proposed transaction price). See also In re Fortunoff Fine Jewelry & Silverware, LLC, BKY Case No. 08-10353, 2008 WL 61986 (Bankr. S.D.N.Y. Feb. 15, 2008) (Hon. James M. Peck) (approving buyer protections that included priority and lien protection for break-up fee and expense reimbursement as part of sale transaction).

In light of the risks, expense and complications associated with the proposed transactions, the Proposed Purchaser would not enter into the Purchase Agreement without the protection of the Break-Up Fee and the Expense Reimbursement. Therefore, absent the Break-Up Fee and the Expense Reimbursement, the Proposed Purchaser would not have negotiated or entered into the Purchase Agreement, which Purchase Agreement will confer value upon the Debtors' estates by, among other things, (i) initiating the bidding process for the assets, (ii) establishing a bid standard or minimum for other bidders early in the bidding process, (iii) placing the assets in a sales configuration mode to attract other bidders, (iv) serving, by the Proposed Purchaser's identity and level of expressed interest and due diligence conducted, as a catalyst for other potential bids; and (v) encouraging customers, vendors and employees to support operations during the case. Similarly, and for the reasons also outlined in the Motion, the Buyer Protections, Allowed Termination Claim and the limited No-Shop Requirement are appropriate protections and reasonable for a transaction of this nature. See generally, Cinerama, Inc. v. Technicolor, 663

8

A.2d 1156 (Del. 1995); In re Mony Group, Inc. Shareholder Litigation, 852 A.2d 9 (Del. Ct. Chancery 2004) (upholding no-shop requirement where, as in this case, the no-shop was limited in duration and not a lock-up). The protections afforded to the stalking horse are clearly in the best interests of Debtors' estates, creditors, and other stakeholders.

## IV.    THE PROPOSED SALE AND BID PROCEDURES WILL RESULT IN A GOOD FAITH SALE OF THE ASSETS.

Section 363(m) of the Bankruptcy Code provides that "the reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith. . . ." 11 U.S.C. § 363(m). As such, a prospective purchaser is afforded a safe-harbor and related protections when a purchase is made in "good faith." See id. This provision serve the important purpose of encouraging good-faith transactions and preserving the finality of the bankruptcy court's order unless stayed pending an appeal. *In re Abbots Dairies, Inc.*, 788 F.2d 143, 149-50 (3d Cir. 1986).

The terms of the Purchase Agreement between the Proposed Purchaser and the Debtors have been negotiated extensively at arms' length and in good faith. In addition, the Bid Procedures that have been developed will encourage a competitive sale. The Court will have the opportunity at the Sale Hearing to approve the sale to ensure that the successful bidder and the back-up bidder are entering into the sale in good faith and have had no unfair advantage. The Debtors, in consultation with their professionals as well as the senior secured lenders,  have designed the sale and the Bid Procedures with the intention of maximizing the return to the Debtor's bankruptcy estates. The Debtors believe that prospective purchasers at the Auction have been, prior to the date hereof, afforded time to conduct extensive due diligence and will have an additional opportunity to conduct due diligence and formulate topping bids for the assets. The

9

Auction will present an opportunity to conduct sale negotiations openly and fairly with the input of the Debtors' financial advisors and the creditors' committee if one is appointed. If the court approves the sale as requested in the motion, the court should also invoke § 363(m) to protect the purchaser's or purchasers' (i.e, the successful bidder and the back-up bider) acquisition by explicitly finding that the purchaser(s) have acted in good faith. *See In re Apex Oil Co*., 92 B.R. 847, 874 (Bankr. E.D. Mo. 1988).

## V.     THE PROPOSED TRANSACTION SATISFIES ALL APPLICABLE LEGAL STANDARDS FOR A SALE FREE AND CLEAR OF ALL LIENS, CLAIMS AND ENCUMBRANCES.

The Debtors believe this Motion, the Purchase Agreement, and the transactions contemplated thereby are in the best interests of the bankruptcy estates and in the best interests of all interested parties in these chapter 11 cases. Section 363(f) of the Bankruptcy Code authorizes a debtor to use, sell or lease property of the estate outside of the ordinary course of business, free and clear of any interest in such property. 11 U.S.C. § 363(f). The Debtors request authority to sell the assets of the Business free and clear of all interests, liens, claims and encumbrances. Any such interests, liens, claims and encumbrances would attach to the net proceeds of the sale of the assets after the payment of the Break-Up Fee and Expense Reimbursement to the Proposed Purchaser, to the extent applicable, and the payment of the Transaction Fee (as and to the extent approved by the Court) to Duff and Phelps (the "Net Proceeds")), with the same validity, priority, force and effect that such interests, liens, claims and encumbrances had against the assets sold.

Pursuant to § 363(f) of the Bankruptcy Code, a debtor may sell property free and clear of liens, claims and encumbrances if one of the following conditions is met:

(1) applicable nonbankrutpcy law permits sale of such property free and clear of such interest;
(2) such entity consents;

10

    (3) such interest is a lien and the price at which such property is to be sold is
       greater than the aggregate value of all liens on such property;

    (4) such interest is in bona fide dispute; or

    (5) such entity could be compelled, in a legal or equitable proceeding, to accept a
       money satisfaction of such interest.

11 U.S.C. § 363(f). The existence of any one of the five conditions provides authority to sell free

and clear of liens. *Citicorp. Homeowners Servs., Inc. v. Elliot (In re Elliot)*, 94 B.R. 343, 345

(E.D. Pa. 1988).

    Under § 363(f)(2) of the Bankruptcy Code, a sale free and clear of all interests, liens,

claims and encumbrances is permissible if all parties asserting liens on or other interests in the

assets to be sold consent. Here, Citizens and JMB consent to the sale to the Proposed Purchaser.

Furthermore, Debtors are providing proper notice of this transaction and the Sale Hearing to

creditors claiming an interest in the assets, thereby giving them the opportunity to object to this

transaction. Provided that no creditors claiming an interest in the assets object to this transaction,

§ 363(f)(2) will be satisfied *See, e.g., Veltman v. Whetzal*, 93 F.3d 517, 521 n.5 (8th Cir. 1996)

(in a chapter 7 case, stating that "some courts have found implied consent, however, when a

party with an interest in the bankruptcy estate fails to object after receiving notice of the sale

under subsection 363(f)(2)") (citing *In re Tabone, Inc*., 175 B.R. 855, 858 (Bankr. D.N.J. 1994);

*In re Elliot*, 94 B.R. 343, 345 (E.D. Pa. 1988); *In re Shary*, 152 B.R. 724, 725-26 (Bankr. N.D.

Ohio 1993).   Approval of the sale free and clear of all interests, liens, claims and encumbrances

is in the best interests of the estate and all of its constituents. The relief requested is appropriate

and is consistent with the letter and spirit of section 363(f).

## VI.    THE COURT SHOULD APPROVE THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES.

    The ability to reject, assume and assign executory contracts and unexpired leases allows a

debtor to maximize the value of its estate by assuming contractual arrangements that are

beneficial and rejecting those that are burdensome. The assumption and assignment by the Debtors to the Purchaser of certain executory contracts and unexpired leases will be an integral part of the proposed Sale and should be approved by the court. Section 365(a) of the Bankruptcy Code authorizes a debtor in possession to assume any executory contract or unexpired lease subject to bankruptcy court approval, and § 365(f) allows for assignments. Section 365(b) of the Bankruptcy Code requires a debtor to satisfy certain requirements at the time of assumption if a default that is materially and economically significant exists under the contract or lease to be assumed.

A bankruptcy debtor's decision to assume or reject an executory contract or unexpired lease is governed by the "business judgment" test. *In re Food Barn Stores, Inc.,* 107 F.3d 558, 567 n.16 (8th Cir. 1996); *In re Chi-Feng Huang,* 23 B.R. 798, 800 (B.A.P. 9th Cir. 1982); *see also Richmond Leasing Co. v. Capital Bank, N.A.,* 762 F.2d 1303, 1309 (5th Cir. 1985); *In re Pesce Baking Co., Inc.,* 43 B.R. 949, 956 (Bankr. N.D. Ohio 1984). Under the business judgment test, a court should approve a debtor's proposed assumption or rejection if it will benefit the estate. *Id.* A debtor's decision to assume or reject an executory contract should be accepted unless evidence is presented that the decision was "clearly erroneous, too speculative, or contrary to the provisions of the Bankrutpcy Code." *Richmond Leasing,* 762 F.2d at 1309.

As part of the Asset Purchase Agreement, the Debtors agreed to use their commercially reasonable efforts to obtain an order of the Bankruptcy Court to assign certain executory contracts and unexpired leases related to the Business and designated by the Proposed Purchaser (the "Designated Contracts"). The Proposed Purchaser may designate contracts during a sixty (60) day period following the Closing Date of the Sale (the "Designation Rights Period"). As soon as practicable after the end of the Designation Rights Period , the Debtors will serve the

12

counterparties (the "Counterparties") to the Contracts with a motion to assume and assign contracts and a notice (the "Contract Notice") that contains the following information: (a) notice of the Debtors' intent to assume and assign certain of the Contracts to Purchaser (or to such other successful bidder(s) ultimately selected pursuant to the Auction and Bidding Procedures), effective as of the date of the closing of the transaction with such parties ("Closing"); (b) a list of the Contracts and the monetary defaults (if any) related to each Contract that are required to be cured pursuant to § 365 of the Bankruptcy Code (the "Cure Amounts"); and (c) the procedures for filing any objections to the assumption and assignment of the Contracts, including any objections to the proposed Cure Amounts.

Based on the foregoing, the Debtors respectfully request that the Court approve the procedure for the assumption and assignment of Acquired Contracts. The Debtors' decision to assume and assign those Contracts in connection with the Proposed Sale transaction stems from the sound exercise of the Debtors' business judgment as they are necessary to maximize the value of the Acquired Assets to the Proposed Purchaser and therefore to the estates.

## <u>CONCLUSION</u>

For the foregoing reasons, the Debtors respectfully request that the court enter one or more orders granting the relief requested in this Motion.

12266796v2

**BRIGGS AND MORGAN, P.A.**

/e/ James M. Jorissen

Dated: December 30, 2019

By: _____

James M. Jorissen, #262833
Karl J. Johnson, #391211
2200 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
Telephone: 612-977-8400
Facsimile: 612-977-8650
jjorissen@briggs.com
kjohnson@briggs.com

**PROPOSED COUNSEL FOR THE DEBTORS**

14